No. 24-10470

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

———————————

STATE OF TEXAS; TEXAS DEPARTMENT OF TRANSPORTATION,

*Plaintiffs-Appellees,*

v.

U.S. DEPARTMENT OF TRANSPORTATION; FEDERAL HIGHWAY ADMINISTRATION; SHAILEN BHATT, in his official capacity, as Administrator of the Federal Highway Administration; PETE BUTTIGIEG, in his official capacity, as Secretary of Transportation,

*Defendants-Appellants.*

———————————

On Appeal from the United States District Court
for the Northern District of Texas

———————————

## OPENING BRIEF FOR DEFENDANTS-APPELLANTS

———————————

SUBASH IYER
  *Acting General Counsel*
PAUL M. GEIER
  *Assistant General Counsel for*
  *Litigation and Enforcement*
EMILY KVESELIS
  *Trial Attorney*
  *U.S. Department of Transportation*

J. AYANNA BUTLER
  *Chief Counsel*
CHRISTOPHER RICHARDSON
  *Assistant Chief Counsel, Legislation,*
  *Regulations & General Law Division*
LEV GABRILOVICH
  *Senior Attorney Advisor,*
  *Program Legal Services Division*
  *Federal Highway Administration*

BRIAN M. BOYNTON
  *Principal Deputy Assistant*
  *Attorney General*

MICHAEL S. RAAB
JEFFREY E. SANDBERG
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7214*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 532-4453*

## CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required, as defendants-appellants are all governmental parties.  5th Cir. R. 28.2.1.

**STATEMENT REGARDING ORAL ARGUMENT**

Texas brought this lawsuit challenging a final rule by the Federal Highway Administration that establishes a technical measure for the environmental performance of federally funded highways—specifically, the percent change in tailpipe $CO_2$ emissions from on-road sources on the National Highway System relative to a reference year—for States to use when setting nonbinding performance targets. *See* 23 U.S.C. § 150. Despite the agency's thorough explanation of the statutory basis for the rule, the district court declared it to be beyond the agency's authority. The government respectfully requests oral argument and suggests that 15 minutes per side would be appropriate.

# TABLE OF CONTENTS

**Page**

STATEMENT OF JURISDICTION ............................................................... 1

STATEMENT OF THE ISSUES ................................................................... 1

STATEMENT OF THE CASE ..................................................................... 2

    A.    Statutory Background ................................................. 2

    B.    Regulatory Background ............................................. 8

    C.    The Rule Under Review ............................................. 11

    D.    District Court Proceedings ....................................... 18

SUMMARY OF ARGUMENT .................................................................... 25

STANDARD OF REVIEW ......................................................................... 27

ARGUMENT ............................................................................................... 28

I.    THE RULE WAS A LAWFUL EXERCISE OF FHWA'S
AUTHORITY TO ESTABLISH PERFORMANCE MEASURES ..... 28

    A.    Congress Instructed FHWA To Exercise Discretion To
Establish Additional Performance Standards, Which May
Include Environmental Performance. ........................................ 28

    B.    FHWA Permissibly Exercised Its Statutory Discretion To
Establish A Measure For Transportation-Related $CO_2$
Emissions And Provide For Declining Emissions Targets. ........ 33

    C.    The District Court Erred In Imposing Atextual Limitations
Upon The Agency's Discretion. ................................................ 36

II.    THE DISTRICT COURT ABUSED ITS DISCRETION IN
ORDERING UNIVERSAL VACATUR ........................................... 49

    A.    The Proper Remedy Is Plaintiff-Specific Equitable Relief. .......... 49

    B.    The District Court Wrongly Thought Its Hands Were Tied. ....... 54

CONCLUSION ........................................................................................... 58

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:**                                                                     **Page(s)**

*Ali v. Federal Bureau of Prisons,*
552 U.S. 214 (2008) ................................................................. 42

*Baylor Cty. Hosp. Dist. v. Price,*
850 F.3d 257 (5th Cir. 2017) .................................................. 27

*Bostock v. Clayton County,*
590 U.S. 644 (2020) ................................................................ 40

*Bourque v. State Farm Mut. Auto. Ins. Co.,*
89 F.4th 525 (5th Cir. 2023) .................................................. 27

*Braidwood Mgmt., Inc. v. Becerra,*
104 F.4th 930 (5th Cir. 2024) ...................................... 51, 52, 57

*Career Colls. & Sch. of Tex. v. U.S. Dep't of Educ.,*
98 F.4th 220 (5th Cir. 2024) .................................................. 51

*Cargill v. Garland,*
57 F.4th 447 (5th Cir. 2023) (en banc), *aff'd*, 602 U.S. 406 (2024) ............. 52

*Central & S.W. Servs., Inc. v. U.S. EPA,*
220 F.3d 683 (5th Cir. 2000) .................................................. 51

*City of Arlington v. FCC,*
569 U.S. 290 (2013) ................................................................ 40

*Clean Water Action v. U.S. EPA,*
936 F.3d 308 (5th Cir. 2019) .................................................. 27

*Corner Post, Inc. v. Board of Governors of the Fed. Reserve Sys.,*
144 S. Ct. 2440 (2024) ............................................................ 50

*FCC v. Prometheus Radio Project,*
592 U.S. 414 (2021) ................................................................ 27

*Food Mktg. Inst. v. Argus Leader Media,*
588 U.S. 427 (2019) ................................................................ 28

*Franciscan All., Inc. v. Becerra,*
47 F.4th 368 (5th Cir. 2022) .................................................. 56

*Gill v. Whitford,*
    585 U.S. 48 (2018) ................................................................. 49

*Heartland Reg'l Med. Ctr. v. Sebelius,*
    566 F.3d 193 (D.C. Cir. 2009) ................................................ 51

*Hecht Co. v. Bowles,*
    321 U.S. 321 (1944) ............................................................... 50

*iTech U.S., Inc. v. Renaud,*
    5 F.4th 59 (D.C. Cir. 2021) .................................................... 42

*Johnson v. U.S. Office of Pers. Mgmt.,*
    783 F.3d 655 (7th Cir. 2015) .................................................. 51

*Kentucky v. Biden,*
    57 F.4th 545 (6th Cir. 2023) .................................................. 31

*Kentucky v. FHWA*, No. 5:23-cv-162-BJB,
    2024 WL 1402443 (W.D. Ky. Apr. 1, 2024) .......................................*passim*

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,*
    591 U.S. 657 (2020) ............................................................... 28

*Lomax v. Ortiz-Marquez,*
    590 U.S. 595 (2020) ............................................................... 40

*Loper Bright Enters. v. Raimondo,*
    144 S. Ct. 2244 (2024) ............................................... 30, 33, 39

*Madsen v. Women's Health Ctr., Inc.,*
    512 U.S. 753 (1994) ............................................................... 49

*Peterson v. Bell Helicopter Textron, Inc.,*
    806 F.3d 335 (5th Cir. 2015) .................................................. 56

*PHH Mortg. Corp. v. Old Republic Nat'l Title Ins. Co.,*
    80 F.4th 555 (5th Cir. 2023) .................................................. 57

*Portillo v. Cunningham,*
    872 F.3d 728 (5th Cir. 2017) .................................................. 56

*Rubin v. Islamic Republic of Iran,*
    830 F.3d 470 (7th Cir. 2016), *aff'd*, 583 U.S. 202 (2018) ............ 31

*SAS Inst., Inc. v. Iancu,*
  584 U.S. 357 (2018) ................................................................ 42

*Starbucks Corp. v. McKinney,*
  144 S. Ct. 1570 (2024) ............................................................ 50

*Texas v. United States,*
  50 F.4th 498 (5th Cir. 2022) .................................................... 27

*Texas Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n,*
  989 F.3d 368 (5th Cir. 2021) ................................................... 51

*Trump v. Hawaii,*
  585 U.S. 667 (2008) ................................................................ 52

*United States v. Buluc,*
  930 F.3d 383 (5th Cir. 2019) ................................................... 42

*United States v. Mendoza,*
  464 U.S. 154 (1984) ................................................................ 54

*United States v. Schopp,*
  938 F.3d 1053 (9th Cir. 2019) ................................................. 30

*United States v. Texas,*
  599 U.S. 670 (2023) ................................................................ 50

*United States v. Wallington,*
  889 F.2d 573 (5th Cir. 1989) ................................................... 30

*University of Tex. Sw. Med. Ctr. v. Nassar,*
  570 U.S. 338 (2013) ................................................................ 42

*Weinberger v. Romero-Barcelo,*
  456 U.S. 305 (1982) ................................................................ 50

*West Virginia v. EPA,*
  597 U.S. 697 (2022) ................................................................ 28

*Western Gulf Mar. Ass'n v. ILA Deep Sea Local 24,*
  751 F.2d 721 (5th Cir. 1985) ................................................... 54

*Ysleta Del Sur Pueblo v. Texas,*
  596 U.S. 685 (2022) ................................................................ 41

**Statutes:**

Administrative Procedure Act (APA):
  5 U.S.C. § 706 ................................................................... 50, 51
  5 U.S.C. § 706(2) ...................................................................... 27

Moving Ahead for Progress in the 21st Century Act (MAP-21),
  Pub. L. No. 112-141, 126 Stat. 405, 524-26 (2012) ........................ 4, 28, 37

23 U.S.C. § 101 *et seq.* ...................................................................... 2

23 U.S.C. § 101(b)(3)(G) ................................................................... 33

23 U.S.C. § 103(b)-(c) ........................................................................ 3

23 U.S.C. § 103(b)(1)(A)-(C) ............................................................. 38

23 U.S.C. § 119 ............................................................................ 2, 21

23 U.S.C. § 119(b)(1) ....................................................................... 32

23 U.S.C. § 119(b)(1)-(3) .................................................................... 3

23 U.S.C. § 119(b)(4) .......................................................... 3, 32, 35, 48

23 U.S.C. § 119(d) ............................................................................ 48

23 U.S.C. § 119(d)(1) ..................................................................... 21, 47

23 U.S.C. § 119(d)(2) ..................................................................... 21, 47

23 U.S.C. § 119(d)(2)(A) ................................................................... 47

23 U.S.C. § 119(d)(2)(H) ................................................................... 47

23 U.S.C. § 119(d)(2)(P) ................................................................... 47

23 U.S.C. § 119(e) ............................................................................. 7

23 U.S.C. § 119(e)(2) ......................................................................... 7

23 U.S.C. § 133 ................................................................................. 3

23 U.S.C. § 134(a)(1) ....................................................................... 33

23 U.S.C. § 134(h)(1)-(2) .................................................................. 22

23 U.S.C. § 134(h)(1)(E) ..............................................................33, 48

23 U.S.C. § 134(h)(1)(I) ...............................................................33, 48

23 U.S.C. § 134(h)(2)(A) ..............................................................33, 48

23 U.S.C. § 135(d)(1)-(2) .................................................................. 22

23 U.S.C. § 135(d)(1)(E) ..............................................................33, 48

23 U.S.C. § 135(d)(1)(I) ...............................................................33, 48

23 U.S.C. § 135(d)(2) ......................................................................... 7

23 U.S.C. § 135(d)(2)(A) ..........................................................7, 33, 48

23 U.S.C. § 135(d)(2)(B)(i)(I) ............................................................ 7

23 U.S.C. § 135(d)(2)(D) .................................................................... 7

23 U.S.C. § 145(a) .........................................................................2, 15

23 U.S.C. § 148 ................................................................................. 3

23 U.S.C. § 149 ................................................................................. 3

23 U.S.C. § 150 ..........................................................................passim

23 U.S.C. § 150(a) .....................................................................passim

23 U.S.C. § 150(b) .....................................................................passim

23 U.S.C. § 150(b)(1)-(7) ......................................................5, 30, 38

23 U.S.C. § 150(b)(4) ...................................................................9, 31

23 U.S.C. § 150(b)(6) .................................................................passim

23 U.S.C. § 150(c) .....................................................................passim

23 U.S.C. § 150(c)(1) ......................................................................... 5

23 U.S.C. § 150(c)(2)(C) .................................................................. 41

23 U.S.C. § 150(c)(3) .................................................... 6, 21, 39, 45

23 U.S.C. § 150(c)(3)(A)(i) ................................................ 16

23 U.S.C. § 150(c)(3)(A)(ii) ................................................ 6

23 U.S.C. § 150(c)(3)(A)(ii)(I)-(III) .........................6, 16, 29, 31, 41

23 U.S.C. § 150(c)(3)(A)(ii)(III) ........................................... 8

23 U.S.C. § 150(c)(3)(A)(ii)(IV)-(V) ........................................*passim*

23 U.S.C. § 150(c)(3)(A)(iii) .............................................. 16

23 U.S.C. § 150(c)(4) ..................................................... 16

23 U.S.C. § 150(c)(4)(A) ................................................... 8

23 U.S.C. § 150(c)(5) ................................................ 6, 16, 43

23 U.S.C. § 150(c)(5)(A) .................................................. 44

23 U.S.C. § 150(c)(5)(B) .................................................. 43

23 U.S.C. § 150(c)(6) .................................................. 16, 44

23 U.S.C. § 150(d) ......................................................*passim*

23 U.S.C. § 150(d)(1) ....................................................6, 13

23 U.S.C. § 150(d)(2) ...................................................... 7

23 U.S.C. § 150(e) ................................................... 10, 29, 36

23 U.S.C. § 150(e)(3) ...................................................8, 36

23 U.S.C. § 167 ........................................................... 3

23 U.S.C. § 175 ........................................................... 3

23 U.S.C. § 176 ........................................................... 3

28 U.S.C. § 1291 .......................................................... 1

28 U.S.C. § 1331 .......................................................... 1

**Regulations:**

23 C.F.R. § 490.105(e)(10) ............................................................. 13

23 C.F.R. § 490.109(f)(1) ................................................................. 8

23 C.F.R. § 490.207(a) .................................................................... 8

23 C.F.R. § 490.407(a)(1)-(3) .......................................................... 8

23 C.F.R. § 490.507 ...................................................................... 44

23 C.F.R. § 490.507(a)(1)-(2) .......................................................... 9

23 C.F.R. § 490.507(b) .................................................................. 12

23 C.F.R. § 490.511(c) .................................................................. 12

23 C.F.R. § 490.515 ...................................................................... 18

23 C.F.R. §§ 490.601-490.613 ........................................................ 44

23 C.F.R. §§ 490.701-490.713 ........................................................ 44

23 C.F.R. § 490.801 *et seq.* .......................................................... 43

**Rules:**

Fed. R. App. P. 4(a)(1)(B) ............................................................... 1

Fed. R. Civ. P. 54(c) ................................................................55, 56

**Other Authorities:**

81 Fed. Reg. 13,882 (Mar. 15, 2016) ............................................... 8

82 Fed. Reg. 5886 (Jan. 18, 2017) .................................................. 8

82 Fed. Reg. 5970 (Jan. 18, 2017) .............................................8, 9, 10

83 Fed. Reg. 24,920 (May 31, 2018) ............................................... 56

87 Fed. Reg. 42,401 (July 15, 2022) ..........................................11, 13

88 Fed. Reg. 85,364 (Dec. 7, 2023) .......................................................*passim*

FHWA, *Federal Highway Administration: An Overview for Our Stakeholders* (2023), https://perma.cc/SUE5-PRGR ........................... 3

FHWA, *Transportation Performance Management*, https://www.fhwa.dot.gov/tpm/ ............................................................ 4

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331. ROA.12.  On March 27, 2024, the court entered judgment in plaintiffs' favor. ROA.4776-77.  Defendants timely appealed on May 23, 2024.  ROA.4778-79; *cf.* Fed. R. App. P. 4(a)(1)(B).  This Court's jurisdiction rests on 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

In December 2023, following notice-and-comment rulemaking, the Federal Highway Administration (FHWA) exercised its authority under 23 U.S.C. § 150(c) to promulgate a performance measure for tailpipe greenhouse gas emissions on the National Highway System, as to which States then set nonbinding targets for reducing emissions.  *See* 88 Fed. Reg. 85,364 (Dec. 7, 2023) (Rule) (ROA.285-315).  Consistent with Congress's instructions, the Rule does not purport to compel emissions reductions, but rather is designed to inform future decisionmaking and facilitate other voluntary efforts by States.  The questions presented are:

1. Whether the district court erred in concluding that FHWA lacked statutory authority to promulgate the Rule.

2. In the alternative, whether the district court abused its discretion in ordering universal vacatur rather than plaintiff-specific equitable relief.

## STATEMENT OF THE CASE

### A.    Statutory Background

**1.**  Congress has long provided substantial federal funding to States to build and maintain the Nation's highways.  FHWA, an agency within the U.S. Department of Transportation (DOT), administers a variety of programs under which the federal government provides financial support and technical assistance to States and other authorities for constructing, improving, and preserving major highways, roads, bridges, tunnels, and other surface transportation assets.  *See* 23 U.S.C. § 101 *et seq.*  Under these various programs, FHWA generally acts as a steward of federal funds and as a leader in establishing national policy objectives, while States exercise the substantive and operational responsibility of determining which specific transportation projects to fund, entering into and supervising contracts, and overseeing development and construction.  *See, e.g.*, *id.* § 145(a) ("States … determine which projects shall be federally financed.").

The largest of the various federal-aid highway programs is the National Highway Performance Program (NHPP), with annual expenditures averaging almost $30 billion.  *See* 23 U.S.C. § 119.  The NHPP is the principal federal program supporting the condition and performance of and construction of new facilities on the National Highway System, a 220,000-mile network of high-

volume roads that includes the Interstate System as well as other major highways. *See id.* § 103(b)-(c) (defining National Highway System).[1]  Among other purposes, *see id.* § 119(b)(1)-(3), the NHPP exists to support efforts "to increase the resiliency of the National Highway System" against environmental threats linked to climate change, including "sea level rise, extreme weather events, flooding, wildfires, or other natural disasters," *id.* § 119(b)(4).

FHWA also administers other federal-aid highway programs that serve distinct but occasionally overlapping purposes, each carrying its own statutory conditions, eligibility requirements, and funding constraints.  These include, among others, the Surface Transportation Block Grant Program, *see* 23 U.S.C. § 133; the Highway Safety Improvement Program (HSIP), *id.* § 148; the Congestion Mitigation & Air Quality Improvement Program (CMAQ), *id.* § 149; the National Highway Freight Program (NHFP), *id.* § 167; the Carbon Reduction Program, *id.* § 175; and the Promoting Resilient Operations for Transformative, Efficient, and Cost-Saving Transportation Program (PROTECT), *id.* § 176.

---

[1] The National Highway System comprises only 5% of the Nation's total road miles but accounts for approximately 55% of vehicle miles traveled every day.  *See* FHWA, *Federal Highway Administration: An Overview for Our Stakeholders* 6 (2023), https://perma.cc/SUE5-PRGR.

**2.** For many decades, there were no explicit requirements for States to demonstrate that their transportation programs supported national performance outcomes. States were not required to measure condition or performance in a nationally consistent manner that FHWA could use to assess the condition of the entire system. It was thus more difficult for FHWA to evaluate the effectiveness of federal-aid highway programs.

In an effort to improve the Nation's highways, in 2012, Congress enacted the Moving Ahead for Progress in the 21st Century Act (MAP-21), which enhanced FHWA's support of federal-aid highway programs by adopting a framework known as "transportation performance management" (often abbreviated "TPM"). Pub. L. No. 112-141, 126 Stat. 405, 524-26 (2012); *see generally* FHWA, *Transportation Performance Management*, https://www.fhwa.dot.gov/tpm/. Congress declared that "[p]erformance management will transform the Federal-aid highway program and provide a means to the most efficient investment of Federal transportation funds by refocusing on national transportation goals, increasing the accountability and transparency of the Federal-aid highway program, and improving project decisionmaking through performance-based planning and programming." 23 U.S.C. § 150(a).

As the foundation for this performance-management framework, Congress specified seven "national transportation goals" on which to "focus the Federal-aid highway program." 23 U.S.C. § 150(a), (b). These seven policy goals, each further defined, are "(1) Safety," "(2) Infrastructure condition," "(3) Congestion reduction," "(4) System reliability," "(5) Freight movement and economic vitality," "(6) Environmental sustainability," and "(7) Reduced project delivery delays." *Id.* § 150(b)(1)-(7). As relevant here, "[e]nvironmental sustainability" means "enhanc[ing] the performance of the transportation system while protecting and enhancing the natural environment." *Id.* § 150(b)(6).

To pursue those seven national goals, Congress enacted a performance-management framework providing for federal leadership, state target-setting and reporting, and state implementation. The operational centerpiece of this framework is the establishment of a suite of performance measures by FHWA, *see* 23 U.S.C. § 150(c), for which States then set their own performance targets, *see id.* § 150(d).

More specifically, section 150(c) directs FHWA to "promulgate a rulemaking that establishes performance measures and standards" for federal-aid highway programs "in consultation with State departments of transportation" (State DOTs) and other stakeholders. 23 U.S.C. § 150(c)(1).

It then provides a series of further directions and authorizations, grouped in relation to specific highway programs, describing the performance measures FHWA should adopt for those specific programs. *See id.* § 150(c)(3) (further instructions for the NHPP); *id.* § 150(c)(4) (same for HSIP); *id.* § 150(c)(5) (same for CMAQ); *id.* § 150(c)(6) (same for national freight movement).

As relevant here, for the NHPP, Congress identified various "measures for States to use to assess" that particular program's performance. 23 U.S.C. § 150(c)(3)(A)(ii). Congress specified three particular topics that must be addressed by performance measures: "the condition of pavements on the Interstate system"; "the condition of pavements on the National Highway System (excluding the Interstate)"; and "the condition of bridges on the National Highway System." *Id.* § 150(c)(3)(A)(ii)(I)-(III). Congress then also vested FHWA with the more general authority to develop additional measures relating to "the performance of the Interstate System" and "the performance of the National Highway System (excluding the Interstate System)." *Id.* § 150(c)(3)(A)(ii)(IV)-(V). For convenience, these latter two provisions are referred to herein as Subclauses (IV)-(V).

Once FHWA establishes these performance measures, the States in turn "set performance targets that reflect" those measures. 23 U.S.C. § 150(d)(1). The targets for each measure are anticipated future results that the State hopes

to achieve by a specified future point, which "may, as appropriate" be different "for urbanized and rural areas." *Id.* § 150(d)(2).  These performance measures help recipients of federal-aid highway funds track the effectiveness of their transportation investments in support of the national goals in 23 U.S.C. § 150.

By statute, the targets that States set for themselves under 23 U.S.C. § 150(d) are references for future decisionmaking, not substantive mandates. The targets are to be considered in certain federally required transportation-planning processes.  *See, e.g.*, 23 U.S.C. §§ 119(e)(2), 135(d)(2).[2]  But the weight, if any, that a State gives each performance target is a matter entirely within its discretion.  States submit biennial reports to FHWA that describe, among other things, their "progress in achieving [the] performance targets"

---

[2] Section 119(e) provides that, in order to receive NHPP funding, each State must develop an "asset management plan [that] include[s] strategies leading to a program of projects that would make progress toward achievement of the State['s] targets … in accordance with section 150(d) and supporting the progress toward the achievement of the national goals identified in section 150(b)."  23 U.S.C. § 119(e)(2).

Section 135(d) requires States to undertake a "statewide transportation planning process," which "shall provide for the establishment and use of a performance-based approach to transportation decisionmaking to support the national goals described in section 150(b)."  23 U.S.C. § 135(d)(2)(A).  In that plan, "[e]ach State shall establish performance targets that address the performance measures described in section 150(c), where applicable."  *Id.* § 135(d)(2)(B)(i)(I).  These "performance measures and targets … shall be considered by a State when developing policies, programs, and investment priorities reflected in the statewide transportation plan and statewide transportation improvement program."  *Id.* § 135(d)(2)(D).

they have set themselves under section 150(d). *Id.* § 150(e)(3). States that do not make significant progress in achieving their own NHPP performance targets do not incur a penalty under section 150(d), but instead provide additional reporting to explain how they intend to meet their targets in the future. *See* 23 C.F.R. § 490.109(f)(1).

### B.    Regulatory Background

FHWA initially implemented Congress's directives in section 150(c) through a series of rulemakings in late 2016 and early 2017. *See* 88 Fed. Reg. at 85,366 (describing regulatory history). The first two rules, informally known as "PM1" and "PM2," focused on performance measures related to safety and to bridge and pavement conditions, respectively. *See* 81 Fed. Reg. 13,882 (Mar. 15, 2016) (PM1); 82 Fed. Reg. 5886 (Jan. 18, 2017) (PM2).[3]

FHWA also promulgated a third rule, known as "PM3," which established further performance measures for the NHPP (as well as measures for certain other highway programs). *See* 82 Fed. Reg. 5970 (Jan. 18, 2017). The further performance measures for the NHPP were issued pursuant to

---

[3] For example, as to safety, FHWA established measures that track the number of fatalities and serious injuries and their rate per 100 million vehicle miles traveled. *See* 23 C.F.R. § 490.207(a); *cf.* 23 U.S.C. § 150(c)(4)(A). As to physical conditions, FHWA established measures that, *inter alia*, track the percentage of bridges on the National Highway System classified as being in good, fair, and poor condition. *See* 23 C.F.R. § 490.407(a)(1)-(3); *cf.* 23 U.S.C. § 150(c)(3)(A)(ii)(III).

Congress's general directive in Subclauses (IV)-(V) that the agency exercise

discretion to develop additional measures to assess the "performance of the

Interstate System" and "the performance of the National Highway System

(excluding the Interstate System)."  23 U.S.C. § 150(c)(3)(A)(ii)(IV)-(V).  For

example, PM3 established a performance measure for "travel time reliability,"

*i.e.*, the consistency of traffic flow hour-to-hour and day-to-day.  *See* 23 C.F.R.

§ 490.507(a)(1)-(2).  FHWA reasoned that this measure, though of course not

expressly required by Congress, was an appropriate measure of "performance"

under Subclauses (IV)-(V) in part because it furthered the congressionally

enacted national goal of "system reliability," meaning "[t]o improve the

efficiency of the surface transportation system."  23 U.S.C. § 150(b)(4).

As relevant here, PM3 also included a performance measure for tracking

emissions of greenhouse gases (GHG).  The measure was defined as the

percent change in $CO_2$ tailpipe emissions generated by on-road mobile sources

on the National Highway System relative to a reference year.  *See* 82 Fed. Reg.

5970.  FHWA explained that this performance measure was likewise

promulgated under Subclauses (IV)-(V) and was designed to further the

congressionally enacted national goal of "environmental sustainability."

23 U.S.C. § 150(b)(6); *see* 82 Fed. Reg. at 5993-6003.  FHWA observed that the

transportation sector is the largest source of GHG emissions in the United

States; that these emissions are significant contributors to climate change; and that climate change in turn has increased the number and severity of adverse events affecting the transportation system. *See* 82 Fed. Reg. at 5993 (explaining that "the transportation system both contributes to climate change and suffers from the impacts of climate change (*e.g.*, flooding, sea level rise)"). FHWA determined that including a GHG measure within the NHPP's performance-management framework would "provide decisionmakers with better information about the transportation system's GHG emissions and a means for measuring progress." *Id.* at 5,996. As required by statute, PM3 also directed States to set targets of their own choice for the GHG measure and to report on their progress in meeting those targets. *See* 23 U.S.C. § 150(d)-(e).[4]

The GHG measure established by PM3 never took practical effect, however, owing to a change in administration. As part of an effort to "streamline regulatory processes," and before the States' deadlines for target-setting or reporting, FHWA published a final rule repealing the GHG measure. 83 Fed. Reg. 24,920, 24,922 (May 31, 2018). In so doing, FHWA questioned both the scope of its statutory authority to establish the measure and whether

---

[4] Contrary to the district court's apparent assumption, *see* ROA.4733, ROA.4736, the PM3 Rule would not have required States to set "declining" targets and did not otherwise guide or constrain States' choice of targets.

the measure would yield information that was nonduplicative and sufficiently useful. *See id.* at 24,923-26.

### C.    The Rule Under Review

Following another change in administration, and upon further consideration, in 2022, FHWA again proposed to establish a GHG measure. *See* 87 Fed. Reg. 42,401 (July 15, 2022) (ROA.316-337).  The agency explained that the 2018 rule repealing its prior GHG measure had seriously misunderstood both the text of the statute and the benefits that would accrue from having a nationally consistent performance measure for tailpipe $CO_2$ emissions. *See id.* at 42,405-12.  FHWA sought public comment on its proposal, which yielded many thousands of comments from States and State DOTs, metropolitan planning organizations (MPOs), federal and state legislators, industry and advocacy organizations, and private citizens. *See* 88 Fed. Reg. at 85,371.

After considering those comments, in December 2023, FHWA issued the Rule now under review.  *See* 88 Fed. Reg. 85,364 (ROA.285-315).  As explained immediately below, the Rule amends FHWA's performance-management regulations to add a performance measure related to GHG emissions and calls for State DOTs and MPOs to set reduction targets for that measure.  In so doing, the Rule effectively reinstated, with some changes, the

measure it had previously adopted in PM3 but then repealed under different leadership.

1. *GHG Measure*.  The Rule establishes the "GHG measure," defined as "the percent change in tailpipe $CO_2$ emissions on the NHS [National Highway System] compared to the reference year" of 2022.  23 C.F.R. § 490.507(b); *see* 88 Fed. Reg. at 85,364.  The emissions in each State in a given year are estimated based on several familiar data sources: the amount of each type of vehicle fuel consumed in the State (multiplied by the standard amount of $CO_2$ emitted per unit of each fuel type); the number of vehicle miles traveled in the State; and the share of those miles traveled on NHS roadways.  *See* 23 C.F.R. § 490.511(c).  Combining those values yields an estimate of "tailpipe $CO_2$ emissions on the NHS for a given year computed in million metric tons," known as the "GHG metric."  88 Fed. Reg. at 85,372.  The "GHG measure," in turn, is the percentage difference between the GHG metric calculated for the year at issue and the GHG metric calculated for the reference year of 2022. The agency explained that it chose this formula for estimating on-road tailpipe $CO_2$ emissions on the NHS because of its "simplicity, ease of calculation, and reliance on data States already report to FHWA."  *Id.* at 85,371.

2. *Targets*.  As for all other performance measures established by FHWA under section 150(c), the Rule affirms that States will set targets for the GHG

measure.  *See* 23 U.S.C. § 150(d)(1) (requiring that "each State shall set performance targets that reflect the measures identified" by FHWA).  In its notice of proposed rulemaking, FHWA had initially proposed to require that States set targets that align with the President's substantive goal of achieving net-zero emissions economywide by the year 2050.  *See* 87 Fed. Reg. at 42,413.  After consideration of public comments, however, FHWA did not adopt that proposal.  The Rule instead provides only that States will establish "declining targets for reducing tailpipe $CO_2$ emissions on the NHS [National Highway System]," 23 C.F.R. § 490.105(e)(10), without "prescribing what declining targets would look like" and without "determin[ing] how State DOTs … should determine their declining targets," 88 Fed. Reg. at 85,369.  The agency thus afforded States the "flexibility to set targets that are appropriate for their communities and that work for their respective climate change and other policy priorities, as long as the targets aim to reduce emissions over time."  *Id.* at 85,364.

FHWA emphasized that, "consistent with existing NHPP performance measures" and the governing statute, the Rule does not require States to achieve the performance targets they set for themselves.  88 Fed. Reg. at 85,378.  "There are no specific penalties for failing to achieve GHG targets."  *Id.*  Instead, as for other performance measures, each State periodically reports

13

on its results and FHWA makes a ministerial determination whether the State has made significant progress on its various self-selected targets. "[I]f significant progress is not made," the State "must document the actions it will take to achieve that target" in the coming years. *Id.* But "[f]ailure to achieve significant progress" does "not trigger any penalties." *Id.*

**3. *Purpose of Rule.*** FHWA devoted substantial attention to explaining the Rule's purpose. It observed that the transportation sector "contributes significantly to the causes of climate change, representing the largest source of U.S. $CO_2$ emissions." 88 Fed. Reg. at 85,365. "[E]ach additional ton of $CO_2$ produced by the combustion of fossil fuels contributes to future warming and other climate impacts," which in turn is expected to lead to "future increases in the occurrence and severity" of "extreme events" that "threaten the reliability, safety, and efficiency of the transportation system." *Id.* at 85,364-65. FHWA emphasized that the "transportation sector is increasingly vulnerable to the effects of climate change" because "[m]uch of existing transportation infrastructure was designed and constructed without consideration of these changes." *Id.* at 85,370. It concluded that the federal government and States have a shared interest in voluntarily reducing emissions to fend off the worst effects of climate change. *See id.* at 85,365, 85,371 (explaining that the Rule

14

"demonstrate[s] Federal leadership" and "aligns with Executive Orders" that "call[] for a government-wide approach to the climate crisis").

The Rule is designed to provide support for that voluntary effort. Unlike regulatory schemes administered by other federal agencies, the transportation-performance-management statute does not itself compel any emissions reductions. But, the agency explained, "[t]he first step toward reducing GHG emissions" in the transportation sector "involves inventorying and monitoring those emissions." 88 Fed. Reg. at 85,365. After taking that step, States then can set workable targets for emission reductions and consider those targets as one of various factors in their future planning efforts. That, in turn, will "facilitate efficient investment of Federal transportation funds," *id.*, which States are responsible for allocating, *see* 23 U.S.C. § 145(a).

The agency anticipated that, given States' different policy priorities and economic circumstances, not all States would choose to prioritize emission reductions. "FHWA expects—but does not require—that this measure will help State DOTs and MPOs select projects that will reduce GHG emissions." 88 Fed. Reg. at 85,375. But FHWA concluded that many States would benefit from the Rule in their "efforts to increase the resiliency of the [National Highway System] to mitigate the cost of damages from sea level rise, extreme weather events, flooding, wildfires, or other natural disasters." *Id.* at 85,376.

FHWA also emphasized that the federal government stands ready to help States that choose to make such voluntary efforts, including through tens of billions of dollars in federal funds authorized by the Bipartisan Infrastructure Law enacted in 2021. *See id.*

4. ***Authority for Rule.*** FHWA also provided extensive discussion of the statutory authority supporting the Rule. *See* 88 Fed. Reg. at 85,367-70. It observed that Congress—in addition to requiring specific measures relating to pavements, bridges, traffic safety, localized air pollutants, and the like, *cf.* 23 U.S.C. § 150(c)(3)(A)(i), (ii)(I)-(III), (iii), (4)-(6)—also expressly directed FHWA in Subclauses (IV)-(V) to promulgate additional measures for the "performance of the Interstate System" and the "performance of the National Highway System (excluding the Interstate System)" to be formulated by the agency itself. *Id.* § 150(c)(3)(A)(ii)(IV)-(V). In those latter clauses, "Congress provided FHWA with clear authority to develop performance measures to help State DOTs and MPOs address significant and long-term issues impacting the performance of the transportation system." 88 Fed. Reg. at 85,367.

FHWA further explained that "[a]lthough the statute does not define the meaning of 'performance'" as that term is used in Subclauses (IV)-(V), the term can readily be given meaning in light of surrounding statutory provisions. 88 Fed. Reg. at 85,364; *see id.* at 85,367 (agency "must interpret this term in the

context of the statute"). In particular, in the immediately preceding subsection, "Congress identified national goals" for the transportation system, "which include environmental sustainability." *Id.* at 85,364 (citing 23 U.S.C. § 150(b)(6)). To support that national goal, FHWA reasoned, it was appropriate to "interpret[] 'performance' of the Interstate System and non-Interstate System under 23 U.S.C. 150(c) to include the system's environmental performance." *Id.*; *cf. supra* p. 9 (noting similar logic as to system-reliability goal).

The agency specifically discussed the 2018 repeal rule and explained why it now found its reasoning unpersuasive. FHWA concluded that the 2018 repeal rule reflected a mistakenly narrow interpretation of the statute in several respects, including by failing to afford meaning to Subclauses (IV)-(V); by disregarding the national goals set forth in subsection 150(b); and by conflating the NHPP's performance measures with those of other FHWA federal-aid highway programs. *See* 88 Fed. Reg. at 85,367-70. The repeal rule had also overlooked the "significant risks that climate change-driven extreme weather pose[s] to the condition and performance of the NHS [National Highway System]." *Id.* at 85,367. Rather, "[t]he environmental sustainability, and specifically the carbon footprint, of the transportation system is a critically

17

important attribute that State DOTs can and should use to assess the performance of the Interstate and non-Interstate NHS." *Id.* at 85,364.[5]

FHWA also justified its requirement calling for States to set "declining" (*i.e.*, improving) performance targets. It explained that "the establishment of declining targets is vital given the urgency of the climate crisis" and noted that "[e]stablishing declining targets will help State DOTs and MPOs plan toward reductions in GHG emissions and make Federal infrastructure investment decisions that reduce climate pollution." 88 Fed. Reg. at 85,369. It also explained that "[i]f one or more aspects of the GHG measure are determined to be invalid, the remaining provisions should remain unaffected and in force." 88 Fed. Reg. at 85,373; *see* 23 C.F.R. § 490.515 (severability provision).

### D.    District Court Proceedings

**1.** Plaintiffs, the State of Texas and its Department of Transportation, brought this lawsuit in the Northern District of Texas challenging the Rule. *See* ROA.8-30. Separately, a group of 21 other States brought a parallel challenge to the Rule in the Western District of Kentucky. *See Kentucky v.*

---

[5] FHWA acknowledged that the Rule was not statutorily compelled, insofar as "nothing in the statute specifically *requires* FHWA to adopt a GHG emissions measure." 88 Fed. Reg. at 85,368 (emphasis added). But it noted that Congress enacted Subclauses (IV)-(V) for the very purpose of establishing additional performance measures to be identified by the agency, and there is "no provision of law *prohibit*[*ing*] FHWA from adopting a GHG emissions measure" under that grant of authority. *Id.* (emphasis added).

*FHWA*, No. 5:23-cv-162 (W.D. Ky.).  Though the Rule initially required
States to make certain submissions by February 1, 2024, FHWA reached
agreement to extend that deadline through April 1, 2024, and the parties in
each case agreed to proceed on cross-motions for summary judgment.

**2.**  The district court declared the Rule to be unlawful and ordered
universal vacatur.  ROA.4727-68.

**a.**  On the merits, the court concluded that the Rule lacked statutory
authorization.  ROA.4742-67.  The court acknowledged both that FHWA had
invoked its authority under Subclauses (IV)-(V) to establish additional
performance measures for the Interstate and National Highway Systems,
ROA.4736-37, and that Congress did not define or qualify the term
"performance" as used in those provisions, ROA.4746.  It nonetheless posited
that any measures established under Subclauses (IV)-(V) must "focus[] on the
infrastructure's effectiveness in facilitating travel, commerce, and national
defense—not environmental outputs of vehicles using the systems."
ROA.4727.  In fashioning that limitation upon the text of Subclauses (IV)-(V),
the district court cited four principal considerations.  ROA.4745-46.

First, the district court stated its view that the concept of "performance"
generally excludes environmental considerations.  ROA.4745-50.  To justify
that view, the court began not with the text of section 150 (such as its expressly

19

stated national transportation goals), but rather, with the statutory definitions of "National Highway System" and other terms elsewhere in the U.S. Code. The court found it important that none of those defined terms referred directly to "environmental emissions or impact," ROA.4748, but instead implied "goals of facilitating travel, commerce, and the national defense," ROA.4749.

Second, analogizing to the principle of *noscitur a sociis*, the district court suggested that because the three provisions immediately preceding Subclauses (IV)-(V) "focus on physical infrastructure" without noting environmental concerns, the separately enumerated statutory authorizations reflected in Subclauses (IV)-(V) should be assumed implicitly to contain the same limitation, notwithstanding their more general wording and nonparallel structure.  ROA.4746; *see* ROA.4750-53.

Third, the district court stated that construing Subclauses (IV)-(V) as vesting FHWA with discretion to establish measures related to $CO_2$ emissions "would render other statutory provisions superfluous."  ROA.4727; *see* ROA.4753-57.  The court noted that, as part of a distinct federal highway program (CMAQ), Congress specifically mandated that FHWA establish performance measures related to the emissions of certain pollutants affecting regional air quality.  The court assumed that Congress's specific directive to establish performance measures for CMAQ implicitly displaced the agency's

discretionary authority to establish any emissions-related measures under the
NHPP, even for different classes of pollutants (greenhouse gases) that pose
categorically different risks (including threats to the highway system itself).

Fourth, the district court rejected FHWA's explanation that the national
goal of "environmental sustainability" codified in section 150(b)(6) supported
its effort to measure environmental performance.  ROA.4757-61.  The court
suggested that "[w]hile environmental sustainability is undoubtedly a statutory
goal," ROA.4757, it was determinative that Congress had not specifically
mandated any particular performance measures related to that goal within the
text of section 150(c)(3), *see* ROA.4758.  The court also suggested that the
concept of "performance" must categorically exclude environmental concerns
because the text of section 150(b)(6) refers to "enhanc[ing] the performance of
the transportation system" generally and then to "protecting and enhancing the
natural environment" specifically.  ROA.4759 (quotation marks omitted).

Finally, the district court added that its narrow reading of Subclauses
(IV)-(V) was supported by inferences drawn from 23 U.S.C. § 119, the
programmatic statute governing the NHPP.  *Cf. supra* pp. 2-3, 7.  The court
noted that section 119(d)(1) identifies various relevant program goals but does
not list "environmental sustainability," and that section 119(d)(2) does not
identify emissions reduction as a freestanding basis for eligibility for States

seeking federal highway funding.  At the same time, the court dismissed the relevance of related statutory provisions requiring States to consider "environmental impact," including "transportation-related fuel consumption and air pollution," in their state planning processes, ROA.4764 n.16 (quotation marks omitted), because they did not appear in section 150 itself.  *Cf.* 23 U.S.C. §§ 134(h)(1)-(2), 135(d)(1)-(2).[6]

**b.**  The district court, after expressing some reservations, ultimately ordered universal vacatur.  *See* ROA.4768-74; *see* ROA.4776 (final judgment).

The district court noted FHWA's argument that "any relief should be limited to the State of Texas," *cf.* ROA.4673-75, and it observed that Texas in requesting vacatur had specifically "defer[red] to the Court as to whether the remedy should be party-specific," ROA.4768.  The court acknowledged that the Administrative Procedure Act (APA) does not invariably compel vacatur and that "courts can, in certain circumstances, choose a more limited approach."  ROA.4772.  And it acknowledged "[it] has discretion in fashioning relief, even if not requested by [the] party" entitled to judgment.  ROA.4771.

---

[6] Having concluded that the Rule was unauthorized, the district court did not consider plaintiffs' related claims that the Rule was arbitrary or capricious or violated the Spending Clause of the U.S. Constitution.  *See* ROA.4767 n.17.

Despite acknowledging those points and expressing some sympathy for defendants' position, the district court nonetheless perceived a "predicament" in that "there is no other clear, more limited remedy requested by the plaintiffs that the Court could grant here that would redress the plaintiffs' injury." ROA.4771.  The court suggested that plaintiffs' failure to request an injunction, as opposed to "vacatur," meant that more "limited relief" would not "ha[ve] been properly noticed to the defendants."  ROA.4772.

**3.**  Separately, on April 1, 2024, the district court in the Kentucky suit issued an opinion concluding that the Rule was invalid for other reasons and ultimately imposed only plaintiff-specific declaratory relief.  *See Kentucky v. FHWA*, No. 5:23-cv-162-BJB, 2024 WL 1402443 (W.D. Ky. Apr. 1, 2024) (Beaton, J.).

First, the Kentucky district court ruled that FHWA lacked authority to call upon States to target emissions reductions.  *See Kentucky*, 2024 WL 1402443, at *8-10.  It acknowledged the plaintiffs' broader contention—which is squarely at issue in the current appeal—that the agency lacked authority to promulgate any GHG measure.  But the court asserted that "[t]he more fundamental problem" is that the Rule "identified no source of authority that authorizes [FHWA] to require states to set *declining* targets."  *Id.* at *9 (emphasis added).

Second, the district court concluded that the Rule was otherwise arbitrary and capricious. *See Kentucky*, 2024 WL 1402443, at *10-14. The court suggested that the Rule would prove useful neither for "reduc[ing] $CO_2$ emissions" nor for "serv[ing] as an informational tool for state policymakers." *Id.* at *10. It emphasized that the Rule does not directly mandate emissions reductions and disclaims any penalty for States that fail to meet their targets. *Id.* at *11-12. In so doing, the court overlooked that the Rule's nonbinding performance targets were compelled by statute rather than a matter for agency discretion.

As to remedy, the *Kentucky* district court rejected the plaintiffs' argument that universal vacatur of the Rule was appropriate, instead entering plaintiff-specific declaratory relief. 2024 WL 1402443, at *2, *15-19. It explained that "because the Final Rule operates on a state-by-state basis, with no one state's compliance or coercion affecting that of any other state, the remedy is appropriately dispensed to the Plaintiff States only, not nationwide." *Id.* at *2. The court invited further briefing by the parties as to whether plaintiff-specific injunctive relief should also be imposed. But the parties reached agreement that declaratory relief would be sufficient, and the court then entered final judgment. The government has separately appealed that order.

## SUMMARY OF ARGUMENT

Congress directed the Federal Highway Administration to exercise its discretion to establish additional performance measures for the National Highway System, as to which States then set targets and report on their progress. Consistent with that direction, and in furtherance of the statutory goal of environmental sustainability, FHWA issued a Rule establishing a measure for tracking the annual change in greenhouse-gas emissions on national highways. Under the Rule, States "set and determine targets based on appropriate data" informed by their own "policies and priorities," 88 Fed. Reg. at 85,369, and FHWA is "neither requiring any specific targets nor mandating any penalties for failing to achieve these targets," *id.* at 85,367. Plaintiffs' challenges to the lawfulness of the Rule are unpersuasive.

**I.** FHWA acted within its authority in enacting the Rule. In a pair of statutory provisions (Subclauses (IV)-(V)), Congress directed FHWA to promulgate additional "performance" measures for the NHPP without further defining or qualifying that term. FHWA reasonably has given content to that provision by looking to the statute's expressly declared national goals, including "[e]nvironmental sustainability." 23 U.S.C. § 150(b)(6). In particular, FHWA concluded that the percent change in tailpipe $CO_2$ emissions relative to a reference year is a useful measure of environmental

25

performance because such emissions are a leading contributor to climate change, which in turn threatens the resiliency of the highway system itself.

The district court erred in finding the GHG measure to be beyond the agency's authority. The court's theory that performance measures under Subclauses (IV)-(V) must relate to travel, commerce, or national defense lacks any foundation in the text of section 150. And the court's other asserted reasons for narrowly reading Subclauses (IV)-(V) overlook obvious clues from statutory context and erroneously disregard the connections that Congress intended between the performance measures (in section 150(c)) and the national goals (in section 150(b)), which were promulgated at the same time.

**II.** Even if the Rule suffered some defect, the proper remedy is not universal vacatur. Plaintiffs did not demand that relief and defendants expressly opposed it. The district court's belief that vacatur was nonetheless compulsory rested solely on its erroneous view that other forms of relief were procedurally foreclosed because they would allegedly cause prejudice to defendants. But defendants expressly *invited* plaintiff-specific equitable relief, and there is no dispute that such relief would redress plaintiffs' injuries. Under these circumstances, universal vacatur is not a permissible remedy. But even if such relief were available, this Court should nonetheless vacate and remand so that the district court may exercise informed discretion in choosing a remedy.

## STANDARD OF REVIEW

Under the Administrative Procedure Act, "[t]his court reviews [the district court's] grant of summary judgment *de novo*, applying the same standard of review as the district court." *Baylor Cty. Hosp. Dist. v. Price*, 850 F.3d 257, 261 (5th Cir. 2017). The APA directs courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, [or] an abuse of discretion" or "in excess of statutory … authority." 5 U.S.C. § 706(2). In reviewing the agency's exercise of discretionary authority, a reviewing court does not "substitute [its] judgment for that of the agency," *Clean Water Action v. U.S. EPA*, 936 F.3d 308, 316 (5th Cir. 2019), but instead "simply ensures that the agency has acted within a zone of reasonableness," *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

The district court's choice of remedy under the APA is reviewed for abuse of discretion. *See, e.g.*, *Texas v. United States*, 50 F.4th 498, 529 (5th Cir. 2022). "Where a district court bases its legal analysis on an erroneous understanding of the governing law, it has abused its discretion." *Bourque v. State Farm Mut. Auto. Ins. Co.*, 89 F.4th 525, 528 (5th Cir. 2023) (quotation marks omitted).

# ARGUMENT

## I.  THE RULE WAS A LAWFUL EXERCISE OF FHWA'S AUTHORITY TO ESTABLISH PERFORMANCE MEASURES

### A.  Congress Instructed FHWA To Exercise Discretion To Establish Additional Performance Standards, Which May Include Environmental Performance.

"In statutory interpretation disputes, a court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself." *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 436 (2019). "[W]ords of a statute must be read in their context and with a view to their place in the overall statutory scheme." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (quotation marks omitted).  A court may neither "add[] terms not found in the statute" nor "impos[e] limits on an agency's discretion that are not supported by the text." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 677 (2020).

In enacting MAP-21, Congress established a new framework for evaluating transportation performance and encouraging systemic improvements.  *See* 23 U.S.C. § 150.  The statute declares a national policy of "[p]erformance management" that includes "refocusing on national transportation goals," *id.* § 150(a); it then articulates those seven national transportation goals, *id.* § 150(b); it both requires and empowers FHWA to develop various performance measures for States to use, *id.* § 150(c); it instructs

28

States to set performance targets as to those measures, *id.* § 150(d); and it directs States to report on their progress in meeting those targets, *id.* § 150(e).

At issue here is FHWA's ability to establish performance measures for the NHPP under its section 150(c) authority.  That subsection not only requires certain specified performance measures, but also directs FHWA to use its discretion to identify and establish additional performance measures that States must use.  Thus, for the NHPP, Congress did not merely direct FHWA to create performance measures for assessing "the condition of pavements on the Interstate system," "the condition of pavements on the National Highway System (excluding the Interstate)," and "the condition of bridges on the National Highway System."  23 U.S.C. § 150(c)(3)(A)(ii)(I)-(III).  It also specifically directed FHWA, in two further subclauses, to create additional measures for assessing "the performance of the Interstate System" and "the performance of the National Highway System (excluding the Interstate System)."  *Id.* § 150(c)(3)(A)(ii)(IV)-(V).

Although Subclauses (IV)-(V) thus empower—and require—FHWA to promulgate additional measures for assessing the performance of the Interstate System and remaining National Highway System, the statute nowhere defines or delimits the term "performance" as used in those provisions.  Congress instead contemplated that FHWA would apply its discretion and policy

29

judgment in determining what additional performance measures would be appropriate. *Cf. Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2263 (2024) (explaining that sometimes "the best reading of a statute is that it delegates discretionary authority to an agency"); *id.* ("[T]he statute's meaning may well be that the agency is authorized to exercise a degree of discretion.").

Surrounding statutory provisions nonetheless provide clues about the kinds of "performance" that Congress would consider important or relevant for purposes of Subclauses (IV)-(V). In particular, the immediately preceding subsection articulates a list of seven "national goals" on which the "United States [should] focus the Federal-aid highway program[s]." 23 U.S.C. § 150(b)(1)-(7). Among them is "[e]nvironmental sustainability," meaning "[t]o enhance the performance of the transportation system while protecting and enhancing the natural environment." *Id.* § 150(b)(6).[7] Congress obviously intended that FHWA work to further those goals, insofar as it explained that "[p]erformance management" would "transform the Federal-aid highway program" by, *inter alia*, "refocusing on national transportation goals." *Id.* § 150(a). These statutory statements of purpose in sections 150(a)-(b) thus

---

[7] The subheadings in section 150(b) were included in the enacted bill and therefore form part of the statute's text. *Cf., e.g.*, *United States v. Wallington*, 889 F.2d 573, 577 (5th Cir. 1989); *United States v. Schopp*, 938 F.3d 1053, 1060 n.3 (9th Cir. 2019).

provide a "useful guide" in construing the provisions of section 150(c).

*Kentucky v. Biden*, 57 F.4th 545, 551 (6th Cir. 2023); *see also, e.g.*, *Rubin v. Islamic Republic of Iran*, 830 F.3d 470, 480 (7th Cir. 2016), *aff'd*, 583 U.S. 202 (2018).

Moreover, many of the national goals set forth in section 150(b) have obvious counterparts among the specific performance measures required by Congress in section 150(c). For example, the national goal of "safety" in section 150(b) logically corresponds to the mandate to "establish measures for … (A) serious injuries and fatalities per vehicle mile traveled; and (B) the number of serious injuries and fatalities" in section 150(c). 23 U.S.C. § 150(c)(4). Likewise, the national goal of "infrastructure condition" in section 150(b) logically corresponds to, *inter alia*, section 150(c)'s specifically mandated measures for assessing the condition of pavements and bridges on the National Highway System. *Id.* § 150(c)(3)(A)(ii)(I)-(III).

By contrast, certain other national goals—including "[s]ystem reliability" and "[e]nvironmental sustainability," 23 U.S.C. § 150(b)(4), (6)—are not the obvious subject of any specifically mandated performance measures. Rather, Congress left it to FHWA's discretion to decide how best to account for those goals within the performance-management regime. A principal way Congress afforded such discretion was by enacting Subclauses (IV)-(V), which generally empower FHWA to promulgate additional measures for the "performance" of

31

the National Highway System without expressly limiting the subject matter to which those performance measures may or must relate.

Further evidence that Congress understood environmental-performance measures to fall within the scope of Subclauses (IV)-(V) is provided by other provisions governing federal-aid highway programs. With respect to the NHPP (the relevant program here), Congress announced that the program's declared purposes include supporting "the condition and performance of the National Highway System" and "provid[ing] support for activities to increase the resiliency of the National Highway System to mitigate the cost of damages" from certain events linked to climate change, including "sea level rise, extreme weather events, flooding, wildfires, or other natural disasters." 23 U.S.C. § 119(b)(1), (4). And Congress directed that, when formulating their required asset management plans for the NHPP, States must "support[] the progress toward the achievement of the national goals identified in section 150(b)," which include environmental sustainability. *Id.* § 119(e)(2).

Similar references to environmental goals pervade Title 23 of the U.S. Code. In its general "declaration of policy" relating to all federal-aid highway programs, Congress declared that one of the country's "[t]ransportation needs of [the] 21st century" is that "transportation should play a significant role in promoting economic growth, *improving the environment*, and sustaining the

32

quality of life." 23 U.S.C. § 101(b)(3)(G) (emphasis added). It further declared

that it is "in the national interest" to develop surface transportation systems

that "minimiz[e] transportation-related fuel consumption and air pollution" as

part of "metropolitan and statewide transportation planning processes." *Id.*

§ 134(a)(1). For that reason, State DOT and MPO planning processes must

include consideration of strategies to "protect and enhance the environment,

promote energy conservation," and "improve the resiliency and reliability of

the transportation system." *Id.* §§ 134(h)(1)(E), (I), 135(d)(1)(E), (I). These

plans must embody a "performance-based approach to transportation

decisionmaking to support the national goals described in section 150(b),"

including environmental sustainability. *Id.* §§ 134(h)(2)(A), 135(d)(2)(A).

### B. FHWA Permissibly Exercised Its Statutory Discretion To Establish A Measure For Transportation-Related CO$_2$ Emissions And Provide For Declining Emissions Targets.

FHWA reasonably invoked its authority under Subclauses (IV)-(V) in

promulgating the Rule under review. "[T]he best reading" of those provisions

"is that [they] delegate[] discretionary authority to [the] agency" to identify

additional performance measures relevant to the NHPP. *Loper Bright Enters.*,

144 S. Ct. at 2263. As the agency explained in the Rule's detailed preamble,

"measuring environmental performance of the Interstate and non-Interstate

[National Highway System] is vital to meeting the Agency's obligations under

23 U.S.C. 150" given the "explicit statutory goal of environmental sustainability." 88 Fed. Reg. at 85,367. "The environmental sustainability, and specifically the carbon footprint, of the transportation system is a critically important attribute that State DOTs can and should use to assess the performance of the Interstate and non-Interstate NHS." *Id.* at 85,364.

The Rule, in turn, is a permissible—and eminently reasonable—exercise of that authority to measure environmental performance. On-road tailpipe emissions from the National Highway System are a key aspect of that system's environmental performance. "[T]ransportation contributes significantly to the causes of climate change, representing the largest source of U.S. $CO_2$ emissions[.]" 88 Fed. Reg. at 85,365. "[E]ach additional ton of $CO_2$ produced by the combustion of fossil fuels contributes to future warming and other climate impacts" such as "increases in heavy precipitation, coastal flooding, heat, wildfires, and other extreme events." *Id.* at 85,365, 85,368. Those climate impacts, in turn, "threaten the reliability, safety, and efficiency of the transportation system." *Id.* at 85,364. "Much of existing transportation infrastructure was designed and constructed without consideration of these [climate] changes," and as a result, the "transportation sector is increasingly vulnerable to the effects of climate change including higher temperatures, more frequent and intense precipitation, and sea level rise." *Id.* at 85,370.

As FHWA explained, "[t]he first step toward reducing GHG emissions involves inventorying and monitoring those emissions." 88 Fed. Reg. at 85,365. Tracking $CO_2$ emissions assists States with their voluntary efforts to achieve the "national goal of environmental sustainability," *id.*, as well as "provides support for activities to increase the resiliency of the [National Highway System]" against climate-change related damage from sea level rise, extreme weather events, and other natural disasters, *id.* at 85,367; *cf.* 23 U.S.C. § 119(b)(4).

In establishing the GHG measure, FHWA emphasized that it was not purporting to arrogate any authority that statutorily belongs to States. Under the Rule, "State DOTs and MPOs will set and determine targets based on appropriate data as informed by State DOT and MPO policies and priorities." 88 Fed. Reg. at 85,369. FHWA "is not prescribing what declining targets would look like in each State or MPO," and the Rule "[does] not set[] forth any requirements … to determine how State DOTs and MPOs should determine their declining targets." *Id.*; *see id.* at 85,380 (contemplating that States "have the flexibility to set targets that work for their respective policies and priorities, so long as the targets are declining"). And of course, "States determine which of their projects shall be federally financed." *Id.* at 85,369; *see* 23 U.S.C. § 145.

FHWA also repeatedly clarified that the Rule does not purport to require that States actually reduce their emissions. "FHWA is not requiring State DOTs and MPOs to achieve targeted emission reductions, nor prescribing the selection of specific projects under this rulemaking." 88 Fed. Reg. at 85,369. That follows from the design of the statute itself, which does not require States to meet targets but instead calls only for periodic reporting. *See* 23 U.S.C. § 150(e)(3) (requiring State to report on, *inter alia*, their "progress in achieving performance targets identified under subsection (d)"). As relevant here, States that do not make progress toward achieving their targets are not penalized, but rather, identify actions they may take to achieve the target in the future. *See* 88 Fed. Reg. at 85,378, 85,384. Consistent with statutory limitations, FHWA's target-setting approach thus imposes no substantive constraints on State decisionmaking, but rather operates as an inducement for voluntary improvement by willing States, like other performance measures under the performance-management regime. *Cf.* 23 U.S.C. § 150(c)-(e).

### C.   The District Court Erred In Imposing Atextual Limitations Upon The Agency's Discretion.

The district court's discussion of the statute, though lengthy and multi-faceted, fails to justify the limitations it seeks to impose upon the statutory text.

**1.** The court acknowledged that, as in the prior iteration of the Rule, FHWA here invoked "the general provisions of Section 150(c)(3)(A)(ii)"—

36

specifically, Subclauses (IV)-(V)—"which authorize it to establish metrics to assess the 'performance' of the Interstate System and National Highway System." ROA.4733. It also acknowledged that the statute does not expressly delimit that authority: "Section 150 does not define 'performance,' nor does it point to a particular provision elsewhere in the code that does." ROA.4746. And it acknowledged FHWA's considered view that "interpret[ing] 'performance' to include 'environmental performance'" is supported by, *inter alia*, "the national goal of 'environmental sustainability' found in Section 150(b)(6)." ROA.4733-34.

Instead of engaging further with the agency's statutory analysis, however, the district court looked further afield. The court apparently shared FHWA's belief that "performance" measures established under Subclauses (IV)-(V) should relate to Congress's goals. But rather than looking to section 150(b)—the express set of national goals enacted in the same provision of the same public Act (MAP-21, § 1203(a), 126 Stat. at 524-26)—the court sought to infer a different, much more limited, set of goals from other preexisting statutory provisions. In particular, after observing that highway routes are selected for designation within the "National Highway System" based on their significance for "serv[ing] major population centers" and "transportation facilities," "meet[ing] national defense requirements," and "serv[ing] interstate

37

and interregional travel and commerce," 23 U.S.C. § 103(b)(1)(A)-(C), the

court posited that "performance" measures under Subclauses (IV)-(V) in

section 150 should be limited to addressing "infrastructure's effectiveness in

facilitating travel, commerce, and national defense." ROA.4727; *see*

ROA.4749 ("The focus is on how well the highways, routes, and connections

within the systems are achieving their goals of facilitating travel, commerce,

and the national defense.").

That restrictive gloss upon "performance" finds no footing in the most

relevant statutory text. Neither Subclauses (IV)-(V) nor any other provision of

section 150 make express mention of "travel," "commerce," or "defense,"

much less specify that "performance" measures be limited to those categories.

The longstanding definition of "National Highway System," while identifying

roadways of national importance, simply does not purport to set forth

performance goals for the NHPP or other federal-aid highway programs.

On the contrary, that is the very reason why Congress enacted section 150: it

establishes a national performance-management regime to "refocus[]" efforts

around seven "national transportation goals." 23 U.S.C. § 150(a) (declaration

of policy); *see id.* § 150(b)(1)-(7) (seven "national goals").

More fundamentally, in seeking to give policy content to the term

"performance," the district court misunderstood its role. Courts must, of

course, ensure that agencies do not stray beyond the bounds fixed by Congress. *Loper Bright Enters.*, 144 S. Ct. at 2262-63.  But sometimes Congress "empower[s] an agency to prescribe rules to 'fill up the details' of a statutory scheme," and the "best reading of a statute is that it delegates discretionary authority to an agency." *Id.*  Here, Congress's choice not to define or qualify the term "performance," even as it went into considerable detail elsewhere, means that Congress expected the agency to reasonably exercise its own discretion in determining what additional performance measures to establish for the NHPP.

**2.**  Without any textual grounding for its suggested exhaustive definition of "performance," the district court ultimately devoted the bulk of its analysis instead to a number of other theories why, at a minimum, "performance" should exclude the GHG measure at issue here.  None has merit.

First, the district court placed undue emphasis upon the absence of an express, specifically worded authorization for a performance measure for on-road $CO_2$ emissions in Subclauses (IV)-(V) or in surrounding text in section 150(c)(3).  Where Congress has conferred general authority upon an agency, no further authorization is necessary to justify each invocation of that authority.  There is no "such thing as a 'canon of donut holes,' in which Congress's failure to speak directly to a specific case that falls within a more

general statutory rule creates a tacit exception." *Bostock v. Clayton County*, 590 U.S. 644, 669 (2020). Rather, "when Congress chooses not to include any exceptions to a broad rule, courts apply the broad rule." *Id.*

Contrary to the district court's suggestion, the relevant language of Subclauses (IV)-(V) is neither "limited" nor "precise." ROA.4744. Those provisions do not identify and describe performance measures with verbatim specificity. Rather, they vest FHWA with the authority and duty to establish those additional "performance" measures that the agency deems to be appropriate. 23 U.S.C. § 150(c)(3)(A)(ii)(IV)-(V). Congress need not further identify specific examples of that authority's exercise in order for that authority to be given meaningful legal effect.

Importantly, had it wished to do so, Congress could easily have qualified the general grant of authority in Subclauses (IV)-(V). Congress "knows to speak in plain terms when it wishes to circumscribe … agency discretion." *City of Arlington v. FCC*, 569 U.S. 290, 296 (2013). For example, it could have required that additional measures established by FHWA relate to the "*physical* performance" or "*commercial* performance" of the National Highway System. But it did not do so. It is error to "narrow a provision's reach by inserting words Congress chose to omit." *Lomax v. Ortiz-Marquez*, 590 U.S. 595, 600 (2020).

40

The district court committed a similar error in deeming the Rule contrary to a provision stating that FHWA must "limit performance measures only to those described in this subsection [*i.e.*, section 150(c)]." 23 U.S.C. § 150(c)(2)(C). There can be no reasonable dispute that FHWA here sought to promulgate the Rule pursuant to authority "described in" subsection (c)— specifically, its authority under Subclauses (IV)-(V) to develop additional performance measures. *Id.* The court's apparent belief that Subclauses (IV)-(V) fail to count as authority "described in" section 150(c) would afford those provisions no meaning at all, contrary to the fundamental principle that courts "normally seek to construe Congress's work 'so that effect is given to all provisions, so that no part will be inoperative or superfluous, void or insignificant.'" *Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685, 698-99 (2022).

The district court also erred in vitiating the intentionally broad scope of Subclauses (IV)-(V) through inapposite canons of construction. The court suggested that, because the three performance measures specifically mandated for the NHPP focus on the "condition" of certain physical infrastructure (pavements and bridges), *see* 23 U.S.C. § 150(c)(3)(A)(ii)(I)-(III), the general delegations of authority provided by Subclauses (IV)-(V) must also be construed as implicitly carrying the same narrow focus. ROA.4746; *see* ROA.4750-53. But courts "do not woodenly apply limiting principles every

41

time Congress includes a specific example along with a general phrase."
*Ali v. Federal Bureau of Prisons*, 552 U.S. 214, 227 (2008). Such an inference is particularly unjustified where, as here, Subclauses (IV)-(V) are separately enumerated; they stand alone grammatically and logically; and they do not employ wording in parallel with the preceding three clauses. *See, e.g.*, *United States v. Buluc*, 930 F.3d 383, 389-91 (5th Cir. 2019) (refusing to apply similar canon where the statutory text "lacks the basic premise for applying *ejusdem generis*—a list of specific terms followed by a catchall generic term or terms"); *iTech U.S., Inc. v. Renaud*, 5 F.4th 59, 64-65 (D.C. Cir. 2021) (similarly rejecting reliance on "canons of *noscitur a sociis* and *ejusdem generis*" where structural context did not justify it).[8]

The negative implication that the district court drew from the wording of a different performance measure, applicable to a different highway program, is likewise unjustified. The court noted that Congress directed that "[f]or the

---

[8] The district court's reasoning would have had more force if, for example, Congress had enacted a single clause directing FHWA to establish "measures for States to use to assess the condition of pavements on the Interstate System and National Highway System, the condition of bridges on the National Highway System, *and other similar measures of performance* for the Interstate System and National Highway System." But that is not the wording that Congress employed. "'[J]ust as Congress' choice of words is presumed to be deliberate' and deserving of judicial respect, 'so too are its structural choices.'" *SAS Inst., Inc. v. Iancu*, 584 U.S. 357, 364 (2018) (quoting *University of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353 (2013)).

purpose of carrying out section 149, the Secretary shall establish measures for States to use to assess … on-road mobile source emissions" for certain non-GHG pollutants. 23 U.S.C. § 150(c)(5)(B). As the agency has repeatedly explained, that provision is addressed not to the NHPP but to CMAQ, a different program serving distinct purposes. *See* 88 Fed. Reg. at 85,369. Specifically, CMAQ addresses certain criteria pollutants (ozone, carbon monoxide, and particulate matter) that affect "local or regional air quality" and which, unlike GHG emissions, do not pose threats to the resiliency of the highway system itself. *Id.* at 85,378. Moreover, the performance measure established for CMAQ tracks a different type of metric—namely, the results achieved by specific federally funded pollution-mitigation projects—and not the change in total on-road emissions over time. *See* 23 C.F.R. § 490.801 *et seq.*

The district court's superfluity analysis also overlooks the fundamental difference between a statutory mandate and statutory authorization. For CMAQ, Congress left FHWA without any discretion: the agency "shall establish" measures related to emissions of criteria pollutants. 23 U.S.C. § 150(c)(5). For the NHPP, by contrast, Congress provided for establishment of "performance" measures in Subclauses (IV)-(V), but did not specify whether emissions measures must or must not be included. A grant of discretionary

authority in one statutory provision does not render a specific mandate in another statutory provision to be "superfluous."  ROA.4756.[9]

More generally, there is nothing unusual about related federal programs employing similar types of performance measures.  That both CMAQ and the NHPP (in the former case at Congress's express direction, in the latter under discretionary authority) may ultimately include measures relating to different forms of tailpipe emissions is not a problem, just as it is not a problem that multiple federal-aid highway programs include performance measures involving aspects of travel-time reliability and travel delays.  *See* 23 U.S.C. § 150(c)(3)(A)(ii)(IV)-(V), (5)(A), (6); *cf.* 23 C.F.R. §§ 490.507, 490.601-490.613, 490.701-490.713 (adopting distinct travel reliability/delay measures under the NHPP, CMAQ, and NHFP).

**3.**  The district court's reasons for failing to afford significance to the statutory goal of "environmental sustainability," 23 U.S.C. § 150(b)(6), are similarly unpersuasive.  As the court conceded, for many of the national goals set forth in section 150(b), there are obvious "corresponding measure[s]" in

---

[9] A similar error is reflected in plaintiffs' reliance on subsequent legislative history, on which the district court correctly declined to rely.  *See* ROA.4756 n.15.  Congress's failure to enact a subsequent statutory amendment that would have specifically *required* the GHG measure, *see* ROA.4731 n.4 (describing this proposed amendment), says nothing about whether existing law *allowed* such a measure.

section 150(c). ROA.4759; *cf. supra* p. 31. Those parallels reflect Congress's overarching expectation that the performance measures established under section 150(c) will serve the goals set forth in section 150(b). The general grant of authority provided by Subclauses (IV)-(V), in turn, is best understood as empowering FHWA to further advance those national goals, including by establishing performance measures that relate to goals for which Congress has not already mandated specific corresponding measures. That reading gives Subclauses (IV)-(V) a clear purpose and results in a coherent and consistent scheme. By contrast, the inference that the district court would seek to draw—that Congress's failure to mandate a specific "corresponding measure" for the environmental-sustainability goal in section 150(c)(3) meant that Congress forbade FHWA from tracking progress toward that goal, ROA.4759—is implausible and leaves little work for Subclauses (IV)-(V) to do.

The district court's other asserted justifications for excluding environmental sustainability from the concept of performance are similarly unpersuasive. The court wrongly inferred that, given the juxtaposition of the general phrase "enhance the performance of the transportation system" with the specific phrase "protecting and enhancing the natural environment" within the text of 23 U.S.C. § 150(b)(6), environmental protection must categorically fall outside the concept of "performance." ROA.4761-62. By that dubious

logic, FHWA would then lack authority to develop any "performance" measures related to section 150(b)(6) alone among the seven national goals in the same subsection. That makes little sense. The most reasonable reading is not that Congress understood there to be some conceptual opposition between "performance" and protecting the environment, but rather, that Congress was affirming its intention that all of the multifarious aspects of performance (*e.g.*, safety, freight movement, pavement condition, etc.) should not be pursued in a manner that would be unduly detrimental to environmental goals.

The district court suggested that denying any role for the environmental-sustainability goal, alone among NHPP performance measures, may be justified on the basis that that goal is "more obviously and naturally accounted for" in "other portions of Title 23." ROA.4760-61. That is a non sequitur. The question is not whether Congress elsewhere authorized the requisite operational mechanisms necessary for achieving its seven national goals (though, of course, it did). Rather, the question is whether Congress intended for progress toward its national goals to be measured and tracked. The answer is yes: indeed, the very point of the "[p]erformance management" tools established under sections 150(c)-(e) is to assist in "focus[ing] the Federal-aid highway program" on the national goals set forth in section 150(b). 23 U.S.C. § 150(a)-(b). The district court offered nothing to support its assumption that

46

Congress believed the environmental-sustainability goal to be so unimportant that FHWA not only may ignore it, but *must* ignore it, when measuring performance of the NHPP.

The same erroneous conflation of the performance-management framework with operational provisions is also reflected elsewhere in the district court's analysis. The court emphasized that section 119(d)(1) does not identify "environmental sustainability" as an operational purpose for the NHPP and that section 119(d)(2) does not identify emissions reduction as a freestanding basis for seeking federal highway funding. ROA.4761-66. But the point of the performance-management framework is to encourage consideration of the national goals in the context of other decisionmaking. Emissions reduction does not itself have to be an "eligible facility" listed in section 119(d)(2) in order for a State to consider environmental sustainability when carrying out the NHPP.[10]

---

[10] For example, States may consider marginal effects on GHG emissions when choosing among alternative designs of projects involving the "[c]onstruction, reconstruction, resurfacing, restoration, rehabilitation, preservation, or operational improvement of segments of the National Highway System." 23 U.S.C. § 119(d)(2)(A). A State's concern for GHG emissions might also lead it to prioritize certain types of eligible projects over others, such as allocating more funding to "[b]icycle transportation and pedestrian walkways" and "[c]onstruction of publicly owned intracity or intercity bus terminals." *Id.* § 119(d)(2)(H), (P).

The district court also offered no reason for overlooking Congress's instruction that States use their transportation planning processes to pursue a "performance-based approach to transportation decisionmaking to support the national goals described in section 150(b) of this title."  23 U.S.C. § 135(d)(2)(A); *see id.* § 134(h)(2)(A).  These statewide planning processes must "provide for consideration and implementation of projects [and] strategies" that will, *inter alia*, "protect and enhance the environment," "promote energy conservation," and "improve the resiliency and reliability of the transportation system."  *Id.* § 135(d)(1)(E), (I); *see id.* § 134(h)(1)(E), (I).  Again, those goals can and should readily be pursued when considering eligible projects under section 119(d), even without "energy conservation" itself being a freestanding justification for obtaining highway project funding.

As the district court also overlooked, one of the four declared purposes of the NHPP is to "provide support for activities to increase the resiliency of the National Highway System" against the threats of "sea level rise, extreme weather events, flooding, wildfires, or other natural disasters."  23 U.S.C. § 119(b)(4).  As FHWA explained, the Rule is intended to support that purpose.  88 Fed. Reg. at 85,376.  The court dismissed this logical connection between the Rule and section 119(b)(4), asserting that "it is unclear how measuring GHG emissions could make the system itself more resilient to

48

natural disasters when they occur." ROA.4763. But as FHWA itself explained, reducing GHG emissions will improve the resiliency of the transportation system against the worst effects of climate change, and "[t]he first step toward reducing GHG emissions involves inventorying and monitoring those emissions." 88 Fed. Reg. at 85,365.

## II. THE DISTRICT COURT ABUSED ITS DISCRETION IN ORDERING UNIVERSAL VACATUR

Even if the Rule were found to exceed FHWA's statutory authority, the proper remedy would be plaintiff-specific equitable relief (in the form of an injunction, declaratory judgment, or both) rather than universal vacatur. The district court erred in imposing a remedy that plaintiffs did not specifically request, that defendants opposed, that the law does not require, and that is unnecessary to redress any conceivable harm to plaintiffs.

### A.    The Proper Remedy Is Plaintiff-Specific Equitable Relief.

**1.** As the district court recognized, "the ordinary principle [is] that relief is limited to what is necessary to redress the plaintiff's demonstrated harm." ROA.4773 n.18 (citing *Gill v. Whitford*, 585 U.S. 48, 73 (2018)). That follows from both equitable and constitutional principles. As a matter of equity practice, relief "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (quotation marks omitted). And as

49

an Article III matter, because "standing is not dispensed in gross," "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill*, 585 U.S. at 73 (quotation marks omitted).

Nothing in the text of section 706 of the APA expressly authorizes any departure from those principles. Congress enacted the APA against the background rule that statutory remedies are construed in accordance with "traditions of equity practice." *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944). That is, "[w]hen Congress empowers courts to grant equitable relief, there is a strong presumption that courts will exercise that authority in a manner consistent with traditional principles of equity." *Starbucks Corp. v. McKinney*, 144 S. Ct. 1570, 1576 (2024); *see also, e.g.*, *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982) (a court "do[es] not lightly assume that Congress has intended to depart from established principles" regarding equitable discretion). Indeed, at least three Supreme Court Justices have recently indicated their understanding that the APA does not require, or perhaps even permit, universal vacatur of agency actions. *See United States v. Texas*, 599 U.S. 670, 695 (2023) (Gorsuch, J., joined by Thomas and Barrett, JJ., concurring in the judgment). *But cf. Corner Post, Inc. v. Board of Governors of the Fed. Reserve Sys.*, 144 S. Ct. 2440, 2462-64 (2024) (Kavanaugh, J., concurring) (advocating opposite view).

50

This Court has stated that "vacatur under [5 U.S.C.] § 706 is … the 'default' remedy for unlawful agency action," *Braidwood Mgmt., Inc. v. Becerra*, 104 F.4th 930, 952 (5th Cir. 2024), and has indicated that such relief is generally "not party-restricted" but rather operates to nullify the agency action itself, *Career Colls. & Sch. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024).  At the same time, however, this Court has made clear that vacatur is *not* a mandatory remedy.  For example, where there is "a serious possibility that the agency will be able to substantiate its decision" on remand, the Court may remand the defective action to the agency, without vacatur, to permit additional consideration and explanation.  *Texas Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389 (5th Cir. 2021); *see also, e.g.*, *Central & S.W. Servs., Inc. v. U.S. EPA*, 220 F.3d 683, 692 (5th Cir. 2000).

Additionally, and as relevant here, a court may choose to afford other remedies instead, such as a declaratory judgment or permanent injunction. *See, e.g.*, *Johnson v. U.S. Office of Pers. Mgmt.*, 783 F.3d 655, 663 (7th Cir. 2015) ("Although vacatur is the presumptive remedy for a violation of the Administrative Procedure Act, courts have discretion to craft other remedies."); *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 199 (D.C. Cir. 2009) (similar).  Such other equitable remedies "can be narrowly tailored to the parties," as the district court recognized.  ROA.4770; *accord Kentucky v. FHWA*,

No. 5:23-cv-162-BJB, 2024 WL 1402443, at *16 (W.D. Ky. Apr. 1, 2024)

(agreeing that courts "may exercise their remedial discretion to fashion

equitable remedies to particular parties and applications," and ultimately

declining to order vacatur).  Indeed, this Court has recognized that such

alternative remedies may sometimes represent the best, or even only, form of

relief available.  *See Braidwood Mgmt.*, 104 F.4th at 955 (finding entry of

"universal" relief to be an "abuse of discretion"); *Cargill v. Garland*, 57 F.4th

447, 472 (5th Cir. 2023) (en banc) (plurality opinion) (allowing consideration

of "a more limited remedy" than universal vacatur and remanding with

instructions for district court to "determine what remedy—injunctive,

declarative, or otherwise—is appropriate to effectuate" its ruling of invalidity),

*aff'd*, 602 U.S. 406 (2024).

Tailored equitable remedies not only have the benefit of remaining fully

consistent with equitable and Article III principles, but also avoid numerous

practical problems.  Universal relief "take[s] a toll on the federal court

system—preventing legal questions from percolating through the federal

courts, encouraging forum shopping, and making every case a national

emergency for the courts and for the Executive Branch."  *Trump v. Hawaii*,

585 U.S. 667, 713 (2008) (Thomas, J., concurring).

**2.** For several reasons, such plaintiff-specific equitable relief—be it injunctive, declaratory, or both—is the only appropriate remedy here.

First, in this case, it is unusually clear that complete relief for plaintiffs' claimed injuries can be provided in a plaintiff-specific manner. "[T]he Final Rule operates on a state-by-state basis, with no one state's compliance or coercion affecting that of any other state." *Kentucky*, 2024 WL 1402443, at *2. An order of universal vacatur provides no benefit to Texas beyond what a plaintiff-specific declaration or injunction would do. Indeed, for that reason, the Kentucky district court expressly declined to order vacatur (despite it there having been requested by the plaintiffs) and instead ultimately afforded only a plaintiff-specific declaratory judgment. *See id.* at *15-20.

Second, plaintiffs here did not request universal relief. Rather, as the district court acknowledged, plaintiffs "defer[red] to the Court as to whether the remedy should be party-specific." ROA.4768; *see* ROA.4708 (Texas's response-and-reply brief) (urging that the court had "broad discretion to appropriately determine the necessary relief … whether state specific or nationwide"). Meanwhile, defendants vigorously opposed universal relief, arguing at length that "any relief should be limited to the State of Texas." ROA.4673 (capitalization omitted); *see* ROA.4673-75.

Third, fashioning plaintiff-specific relief would avoid the obvious risk of bringing this Court into conflict with its sister circuits. This is not the only suit challenging the Rule. The government has separately appealed the Kentucky court's decision, and if it succeeds, the Sixth Circuit will have held the Rule to be a lawful exercise of FHWA's authority. If the district court's vacatur decision here is allowed to stand, the agency may effectively be robbed of that victory, contrary to the fundamental principle that one adverse decision should not estop the government against all other challengers. *Cf. United States v. Mendoza*, 464 U.S. 154 (1984). This Court has previously worked to "avoid rulings which may trench upon the authority of sister courts," and it should do so again here. *Western Gulf Mar. Ass'n v. ILA Deep Sea Local 24*, 751 F.2d 721, 729 (5th Cir. 1985).

## B. The District Court Wrongly Thought Its Hands Were Tied.

The district court did not dispute that all of the foregoing considerations weighed in favor of plaintiff-specific relief. Indeed, the court acknowledged that universal vacatur "runs contrary to the ordinary principle that relief is limited to what is necessary to redress the plaintiff's demonstrated harm" and has recently been the subject of substantial criticism. ROA.4773 n.18. Nonetheless, the court concluded, reluctantly, that it was duty-bound to order universal relief because Texas had requested "vacatur" and did not supplement

that request with any "viable or appropriate alternative."  ROA.4772-73 &

n.18; *see* ROA.4771 ("The present predicament is that there is no other clear,

more limited remedy requested by the plaintiffs that the Court could grant here

that would redress the plaintiffs' injury.").

That conclusion reflects an erroneous understanding of the law.

A plaintiff's request for a particular type of remedy does not circumscribe the

court's discretion.  The Federal Rules of Civil Procedure specifically provide

that courts "should grant the relief to which each party is entitled, even if the

party has not demanded that relief in its pleadings."  Fed. R. Civ. P. 54(c).

A court thus may enter declaratory and/or injunctive relief in an APA suit

even if the plaintiff expressly sought only vacatur.

The district court professed to agree that a plaintiff's demand for one

particular remedy should not preclude the court from entering an otherwise

proper form of relief.  *See* ROA.4771 ("Of course, the Court has discretion in

fashioning relief, even if not requested by a party[.]").  But it nonetheless

effectively endorsed such a limitation in practice, theorizing that the entry of

injunctive relief absent the plaintiffs' specific request would not be "properly

noticed" to defendants and therefore would cause them procedural prejudice.

ROA.4772.  As justification for that specific conclusion, the court pointed to

the general principle that judicially ordered relief generally should be "tested

adversarially, tried by consent, or at least developed with meaningful notice to the defendants." ROA.4771 (quoting *Peterson v. Bell Helicopter Textron, Inc.*, 806 F.3d 335, 340 (5th Cir. 2015)) (brackets omitted).[11]

That general principle did not tie the district court's hands here. The federal government was hardly unaware that the district court could enter declaratory or injunctive relief on plaintiffs' APA claim. On the contrary, defendants invited such relief, arguing at length that any remedy should be limited to the State of Texas, *see* ROA.4673-75. "Where this court has found relief improper under Rule 54(c), the relief has generally been of a substantially different character" that the defendant could not have reasonably expected, such as an injunction instead of damages. *Portillo v. Cunningham*, 872 F.3d 728, 735 (5th Cir. 2017). Here, by contrast, a plaintiff-specific injunction would not have constituted "substantially different relief," *id.*, and would not have come as any surprise. *Cf. Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 379 (5th Cir. 2022) ("No surprise means no prejudice."). And such a plaintiff-specific injunction would, as the Kentucky court suggested, clearly represent

---

[11] This case bears no resemblance to *Peterson*, where the court entered a post-trial injunction despite the fact that, during the "entirety of the litigation," the defendant reasonably "believed it was only defending against a suit for [the plaintiff's] personal money damages." 806 F.3d at 340-41. This Court's disapproval of that post-trial injunction turned on "reasons unique to th[at] case," *id.* at 339, not on any general principle that injunctions are categorically unavailable unless a plaintiff specifically demands one.

the "less drastic" remedy in these circumstances. *Kentucky*, 2024 WL 1402443, at *16 (quotation marks omitted).

For these reasons, assuming the Court finds the Rule to be invalid, the proper recourse would be to reverse and remand for entry of declaratory and/or injunctive relief tailored to the plaintiffs. This Court should clarify that universal vacatur is not a permissible remedy when it is neither demanded by plaintiffs nor is necessary to provide full relief. *Cf. Braidwood Mgmt.*, 104 F.4th at 955 ("conclud[ing] that it was an abuse of discretion to enter universal injunctive relief after already providing complete relief to the plaintiffs").

At a minimum, even if universal vacatur is a permissible remedy, this Court should nonetheless vacate the district court's judgment and remand to the district court. "A district court abuses its discretion" where, as here, "its ruling is 'based on an erroneous view of the law.'" *PHH Mortg. Corp. v. Old Republic Nat'l Title Ins. Co.*, 80 F.4th 555, 559 (5th Cir. 2023). As discussed, the district court erroneously believed it had no choice but to impose universal vacatur and all but stated that it would not have ordered such relief if it were aware of a "viable or appropriate alternative." ROA.4773 n.18. Once this Court corrects that mistaken assumption, it should afford the district court an opportunity to select among the range of legally permissible remedies.

# CONCLUSION

For the foregoing reasons, the judgment should be reversed.

Respectfully submitted,

SUBASH IYER
*Acting General Counsel*

PAUL M. GEIER
*Assistant General Counsel for*
*Litigation and Enforcement*

EMILY KVESELIS
*Trial Attorney*
*U.S. Department of Transportation*

J. AYANNA BUTLER
*Chief Counsel*

CHRISTOPHER RICHARDSON
*Assistant Chief Counsel, Legislation,*
*Regulations & General Law Division*

LEV GABRILOVICH
*Senior Attorney Advisor,*
*Program Legal Services Division*
*Federal Highway Administration*

September 2024

BRIAN M. BOYNTON
*Principal Deputy Assistant*
*Attorney General*

MICHAEL S. RAAB

/s/ *Jeffrey E. Sandberg*

JEFFREY E. SANDBERG
*Attorneys, Appellate Staff*
*Civil Division, Room 7214*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 532-4453*
*jeffrey.e.sandberg@usdoj.gov*

## CERTIFICATE OF SERVICE

I hereby certify that on September 4, 2024, I electronically filed the foregoing brief with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*/s/ Jeffrey E. Sandberg*
Jeffrey E. Sandberg

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of

Appellate Procedure 32(a)(7)(B) because it contains 12,306 words.  This brief

also complies with the typeface and type-style requirements of Federal Rule of

Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for

Microsoft 365 in Calisto MT 14-point font, a proportionally spaced typeface.

*/s/ Jeffrey E. Sandberg*
Jeffrey E. Sandberg