**No. 24-10470**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

STATE OF TEXAS; TEXAS DEPARTMENT OF TRANSPORTATION,

*Plaintiffs-Appellees,*

v.

U.S. DEPARTMENT OF TRANSPORTATION; FEDERAL HIGHWAY ADMINISTRATION; SHAILEN BHATT, in his official capacity, as Administrator of the Federal Highway Administration; PETE BUTTIGIEG, in his official capacity, as Secretary of Transportation,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Northern District of Texas

## RECORD EXCERPTS

SUBASH IYER
  *Acting General Counsel*
PAUL M. GEIER
  *Assistant General Counsel for
  Litigation and Enforcement*
EMILY KVESELIS
  *Trial Attorney
  U.S. Department of Transportation*

J. AYANNA BUTLER
  *Chief Counsel*
CHRISTOPHER RICHARDSON
  *Assistant Chief Counsel, Legislation,
  Regulations & General Law Division*
LEV GABRILOVICH
  *Senior Attorney Advisor,
  Program Legal Services Division
  Federal Highway Administration*

BRIAN M. BOYNTON
  *Principal Deputy Assistant
  Attorney General*

MICHAEL S. RAAB
JEFFREY E. SANDBERG
  *Attorneys, Appellate Staff
  Civil Division, Room 7214
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  (202) 532-4453*

# TABLE OF CONTENTS

District Court Docket Sheet (ROA.1-7)..................................................... Tab 1

Defendants' Notice of Appeal
    (May 23, 2024) (ROA.4778-79) ........................................................ Tab 2

Final Judgment
    (Mar. 27, 2024) (ROA.4776-77) ....................................................... Tab 3

Memorandum Opinion and Order
    (Mar. 27, 2024) (ROA.4727-75) ....................................................... Tab 4

Final Rule
  (Dec. 7, 2023) (ROA.285-315) (88 Fed. Reg. 85,364)............................ Tab 5

CERTIFICATE OF SERVICE

**TAB 1**

# U.S. District Court
# Northern District of Texas (Lubbock)
# CIVIL DOCKET FOR CASE #: 5:23-cv-00304-H

State of Texas et al v. U.S. Department of Transportation et al

Assigned to: Judge James Wesley Hendrix

Case in other court:  USCA Fifth Circuit, 24-10470

Cause: 05:702 Administrative Procedure Act

Date Filed: 12/19/2023

Date Terminated: 03/27/2024

Jury Demand: None

Nature of Suit: 899 Other Statutes: Administrative Procedure Act/Review or Appeal of Agency Decision

Jurisdiction: U.S. Government Defendant

**Plaintiff**

**State of Texas**                            represented by  **Wesley Scott Williams**
Office of the Attorney General of Texas
Environmental Protection Division
PO Box 12548
Mc-066
Austin, TX 78711-2548
512-463-2012
Fax: 512-320-0911
Email: wesley.williams@oag.texas.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Logan Harrell**
PO Box 12548
Capitol Station MC066
Austin, TX 78711
817-875-4520
Email: logan.harrell@oag.texas.gov
*TERMINATED: 03/18/2024*
*Bar Status: Not Admitted*

**Plaintiff**

**Texas Department of Transportation**        represented by  **Wesley Scott Williams**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Logan Harrell**
(See above for address)
*TERMINATED: 03/18/2024*
*Bar Status: Not Admitted*

V.

**Defendant**

**U.S. Department of Transportation**          represented by  **Michael Patrick Clendenen**
US Department of Justice
1100 L Street NW
Washington, DC 20005
202-305-0693
Fax: 202-616-8470
Email: michael.p.clendenen@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Defendant**

**Federal Highway Administration**          represented by  **Michael Patrick Clendenen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Defendant**

**Shailen Bhatt**          represented by  **Michael Patrick Clendenen**
*in his official capacity, as Administrator of*          (See above for address)
*the Federal Highway Administration*          *LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Defendant**

**Pete Buttigieg**          represented by  **Michael Patrick Clendenen**
*in his official capacity, as Secretary of*          (See above for address)
*Transportation*          *LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**American Road and Transportation**          represented by  **Matthew G. Sheridan**
**Builders Association**          Baker Botts LLP
*Party and attorney are active (attorney has*          One Shell Plaza
*been terminated to restrict access to sealed*          910 Louisiana Street
*filings.)*          Houston, TX 77002-4995
713-229-1234
Fax: 713-229-2850
Email: matthew.sheridan@bakerbotts.com
*TERMINATED: 02/16/2024*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Megan H Berge**
Baker Botts LLP
700 K Street NW

Washington, DC 20001
202-639-1308
Email: megan.berge@bakerbotts.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

**Associated General Contractors of America, Inc.**
*Party and attorney are active (attorney has been terminated to restrict access to sealed filings.)*

represented by **Matthew G. Sheridan**
(See above for address)
*TERMINATED: 02/16/2024*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Megan H Berge**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/19/2023 | 1 (p.8) | COMPLAINT against All Defendants filed by State of Texas, Texas Department of Transportation. (Filing fee $405; Receipt number ATXNDC-14258086) Clerk to issue summons(es). In each Notice of Electronic Filing, the judge assignment is indicated, and a link to the Judges Copy Requirements and Judge Specific Requirements is provided. The court reminds the filer that any required copy of this and future documents must be delivered to the judge, in the manner prescribed, within three business days of filing. Unless exempted, attorneys who are not admitted to practice in the Northern District of Texas must seek admission promptly. Forms, instructions, and exemption information may be found at www.txnd.uscourts.gov, or by clicking here: Attorney Information - Bar Membership. If admission requirements are not satisfied within 21 days, the clerk will notify the presiding judge. (Attachments: # 1 (p.8) Exhibit(s) 1, # 2 (p.142) Exhibit(s) 2, # 3 (p.144) Exhibit(s) 3, # 4 (p.168) Exhibit(s) 4, # 5 (p.170) Exhibit(s) 5, # 6 (p.172) Exhibit(s) 6, # 7 (p.174) Cover Sheet) (Harrell, Logan) (Entered: 12/19/2023) |
| 12/20/2023 | 2 (p.142) | New Case Notes: A filing fee has been paid. Pursuant to Misc. Order 6, Plaintiff is provided the Notice of Right to Consent to Proceed Before A U.S. Magistrate Judge. Clerk to provide copy to plaintiff if not received electronically. (bdg) (Entered: 12/20/2023) |
| 12/20/2023 | 3 (p.144) | Summons issued as to All Defendants, U.S. Attorney, and U.S. Attorney General. (bdg) (Entered: 12/20/2023) |
| 12/20/2023 | 4 (p.168) | CERTIFICATE OF INTERESTED PERSONS/DISCLOSURE STATEMENT by State of Texas, Texas Department of Transportation. (Clerk QC note: No affiliate entered in ECF). (Harrell, Logan) (Entered: 12/20/2023) |
| 01/08/2024 | 5 (p.170) | ORDER: Roughly three weeks have passed since the complaint was filed, and there have been no filings or updates. Accordingly, by no later than January 16, 2024, the |

| | | Plaintiffs are ordered to provide a report addressing the status of this case. (Ordered by Judge James Wesley Hendrix on 1/8/2024) (krr) (Entered: 01/08/2024) |
|---|---|---|
| 01/16/2024 | 6 (p.172) | NOTICE of Attorney Appearance by Michael Patrick Clendenen on behalf of Shailen Bhatt, Pete Buttigieg, Federal Highway Administration, U.S. Department of Transportation. (Filer confirms contact info in ECF is current.) (Clendenen, Michael) (Entered: 01/16/2024) |
| 01/16/2024 | 7 (p.174) | STATUS REPORT filed by State of Texas, Texas Department of Transportation. (Harrell, Logan) (Entered: 01/16/2024) |
| 01/17/2024 | 8 (p.178) | ORDER: Should the plaintiffs request emergency relief from the Court, the Court orders the plaintiffs to confer with the defendants and to prepare a status report for the Court that provides: (1) a proposed briefing schedule regarding the plaintiffs' motion; (2) the parties' position on whether the Court may resolve the motion on the papers alone; (3) a proposed hearing date, if a hearing is desired or necessary; (4) an explanation of whether any hearing would be evidentiary in nature; (5) if so, a general description of what evidence the parties plan to submit; (6) whether, and to what extent, expedited discovery is necessary; and (7) whether the Court should advance to trial on the merits and consolidate trial with the preliminary injunction hearing. The plaintiffs shall file the status report no later than Friday, January 19, at 12:00 p.m. (Ordered by Judge James Wesley Hendrix on 1/17/2024) (bmh) (Entered: 01/17/2024) |
| 01/17/2024 | 9 (p.180) | MOTION for Injunction *Enjoining the Effectiveness, Implementation, and Enforcement of the 2023 Greenhouse Gas Rule* filed by State of Texas, Texas Department of Transportation with Brief/Memorandum in Support. (Attachments: # 1 (p.8) Proposed Order Proposed Order) (Harrell, Logan) (Entered: 01/17/2024) |
| 01/17/2024 | 10 (p.216) | Appendix in Support filed by State of Texas, Texas Department of Transportation re 9 (p.180) MOTION for Injunction *Enjoining the Effectiveness, Implementation, and Enforcement of the 2023 Greenhouse Gas Rule* (Harrell, Logan) (Entered: 01/17/2024) |
| 01/19/2024 | 11 (p.263) | Second STATUS REPORT filed by State of Texas, Texas Department of Transportation. (Harrell, Logan) (Entered: 01/19/2024) |
| 01/19/2024 | 12 (p.267) | ***VACATED PER ORDER - DOC. NO. 14*** ORDER: Given that this case involves questions under the Administrative Procedure Act and a challenge to a final rule, the defendants are hereby ordered to file the administrative record for the final rule in question by no later than January 31, 2024. If there is no administrative record, the defendants must file a notice with the Court affirming that no administrative record exists by that same date. The Court recognizes that the parties have deferred to the Court about the necessity of a hearing. See Dkt. No. 11 at 2. If necessary, the Court will set a hearing at a later date. (Ordered by Judge James Wesley Hendrix on 1/19/2024) (bdg) Modified on 1/26/2024 (bdg). (Entered: 01/19/2024) |
| 01/26/2024 | 13 (p.269) | STATUS REPORT *TEXAS'S ADVISORY TO THE COURT* filed by State of Texas. (Harrell, Logan) (Entered: 01/26/2024) |
| 01/26/2024 | 14 (p.273) | ORDER: The Court vacates the deadlines set by its prior scheduling order (Dkt. No. 12). The defendants are ordered to file the administrative record, or a notice affirming the record's non-existence, by no later than January 31, 2024. The plaintiffs are ordered to file their motion for summary judgment by no later than February 9, 2024. The defendants are ordered to file their combined response to the |

| | | plaintiffs' motion, and to file their own cross-motion for summary judgment, by no later than February 20, 2024. The plaintiffs are ordered to file their combined response to the defendants' motion for summary judgment, and their reply in support of their own motion, by no later than February 27, 2024. Finally, the defendants are ordered to file their reply in support of their own motion no later than March 5, 2024. The Court recognizes that the parties have deferred to the Court about the necessity of a hearing. See Dkt. No. 13 at 2. If necessary, the Court will set a hearing at a later date. (Ordered by Judge James Wesley Hendrix on 1/26/2024) (bdg) (Entered: 01/26/2024) |
|---|---|---|
| 01/31/2024 | 15 (p.275) | Administrative Record consisting of Administrative Record filed by Shailen Bhatt, Pete Buttigieg, Federal Highway Administration, U.S. Department of Transportation. (Attachments: # 1 (p.8) Cover Sheet Administrative Record Index, # 2 (p.142) Additional Page(s), # 3 (p.144) Additional Page(s), # 4 (p.168) Additional Page(s), # 5 (p.170) Additional Page(s), # 6 (p.172) Additional Page(s), # 7 (p.174) Additional Page(s), # 8 (p.178) Additional Page(s), # 9 (p.180) Additional Page(s), # 10 (p.216) Additional Page(s), # 11 (p.263) Additional Page(s), # 12 (p.267) Additional Page(s), # 13 (p.269) Additional Page(s), # 14 (p.273) Additional Page(s), # 15 (p.275) Additional Page(s), # 16 (p.4574) Additional Page(s), # 17 (p.4577) Additional Page(s), # 18 (p.4578) Additional Page(s), # 19 (p.4582) Additional Page(s), # 20 (p.4612) Additional Page(s), # 21 (p.4615) Additional Page(s)) (Clendenen, Michael) (Entered: 01/31/2024) |
| 02/06/2024 | 16 (p.4574) | MOTION to Withdraw 9 (p.180) MOTION for Injunction *Enjoining the Effectiveness, Implementation, and Enforcement of the 2023 Greenhouse Gas Rule* filed by State of Texas, Texas Department of Transportation (Harrell, Logan) (Entered: 02/06/2024) |
| 02/08/2024 | 17 (p.4577) | ORDER: Before the Court is Texass Notice of Withdrawal of Motion for Preliminary Injunction. Dkt. No. 16. The Court has construed this notice as a motion to withdraw the request for a preliminary injunction. In light of the parties' representations to the Court (see Dkt. No. 13), the Court grants the motion. The Court instructs the Clerk of Court to terminate the plaintiffs' request for a preliminary injunction (Dkt. No. 9) as withdrawn. (Ordered by Judge James Wesley Hendrix on 2/8/2024) (bdg) (Entered: 02/08/2024) |
| 02/09/2024 | 18 (p.4578) | MOTION for Summary Judgment *with separate supporting brief* filed by State of Texas, Texas Department of Transportation (Harrell, Logan) (Entered: 02/09/2024) |
| 02/09/2024 | 19 (p.4582) | Brief/Memorandum in Support filed by State of Texas, Texas Department of Transportation re 18 (p.4578) MOTION for Summary Judgment *with separate supporting brief* (Harrell, Logan) (Entered: 02/09/2024) |
| 02/15/2024 | 20 (p.4612) | Unopposed MOTION to Stay *Deadline to Respond to Complaint* filed by Shailen Bhatt, Pete Buttigieg, Federal Highway Administration, U.S. Department of Transportation (Attachments: # 1 (p.8) Proposed Order) (Clendenen, Michael) (Entered: 02/15/2024) |
| 02/15/2024 | 21 (p.4615) | ORDER granting 20 (p.4612) Motion to Stay Deadline to Respond to Complaint. The Court hereby stays the defendants' deadline to file their answer or otherwise respond to the plaintiffs' complaint (Dkt. No. 1). (Ordered by Judge James Wesley Hendrix on 2/15/2024) (bdg) (Entered: 02/15/2024) |
| 02/16/2024 | 22 (p.4616) | Unopposed MOTION for Leave to File Brief of Amici Curiae in Support of the Plaintiffs' 18 (p.4578) Motion for Summary Judgment filed by American Road and |

| | | Transportation Builders Association, Associated General Contractors of America, Inc. (Attachments: # 1 (p.8) Exhibit(s) A - Brief of Amici Curiae, # 2 (p.142) Exhibit(s) B- Proposed Order Granting Motion for Leave to File Brief of Amici Curiae). Party American Road and Transportation Builders Association and Associated General Contractors of America, Inc. added with Attorney Matthew G. Sheridan. (Sheridan, Matthew) Docket text modified on 2/16/2024 (twd). (Entered: 02/16/2024) |
|---|---|---|
| 02/16/2024 | 23 (p.4638) | Application for Admission Pro Hac Vice with Certificate of Good Standing (Filing fee $100; Receipt number ATXNDC-14399483) filed by American Road and Transportation Builders Association, Associated General Contractors of America, Inc. (Attachments: # 1 (p.8) Proposed Order)Attorney Megan H Berge added to party American Road and Transportation Builders Association(pty:mov), Attorney Megan H Berge added to party Associated General Contractors of America, Inc.(pty:mov) (Berge, Megan) (Entered: 02/16/2024) |
| 02/20/2024 | 24 (p.4644) | Cross MOTION for Summary Judgment filed by Shailen Bhatt, Pete Buttigieg, Federal Highway Administration, U.S. Department of Transportation (Attachments: # 1 (p.8) Proposed Order) (Clendenen, Michael) (Entered: 02/20/2024) |
| 02/20/2024 | 25 (p.4647) | Brief/Memorandum in Support filed by Shailen Bhatt, Pete Buttigieg, Federal Highway Administration, U.S. Department of Transportation re 24 (p.4644) Cross MOTION for Summary Judgment , 18 (p.4578) MOTION for Summary Judgment *with separate supporting brief* (Clendenen, Michael) (Entered: 02/20/2024) |
| 02/22/2024 | 26 (p.4677) | ORDER granting 23 (p.4638) Application for Admission Pro Hac Vice of Megan H Berge. Important Reminder: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Judge James Wesley Hendrix on 2/22/2024) (bdg) (Entered: 02/22/2024) |
| 02/22/2024 | 27 (p.4678) | ORDER granting 22 (p.4616) Motion for Leave to File Brief of Amici Curiae in Support of the Plaintiffs' Motion for Summary Judgment. (Unless the document has already been filed, clerk to enter the document as of the date of this order.) The Clerk of Court is directed to file the amicus brief (Dkt. No. 22-1) in the official record of this case. (Ordered by Judge James Wesley Hendrix on 2/22/2024) (bdg) (Entered: 02/22/2024) |
| 02/22/2024 | 28 (p.4679) | Brief in Support filed by American Road and Transportation Builders Association, Associated General Contractors of America, Inc. re 18 (p.4578) MOTION for Summary Judgment (bdg) (Entered: 02/22/2024) |
| 02/27/2024 | 29 (p.4692) | RESPONSE filed by State of Texas, Texas Department of Transportation re: 24 (p.4644) Cross MOTION for Summary Judgment (Harrell, Logan) (Entered: 02/27/2024) |
| 02/27/2024 | 30 (p.4695) | Brief/Memorandum in Support filed by State of Texas, Texas Department of Transportation re 29 (p.4692) Response/Objection *and Reply in Support of its MSJ* (Harrell, Logan) (Entered: 02/27/2024) |
| 03/05/2024 | 31 (p.4710) | REPLY filed by Shailen Bhatt, Pete Buttigieg, Federal Highway Administration, U.S. Department of Transportation re: 24 (p.4644) Cross MOTION for Summary Judgment (Clendenen, Michael) (Entered: 03/05/2024) |
| 03/13/2024 | 32 (p.4722) | MOTION to Substitute Attorney, added attorney Logan Harrell,Wesley Scott Williams for Texas Department of Transportation,Wesley Scott Williams for State |

| | | of Texas. Motion filed by Texas Department of Transportation, State of Texas (Harrell, Logan) (Entered: 03/13/2024) |
|---|---|---|
| 03/18/2024 | 33 (p.4726) | ORDER granting 32 (p.4722) Motion to Substitute Attorney. Wesley S. Williams is substituted as counsel for the plaintiffs. Logan Harrell is relieved of his obligations and duties to this Court as counsel for the plaintiffs in this case. (Ordered by Judge James Wesley Hendrix on 3/18/2024) (bmh) (Entered: 03/18/2024) |
| 03/27/2024 | 34 (p.4727) | Memorandum Opinion and Order: For the reasons stated in the attached memorandum opinion and order, the Court grants the plaintiffs' Motion for Summary Judgment 18 (p.4578) and denies the defendants' Cross-Motion for Summary Judgment 24 (p.4644) . The Court concludes that the challenged rule was promulgated in excess of the Department of Transportations statutory authority. Therefore, in accordance with the Administrative Procedure Act and Fifth Circuit precedent, the Court sets aside and vacates the final rule. The Court will enter a final judgment, including a seven-day administrative stay, by separate order. (Ordered by Judge James Wesley Hendrix on 3/27/2024) (chmb) (Entered: 03/27/2024) |
| 03/27/2024 | 35 (p.4776) | FINAL JUDGMENT (Ordered by Judge James Wesley Hendrix on 3/27/2024) (chmb) (Entered: 03/27/2024) |
| 05/23/2024 | 36 (p.4778) | NOTICE OF APPEAL to the Fifth Circuit by Shailen Bhatt, Pete Buttigieg, Federal Highway Administration, U.S. Department of Transportation. T.O. form to appellant electronically at Transcript Order Form or US Mail as appropriate. Copy of NOA to be sent US Mail to parties not electronically noticed. IMPORTANT ACTION REQUIRED: Provide an electronic copy of any exhibit you offered during a hearing or trial that was admitted into evidence to the clerk of the district court within 14 days of the date of this notice. Copies must be transmitted as PDF attachments through ECF by all ECF Users or delivered to the clerk on a CD by all non-ECF Users. See detailed instructions here. (Exception: This requirement does not apply to a pro se prisoner litigant.) Please note that if original exhibits are in your possession, you must maintain them through final disposition of the case. (Clendenen, Michael) (Entered: 05/23/2024) |
| 06/10/2024 | | USCA Case Number 24-10470 in USCA Fifth Circuit for 36 (p.4778) Notice of Appeal filed by Pete Buttigieg, Federal Highway Administration, U.S. Department of Transportation, Shailen Bhatt. (bdg) (Entered: 06/10/2024) |

**TAB 2**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### LUBBOCK DIVISION

|  |  |
|---|---|
| STATE OF TEXAS, *et al.*,<br><br>        Plaintiffs,<br><br>     v.<br><br>U.S. DEPARTMENT OF<br>TRANSPORTATION, *et al.*,<br><br>        Defendants. | Case No. 5:23-cv-00304-H |

## DEFENDANTS' NOTICE OF APPEAL

Notice is hereby given this 23rd day of May, 2024, that Defendants the U.S. Department of Transportation, the Federal Highway Administration, Pete Buttigieg, in his official capacity as Secretary of Transportation, and Shailen Bhatt, in his official capacity as Administrator of the Federal Highway Administration, hereby appeal to the United States Court of Appeals for the Fifth Circuit from the Court's Final Judgment of March 27, 2024 (ECF No. 35), and from the opinions and orders on which it is predicated, including the Court's Memorandum Opinion and Order of March 27, 2024 (ECF No. 34).

DATED: May 23, 2024                          Respectfully submitted,

24-10470.4778

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

JULIE STRAUS HARRIS
Assistant Branch Director

/s/ *Michael P. Clendenen*
MICHAEL P. CLENDENEN
Trial Attorney
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L Street, NW
Washington, DC 20005
Phone: (202) 305-0693
E-mail: michael.p.clendenen@usdoj.gov

*Counsel for Defendants*

## Certificate of Service

On May 23, 2024, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/ *Michael P. Clendenen*

2

**TAB 3**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

STATE OF TEXAS, et al.,

     Plaintiff,

v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, et al.,

     Defendants.

No. 5:23-CV-304-H

## FINAL JUDGMENT

For the reasons set forth in the Court's Memorandum Opinion and Order on this date (Dkt. No. 34), it is hereby ordered and adjudged that the plaintiffs' motion for summary judgment (Dkt. No. 18) is granted.  The defendants' cross-motion for summary judgment (Dkt. No. 24) is denied.  It is further ordered and adjudged that:

1.    Final Judgment is entered in favor of the plaintiffs on Claim I of the Complaint.  *See* Dkt. No. 1 at ¶¶ 46–51.

2.    The Court does not reach Claims II and III.  *See* Dkt. No. 1 at ¶¶ 52–62.

3.    The Court vacates and sets aside, in its entirety, the Federal Highway Administration's Final Rule titled *National Performance Management Measures; Assessing Performance of the National Highway System, Greenhouse Gas Emissions Measure* (88 Fed. Reg. 85,364 (Dec. 7, 2023)).  The Court remands this matter to the Secretary of Transportation for further consideration.  The Court denies all other requested relief.

4.    The Court administratively stays this Order for seven days to permit the United States to seek relief, if it so chooses, from the Fifth Circuit.  To give effect to the stay while simultaneously protecting the plaintiffs' rights, the Court orders that the plaintiffs are not required to comply with the 2023 Rule's requirements during the administrative-stay period, nor shall the plaintiffs face any consequence for their non-compliance with the 2023 Rule during that window.

So ordered on March 27, 2024.

JAMES WESLEY HENDRIX
UNITED STATES DISTRICT JUDGE

24-10470.4777

**TAB 4**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

STATE OF TEXAS, et al.,

      Plaintiffs,

v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, et al.,

      Defendants.

No. 5:23-CV-304-H

## MEMORANDUM OPINION AND ORDER

A federal administrative agency cannot act without congressional authorization. Here, the Federal Highway Administration created a rule requiring the states to measure, report, and set declining targets for the amount of carbon dioxide emitted by vehicles using the interstate and national-highway systems. For authority, the agency relied on 23 U.S.C. § 150(c)(3), which permits it to create measures to assess pavement conditions, bridge conditions, and "the performance of the Interstate System . . . [and] the National Highway System." Texas sued, alleging that the agency lacked authority to enact the rule. Given the statutory text's plain language and context, the Court agrees. The relevant definitions and related performance measures make clear that "performance of the Interstate/National Highway Systems" focuses on the infrastructure's effectiveness in facilitating travel, commerce, and national defense—not environmental outputs of vehicles using the systems. Moreover, the DOT's expansive interpretation is undermined by the fact that adopting it would render other statutory provisions superfluous. Additionally, Section 150(c)(3)'s performance measures only exist to carry out Section 119's National Highway Performance Program, which also distinguishes between the highway system's performance and environmental impact. Thus, the Court concludes that the rule was unauthorized.

1.     **Factual and Procedural Background**

    A.    **The National Highway Performance Program (NHPP) and 23 U.S.C. § 150's Performance Measures**

        i.    **The NHPP facilitates the construction, maintenance, and improvement of the nation's transportation infrastructure.**

The federal government has provided some form of highway funding to the states for more than 100 years. These programs are "almost entirely focused on highway construction," and "[s]tate [departments of transportation (DOTs)] largely determine which projects are funded" so long as the fund-use is statutorily authorized. Robert S. Kirk, Cong. Rsch. Serv., R47022, Federal Highway Programs: In Brief 1 (2022). The NHPP is the largest federal-aid highway program in the country, with recent annual authorizations averaging nearly $30 billion dollars. *Id.* at 5. The NHPP "funds projects to achieve national performance goals consistent with state and metropolitan planning" by supporting "improvement of the condition and performance of the National Highway System, which includes Interstate System highways and bridges." *Id.*

The NHPP's statutory authorization and funding requirements are found in 23 U.S.C. § 119. In addition to restricting the way that funds may be used, the statute also identifies the program's four broad purposes:

(1) to provide support for the condition and performance of the National Highway System;

(2) to provide support for the construction of new facilities on the National Highway System;

(3) to ensure that investments of Federal-aid funds in highway construction are directed to support progress toward the achievement of performance targets established in an asset management plan of a [s]tate for the National Highway System; and

– 2 –

24-10470.4728

(4) to provide support for activities to increase the resiliency of the National
Highway System to mitigate the cost of damages from sea level rise,
extreme weather events, flooding, wildfires, or other natural disasters.

23 U.S.C. § 119(b). Conceivably, a broad range of projects could support those purposes,

but the statute only funds certain "eligible projects" that are consistent with them. *See id.*

§ 119(d).

To be eligible for funding, projects must first "support[] progress toward the

achievement of national performance goals for improving infrastructure condition, safety,

congestion reduction, system reliability, or freight movement on the National Highway

System." *Id.* § 119(d)(1)(A). Second, projects must be consistent with the broader

transportation planning process and its goals, which are codified at 23 U.S.C. §§ 134 and

135.[1] *Id.* § 119(d)(1)(B). Should a project meet those two threshold requirements, Section

119 then provides a specific list of purposes that NHPP funds may finance. *See id.*

§ 119(d)(2). Many of those purposes relate to building, maintaining, or improving the

---

[1] 23 U.S.C. § 134 is entitled "Metropolitan transportation planning." The goal of the statute is "to
encourage and promote the safe and efficient management, operation, and development of surface
transportation systems" that will "serve the mobility needs of people and freight," "foster economic
growth and development," and "better connect housing and employment," while "minimizing
transportation-related fuel consumption and air pollution through metropolitan and statewide
transportation planning processes identified in this chapter." 23 U.S.C. § 134(a)(1). Broadly
speaking, the section is devoted to laying out the planning requirements for "long-range
transportation plans and transportation improvement programs through a performance-driven,
outcome-based approach to planning for metropolitan areas of [a] [s]tate." *Id.* § 134(c)(1).

23 U.S.C. § 135 is entitled "Statewide and nonmetropolitan transportation planning." Section 135
explicitly incorporates the goals laid out in Section 134(a), in addition to other stated goals. *Id.*
§ 135(a). In general, whereas Section 134 is focused specifically on metropolitan areas, Section 135
provides for the transportation-planning process for non-metropolitan areas. *See generally id.* § 135.

In many respects, Sections 134 and 135 have similar, if not identical, language and fulfill similar
purposes as to their respective targets (metropolitan areas and non-metropolitan areas). *See generally
id.* §§ 134, 135. States and the designated organizations are required to complete these plans to be
eligible for NHPP funds. *See id.* §§ 134(c), 135(a).

physical infrastructure of the National Highway System, the Interstate System, and other federal-aid highways, as well as the tunnels, bridges, ferries, and public bus stations that service those systems. *See, e.g.*, *id.* § 119(d)(2)(A)–(C), (F), (G), (P). Other purposes authorize funding for operational programs, such as training bridge and tunnel inspectors, paying for the bridge and tunnel inspections themselves, or providing for the operating costs of traffic-monitoring systems. *See, e.g.*, *id.* § 119(d)(2)(D), (E), (J). Some purposes authorize funding for specific environment-related projects, like mitigating water pollution or environmental degradation caused by a transportation facility, controlling noxious weeds, implementing mitigation efforts authorized by Section 119(g),[2] or making resiliency improvements along the National Highway System.[3] *See, e.g.*, *id.* § 119(d)(2)(M)–(O), (R). Thus, to be eligible for funding under the NHPP, a project must (1) support progress towards a specified national performance goal or goals; (2) be consistent with Sections 134 and 135; and (3) qualify as one of the explicitly enumerated purposes. *See id.* § 119(d).

---

[2] Section 119(g) authorizes NHPP funds for "participation in natural habitat and wetlands mitigation efforts." 23 U.S.C. § 119(g)(1). These authorized efforts include "participation in mitigation banking or other third-party mitigation arrangements," "contributions to statewide and regional efforts to conserve, restore, enhance, and create natural habitats and wetlands," and "the development of statewide and regional environmental protection plans." *Id.* Authorization is limited, however, to programs "relating to projects funded under [Title 23]." *Id.*

[3] This authorization allows funds to go toward the "protective features" described in Section 119(k)(2), which include things likes "raising roadway grades," "relocating roadways" located in flood plains, and "increasing the size or number of drainage structures." U.S.C. § 119(d)(2)(R), (k)(2).

ii.    **Section 150 authorizes the federal Department of Transportation (DOT) to promulgate performance measures to accomplish the NHPP's purpose.**

In 2012, and then again in 2015, Congress amended the NHPP to authorize the Secretary of Transportation to promulgate rules establishing "performance measures."[4] *See id.* § 150. These performance measures "provide a means to the most efficient investment of [f]ederal transportation funds by refocusing on national transportation goals . . . and improving project decisionmaking through performance-based planning and programming." *Id.* § 150(a). Section 150 then lists seven "national goals" on which "Federal-aid highway program[s]" should be focused, including safety, infrastructure condition, congestion reduction, system reliability, freight movement and economic vitality, and reduced project delivery delays. *Id.* § 150(b). Most relevant here is the goal of environmental sustainability: "To enhance the performance of the transportation system while protecting and enhancing the natural environment." *Id.* § 150(b)(6).

In spite of those broad national goals, Section 150's reach is limited. The statute provides that performance measures may only be promulgated if they are specifically authorized in Section 150(c). *Id.* § 150(c)(2)(C). In other words, Congress deliberately

---

[4] Section 150 was last amended in December 2015. *See* Fixing America's Surface Transportation Act, Pub. L. No. 114-94, § 1446, 129 Stat. 1312, 1437–38 (2015). That said, Congress has considered amending Section 150 in the years since. The parties dispute whether one prior proposed amendment is relevant to the analysis. Specifically, an earlier House of Representatives version of the Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 429 (2021), would have amended Section 150. *See* INVEST in America Act, H.R. 3684, 117th Cong. § 1403 (2021) (as introduced in the House).

One such proposed amendment would have authorized federal agencies to establish "measures for the [s]tates to use to assess (A) carbon dioxide emissions per capita on public roads; (B) carbon dioxide emissions using different parameters than described in subparagraph (A) that the Secretary determines to be appropriate; and (C) any other greenhouse gas emissions on public roads that the Secretary determines to be appropriate." *Id.* This language was ultimately stricken from the final bill and the subsequently codified law. *See* Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 429 (2021).

24-10470.4731

limited the types of performance measures that Section 150 authorizes the government to create. *See id.* Sections 150(c)(3)–(6) describe the authorized measures, three categories of which are specifically tied to other provisions of Title 23. Section 150(c)(3)'s measures, for instance, are "for the purpose of carrying out [S]ection 119." *Id.* § 150(c)(3). To that end, Section 150(c)(3) directs the Secretary to establish "measures for [s]tates to use to assess" pavement conditions, bridge conditions, and "the performance of the Interstate System . . . [and] the performance of the National Highway System." *Id.* § 150(c)(3)(A).

The statute mandates measures for three additional topics—highway safety, congestion mitigation and air quality, and national freight movement. *Id.* § 150(c)(4)–(6). And, regarding air quality, Congress specifically directs the Secretary to establish measures relating to "on-road mobile source emissions." *Id.* § 150(c)(5). For safety and air quality, the measures are for the purposes of carrying out 23 U.S.C. §§ 148 and 149.[5] *See id.* § 150(c)(4)–(5). Further, while not tied to another provision of Title 23, Section 150(c)(6) requires the Secretary to "establish measures for [s]tates to use to assess freight movement on the Interstate System." *Id.* § 150(c)(6). In addition to the rule-making authorization, the statute requires such measures to be promulgated in a specific manner and for states to report on their progress towards achieving such measures. *See id.* § 150(c)(1)–(2), (e).

---

[5] Section 148 codifies the Highway Safety Improvement Program—the purpose of which is to "achieve a significant reduction in traffic fatalities and serious injuries on all public roads" by authorizing funding for safety-related projects and planning. *See* 23 U.S.C. § 148. Section 149 codifies the Congestion Mitigation and Air Quality Improvement Program, which authorizes Title 23 funds for specific projects which include the regulation of on-road mobile source emissions like ozone, carbon monoxide, and particulate matter. *Id.* § 149.

**B.      The History of the DOT's Greenhouse Gas (GHG) Emissions Measure**

**i.      The 2017 Rule**

Following the codification of Section 150, the first performance-measurement rules were issued in 2016.[6]  One such rule, promulgated by the DOT's Federal Highway Administration,[7] established a performance measure related to GHG emissions.  *See* National Performance Management Measures; Assessing Performance of the National Highway System, Freight Movement on the Interstate System, and Congestion Mitigation and Air Quality Improvement Program, 82 Fed. Reg. 5970, 5974 (Jan. 18, 2017) (to be codified at 23 C.F.R. pt. 490) (the "2017 Rule").  In relevant part, the rule required state DOTs and metropolitan planning organizations (MPOs) to measure and track $CO_2$ emissions on system highways, "establish [declining $CO_2$ emissions targets,] and report on [their] progress" towards achieving those targets.  *Id.* at 5974, 5980–81.

For statutory support for the GHG emissions measure, the DOT relied on the general provisions of Section 150(c)(3)(A)(ii), which authorize it to establish metrics to assess the "performance" of the Interstate System and National Highway System.  *Id.* at 5994; *see also* 23 U.S.C. § 150(c)(3)(A)(ii)(IV)–(V).  In finding that authority, the DOT interpreted "performance" to include "environmental performance," which it described as "an integral part of the Federal-aid Highway Program."  82 Fed. Reg. at 5995.  It claimed

---

[6] *See, e.g.*, National Performance Management Measures: Highway Safety Improvement Program, 81 Fed. Reg. 13882 (Mar. 15, 2016) (to be codified at 23 C.F.R. pt. 490); National Performance Management Measures; Assessing Pavement Condition for the National Highway Performance Program and Bridge Condition for the National Highway Performance Program, 82 Fed. Reg. 5886 (Jan. 18, 2017) (to be codified at 23 C.F.R. pt. 490).

[7] Because Section 150 requires "the Secretary" of Transportation to "promulgate . . . rulemaking[s] that establish[] performance measures and standards," 23 U.S.C. § 150(c)(1), the Court refers to the rules as DOT actions.

– 7 –

that its interpretation was supported by the national goal of "environmental sustainability" found in Section 150(b)(6), the transportation-planning provisions in Sections 134 and 135, and other provisions in Title 23. *See id.* The interrelatedness of the various provisions, the DOT argued, supported a broad interpretation of "performance," which then necessarily included "environmental performance." *See id.* at 5995–96. But the 2017 Rule's shelf life was short.

### ii.    The 2018 Rule's Repeal of the 2017 Rule

The agency reversed course in 2018 and concluded that Section 150 did not enable the agency to establish a GHG emissions measure. Following a change in the presidential administration and a series of executive orders,[8] the DOT began a review of its existing regulations "to determine whether changes would be appropriate to eliminate duplicative regulations and streamline regulatory processes." National Performance Management Measures; Assessing Performance of the National Highway System, Freight Movement on the Interstate System, and Congestion Mitigation and Air Quality Improvement Program, 83 Fed. Reg. 24920, 24922 (May 31, 2018) (codified at 23 C.F.R. pt. 490) (the "2018 Rule"). The DOT subsequently identified the 2017 Rule, and specifically the GHG emissions measure, as one such regulation. *See id.* As a result, the DOT began the process of the rule's repeal. *See id.*

The 2018 Rule was simple in scope—it repealed the 2017 Rule. *Id.* at 24920. In doing so, it identified three problems with the 2017 Rule: (1) that the 2017 Rule exceeded the statutory authority delegated to the DOT in Section 150; (2) that the costs of the 2017

---

[8] *See, e.g.*, Exec. Order No. 13771, 82 Fed. Reg. 9339 (Jan. 30, 2017); Exec. Order No. 13777, 82 Fed. Reg. 12285 (Feb. 24, 2017).

24-10470.4734

Rule outweighed its benefits; and (3) that the 2017 Rule was duplicative of other regulatory efforts. *See id.* at 24923–26. Particularly, it stated that the 2017 Rule could point to no "statutory provision that specifically directs or requires [the DOT] to adopt a GHG measure." *Id.* at 24923. It further observed that "the national goals language" in Section 119(d)(1)(A) imposed limitations on NHPP funds. *Id.* at 24923–24. Section 119's language focuses on "physical condition[s] of the system and the efficiency of transportation operations across the system . . . [but it does not] support [the DOT's] prior, broader interpretation of 'performance' under [S]ection 150(c)(3)." *Id.* In other words, "[t]he structure of [S]ection 150 itself supports a narrower construction of the [S]ection 150 performance measures authorization than previously adopted by [the DOT]." *Id.* at 24924. And, for a few years, that was the final word on the matter.

### iii.    The 2022 Proposed Rule and the 2023 Final Rule

In 2022, after another administration change and updated agency directives,[9] the DOT once again revisited the scope of its authority under Section 150, and it began the process of promulgating a new iteration of the GHG emissions measure. National Performance Management Measures; Assessing Performance of the National Highway System, Greenhouse Gas Emissions Measure, 87 Fed. Reg. 42401, 42402–03 (proposed July 15, 2022) (to be codified at 23 C.F.R. pt. 490) (the "2022 Proposed Rule"). The 2022 Proposed Rule sought to re-establish the GHG emissions measure, and it proposed requiring states "to establish declining [$CO_2$] targets and to establish a method for the measurement and reporting of [GHG] emissions associated with transportation" on the

---

[9] *See, e.g.*, Exec. Order No. 13990, 86 Fed. Reg. 7037 (Jan. 20, 2021); Exec. Order No. 14008, 86 Fed. Reg. 7619 (Jan. 27, 2021).

highway system.  *Id.* at 42401.  Unlike the 2017 Rule, it gave states additional flexibility to establish their own targets, but it required those targets to meet the Administration's targets of net-zero emissions by 2050.  *Id.*

Despite the 2018 Rule, the DOT asserted that it did in fact have the authority to promulgate the GHG emissions measure under Section 150(c)(3)(A)(ii)(IV)–(V).  *See id.* at 42407–10.  The agency's review contended that the 2018 Rule had "adopted a narrow interpretation of" Section 150 and that the 2022 Proposed Rule's reading was consistent with the statute.  *Id.* at 42408.  In response, Texas and the Texas Department of Transportation (TXDOT) each commented on the proposed rule's statutory authorization. *See* Dkt. Nos. 1-3 (Texas's comments on the proposed rule); 1-6 (TXDOT's comments on the proposed rule).  Each entity claimed, among other things, that the 2022 Proposed Rule would exceed the statutory authority present in Section 150.  Dkt. Nos. 1-3 at 6, 8 (arguing that the DOT's interpretation of "performance" ignores the statutory text found in Section 119 and that the national-goals language found in Section 150(b)(6) does not create rule-making authority); 1-6 at 4 (arguing the same).

The agency disagreed.  In December 2023, the DOT issued the 2023 Rule establishing the GHG measure.  National Performance Management Measures; Assessing Performance of the National Highway System, Greenhouse Gas Emissions Measure, 88 Fed. Reg. 85364 (Dec. 7, 2023) (to be codified at 23 C.F.R. pt. 490) (the "2023 Rule").  The 2023 Rule was different than the 2022 Proposed Rule in two primary ways.  First, the 2023 Rule clarified that while states must set declining targets for GHG emissions, those targets do not need to demonstrate reductions toward net-zero emissions by 2050.  *Id.* at 85380. Second, the 2023 Rule stated that there were no penalties for a state's failure to meet those

24-10470.4736

targets or even to achieve significant progress toward those targets—other than having to explain the lack of progress towards its self-established target. *Id.* at 85378. A state that "set[s] a declining target but fail[s] to achieve [that] target[] can satisfy regulatory requirements by documenting the actions [the state] will take to achieve that target" in their next report. *Id.* Aside from those differences, the crux of the 2022 Proposed Rule remained—states are required to measure and report $CO_2$ emissions generated by on-road mobile sources on the highway system and to establish declining $CO_2$ emission targets. *See id.* at 85364.

The finalized 2023 Rule reiterates that the DOT relied on 23 U.S.C. § 150(c)(3)(A)(ii)(IV)–(V) for statutory authority. The 2023 Rule "reaffirms that Congress provided the [DOT] with clear authority" to promulgate the GHG emissions measure. *See id.* at 85367. That directive, the DOT argues, necessarily means that "performance" in Section 150(c)(3)(A)(ii)(IV)–(V) includes "environmental performance." *See id.* The DOT asserts that its current reading of "performance" is limited in scope to the performance only of the National Highway System and the Interstate System, but it nevertheless broadly authorizes the DOT to attack climate change. *See id.* at 85375–76, 85379. It further argues that its current reading of "performance" is consistent with other sections of Title 23, *see id.* at 85367–68, and that the 2018 Rule's statutory analysis was flawed, *id.* at 85369–70. The 2023 Rule was scheduled to take effect on January 8, 2024, with the states' targets originally due on February 1, 2024. *Id.* at 85364.

## C.    Procedural History

On December 19, 2023, Texas and TXDOT filed a complaint challenging the legality of the 2023 Rule. Dkt. No. 1. The complaint alleges that the 2023 Rule: (1) exceeds the

24-10470.4737

DOT's statutory authority; (2) is arbitrary and capricious in violation of the Administrative

Procedure Act (APA); and (3) violates the Spending Clause of the U.S. Constitution. *Id.* at

17–22. The plaintiffs seek a declaration from the Court that the 2023 Rule is unlawful

because it was promulgated in excess of the agency's authority and that it was arbitrary and

capricious, vacatur of the 2023 Rule, and attorneys' fees. *Id.* at 22. After several weeks had

passed, and in light of the looming February 1 reporting deadline, the Court ordered the

plaintiffs to report on the status of this case, including whether the plaintiffs intended to

request emergency relief. Dkt. No. 5.

        In response to that Order, the plaintiffs informed the Court that they did intend to

seek a preliminary injunction, *see* Dkt. No. 7, so the Court ordered the parties to confer and

submit a proposed briefing schedule, *see* Dkt. No. 8. Shortly after the plaintiffs filed their

request for an injunction (Dkt. Nos. 9–10), the parties informed the Court that they had

agreed to a "45-day extension of the [2023] Rule's upcoming deadline"—effectively pushing

the operative date of the 2023 Rule to March 17, 2024, *see* Dkt. No. 11. The Court issued a

scheduling order adopting the parties' proposed schedule. *Id.*; Dkt. No. 12. The parties

later informed the Court that the defendants had extended the 2023 Rule's delayed deadline

from March 17, 2024, to March 29, 2024. Dkt. No. 13. Further, the parties notified the

Court that they wished to resolve this case on the merits through cross-motions for summary

judgment. *Id.* In light of that update, the Court vacated its previous scheduling order and

set a schedule for the parties to complete briefing on the cross-motions for summary

judgment. Dkt. No. 14.

        After the plaintiffs withdrew their motion for a preliminary injunction (Dkt. Nos. 16;

17), they filed their motion for summary judgment (Dkt. No. 18). The defendants

responded with their own cross-motion for summary judgment.  Dkt. No. 24.  Briefing on

the cross-motions is now complete.  The American Road and Transportation Builders

Association and the Associated General Contractors of America, Inc. (together, "Amici")

filed an amicus brief in support of the plaintiffs.  Dkt. No. 28.  Further, the defendants have

filed a copy of the 2023 Rule's administrative record.  Dkt. No. 15.  The cross-motions for

summary judgment (Dkt. Nos. 18; 24) are now ripe and before the Court.

**2.      Standard of Review**

The parties agree that summary judgment is appropriate to resolve the plaintiffs'

complaint.  *See* Dkt. No. 13 at 1.  Summary judgment is proper where "there is no genuine

issue as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).  In the context of a challenge to an agency action under the APA,

"[s]ummary judgment is the proper mechanism for deciding, as a matter of law, whether an

agency action is supported by the administrative record and consistent with the APA

standard of review."  *Blue Ocean Inst. v. Gutierrez*, 585 F. Supp. 2d 36, 41 (D.D.C. 2008).  In

other words, in evaluating an APA case on summary judgment, courts apply the standard of

review from the APA.  *See Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 627 (5th Cir. 2001).

That standard requires a court to "hold unlawful and set aside agency action, findings, and

conclusions found to be," among other things, promulgated in excess of statutory authority.

5 U.S.C. § 706(2)(A)–(D).

**3.      Jurisdiction**

Neither party has challenged the Court's jurisdiction.  But even where Article III

standing has not been challenged, a court "must—where necessary—raise it *sua sponte*."

*Ford v. NYLCare Health Plans of Gulf Coast, Inc.*, 301 F.3d 329, 331–32 (5th Cir. 2002).

– 13 –

Federal courts have jurisdiction over cases or controversies only, and standing is "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  "[S]tanding is not dispensed in gross," so a court must conclude that standing has been established as to each claim and for each form of relief sought.  *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).  To demonstrate standing, the plaintiffs must suffer an "injury in fact" that is both "concrete and particularized" and "actual or imminent." *Lujan*, 504 U.S. at 560 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)).  That injury must be "fairly traceable to the challenged action of the defendants." *Id.* (cleaned up) (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41–42 (1976)).  And it must be "likely"—not speculative—that the injury will be "redressed by a favorable decision." *Id.* at 561 (quoting *Simon*, 426 U.S. at 38).  The "ordinary rule," however, is that a party that is the "object of the regulation may challenge it." *Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 266 (5th Cir. 2015) (cleaned up).  The Court considers each aspect of standing in turn.  But in light of the lack of any challenge to the Court's jurisdiction, it does so briefly.

First, the Court finds that the plaintiffs would suffer an injury in fact if the 2023 Rule were to take effect.  While such injury need not have already occurred, an injury must be "certainly impending" for a court to find that there is an injury in fact.  *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (emphasis omitted) (quoting *Lujan*, 504 U.S. at 565 n.2).  Here, the 2023 Rule would indisputably require either Texas or TXDOT[10] to

---

[10] All that is required of the case-or-controversy requirement is that one party has standing.  *See Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006).  The 2023 Rule itself does not make clear which plaintiff would bear this cost—but it is obvious that one of them would.  *See* Dkt. No. 15-2 at 2.

expend compliance costs.  Dkt. No. 15-2 at 2; *see also* Dkt. Nos. 19 at 21 (noting that the

2023 Rule would require compliance costs); 25 at 24 (estimating the final cost to state

DOTs).  At a minimum, the plaintiffs would be forced to spend money to "establish[] the

GHG measure" and "implement[] the GHG measure for each component of the rule that

may involve costs."  Dkt. No. 15-2 at 2.  This "amounts to an increased regulatory burden,"

which "typically satisfies the injury in fact requirement."  *Contender Farms, L.L.P.*, 779 F.3d

at 266.  The Court finds that this certainly impending injury is sufficient to establish the

plaintiffs' injury in fact.

Resolving the remaining two elements of standing is straightforward.  Where a

plaintiff would suffer injury as the object of the challenged government action, "there is

ordinarily little question that the action . . . has caused him injury, and that a judgment

preventing . . . the action will redress it."  *Id.* at 264 (quoting *Lujan*, 504 U.S. at 561–62).

Here, there is little doubt that the plaintiffs' imminent injuries—which they would incur

should the 2023 Rule take effect—are the direct result of the DOT's enforcement of the 2023

Rule and are therefore fairly traceable to the challenged rule.  *See* Dkt. No. 15-2 at 2.

Further, the relief sought by the plaintiffs—vacatur of the rule—would redress the plaintiffs'

injuries.  Without the 2023 Rule, the plaintiffs need not incur costs from establishing and

implementing the GHG emissions measure.  Therefore, the Court finds that the plaintiffs

have established traceability and redressability.  And finding that all three elements of

standing are present, the Court concludes that the plaintiffs have standing to challenge the

2023 Rule.

24-10470.4741

4.      **Analysis**

A.      **Administrative agencies may only do what Congress authorizes them to do.**

"It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated [to it] by Congress." *VanDerStok v. Garland*, 86 F.4th 179, 187 (5th Cir. 2023) (quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988)). Legislative grants to agencies are policed by the APA, which requires courts to "set aside agency action found to be, among other things, 'in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.'" *Id.* at 187–88 (quoting 5 U.S.C. § 706(2)(C)). The "core inquiry" in an APA case is whether the rule in question is a "lawful extension of the statute under which the agency purports to act, or whether the agency has indeed exceeded its 'statutory jurisdiction, authority, or limitations.'" *Id.* at 188 (quoting 5 U.S.C. § 706(2)(C)).

"No matter how it is framed, the question a court faces when confronted with an agency's interpretation of a statute it administers is always, simply, whether the agency has stayed within the bounds of its statutory authority." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013) (emphasis omitted). Therefore, an analysis of a rule's authority must begin with the text of the authorizing statute. *Sackett v. EPA*, 598 U.S. 651, 671 (2023). The "ordinary meaning and structure of the law itself" guides this inquiry. *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019). The words of an authorizing statute must be read "in their context and with a view to their place in the overall statutory scheme." *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989); *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988) ("In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a

– 16 –

whole."). After all, a word's context in a statute dictates its meaning. *See Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 289–90 (2010) (stating that "[s]tatutory language has meaning only in context" and that a court has a "duty to construe statutes, not isolated provisions" (alteration in original) (quotations omitted)).

Additionally, statutory interpretation is not an exercise in determining "the outer limits of [a word's] definitional possibilities." *See FCC v. AT&T Inc.*, 562 U.S. 397, 407 (2011) (alteration in original) (quoting *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006)). Flowing from that principle, courts have generally looked with suspicion on "cryptic" delegations of authority. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000). Courts should generally be skeptical of agencies that seek to find "elephants in mouseholes" or otherwise seek to rely on tiny grants of authority to justify major actions. *See West Virginia v. EPA*, 597 U.S. 697, 746–47 (2022) (Gorsuch, J., concurring) (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)).

### B.     The DOT's authorization to promulgate performance measures is expressly limited to those listed in Section 150(c).

As detailed above, Congress created the NHPP to provide support for the condition and construction of the National Highway System. 23 U.S.C. § 119(a), (b)(1)–(2). The NHPP also ensures that investments of federal highway funds "are directed to support progress toward the achievement of performance targets" established in a state's asset-management plan. *Id.* § 119(b)(3). The NHPP further provides funding to states for eligible projects. *Id.* § 119(d).

But Congress did not want to invest blindly in the highway system. As a result, Congress ordered the DOT to establish certain performance measures and targets, which "provide a means to the most efficient investment of [f]ederal transportation funds." *Id.*

– 17 –

§ 150(a), (c). The states, in turn, must track those measures for use in NHPP-fund investment and set targets based off those measures. *See id.* § 150(c)–(d). States must then submit reports to the DOT detailing, among other things, their progress toward achieving those targets. *Id.* § 150(e).

Critically, however, Congress did not authorize the DOT to create any performance measure it deemed appropriate. To the contrary, Congress expressly limited the permissible performance measures to only those specifically enumerated in the statute. *Id.* § 150(c)(2). The statute provides that, "[i]n carrying out paragraph (1) [establishing performance measures and standards], the Secretary shall . . . limit performance measures only to those described in this subsection[—that is, subsection 150(c)]." *Id.* § 150(c)(2)(C).

Thus, Congress provided a clearly delineated and expressly limited grant of authority to the DOT in establishing performance measures, and the Court must be faithful to that limitation. And precedent makes clear that when Congress provides an agency with a limited grant of authority, courts should be hesitant to adopt an agency's expansive interpretation of its own power. *See Biden v. Nebraska*, 143 S. Ct. 2355, 2368–71 (2023) (interpreting a limiting provision to require a strict reading of a statute's authorization). Recognizing this limitation, the DOT cites Section 150(c)(3)(A)(ii) as authority to establish the GHG emissions measure, but Section 150(c)'s limited, precise statutory language cannot bear the weight of the DOT's proposed expansive interpretation.[11]

---

[11] Although the Court interprets Section 150's scope of authority in light of this express limitation, the Court does not rely on the major-questions doctrine. The plaintiffs invite the Court to invoke the doctrine because, in their view, the states will incur significant costs to comply with the 2023 Rule. *See* Dkt. No. 19 at 21–22; *see also West Virginia*, 597 U.S. at 716, 724–32 (discussing the major-questions doctrine). The defendants counter that the doctrine does not apply because the costs are limited to around $13 million. *See* Dkt. No. 25 at 20–21. But because the statutory language itself makes clear that the DOT lacked authorization to promulgate the 2023 Rule, the Court need not

**C.** **Section 150's text makes clear that "the performance of the Interstate System . . . [and] the National Highway System" focuses on the system's effectiveness in facilitating travel, commerce, and national defense—not the environmental performance of vehicles using that system.**

The Court's task is to determine the scope of Section 150's authorized performance measures. In doing so, the Court's analysis begins with the statute's plain language. "In matters of statutory interpretation, text is always the alpha." *In re DeBerry*, 945 F.3d 943, 947 (5th Cir. 2019); *see also United States v. Koutsostamatis*, 956 F.3d 301, 306 (5th Cir. 2020) ("In statutory interpretation, we have three obligations: '(1) Read the statute; (2) read the statute; (3) read the statute!'" (quoting Henry J. Friendly, *Benchmarks* 202 (1967))). As a result, the Court must determine whether "measures for [s]tates to use to assess . . . the performance of the Interstate System . . . [and] the National Highway System" may appropriately include measures regarding GHG emissions from vehicles using the highways. *See* 23 U.S.C. § 150(c)(3)(A)(ii)(IV)–(V). In Texas's view, "performance," by its plain language, cannot authorize the GHG emissions measure. *See* Dkt. No. 19 at 18–22. The DOT, in contrast, argues a more expansive reading and asserts that "performance" encompasses the highway systems' environmental performance, including the GHG emissions from vehicles using the systems. *See* Dkt. No. 25 at 15–22.

After carefully examining the statutory language and the parties' arguments, the Court concludes that the relevant statutory provisions do not authorize the DOT's GHG emissions measure. Four reasons support this conclusion. First, the key terms' definitions focus on the infrastructure's effectiveness at achieving its purposes and not on the

_____

resolve whether the issue presented constitutes a "major question." If the doctrine applied, given its requirement of "clear congressional authorization," *see West Virginia*, 597 U.S. at 732, the Court's conclusion would be especially apparent.

environmental impact of vehicles using the infrastructure. Second, all of the related performance measures in Section 150(c)(3) focus on physical infrastructure, which makes it less likely that the DOT's broad interpretation is accurate. Third, the DOT's proposed interpretation would render other portions of the statute superfluous. And fourth, Section 150(b)'s list of—and language related to—the national goals of the federal-aid highway program indicate that "performance" of the system does not include environmental performance. Thus, the statutory text demonstrates that "measures . . . to assess . . . the performance of the Interstate System . . . [and] the National Highway System" do not include GHG emissions from vehicles using the systems.

> ### i. The definitions of "performance," "National Highway System," and "Interstate System" do not encompass the environmental impact of vehicles.

Section 150 does not define "performance," nor does it point to a particular provision elsewhere in the code that does. *See* 23 U.S.C. § 150. Title 23 does contain a definitions provision, but that section does not define "performance." *See* 23 U.S.C. § 101. Where Congress does not define a term within a statute, a court should "interpret the words consistent with their ordinary meaning at the time Congress enacted the statute." *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 277 (2018) (cleaned up) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)).

Heeding that advice, the Court will look to a dictionary definition of "performance" at the time of statutory enactment. *See Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566–67 (2012) (noting that "[w]hen a term goes undefined in a statute, [a court should] give the term its ordinary meaning," which may be discerned from dictionaries in use at the time of enactment). Section 150 is a relatively recent statute—its first version became law in

2012, and it was subsequently amended in 2015.  *See* 88 Fed. Reg. at 85365 (describing the history of Section 150).[12]  At the time of the statute's enactment, the dictionary definition of "performance" was, in relevant part, "the competence or effectiveness of a person or thing in performing an action; *spec.* the capabilities, productivity, or success of a machine, product, or person when measured against a standard."[13]  *Performance*, Oxford English Dictionary, https://perma.cc/6VPX-2JLS (last visited Mar. 26, 2024).  The term focuses on an identified object's or person's capability.  *See id.*  Applying the definition to the statute at issue, Congress authorized the DOT to create a measure to assess "the [competence or effectiveness]" of the identified objects—the Interstate System and National Highway System.

Because the DOT may properly measure the competence or effectiveness of the Interstate and National Highway Systems, the Court's analysis likewise depends on the scope of the latter terms.  Thankfully, Congress provided precise definitions for "Interstate System," "National Highway System," and "Highway."  23 U.S.C. § 101(11), (12), (16).  As detailed below, the critical point is that each definition relates to transportation infrastructure and describes their purposes as facilitating travel, commerce, and national defense.  *See id.*; *see also id.* § 103(b) (defining "National Highway System"), (c) (defining "Interstate System").

Title 23's definition of "highway" includes a long list of transportation infrastructure, including:

---

[12] *See also supra* note 4.

[13] Given the relative recency of Section 150's enactment, the Court uses a modern dictionary.  *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 419, 423 (2012).  Further, neither party has directed the Court to a particular definition that would contradict this approach.

(A) a road, street, and parkway;

(B) a right-of-way, bridge, railroad-highway crossing, tunnel, drainage structure including public roads on dams, sign, guardrail, and protective structure, in connection with a highway; and

(C) a portion of any interstate or international bridge or tunnel and the approaches thereto, . . . including such facilities as may be required by the United States Customs and Immigration Services in connection with the operation of an international bridge or tunnel.

*Id.* § 101(11).

"National Highway System" is defined as "the Federal-aid highway system described in [S]ection 103(b)." *Id.* § 101(16). In turn, Section 103(b) defines "National Highway System" as "the highway routes and connections to transportation facilities" that serve three purposes—none of which relate to environmental emissions or impact:

(A) serve major population centers, international border crossings, ports, airports, public transportation facilities, and other intermodal transportation facilities and other major travel destinations;

(B) meet national defense requirements; and

(C) serve interstate and interregional travel and commerce.

*Id.* § 103(b)(1). The definition specifies that various components are included in the National Highway System, like "urban and rural principal arterial routes." *Id.* § 103(b)(2).

Unsurprisingly, "Interstate System" is likewise defined as certain transportation infrastructure and does not include environmental emissions or impact. The term "means the Dwight D. Eisenhower National System of Interstate and Defense Highways described in [S]ection 103(c)." *Id.* § 101(12). And Section 103(c) specifies that the Interstate System "consists of highways designed, located, and selected in accordance with this paragraph." *Id.* § 103(c)(1)(A). Moreover, the interstate highways must be located to fulfill three purposes:

– 22 –

    (i)   to connect by routes, as direct as practicable, the principal metropolitan areas, cities, and industrial centers;

    (ii)  to serve the national defense; and

    (iii) to the maximum extent practicable, to connect at suitable border points with routes of continental importance in Canada and Mexico.

*Id.* § 103(c)(1)(C).

Synthesizing the various definitions brings into focus the proper scope of Section 150's congressional authorization for the DOT to create "measures . . . to assess . . . the performance of the Interstate System . . . [and] the National Highway System." The performance of these transportation systems turns on their "competence or effectiveness" at achieving the specified aims of each of these roadways. For the National Highway System's performance, the DOT may establish measures to assess the "competence or effectiveness" of "the highway routes['] and connections[']" ability to "serve major population centers," "meet national defense requirements," and "serve interstate and interregional travel and commerce." *Id.* §§ 101(16); 103(b); 150(c)(3). For the Interstate System's performance, the DOT may establish measures to assess the "competence or effectiveness" of the interstate highways' ability to directly connect "metropolitan areas, cities, and industrial centers," "serve the national defense," and "connect at suitable border points with routes of continental importance in Canada and Mexico." *Id.* §§ 101(12); 103(c); 150(c)(3).

Nothing within these definitions or the statutory goals of the National Highway System or Interstate System indicate that GHG emissions are a relevant metric. The focus is on how well the highways, routes, and connections within the systems are achieving their goals of facilitating travel, commerce, and the national defense. The statute's plain language does not include within the scope of the National Highway System or the

– 23 –

Interstate System the environmental performance or impact of the vehicles that use those

systems.  As a result, the very definitions of the relevant terms undercut the DOT's

argument and proposed expansive definition, and the statute does not authorize the GHG

emissions measure.

> ### ii.    Section 150(c)(3)'s remaining performance measures relate to physical infrastructure, further indicating that these measures focus on the highways' effectiveness, not the vehicles' environmental impact.

When interpreting words with disputed meanings, courts should consider words in

light of the terms surrounding them.  *See Dubin v. United States*, 599 U.S. 110, 118 (2023)

(citing *Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004)).  After all, "a word is known by the company

it keeps."  *Yates v. United States*, 574 U.S. 528, 543–44 (2015) (plurality opinion).  Thus,

"[w]hen several nouns or verbs or adjectives or adverbs—any words—are associated in a

context suggesting that the words have something in common, they should be assigned a

permissible meaning that makes them similar."  Antonin Scalia & Bryan A. Garner, *Reading

Law: The Interpretation of Legal Texts* 195 (2012).  And, relevant in this case, "[t]he canon

especially holds that 'words grouped in a list should be given related meanings.'"  *Id.* at 195

& n.2 (quoting *Third Nat'l Bank in Nashville v. Impac Ltd.*, 432 U.S. 312, 322 (1977)).

Here, the company "performance of the Interstate System . . . [and] the National

Highway System" keeps is uniformly focused on the physical condition of transportation

infrastructure.  The relevant subsection provides that the DOT shall establish measures to

assess:

> (I)    the condition of pavements on the Interstate [S]ystem;
>
> (II)    the condition of pavements on the National Highway System (excluding the Interstate);

(III)  the condition of bridges on the National Highway System;

(IV)  the performance of the Interstate System; and

(V)  the performance of the National Highway System (excluding the Interstate System)[.]

23 U.S.C. § 150(c)(3)(A)(ii).

The clear focus of Section 150(c)(3)(A)(ii) on the physical structures of the interstate and national-highway systems demonstrates that "performance" is also focused on those physical structures. Congress authorized the DOT to measure the system's physical infrastructure itself and how well that physical infrastructure meets its objectives. Three of the five measures relate expressly to physical conditions—the condition of interstate pavement, the condition of highway pavement, and the condition of bridges. These are tactile, material items. Given these closely associated measurements, the two immediately following measurements—interstate and national-highway performance—are likewise limited to the systems' physical infrastructure and its ability to meet its objectives.

The DOT's expansive reading of "performance" to include $CO_2$ emissions from vehicles ignores its context in this list of tactile measurements, which favors a more confined reading. Unlike interpreting the list of items in relation to one another, the DOT's proposed interpretation would "generate confusion or unpredictability," like a list of "fire-engine red, light pink, maroon, *navy blue*, or colors that otherwise involve shades of red." *Cf. Johnson v. United States*, 576 U.S. 591, 603 (2015) (emphasis in original) (quotation omitted). Construing "performance" following the specified "condition of pavements" and "bridges" as pertaining to the performance of the physical structure maintains the unified nature of the statute. But if "performance" instead encompasses things as vast as the GHG emissions of vehicles using the interstate and national-highway systems, the provision's scope is

– 25 –

unfettered—it introduces navy blue into a list otherwise clearly constrained to ordinary reds. *See Johnson*, 576 U.S. at 603. Given all these considerations, the Court concludes that the measurements are associated with one another and should be interpreted harmoniously and in relation to one another. *See Yates*, 574 U.S. at 543–44 (plurality opinion).

That understanding is confirmed when examining the rest of the statute and related statutes because "condition" and "performance" are often grouped together. *See* 23 U.S.C. § 150(e)(1) (requiring that states report on "the condition and performance of the National Highway System in the [s]tate"); *id.* § 119(b)(1) (stating that a purpose of the NHPP is "to provide support for the condition and performance of the National Highway System"); *id.* § 119(e)(2) (requiring a state's asset-management plan to include strategies "leading to a program of projects that would make progress toward achievement of the [s]tate targets for asset condition and performance of the National Highway System"). This frequent pairing further demonstrates that "condition" and "performance" are related and bear on each other's meaning within Section 150. *See id.* §§ 119, 150. Because "condition" is focused on the physical attributes of the interstate and national-highway systems, the text indicates that "performance" is likewise tied to the physical infrastructure. *See id.*

Further, this interpretation avoids the contradiction with the statute's express limitation on the number of authorized performance measures that would result from the DOT's position. "The provisions of a text should be interpreted in a way that renders them compatible, not contradictory." Scalia & Garner, *supra*, at 180. Section 150 speaks in mandatory, limiting language in providing that the DOT "Secretary shall . . . limit performance measures only to those described in this subsection." 23 U.S.C. § 150(c)(2)(C). But the DOT's view would untether the limitation from the interstate and national-highway

systems' infrastructure, instead permitting the DOT to require states to measure anything that happens to use or relate in any way to those systems.  And the DOT does not dispute this expansive view.  In the 2023 Rule, the DOT notes that, while its authority to impose "performance" measures is not unlimited, the only limitation is the scope of the interstate and national-highway systems.  *See* 88 Fed. Reg. at 85367.  In other words, the only limit on permissible performance measures is that they can only apply to certain roads and things coming into contact with or relating to those roads—not that the measures themselves are limited to certain subjects.  *See id.*  Given the expansive systems at issue and the number of things and people that relate in some way to them, this is no limit at all.  The agency's interpretation would figuratively open the floodgates and effectively eliminate the strict limit that Congress placed on the agency's authority to promulgate measures.  *See* 23 U.S.C. § 150(c)(2)(C).  But once the Court interprets the relevant terms in relation to the associated list, the contradiction falls away.

### iii.   The DOT's proposed interpretation would render other portions of the statute superfluous.

Although the analysis thus far has focused on Section 150(c)(3)'s performance measures, the statute mandates measures for three additional topics—highway safety, congestion mitigation and air quality, and national freight movement.  23 U.S.C. § 150(c)(4)–(6).  And, regarding air quality, Congress specifically directs the DOT to establish measures relating to "on-road mobile source emissions."  *Id.* § 150(c)(5).  The plaintiffs argue that this provision cabins the DOT's authority to establish performance measures to ozone, carbon monoxide, and particulate matter through its tie to Section 149.  *See* Dkt. No. 19 at 20.  The defendants counter that the provision does not prohibit the DOT from otherwise adopting other measures to combat $CO_2$ emissions.  *See* Dkt. No. 25 at 20.

– 27 –

The statutory text and settled canons of statutory interpretation support the plaintiffs' argument.

Section 150(c)(5) provides that, "[f]or the purpose of carrying out [S]ection 149, the Secretary shall establish measures for [s]tates to use to assess . . . on-road mobile source emissions." 23 U.S.C. § 150(c)(5). Section 149 codifies the "congestion mitigation and air quality improvement program" (CMAQ), which allows states to obligate funds apportioned to it under Title 23 to certain programs that relate to road congestion and air quality. *See id.* § 149. Under Section 149, the states are authorized to regulate on-road mobile source emissions of ozone, carbon monoxide, and particulate matter. *See id.* § 149(b). That section does not authorize programs to address $CO_2$ emissions, which the parties do not dispute. *See id.*

"When presented with two plausible readings of a regulatory text, this court common-sensically . . . prefers the reading that does not render portions of that text superfluous." *Exelon Wind 1, L.L.C. v. Nelson*, 766 F.3d 380, 399 (5th Cir. 2014). As Justice Scalia and Bryan Garner explain: "If possible, every word and every provision is to be given effect (*verba cum effectu sunt accipienda*). None should be ignored. None should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence." Scalia & Garner, *supra*, at 174 (footnote omitted).

Here, the 2023 Rule seeks to have states establish targets for and measure GHG emissions generated by "on-road mobile sources." 88 Fed. Reg. at 85364. But instead of ozone, carbon monoxide, and particulate matter, it seeks to regulate $CO_2$ emissions. *See id.* In citing to Section 150(c)(3)(A)(ii)(IV)–(V), the agency claims another source of authority to regulate on-road mobile source emissions. *Compare* 23 U.S.C. § 150(c)(3)(A)(ii)(IV)–(V),

24-10470.4754

*with id.* § 150(c)(5).  In effect, the DOT claims that both sections authorize the regulation of on-road mobile source emissions.  But if air quality and "on-road mobile source emissions" were contemplated by Congress when it used "performance" in Section 150(c)(3)(A)(ii), then the authorization found in Section 150(c)(5) would be superfluous.  If "performance" included the broad authority to promulgate measures related to on-road mobile source emissions, Congress would not have needed to separately authorize such measures later in the statute.[14]  *See id.* § 150(c).  The DOT's "reading is thus at odds with one of the most basic interpretive canons, that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant."  *Corley v. United States*, 556 U.S. 303, 314 (2009) (cleaned up) (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)).  Congress had no need to duplicate the provision of this authority in two separate subsections, and it is especially unlikely that it created an expansive, duplicative authorization after limiting the universe of possible measures "only to those described in this subsection."  23 U.S.C. § 150(c)(2)(C).

Moreover, Section 150(c)(5)'s on-road mobile source emission standard is precisely drafted to cover only certain pollutants, and it excludes $CO_2$.  *See id.* § 149(b).  Nothing in the statute's text indicates that, despite the precision in (c)(5) and the limitation of permissible measures in (c)(2), Congress wanted the DOT to go beyond (c)(5) and create

---

[14] The Court recognizes that CMAQ might cover a "transportation project or program" that is not part of the Interstate System or National Highway System.  *See* 23 U.S.C. § 149(b).  For such a project, an on-road mobile source emissions measure might be promulgated under Section 150(c)(5) that would not fit under (c)(3).  However, given the breadth of the definitions of the Interstate System and National Highway System, *see supra* Section 4.C.i, there is undoubtedly a very large overlap between those systems and any project covered by CMAQ, rendering (c)(5) superfluous. For that reason, and for the other textual and contextual reasons detailed in this order, this aspect of CMAQ does not materially alter the Court's analysis.

24-10470.4755

additional measures for on-road source emissions based on the more general authorization related to "the performance of the Interstate System . . . [and] the National Highway System."  Additionally, the agency fails to point to how, as a matter of logic, its interpretation of "performance" could encompass on-road mobile source emissions related to $CO_2$ but not carbon monoxide.  *See generally* 88 Fed. Reg. at 85364.  Congress chose to use "on-road mobile source emissions" in one place—which authorized measures relating to ozone, carbon monoxide, and particulate matter.  *See* 23 U.S.C. § 150(c)(5).  The Court will not interpret (c)(3) in a way that renders (c)(5) superfluous.[15]

And to the extent the DOT asserts that, despite the duplication in (c)(3) and (c)(5), Congress could nevertheless detail the air-quality program specified in subsection (c)(5), that assertion runs roughshod into the negative-implication canon.  That canon teaches that "[t]he expression of one thing implies the exclusion of others."  Scalia & Garner, *supra*, at 107.  Congress specifically addressed an air-quality program and on-road mobile source emissions in (c)(5), and no party argues that this subsection can authorize the GHG

---

[15] Relatedly, the plaintiffs argue that legislative history provides support for their position that Congress deliberately chose to exclude performance measures related to $CO_2$ emissions.  *See* Dkt. No. 19 at 18–19.  Because of the limited analytical benefit derived from legislative history, the Court finds that argument unconvincing.  After all,

> Apart from th[e] political problem [that the legislature makes law only by voting on proposed statutes] and a torrent of practical problems . . . the use of legislative history poses a major theoretical problem: It assumes that what [a court is] looking for is the intent of the legislature rather than the meaning of the statutory text.  That puts things backwards.  To be "a government of laws, not of men" is to be governed by what the laws *say*, and not by what the people who drafted the laws intended.

Scalia & Garner, *supra*, at 375 (emphasis in original).  As stated more succinctly by Justice Holmes: "We do not inquire what the legislature meant; we ask only what the statute means."  Oliver Wendell Holmes, *The Theory of Legal Interpretation*, 12 Harv. L. Rev. 417, 419 (1899) (quoted with approval in *Schwegmann Bros. v. Calvert Distillers Corp.*, 341 U.S. 384, 397 (1951) (Jackson, J., concurring)).

emissions measure.  *See generally* Dkt. Nos. 19; 25.  The implication is clear.  Congress's

choice to address emissions in (c)(5), and to do so in a way that cannot authorize the 2023

Rule, implies the exclusion of other on-road mobile source emission measurements,

including GHG emissions.  *See Bartenwerfer v. Buckley*, 598 U.S. 69, 78 (2023) ("'[W]hen

Congress includes particular language in one section of a statute but omits it in another

section of the same [a]ct,' [courts] generally take the choice to be deliberate." (quoting

*Badgerow v. Walters*, 596 U.S. 1, 11 (2022))); *see also* Dkt. No. 28 at 10–11.

        In an attempt to establish otherwise, the defendants confuse the source of an

agency's power to act.  They assert that the 2023 Rule is justified despite Section 150(c)(5)'s

specific mention of on-road emissions because "Congress did not include any language

prohibiting [the DOT] from establishing other measures related to emissions for the

NHPP."  Dkt. No. 25 at 20.  This gets things backwards.  An agency must have statutory

authorization to enact a rule; the absence of a statutory prohibition does not indicate that

such authority has been given.  *See City of Arlington*, 569 U.S. at 297; *see also VanDerStok*, 86

F.4th at 187.  Thus, the lack of a statutory prohibition provides no support for the

defendants' position.

> ### iv.  Section 150(b)'s list of national goals indicates that "performance" of the interstate and national-highway systems does not include environmental performance.

        The DOT relies heavily on the national goals articulated in Section 150(b) to justify

its interpretation of "performance"—particularly the goal of environmental sustainability.

*See* Dkt. No. 25 at 15–19.  The plain language of the provision and the statutory structure,

however, undermine the agency's interpretation.  While environmental sustainability is

undoubtedly a statutory goal, it does not follow that, as a result, measuring the interstate

– 31 –

and national-highway systems' "performance" includes the GHG emissions measure.  To the contrary, environment-related measures are included in Section 150(c)(5), and environmental sustainability is also addressed in various other sections of the Title 23.  Thus, the DOT cannot properly use the broad national goal mentioned in Section 150(b) to shoehorn the GHG emissions measure into Section 150(c)'s limited, specific list of performance measures that the states must track and report.

Turning to the goals themselves, the Court recognizes that the NHPP aims to "provide a means to the most efficient investment of [f]ederal transportation funds by refocusing [the program] on national transportation goals."  23 U.S.C. § 150(a).  These goals include (1) safety; (2) infrastructure condition; (3) congestion reduction; (4) system reliability; (5) freight movement and economic vitality; (6) environmental sustainability; and (7) reduced project delivery delays.  *Id.* § 150(b).  Critically here, the environmental-sustainability goal is "[t]o enhance the performance of the transportation system while protecting and enhancing the natural environment."  *Id.* § 150(b)(6).

Contrary to the DOT's contention, the environmental-sustainability goal does not authorize the 2023 Rule for three reasons.  First, and most simply, neither GHG emissions nor environmental sustainability more broadly is included as one of the categories of performance measures in Section 150(c)(3).  Those five measures focus on the condition of pavements, the condition of bridges, and the competence or effectiveness of the interstate and national-highway systems.  *Id.* § 150(c)(3)(A)(ii)(I)–(V).  In contrast, the environment-related goal relates to the measures detailed in (c)(5)'s air-quality program.  Similarly, other national goals have related and easily identified measures.  The safety goal corresponds to (c)(4)'s "[h]ighway safety improvement program."  The infrastructure-condition and system-

– 32 –

reliability goals correspond to (c)(3)'s infrastructure and efficiency-related measures. Congestion reduction corresponds to (c)(5)'s "[c]ongestion mitigation" program. The freight-movement goal corresponds to (c)(6)'s "[n]ational freight movement" measures.

But not every goal appears to have a corresponding measure. Specifically, the goal of reducing project-delivery delays seeks to reduce costs of federal highway projects by "eliminating delays in the project development and delivery process, including reducing regulatory burdens and improving agencies' work practices." *Id.* § 150(b)(7). Despite this goal, none of the specified performance measures in subsection (c) address costs or project delays, which indicates that the states do not necessarily need to measure and report on every aspect of the national goals. Because the environmental-sustainability goal is not included in (c)(3)'s authorized measures, that provision cannot authorize the GHG emissions measure.

Second, the language of the environmental-sustainability goal itself undermines the DOT's position that it may be measured as an aspect of "the performance of the Interstate System . . . [and] the National Highway System." Again, the national goal is to "enhance the performance of the transportation system while protecting and enhancing the natural environment." *Id.* § 150(b)(6). Pared down, the goal is to do one thing (enhance system performance) while also doing another thing (enhance the environment). By separating the two aspirations with the conjunction "while," the statutory language distinguishes "the performance of the transportation system" from "protecting and enhancing the natural environment." *See id.* Given that the Court must "give effect to every word that Congress used in the statute," *Lowe v. SEC*, 472 U.S. 181, 207 n.53 (1985), the Court concludes that, within the context of Section 150, the "performance of the transportation system" is distinct

– 33 –

from "protecting and enhancing the natural environment." *See* 23 U.S.C. § 150(b). To include "protecting and enhancing the natural environment" in the definition of "the performance of the transportation system"—and by extension, the performance of the Interstate System and the National Highway System—would render portions of the environmental-sustainability goal's provision redundant. *See id.* If the DOT's interpretation were correct, the national goal could be restated as "to protect and enhance the natural environment while protecting and enhancing the natural environment." Adopting such a nonsensical interpretation would create a redundancy in the statute—something precedent cautions the Court against. *See Williams v. Taylor*, 529 U.S. 362, 404 (2000) ("It is, however, a cardinal principle of statutory construction that [a court] must 'give effect, if possible, to every clause and word of a statute.'" (quoting *United States v. Menasche*, 348 U.S. 528, 538–39 (1955))). Nor can the Court assume that "performance" as used in Section 150(b)(6) is different than "performance" as used within Section 150(c)(3)(A)(ii) absent some evidence in the text supporting different readings. *See Mohasco Corp. v. Silver*, 447 U.S. 807, 826 (1980) (concluding that a court cannot unreasonably give a word a different meaning across the same section of a statute).

Third, the environmental-sustainability goal is more obviously and naturally accounted for in other portions of the statute. As discussed elsewhere in this Order, other portions of the statutory scheme shed light on how programs authorized under Section 119, Section 150, and elsewhere in Title 23 further environmental sustainability. *See supra* Section 4.C.iii; *infra* Section 4.D. For instance, Section 119 allows funding for specific projects that support the goal of protecting and enhancing the natural environment. *See, e.g.*, 23 U.S.C. § 119(d)(2)(M) (authorizing funding for projects that accomplish

– 34 –

"[e]nvironmental restoration and pollution abatement in accordance with [S]ection 328").
And within Section 150 itself, subsection (c)(5) allows the defendants to promulgate
performance measures related to traffic congestion and non-$CO_2$ types of on-road mobile
source emissions.  *See id.* §§ 149(b), 150(c)(5).  Each of those sections supports the national
goal of environmental sustainability.

Given that (1) environmental measures are not included in Section 150(c)(3)'s
performance measures; (2) the language of the environment-sustainability goal contrasts
system performance with environmental enhancement; and (3) environmental sustainability
is expressly accounted for in other portions of Title 23, (c)(3)'s infrastructure-specific
measures do not include measures of environmental performance.

### D.    Section 150's statutory context demonstrates that "performance" of the interstate and national-highway systems is not broadly defined to include the GHG emissions from cars using the system.

In light of the above analysis, the plain language of Section 150 alone demonstrates
that the 2023 Rule exceeded the DOT's authority.  If any doubt remains, however, the
broader statutory context proves the same.  "Context is a primary determinant of meaning."
Scalia & Garner, *supra*, at 167; *see also Graham Cnty. Soil & Water Conservation Dist.*, 559 U.S.
at 289–90.  Because a statute "typically contains many interrelated parts that make up the
whole," "[t]he entirety of the document thus provides the context for each of its parts."
Scalia & Garner, *supra*, at 167.

Here, the context reveals that Section 150—and the performance measures at issue—
are connected to Section 119.  Congress instructed in Section 150 that (c)(3)'s performance
measures exist expressly "for the purpose of carrying out [S]ection 119."  23 U.S.C.
§ 150(c)(3)(A).  Thus, Section 119 and its purposes aid the Court in determining the scope of

Section 150's permissible performance measures, and they provide further support for the

Court's conclusion.

> ### i. Section 119(b)'s purposes distinguish between the highway system's performance and the system's resilience to avoid environmental disasters.

Section 119 requires the DOT to implement the NHPP and enumerates four

purposes for that program. 23 U.S.C. § 119(b). Specifically, the statute provides that "[t]he

purposes of the national highway performance program" are:

> (1) to provide support for the condition and performance of the National Highway System;
>
> (2) to provide support for the construction of new facilities on the National Highway System;
>
> (3) to ensure that investments of Federal-aid funds in highway construction are directed to support progress toward the achievement of performance targets established in an asset management plan of a [s]tate for the National Highway System; and
>
> (4) to provide support for activities to increase the resiliency of the National Highway System to mitigate the cost of damages from sea level rise, extreme weather events, flooding, wildfires, or other natural disasters.

*Id.*

Two aspects of these purposes aid the Court. First, the statute lists "performance of

the National Highway System" as a separate purpose from "mitigat[ing] the cost of

damages from" natural disasters. *Cf. id.* § 119(b)(1), (b)(4). As distinct purposes using

different terminology, the Court construes them as having independent meaning. *See*

*Williams*, 529 U.S. at 404. If the "performance" of the system included its resiliency to

mitigate the cost from environmental impacts, then (b)(4) would be redundant. Once again,

the Court will not interpret "performance" in a way that renders other portions of the statute

superfluous. *Exelon Wind 1, L.L.C.*, 766 F.3d at 399. This is yet another indicator that the

"performance" of the highway system means the efficiency of the infrastructure itself and not its "environmental performance."

Second, the statutory purpose related to natural disasters demonstrates that Section 119's environmental focus is increasing the system's "resiliency . . . to mitigate the cost of damages" resulting from potential disasters—not the potential underlying cause of those disasters. 23 U.S.C. § 119(b)(4). Congress seeks to support activities that make the National Highway System able to withstand or recover quickly from things like sea-level rise, extreme weather, flooding, and wildfires. *See id.* That is, the purpose is not about mitigating the causes of the damage to the system, but about mitigating the damage to the system. *See id.* Further, when damage does occur, the provision is directed at ensuring that the system may survive that damage. *See id.* But environmental inputs, like vehicle emissions, are omitted from the list, and it is unclear how measuring GHG emissions could make the system itself more resilient to natural disasters when they occur. Thus, Section 119(b)(4) is yet another indicator that GHG emissions are not properly included in Section 150(c)(3)'s scope.

ii.  **In defining eligible projects, Section 119(d)(1)(A)'s list of "performance goals" focuses on the infrastructure's capabilities; it does not mention environmental sustainability.**

As detailed in Part 1, to be eligible for NHPP funding, a project must meet certain criteria. *Id.* § 119(d). First, funds "may be obligated only for a project on an eligible facility that" supports progress in achieving the national performance goals for improving "infrastructure condition, safety, congestion reduction, system reliability, or freight movement." *Id.* § 119(d)(1)(A). Second, the project must be "consistent with [S]ections 134

– 37 –

and 135."[16]  *Id.* § 119(d)(1)(B).  Third, the project must be for one or more defined purposes. *Id.* § 119(d)(2).

It is telling that, in defining which projects are eligible for funding, Section 119's "national performance goals" do not mention environmental sustainability.  Each of the goals—infrastructure condition, safety, reducing congestion, system reliability, and freight movement—focuses on the system's infrastructure and efficiency.  These goals, which Section 150(c)(3) exists to carry out, are consistent with the Court's interpretation of "performance of the Interstate System . . . [and] the National Highway System" as focusing on the system's physical condition and efficiency.  And they undermine the DOT's more expansive interpretation to include "environmental performance."

---

[16] The Court notes that Sections 134 and 135 each contain provisions that require a state to assess the environmental impact of its transportation planning.  *See, e.g.*, 23 U.S.C. § 134(a) (noting that "[i]t is in the national interest" to "minimiz[e] transportation-related fuel consumption and air pollution"); *id.* § 135(d)(1)(E) (noting that an aspect of a state's plan should include "consideration and implementation of projects" that "protect and enhance the environment").  While this language requires states to consider the environmental impact of transportation decisions in their planning processes, that consideration is wholly divorced from whether Section 150(c) authorizes a GHG emissions measure.  The performance goals in Section 119(d)(1)(A) exclude environmental sustainability—so NHPP funding is not conditioned on a project accomplishing progress toward that goal.  And projects may of course be consistent with the planning requirements of Sections 134 and 135 without achieving progress towards an environmental-sustainability national goal.  Finally, to assert that the language in Sections 134 and 135 indicates that "performance" includes "environmental performance" ignores the more relevant statutory language present in both Section 150 and Section 119.  Finding authority to promulgate the GHG emissions measure in Sections 134 and 135—two sections removed from Section 150—would be the sort of "cryptic" authority that the Supreme Court has viewed with suspicion.  *See Brown & Williamson Tobacco Corp.*, 529 U.S. at 160.  The defendants' references to 23 U.S.C. § 101(b)(3)(G) for authorization fall into the same category.  *See* Dkt. No. 25 at 17; *see also* 23 U.S.C. § 101(b)(3)(G) (providing in a declaration of policy that "transportation should play a significant role in promoting economic growth, improving the environment, and sustaining the quality of life").

### iii.    Section 119(d)(2)'s list of eligible project purposes specifies multiple environmental purposes; none include GHG emission reduction.

Assuming that a project can meet the threshold eligibility requirements found in Section 119(d)(1), Section 119(d)(2) enumerates a variety of purposes for which funds may be directed.  It includes 19 separate purposes for which funds may be authorized.  Nine are explicitly tied to the construction or maintenance of infrastructure on the National Highway System, Interstate System, and related facilities.  *See id.* § 119(d)(2)(A)–(C), (F)–(H), (L), (P), (Q).  Two more relate to the inspection of and the training of inspectors for the National Highway System's infrastructure.  *See id.* § 119(d)(2)(D)–(E).  Several more purposes relate to safety and operations.  *See id.* § 119(d)(2)(I)–(K), (S).  Most relevant here, four of the permissible purposes relate to the environment.  *See id.* § 119(d)(2)(M)–(O), (R).

Like all the provisions found in Section 119(d)(2), those environmental provisions only authorize funds for specific, narrow activities.  Section 119(d)(2)(M) provides that funds may be used towards "[e]nvironmental restoration and pollution abatement in accordance with [S]ection 328."  *Id.* § 119(d)(2)(M).  Section 328 provides for specific projects related solely to "minimiz[ing] or mitigat[ing] the impacts of any transportation project" funded by the NHPP.  *See id.* § 328(a).  Further, projects funded under subsection (M) are only allowed "to address water pollution or environmental degradation caused wholly or partially by a transportation facility."  *Id.*  Section 119(d)(2)(N) provides that funds may be used towards the "[c]ontrol of noxious weeds and aquatic noxious weeds and establishment of native species in accordance with [S]ection 329."  *Id.* § 119(d)(2)(N).  Section 329, in turn, deals with protecting plant systems specifically "related to transportation projects funded under this title."  *Id.* § 329(a).  It further lists discrete activities related to that goal that may be addressed through NHPP funding, such as the establishment

of plants for the abatement of water runoff and the control or elimination of plants that impede or impair a transportation system. *See id.* § 329(a)–(b). Section 119(d)(2)(O) provides that funds may go towards "[e]nvironmental mitigation efforts related to projects funded under this [S]ection, as described in [Section 119(g)]." *Id.* § 119(d)(2)(O). Section 119(g) allows funds for a variety of mitigation efforts, such as participating in mitigation banking or contributions to statewide and regional efforts to conserve natural habitats and wetlands. *See generally id.* § 119(g)(1)–(2). Section 119(d)(2)(R) permits funds to go towards "[r]esiliency improvements on the National Highway System, including protective features described in [Section 119(k)(2)]." *Id.* § 119(d)(2)(R). Section 119(k)(2) lists protective features for which NHPP funds may be used, including things like "raising roadway grades," "stabilizing slide areas," and "increasing the size or number of drainage structures." *Id.* § 119(k)(2).

What these environmentally related purposes all have in common is a strict limitation on how NHPP funds may be used. Section 119(d)(2)(M) is strictly limited to accomplishing the terms of Section 328. *See id.* §§ 119(d)(2)(M), 328. Section 119(d)(2)(N) is likewise controlled by Section 329. *See id.* §§ 119(d)(2)(N), 329. Section 119(d)(2)(O) is tied to the mitigation efforts described in Section 119(g)—which, while broad in nature, are limited to reactive purposes, as demonstrated by the term "mitigation." *See id.* § 119(d)(2)(O), (g)(1)–(2). Section 119(d)(2)(R) is limited to "resiliency" improvements, which are tied to constructive or reconstructive efforts to protect infrastructure. *See id.* § 119(d)(2)(R), (k)(2). Thus, the funds could not properly apply towards the reduction of GHG emissions.

– 40 –

Further, the explicit enumeration of these provisions evince that Congress specifically excluded other environmental purposes. *See NLRB v. SW Gen., Inc.*, 580 U.S. 288, 302 (2017). Importantly, none of the provisions touch a subject even remotely related to $CO_2$ emissions by vehicles on the Interstate System or National Highway System. They are each more limited in scope to particular aspects of environmental impacts of the interstate and national-highway systems. The specific inclusion of these authorized environmental purposes—and the omission of anything related to GHG emissions—further weigh against adopting the DOT's broad interpretation of "performance."

\* \* \*

In sum, the statutory text indicates at every turn that measuring the "performance of the Interstate System . . . [and] the National Highway System" does not authorize measures of environmental performance. The definitions of "performance," "National Highway System," and "Interstate System" instruct that it is the roadways' efficiency and reliability in facilitating travel, commerce, and the national defense that may be measured. The associated measures in Section 150(c)(3) support this conclusion by focusing on the systems' physical infrastructure. The DOT's position, in contrast, would render other portions of the statute superfluous, and the national goal on which the DOT relies so heavily provides more support for the plaintiffs' position. Likewise, the statutory context consistently instructs the Court to reject the DOT's expansive interpretation. Thus, the Court concludes that the DOT's GHG emission measure is unauthorized by the statute.[17]

---

[17] In light of this conclusion, the Court need not, and does not, reach the plaintiffs' remaining claims that the 2023 Rule is arbitrary and capricious under the APA and also violates the Constitution's Spending Clause.

– 41 –

5.      **Remedy**

Having concluded that the DOT promulgated the GHG emissions measure in excess

of its statutory authority, the Court now turns to the proper remedy.  The plaintiffs ask the

Court to vacate the 2023 Rule.  Dkt. No. 1 at 22.  They defer to the Court as to whether the

remedy should be party-specific.  Dkt. No. 30 at 14.  The defendants argue that any relief

should be limited to the State of Texas.  Dkt. No. 25 at 27.  For the reasons described below

and in light of binding precedent, the Court remands the rule with vacatur, a remedy that

inherently sweeps broader than the parties.

A.      **The Rule is vacated and remanded.**

Under the APA, a court shall hold unlawful and set aside agency action that is in

excess of the statutory authority.  5 U.S.C. § 706(2).  Section 706(2) goes "beyond the mere

non-enforcement remedies available to courts" and "empowers courts to set aside—*i.e.*,

formally nullify and revoke—an unlawful agency action."  *Data Mktg. P'ship v. U.S. Dep't of

Lab.*, 45 F.4th 846, 859 (5th Cir. 2022) (cleaned up) (quotation omitted).  The 2023 Rule is

such an agency action.  *See* 5 U.S.C. § 551(13).

When awarding relief under Section 706(2), the Court may fashion the remedy in

one of two ways: remand the rule with vacatur or remand the rule without vacatur.  *See

Texas v. United States*, 50 F.4th 498, 529–30 (5th Cir. 2022).  The default rule is to vacate and

remand the rule.  *See Data Mktg. P'Ship*, 45 F.4th at 859.  Remand without vacatur is an

exceptional remedy that is appropriate where "there is at least a serious possibility that the

agency will be able to substantiate its decision given an opportunity to do so."  *See Texas v.

Biden*, 10 F.4th 538, 560 (5th Cir. 2021) (quoting *Tex. Ass'n of Mfrs. v. U.S. Consumer Prod.*

24-10470.4768

*Safety Comm'n*, 989 F.3d 368, 389 (5th Cir. 2021)); *see Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 934 F.3d 649, 674 (D.C. Cir. 2019).

When deciding whether vacatur is appropriate, a court should consider two factors. First, the court should evaluate "the seriousness of the deficiencies of the action" or "how likely it is the agency will be able to justify its decision on remand." *Texas*, 50 F.4th at 529 (quoting *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019)). Second, the court should assess "the disruptive consequences of vacatur." *Id.* (quoting *United Steel*, 925 F.3d at 1287). "A strong showing of one factor may obviate the need to find a similar showing of the other." *Am. Bankers Ass'n*, 934 F.3d at 674.

Here, the 2023 Rule was promulgated in excess of the agency's statutory authority and is therefore substantially deficient. *See supra* Section 4. Further, the defendants have not explained how they would substantiate the 2023 Rule if given the opportunity to do so. Without any such explanation, and in light of the 2023 Rule's deficiencies, the Court finds it unlikely that the defendants will be able to justify their decision on remand. *See Texas*, 10 F.4th at 560.

Further, there are no disruptive consequences that would support remand without vacatur. As a preliminary matter, the defendants do not raise any arguments on this front, other than noting that setting the rule aside would affect other court decisions currently pending around the country. *See* Dkt. No. 25 at 27–29. But that argument is more relevant to the scope of relief, discussed below. The Court notes that the 2023 Rule's effective date has been delayed several times, and the first reporting deadline is not until March 29, 2024. *See* Dkt. No. 13 at 1. Thus, the Court cannot identify a disruptive effect that would be caused by vacating the Rule. After all, the 2023 Rule is not functionally effective at this

24-10470.4769

moment, and its predecessor has not been in effect since the 2018 repeal.  Having

considered both the applicable factors, the Court concludes that remanding the Rule with

vacatur is appropriate.

> **B.     Fifth Circuit precedent provides that setting aside an unlawful agency action under the APA nullifies and voids that action; thus, the Court does not limit the vacatur to the plaintiffs.**

Having determined what relief is appropriate, the Court now considers the scope of

relief.  The defendants urge the Court to limit relief to the plaintiffs in this case.  *See* Dkt.

No. 25 at 27–29.  For support, they cite a host of authority regarding the propriety of

nationwide injunctions, *see id.* at 27–28, before addressing the scope of relief under the APA,

*see id.* at 28–29.  Here, the plaintiffs have requested vacatur, not an injunction, so the

injunction-related case law misses the mark.

While injunctions can be narrowly tailored to the parties, vacatur "formally nullifies

and revokes an unlawful agency action."  *Data Mktg. P'ship*, 45 F.4th at 859 (cleaned up)

(quotation omitted); *see also Vacate*, Black's Law Dictionary (11th ed. 2019) ("To nullify or

cancel; make void; invalidate."); John Harrison, *Vacatur of Rules under the Administrative

Procedure Act*, 40 Yale J. on Reg. Bull. 119, 120 (2023) ("[V]acatur is inherently universal.").

In other words, "[u]nlike an injunction, which merely blocks enforcement, vacatur unwinds

the challenged agency action."  *Data Mktg. P'ship*, 45 F.4th at 859 (quoting *Driftless Area

Land Conservancy v. Valcq*, 16 F.4th 508, 522 (7th Cir. 2021)).  Vacatur therefore "erase[s]

[the agency action] from the books."  *See United States v. Texas*, 143 S. Ct. 1964, 1981 (2023)

(Gorsuch, J., concurring in the judgment).  And, if erased from the books, this relief cannot

logically be limited to the plaintiffs—if the rule no longer exists, it does not exist at all.  *See

Data Mktg. P'ship*, 45 F.4th at 859; *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir.

– 44 –

1989).  While this sweeping result has led some jurists to criticize the grant of such relief, *see, e.g.*, *Texas*, 143 S. Ct. at 1980–86 (Gorsuch, J., concurring in the judgment), this Court is bound by Fifth Circuit precedent that has continually maintained that vacatur is "the appropriate remedy" by "default." *Data Mktg. P'ship*, 45 F.4th at 859; *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (en banc), *cert. granted*, 144 S. Ct. 374 (2023).

To be sure, vacatur's status as the default rule does not mean the Court is without discretion to choose "a more limited remedy" if appropriate.  *See Cargill*, 57 F.4th at 472.  But a more limited remedy is not party-specific vacatur.  It is instead some other kind of remedy—"injunctive, declarative, or otherwise."  *See id.*  The present predicament is that there is no other clear, more limited remedy requested by the plaintiffs that the Court could grant here that would redress the plaintiffs' injury.  *See* Dkt. No. 18 at 2.  While the plaintiffs previously sought injunctive relief, they withdrew that request before the defendants had an opportunity to respond.  Dkt. Nos. 9; 16.  Of course, the Court has discretion in fashioning relief, even if not requested by a party, Fed. R. Civ. P. 54(c), but that relief must have been "tested adversarially, tried by consent, or at least developed with meaningful notice to the defendant[s]."  *Peterson v. Bell Helicopter Textron, Inc.*, 806 F.3d 335, 340 (5th Cir. 2015); *Deanda v. Becerra*, --- F.4th ----, No. 23-10159, 2024 WL 1059721, at *13 (5th Cir. Mar. 12, 2024).  Several federal appellate courts have found it improper to use Rule 54(c) to grant injunctive relief even when actually requested in the complaint if the plaintiff fails to pursue an injunction throughout litigation.  *See id.* at 341 (collecting cases).  If those discretion-based injunctions were improper, it would seem odd that a sua sponte injunction where none is requested would be a valid use of Rule 54(c).  Even if the Court could issue a sua sponte party-specific injunction here, it would have to act without the benefit of developed

– 45 –

briefing on all four elements, in spite of the plaintiffs' prior abandonment of their request for such relief, and importantly, without the defendants having clear notice of such a possibility. And, despite its scope, vacatur is often considered "a less drastic remedy" than an injunction, so courts typically vacate rather than enjoin. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010).

As for the request for a declaratory judgment, Dkt. No. 18 at 2, given the time-sensitive nature of the plaintiffs' impending obligations under the Rule, adequate relief requires an affirmative blockade of the agency's action, not merely a defensive tool. Moreover, courts in this circuit generally consider a declaratory judgment only after addressing vacatur. *E.g.*, *D&B Boat Rentals, Inc. v. United States*, 508 F. Supp. 3d 87, 101 (E.D. La. 2020); *Texas v. United States*, 606 F. Supp. 3d 437, 501–02 (S.D. Tex. 2022), *rev'd on other grounds*, 143 S. Ct. 1964 (2023). This ordering makes sense given that the APA directs that a "reviewing court *shall* . . . hold unlawful and set aside agency action"—which, again, generally means vacate—while declaratory relief is instead equitable and discretionary. *See* 5 U.S.C. § 706 (emphasis added); *Data Mktg. P'ship*, 45 F.4th at 859; *Rowan Cos. v. Griffin*, 876 F.2d 26, 28 (5th Cir. 1989). And the defendants do not argue that the Court should grant a declaratory judgment in lieu of vacatur. Dkt. No. 25 at 27–29. As a result, based on the present record before the Court, there is no other more limited relief available that would address the plaintiffs' injuries that has been properly noticed to the defendants. So, although courts can, in certain circumstances, choose a more limited approach than vacatur, *Cargill*, 57 F.4th at 472, the Court concludes that doing so here would be inappropriate.

– 46 –

Accordingly, the Court concludes that the proper remedy here is vacatur, and, by necessary implication, that means relief not limited to the plaintiffs. A remedy must be tailored to redress the plaintiffs' particular injury. *Id.* But the Court is not free to ignore the Fifth Circuit's precedent instructing that the precise remedy for the plaintiffs' APA claim is vacatur, particularly when, as here, no other suitable remedy is before the Court.[18] *See Data Mktg. P'ship*, 45 F.4th at 859–60 (holding that the set-aside vacatur under Section 706(2) nullifies and revokes unlawful agency action). The Fifth Circuit has repeatedly granted vacatur without limiting such relief to the parties. *See, e.g.*, *Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616, 623 (5th Cir. 2022), *cert. granted*, 143 S. Ct. 978 (2023); *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1033 (5th Cir. 2019); *Texas*, 50 F.4th at 529–30. To the extent courts tailor vacatur, those limits address the scope of the agency action that is vacated, nullifying only those portions that are invalid. *See Franciscan All., Inc. v. Azar*, 414 F. Supp. 3d 928, 944–45 (N.D. Tex. 2019). Unsurprisingly, because party-specific vacatur

---

[18] As the Court has already noted, members of the Supreme Court have questioned the validity of non-party-specific relief such as vacatur. *See Texas*, 143 S. Ct. at 1980–86 (Gorsuch, J., concurring in judgment). And there is ongoing scholarly debate on the subject, with some arguing that vacatur under the APA is universal and others claiming that any relief should be limited in scope to only the plaintiffs. *Compare* Mila Sohoni, *The Power to Vacate a Rule*, 88 Geo. Wash. L. Rev. 1121 (2020), *with* John Harrison, *Section 706 of the Administrative Procedure Act Does Not Call for Universal Injunctions or Other Universal Remedies*, 37 Yale J. on Reg. Bull. 37 (2020), *and* Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417 (2017). However, because the Court cannot ignore existing Fifth Circuit precedent on vacatur absent a Supreme Court decision overruling it, the Court follows existing precedent in vacating the Rule without limitation to the plaintiffs.

The Court recognizes the weighty concerns raised by the defendants as to why relief not limited to the parties should be disfavored. For one, there is ongoing litigation in another district where 21 states have challenged the same rule, creating the possibility of conflicting rulings. *See Kentucky v. Fed. Highway Admin.*, No. 5:23-cv-162-BJB (W.D. Ky. filed Dec. 21, 2023). Moreover, vacatur runs contrary to the ordinary principle that relief is limited to what is necessary to redress the plaintiff's demonstrated harm. *See Gill v. Whitford*, 585 U.S. 48, 73 (2018). The Court does not grant this relief lightly. But based on its understanding of precedent and the unique procedural posture at hand, the Court sees no viable or appropriate alternative.

runs contrary to the very nature of the relief, the defendants have cited no examples to the contrary. *See* Dkt. No. 25 at 27–29. To vacate is to void. And the Court must do so here.

**6.    Conclusion**

"When a regulation attempts to override statutory text, the regulation loses every time—regulations can't punch holes in the rules Congress has laid down." *Djie v. Garland*, 39 F.4th 280, 285 (5th Cir. 2022). That is what occurred here—the DOT's 2023 Rule attempts to override Section 150(c)(3)'s clear limitation of authorized performance measures to those that track the physical condition and efficiency of the interstate and national-highway systems. If the people, through Congress, believe that the states should spend the time and money necessary to measure and report GHG emissions and set declining emission targets, they may do so by amending Section 150 or passing a new law. But an agency cannot make this decision for the people. An agency can only do what the people authorize it to do, and the plain language of Section 150(c)(3) and its related statutory provisions demonstrate the DOT was not authorized to enact the 2023 Rule.

Given this reality, the Court grants the plaintiffs' motion for summary judgment (Dkt. No. 18) and denies the defendants' cross-motion for summary judgment (Dkt. No. 24). Further, in light of relevant Fifth Circuit precedent, the Court determines that remand with vacatur is the appropriate remedy. Therefore, the Court sets aside and vacates the 2023 Rule. The Court denies all other requested relief. Judgment, including a seven-day administrative stay, will follow in a separate Order.

So ordered on March 27, 2024.

_____
JAMES WESLEY HENDRIX
UNITED STATES DISTRICT JUDGE

24-10470.4775

**TAB 5**

## DEPARTMENT OF TRANSPORTATION

### Federal Highway Administration

**23 CFR Part 490**

[FHWA Docket No. FHWA–2021–0004]

RIN 2125–AF99

**National Performance Management Measures; Assessing Performance of the National Highway System, Greenhouse Gas Emissions Measure**

**AGENCY:** Federal Highway Administration (FHWA), U.S. Department of Transportation (DOT).

**ACTION:** Final rule.

**SUMMARY:** This final rule amends FHWA's regulations governing national performance management measures and establishes a method for the measurement and reporting of greenhouse gas (GHG) emissions associated with transportation (GHG measure). It requires State departments of transportation (State DOT) and metropolitan planning organizations (MPO) to establish declining carbon dioxide ($CO_2$) targets for the GHG measure and report on progress toward the achievement of those targets. The rule does not mandate how low targets must be. Rather, State DOTs and MPOs have flexibility to set targets that are appropriate for their communities and that work for their respective climate change and other policy priorities, as long as the targets aim to reduce emissions over time. The FHWA will assess whether State DOTs have made significant progress toward achieving their targets.

**DATES:** This final rule is effective January 8, 2024.

**FOR FURTHER INFORMATION CONTACT:** Mr. John G. Davies, Office of Natural Environment, (202) 366–6039, or via email at *JohnG.Davies@dot.gov,* or Mr. Lev Gabrilovich, Office of the Chief Counsel, (202) 366–3813, or via email at *Lev.Gabrilovich@dot.gov.* Office hours are from 8 a.m. to 4:30 p.m., E.T., Monday through Friday, except Federal holidays.

**SUPPLEMENTARY INFORMATION:**

### Electronic Access and Filing

This document, the notice of proposed rulemaking (NPRM), all comments received, and all supporting material may be viewed online at *www.regulations.gov* using the docket number listed above. Electronic retrieval help and guidelines are available on the website. It is available 24 hours each day, 365 days each year. An electronic copy of this document may also be downloaded from the Office of the Federal Register's website at *www.federalregister.gov* and the Government Publishing Office's website at *www.GovInfo.gov.*

### I. Executive Summary

The FHWA is amending its regulations on national performance management measures at 23 CFR part 490 (part 490) and establishing a method for the measurement and reporting of GHG emissions. The environmental sustainability, and specifically the carbon footprint, of the transportation system is a critically important attribute that State DOTs can and should use to assess the performance of the Interstate and non-Interstate NHS. Section 150(c) of Title 23, U.S.C., clearly directs FHWA to establish performance measures that the State DOTs can use to assess performance of the Interstate and non-Interstate NHS. Although the statute does not define the meaning of "performance" of the Interstate and non-Interstate NHS under 23 U.S.C. 150(c), Congress identified national goals under 23 U.S.C. 150(b), which include environmental sustainability. *See* 23 U.S.C. 150(b)(6). To support the environmental sustainability national goal, FHWA is interpreting "performance" of the Interstate System and non-Interstate NHS under 23 U.S.C. 150(c) to include the system's environmental performance. This definition of "performance" is also consistent with other Title 23, U.S.C. provisions, such as 23 U.S.C. 119, discussed later in this preamble.

The GHG measure established in this rule is the same as the measure proposed in the NPRM, which is the percent change in on-road tailpipe $CO_2$ emissions on the NHS relative to the reference year. The FHWA is finalizing a reference year of 2022 as part of this rule. The measure is part of the National Highway Performance Program (NHPP) performance measures that FHWA established in part 490 through prior rulemakings. The GHG measure requires State DOTs and MPOs that have NHS mileage within their State geographic boundaries and metropolitan planning area boundaries, respectively, to establish declining targets for reducing $CO_2$ emissions [1] generated by on-road

mobile sources. The regulation uses "NHS" to mean the mainline highways of the NHS, consistent with the applicability of the measure described in § 490.503(a)(2). Consistent with the Transportation Performance Management (TPM) framework, State DOTs will establish 2- and 4-year statewide emissions reduction targets, and MPOs will establish 4-year emissions reduction targets for their metropolitan planning areas. In addition, the rule will require certain MPOs serving UZAs with populations of 50,000 or more to establish additional joint targets. Specifically, when the metropolitan planning area boundaries of two or more MPOs overlap any portion of an UZA, and the UZA contains NHS mileage, those MPOs will establish joint 4-year targets for that UZA. This joint target will be established in addition to each MPO's target for their metropolitan planning area. State DOTs and MPOs have the flexibility to set targets that work for their respective climate change policies and other policy priorities, so long as they are declining. The State DOTs and MPOs are also required to report on their progress in meeting their targets. The final rule applies to the 50 States, the District of Columbia, and Puerto Rico, consistent with the definition of the term "State" in 23 U.S.C. 101(a). To realize the benefits of a GHG measure as soon as is practicable, State DOTs will first establish targets and report those targets by February 1, 2024, and subsequent targets will be established and reported no later than October 1, 2026, with biennial reports thereafter.

The GHG measure will help the United States (U.S.) confront the increasingly urgent climate crisis. The Sixth Assessment Report by the Intergovernmental Panel on Climate Change (IPCC), released on August 7, 2021, confirms that human activities are increasing GHG concentrations that have warmed the atmosphere, ocean, and land at a rate that is unprecedented in at least the last 2000 years.[2] Changes in extreme events, along with anticipated future increases in the occurrence and severity of these events because of climate change, threaten the reliability, safety, and efficiency of the transportation system and the people who rely on it to move themselves and transport goods. At the same time,

---

[1] The proposed GHG measure specifically applies to $CO_2$ emissions, which is the predominant human-produced GHG. $CO_2$ is also the predominant GHG from on-road mobile sources, accounting for approximately 97 percent of total GHG emissions weighted by global warming potential in 2021. See U.S. Environmental Protection Agency, 2023: Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990–2021, table 2–13, available at *https://*

*www.epa.gov/ghgemissions/inventory-us-greenhouse-gas-emissions-and-sinks-1990-2021.*

[2] *See* IPCC, 2021: Summary for Policymakers. In: Climate Change 2021: The Physical Science Basis. Contribution of Working Group I to the Sixth Assessment Report of the Intergovernmental Panel on Climate Change, available at *https:// www.ipcc.ch/report/ar6/wg1/#SPM.*

transportation contributes significantly to the causes of climate change,[3] representing the largest source of U.S. $CO_2$ emissions, and each additional ton of $CO_2$ produced by the combustion of fossil fuels contributes to future warming and other climate impacts.

The GHG measure aligns with Executive Orders (E.O.) described later in this preamble and supports the U.S. target of reducing GHG emissions 50–52 percent below 2005 levels in 2030, on course to reaching net-zero emissions economywide no later than 2050.[4] As a matter of transportation policy, DOT considers the GHG measure essential to improve transportation sector performance and demonstrate Federal leadership in the assessment and disclosure of climate pollution. The first step toward reducing GHG emissions involves inventorying and monitoring those emissions. By providing consistent and timely information about on-road mobile source emissions on the NHS, the GHG measure has the potential to increase public awareness of GHG emissions trends, improve the transparency of transportation decisions, enhance decisionmaking at all levels of government, and support better informed planning choices to reduce GHG emissions or inform tradeoffs among competing policy choices.

Furthermore, the rule responds to the direction in sections 1 and 2 of E.O. 13990 (86 FR 7037) that Federal agencies review any regulations issued or similar actions taken between January 20, 2017, and January 20, 2021, and, consistent with applicable law, take steps to address any such actions that conflict with the national objectives set forth in the order to address climate change. The FHWA reviewed its 2018 final rule (83 FR 24920, May 31, 2018) that repealed a GHG measure FHWA adopted in 2017 (2017 GHG measure) and determined that the repeal conflicts with those objectives.

After reviewing the 2018 final rule, FHWA has reconsidered its position that the Agency's authority to promulgate the 2017 final rule reflected a ''strained reading of the statutory language in section 150.'' 83 FR at 24923. The FHWA now concludes, as it did when establishing a GHG measure in the 2017 PM3 final rule, that it has the legal authority to establish the GHG measure under 23 U.S.C. 150. Specifically, FHWA is clearly directed under 23 U.S.C. 150(c)(3)(A)(ii)(IV)–(V) to establish measures for States to use to assess the performance of the Interstate System and non-Interstate NHS. Although the statute does not define performance, 23 U.S.C. 150(b)(6) identifies environmental sustainability as a national goal of the Federal-aid highway program, and Congress, in 23 U.S.C. 150(a), has declared that performance management, including the use of performance measures, is key to meeting the national goals of section 150(b). To address the national goal of environmental sustainability, FHWA has determined that the performance of the Interstate System and the NHS under 23 U.S.C. 150(c)(3)(A)(ii)(IV)–(V) logically includes environmental performance. The GHG measure is also appropriate in light of other provisions of Title 23, U.S.C., notably the NHPP provisions at 23 U.S.C. 119, which include requirements for State asset management plans that support progress toward the achievement of the national goals identified in 23 U.S.C. 150(b), including the national goal to enhance the performance of the transportation system while protecting and enhancing the natural environment at 23 U.S.C. 150(b)(6), and include a risk management analysis that specifically addresses extreme weather and resilience. *See* 23 U.S.C. 119(e)(2) and (e)(4)(D). This reconsideration is discussed in detail in section III.B in the NPRM, *see* 87 FR 42407–42410, and section III below.

The regulatory impact analysis (RIA) prepared pursuant to E.O. 12866, as amended by E.O. 14094, is available in the rulemaking docket (Docket No. FHWA–2021–0004). The RIA estimates the costs associated with establishing the GHG measure, derived from the costs of implementing the GHG measure for each component of the rule that may involve costs. To estimate the costs, FHWA assessed the level of effort that would be needed to comply with each applicable section in part 490 with respect to the GHG measure, including labor hours by labor category, over a 10-year study period (2023–32). Total costs over this period are estimated to be $10.8 million, discounted at 7 percent, and $12.7 million, discounted at 3 percent. The RIA also discusses anticipated benefits of the rule qualitatively because the anticipated quantitative benefits are difficult to forecast and monetize. These benefits include: (1) more-informed decision-making through the creation of complete, consistent, and timely information on GHG emissions; (2) greater accountability through the establishment of a more highly visible and transparent performance reporting system; and (3) improved progress toward achieving national transportation goals by including declining targets for $CO_2$ emissions on the NHS in the set of existing performance requirements designed to help the Federal-aid highway program support balanced performance outcomes and national climate policies.

## II. Background and Regulatory History

The 2012 Moving Ahead for Progress in the 21st Century Act (MAP–21) (Pub. L. 112–141) and the 2015 Fixing America's Surface Transportation (FAST Act) (Pub. L. 114–94) transformed the Federal-aid highway program by establishing performance management requirements and tasking FHWA with carrying them out. To implement this program, FHWA established an organizational unit with dedicated full-time staff to coordinate with program staff from each of the performance areas to design and establish an approach to effectively implement the Title 23 performance provisions. The FHWA has technical and policy experts on staff to assist State DOTs and MPOs with implementing performance management and oversee program requirements. The FHWA implemented this performance management network through multiple rulemakings, which established in 23 CFR part 490 the performance measures and requirements for target establishment, reporting on progress, and how determinations would be made on whether State DOTs have made significant progress toward applicable targets.

The TPM requirements provide increased accountability and transparency, and facilitate efficient investment of Federal transportation funds through a focus on performance outcomes for the seven national

[3] Jacobs, J.M., M. Culp, L. Cattaneo, P. Chinowsky, A. Choate, S. DesRoches, S. Douglass, and R. Miller, 2018: Transportation. In Impacts, Risks, and Adaptation in the United States: Fourth National Climate Assessment, Volume II [Reidmiller, D.R., C.W. Avery, D.R. Easterling, K.E. Kunkel, K.L.M. Lewis, T.K. Maycock, and B.C. Stewart (eds.)]. U.S. Global Change Research Program, Washington, DC, USA, pp. 479–511. doi: 10.7930/NCA4.2018.CH12.

[4] White House Fact Sheet: The Biden-Harris Electric Vehicle Charging Action Plan (December 13, 2021), available at *https://www.whitehouse.gov/briefing-room/statements-releases/2021/12/13/fact-sheet-the-biden-harris-electric-vehicle-charging-action-plan/*; White House Fact Sheet: President Biden Sets 2030 Greenhouse Gas Pollution Reduction Target Aimed at Creating Good-Paying Union Jobs and Securing U.S. Leadership on Clean Energy Technologies (Apr. 22, 2021), available at *https://www.whitehouse.gov/briefing-room/statements-releases/2021/04/22/fact-sheet-president-biden-sets-2030-greenhouse-gas-pollution-reduction-target-aimed-at-creating-good-paying-union-jobs-and-securing-u-s-leadership-on-clean-energy-technologies/*; White House Fact Sheet: President Biden's Leaders Summit on Climate (Apr. 23, 2021), available at *https://www.whitehouse.gov/briefing-room/statements-releases/2021/04/23/fact-sheet-president-bidens-leaders-summit-on-climate/*.

transportation goals concerning safety, infrastructure condition, congestion reduction, system reliability, freight movement and economic vitality, environmental sustainability, and reduced project delivery delays. *See* 23 U.S.C. 150(b). Through performance management, recipients of Federal-aid highway funds make transportation investments to achieve short-term performance targets and make progress toward the seven statutory national transportation goals. Performance management allows FHWA to more effectively evaluate and report on the Nation's surface transportation conditions and performance.

Prior to MAP–21, there were no explicit statutory requirements for State DOTs or MPOs to demonstrate how their transportation programs supported national performance outcomes, making it difficult to assess the effectiveness of the Federal-aid highway program. The TPM requirements established in MAP–21 changed this paradigm by requiring State DOTs and MPOs to measure condition or performance, establish targets, assess progress toward targets, and report on condition or performance in a nationally consistent manner for the first time. *See* 23 U.S.C. 150(e); 23 CFR 490.107. As previously noted, FHWA conducted several rulemakings implementing the performance management framework. Most relevant to this proposed rule are three related national performance management measure rulemakings in which FHWA established various measures for State DOTs and MPOs to use to assess performance, found at 23 CFR part 490. The first rulemaking focused on Safety Performance Management (PM1), and a final rule published on March 15, 2016 (81 FR 13882), established performance measures for State DOTs to use to carry out the Highway Safety Improvement Program (HSIP). The second rulemaking on Infrastructure Performance Management (PM2) resulted in a final rule published on January 18, 2017 (82 FR 5886), that established performance measures for assessing pavement condition and bridge condition for the NHPP. The third rulemaking, System Performance Management (PM3), established measures for State DOTs and MPOs to use to assess the performance of the Interstate and non-Interstate NHS for the purpose of carrying out the NHPP; to assess freight movement on the Interstate System; and to assess traffic congestion and on-road mobile source emissions for the purpose of carrying out the Congestion Mitigation and Air Quality (CMAQ) Program. The PM3 final rule was published on January 18, 2017 (82 FR 5970). The PM3 rule addressed a broad set of performance issues and some of the national transportation goals, such as environmental sustainability, that were not addressed in the earlier rulemakings focused solely on safety and infrastructure condition. In the preamble to the PM3 proposed rule, published on April 22, 2016 (81 FR 23806), FHWA requested public comment on whether to establish a $CO_2$ emissions measure in the final rule and, if so, how to do so. The FHWA acknowledged the contribution of on-road sources to over 80 percent of U.S. transportation sector GHG emissions, and the historic Paris Agreement in which the U.S. and more than 190 other countries agreed in December 2015 to reduce GHG emissions, with the goal of limiting global temperature rise to less than 2 degrees Celsius above pre-industrial levels by 2050. The FHWA recognized that achieving U.S. climate goals would require significant GHG reductions from on-road transportation sources. *See* 81 FR 23830. Against this backdrop, FHWA stated that it was considering how GHG emissions could be estimated and used to inform planning and programming decisions to reduce long term emissions. The FHWA sought comment on the potential establishment and effectiveness of a GHG emissions measure as a planning, programming, and reporting tool, and FHWA requested feedback on specific considerations related to the design of such a measure. *See* 82 FR 23831.

In the PM3 final rule, after considering extensive public comments on whether and how FHWA should establish such a measure, FHWA established a GHG emissions performance measure to measure environmental performance in accordance with 23 U.S.C. 150(c)(3). The measure involved the percent change in $CO_2$ emissions from the reference year 2017, generated by on-road mobile sources on the NHS. After a change in Administration, FHWA repealed the 2017 GHG measure before the respective due dates for target setting or reporting. On October 5, 2017 (82 FR 46427), FHWA proposed to repeal the 2017 GHG measure. The FHWA requested public comment on whether to retain or revise the 2017 GHG measure. *See* 82 FR 46430. In light of policy direction at the time to review existing regulations to determine whether changes would be appropriate to eliminate duplicative regulations, reduce costs, and streamline regulatory processes, and after considering public comments received, on May 31, 2018 (83 FR 24920), FHWA repealed the GHG measure, effective on July 2, 2018. The FHWA identified three main reasons for the repeal: (1) reconsideration of the underlying legal authority; (2) the cost of the GHG measure in relation to the lack of demonstrated benefits; and (3) potential duplication of information produced by the GHG measure and information produced by other initiatives related to measuring $CO_2$ emissions.

On July 15, 2022 (87 FR 42401), FHWA published a NPRM to establish a GHG measure. After reconsidering the arguments for the 2018 final rule and finding them lacking, FHWA proposed to require State DOTs and MPOs that have NHS mileage within their State geographic boundaries and metropolitan planning area boundaries, respectively, to establish declining targets for reducing $CO_2$ emissions generated by on-road mobile sources, that align with the Administration's target of net-zero emissions, economy-wide, by 2050, accordance with the national policy established under section 1 of E.O. 13990, "Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis", section 201 of E.O. 14008, "Tackling the Climate Crisis at Home and Abroad", and at the Leaders Summit on Climate. Under the proposed rule, State DOTs would establish 2- and 4-year statewide emissions reduction targets, and MPOs would establish 4-year emissions reduction targets for their metropolitan planning areas. In addition, FHWA proposed to require MPOs serving select UZA to establish additional joint targets. The term "urbanized area" means a geographic area with a population of 50,000 or more, as designated by the Bureau of the Census. *See* 23 U.S.C. 101(a)(36); 23 CFR 450.104. The NPRM specified that when the metropolitan planning area boundaries of two or more MPOs overlap any portion of the same UZA, and the UZA contains NHS mileage, those MPOs would establish joint 4-year targets for that UZA. This joint target would be established in addition to each MPO's target for their metropolitan planning area. Further, FHWA proposed to require State DOTs and MPOs to set declining targets for reducing tailpipe $CO_2$ emissions on the NHS. Under the NPRM, State DOTs and MPOs would have the flexibility to set targets that work for their respective climate change policies and other policy priorities, so long as they aligned with the goal of net-zero GHG emissions, economy-wide, by 2050. The FHWA also proposed to require State DOTs and MPOs to report on their progress in

meeting the targets. The FHWA identified that the proposed rule would apply to the 50 States, the District of Columbia, and Puerto Rico, consistent with the definition of the term "State" in 23 U.S.C. 101(a). The FHWA now finalizes the proposed measure with some modifications.

## III. Statutory Authority for Performance Management and the GHG Measure

The FHWA is establishing the GHG emissions performance measure under 23 U.S.C. 150(c)(3), which calls for FHWA to establish performance measures that the States can use to assess performance of the Interstate and non-Interstate NHS for the purpose of carrying out the NHPP under 23 U.S.C. 119. *See* 23 U.S.C. 150(c)(3)(A)(ii)(IV)–(V). The FHWA received many comments both in support and in opposition to the Agency's authority to promulgate this rulemaking. After considering these comments, FHWA reaffirms that Congress provided FHWA with clear authority to develop performance measures to help State DOTs and MPOs address significant and long-term issues impacting the performance of the transportation system. These comments and FHWA's response are further discussed in Section VII of this preamble.

The FHWA has determined that measuring environmental performance of the Interstate and non-Interstate NHS is vital to meeting the Agency's obligations under 23 U.S.C. 150. As discussed in the NPRM, Congress charged FHWA with establishing performance measures, but did not define the term "performance," as used in 23 U.S.C. 150(c)(3). Thus, FHWA must interpret this term in the context of the statute, FHWA's statutory authority in Title 23, U.S.C., to administer the Federal-aid highway program, and congressional intent. Accordingly, FHWA is interpreting "performance" of the Interstate System and non-Interstate NHS under 23 U.S.C. 150(c) to include the system's environmental performance, consistent with the program's statutorily mandated goal to enhance the performance of the transportation system while protecting and enhancing the natural environment. *See* 23 U.S.C. 150(b). As described further in this preamble, FHWA interprets this national goal to mean that the Agency should take reasonable steps to assist State DOTs and MPOs measure and evaluate the GHG emissions on the Interstate and non-Interstate NHS. The FHWA's interpretation of performance under 23 U.S.C. 150(c) is consistent with 23 U.S.C. 119(e), which calls for

State DOTs to develop a performance-driven asset management plan that would "support progress toward the achievement of the national goals identified in section 150(b)." 23 U.S.C. 119(e)(2). In addition, 23 U.S.C. 119(b) provides the purposes of the NHPP, which include supporting the condition and performance of the NHS, supporting construction of new facilities on the NHS, ensuring investments of Federal-aid funds in highway construction are directed to support progress toward the achievement of performance targets established in a State asset management plan, and supporting activities to increase the resiliency of the NHS to mitigate the cost of damages from sea level rise, extreme weather events, flooding, wildfires, or other natural disasters. Assessing environmental performance provides support for activities to increase the resiliency of the NHS to mitigate the cost of damages from sea level rise, extreme weather events, flooding, wildfires, or other natural disasters.

Importantly, FHWA does not believe its authority in this area is unlimited. Since 23 U.S.C. 150(c)(3)(A)(ii)(IV)–(V) refers only to the performance of the Interstate System and the non-Interstate NHS, FHWA only has authority to apply this measure to the Interstate System and the non-Interstate NHS. In addition, FHWA is only requiring that State DOTs and MPOs establish declining targets for GHG emissions on the NHS. The FHWA is neither requiring any specific targets nor mandating any penalties for failing to achieve these targets. The measure and the associated targets are intended only to help State DOTs and MPOs consistently and transparently monitor the current performance of the NHS, and plan transportation projects in a way that protects the long-term performance of the NHS.

As described in the NPRM, *see* 87 FR 42408, Congress specifically directed FHWA to establish measures for States to use to assess the performance of the Interstate System and the non-Interstate NHS. *See* 23 U.S.C. 150(c)(3)(A)(ii)(IV)–(V). Although Congress did not define the meaning of performance under this provision, the statute identifies seven national goals to inform performance management. Environmental sustainability is one of the specifically identified goals, which is defined as "enhanc[ing] the performance of the transportation system while protecting and enhancing the natural environment." 23 U.S.C. 150(b)(6). Congress directed FHWA to determine the nature and scope of the specific performance measures that will fulfill the statutory mandate in 23 U.S.C.

150(c), and has not clarified this authority even after FHWA finalized the three national performance management measure rulemakings described earlier. The FHWA notes that 23 U.S.C. 150(c)(2)(C) limits performance measures to those described in 23 U.S.C. 150(c). When FHWA repealed the GHG performance measure, the Agency took an unduly narrow view and determined that since 23 U.S.C. 150(c)(2)(C) directs FHWA to limit performance measures only to those described in 23 U.S.C. 150(c), FHWA's previous interpretation that performance of the Interstate System and the National Highway System under 23 U.S.C. 150(c)(3)(A)(ii)(IV)–(V) includes environmental performance was overly broad. As FHWA described in the NPRM, *see* 87 FR 42408, this provision limits FHWA's authority to establish measures States use to assess performance only to the Interstate System and the non-Interstate NHS. However, the provision does not otherwise limit the meaning of "performance," and upon reconsideration, FHWA has determined that its original interpretation of the scope of its section 150(c) authority from the 2017 final rule is the better read of the statute. Specifically, in light of the explicit statutory goal of environmental performance, the significant risks that climate change-driven extreme weather pose to the condition and performance of NHS, and FHWA's unquestioned authority to establish performance measures, FHWA believes that it is appropriate to interpret the meaning of performance of the Interstate System and the non-Interstate NHS under 23 U.S.C. 150(c)(3)(A)(ii)(IV)–(V) to include environmental performance.

As described in the NPRM and previously discussed in this preamble, this GHG measure is consistent with other parts of Title 23, U.S.C., notably 23 U.S.C. 119. Section 119(d)(1) of Title 23, U.S.C., establishes eligibility criteria for using funds apportioned to a State for carrying out the NHPP, but does not set forth all relevant considerations for carrying out the program. For example, 23 U.S.C. 119(d)(2) identifies purposes for eligible projects, including development and implementation of a State DOT's asset management plan for the NHS under 23 U.S.C. 119(e), and environmental mitigation efforts related to projects funded under 23 U.S.C. 119(g). Section 119(e) calls for a performance-driven asset management plan that would "support progress toward the achievement of the national goals identified in Section 150(b)",

which includes the environmental sustainability national goal under 23 U.S.C. 150(b)(6). Risk-based asset management planning under 23 U.S.C. 119(e) includes consideration of life-cycle costs and risk management, financial planning, and investment strategies. Rapidly changing climate and increased weather extremes because of fossil fuel combustion directly impact the condition and performance of transportation facilities because of increases in heavy precipitation, coastal flooding, heat, wildfires, and other extreme events. Extreme events are already leading to transportation challenges, inducing societal and economic consequences, which will only increase in the years ahead. The number of billion-dollar climate disaster events has been much higher over the last 5 years than the annual average over the last 30 years.[5] Low-income and vulnerable populations are disproportionately affected by the impacts of climate change.[6] These impacts are not attributable to any single action, but are exacerbated by a series of actions, including actions taken under the Federal-aid highway program. Recognizing the need to plan for and consider the risks of extreme weather, Congress amended the requirements for States' asset management plans under 23 U.S.C. 119(e) to include lifecycle cost and risk management analyses that specifically consider extreme weather and resilience. *See* 23 U.S.C. 119(e)(4)(D) (as amended by Pub. L. 117–58, sec. 11105). Measuring environmental performance through the GHG performance measure will assist States in considering $CO_2$ emissions from transportation in the performance management framework, including the impact of $CO_2$ emissions on the medium- and long-term conditions of transportation assets arising from the risks of, and costs related to extreme weather, and help frame responses to the growing climate crisis. Therefore, the GHG performance measure is appropriate in light of 23 U.S.C. 119, and FHWA has determined that the Agency's interpretation of

---

[5] NOAA National Centers for Environmental Information (NCEI), 2022: U.S. Billion-Dollar Weather and Climate Disasters, available at *https://www.ncdc.noaa.gov/billions/*, DOI: 10.25921/stkw-7w73.

[6] Ebi, K.L., J.M. Balbus, G. Luber, A. Bole, A. Crimmins, G. Glass, S. Saha, M.M. Shimamoto, J. Trtanj, and J.L. White-Newsome, 2018: Human Health. In *Impacts, Risks, and Adaptation in the United States: Fourth National Climate Assessment, Volume II* [Reidmiller, D.R., C.W. Avery, D.R. Easterling, K.E. Kunkel, K.L.M. Lewis, T.K. Maycock, and B.C. Stewart (eds.)]. U.S. Global Change Research Program, Washington, DC, USA, pp. 539–571. doi: 10.7930/NCA4.2018.CH14.

''performance'' to include ''environmental performance'' is consistent with 23 U.S.C. 119.

As FHWA noted in the NPRM, several other provisions in Title 23, U.S.C., support FHWA's authority for its proposal to address GHG emissions in this rulemaking. To help conceptualize FHWA's framework for analyzing its authority under Title 23, U.S.C., this preamble restates these provisions as follows:

• In Section 101(b)(3)(G), Congress declared that ''transportation should play a significant role in promoting economic growth, improving the environment, and sustaining the quality of life.''

• Section 134(a)(1) states as a matter of transportation planning policy that ''[i]t is in the national interest to encourage and promote the safe and efficient management, operation, and development of surface transportation systems . . . while minimizing transportation-related fuel consumption and air pollution through metropolitan and statewide transportation planning processes identified in this chapter.''

• Section 134(c)(1) requires MPOs to develop long range plans and transportation improvement programs to achieve the objectives in 23 U.S.C. 134(a)(1) through a performance-driven, outcome-based approach to planning.

• Section 134(h) defines the scope of the metropolitan planning process. Paragraphs (h)(1)(E) and (I), respectively, require consideration of projects and strategies that will ''. . . protect and enhance the environment, promote energy conservation, improve the quality of life . . .'' and ''. . . improve the resiliency and reliability of the transportation system . . .''.

• Section 135(d)(1) defines the scope of the statewide planning process. Paragraphs (d)(1)(E) and (I), respectively, require consideration of projects, strategies, and services that will ''. . . protect and enhance the environment, promote energy conservation, improve the quality of life . . .'', and ''. . . improve the resiliency and reliability of the transportation system . . .''.

• Section 135(d)(2) requires the statewide transportation planning process to ''. . . provide for the establishment and use of a performance-based approach to transportation decision-making to support the national goals described in Section 150(b) of this title . . .''.

The FHWA reaffirms that these Title 23, U.S.C., provisions make it clear that assessing infrastructure performance under 23 U.S.C. 150(c)(3) properly encompasses the assessment of

environmental performance, including GHG emissions and other climate-related matters. As noted in FHWA's May 2018 repeal of the 2017 GHG measure, nothing in the statute specifically requires FHWA to adopt a GHG emissions measure. However, consistent with the statutory provisions cited above, no provision of law prohibits FHWA from adopting a GHG emissions measure, despite ample opportunity for Congress to do so.

On November 15, 2021, President Biden signed the Infrastructure Investment and Jobs Act (IIJA) (Pub. L. 117–58, also known as the ''Bipartisan Infrastructure Law'') (BIL) into law. The BIL does not explicitly direct FHWA to assess environmental performance. However, Congress set forth new programs and eligibilities under BIL that State DOTs and MPOs will use to address GHG emissions, and environmental performance will be central to proper administration of the programs. Thus, this GHG measure will help State DOTs and MPOs effectively use these new transportation dollars. For example, BIL authorized a new Carbon Reduction Program (CRP) codified at 23 U.S.C. 175. The CRP provides billions of dollars for Fiscal Years 2022–2026 for use on a range of projects that can demonstrate reductions in transportation emissions over the project's lifecycle. The CRP also requires State DOTs to develop a carbon reduction strategy in consultation with any MPO designated within the State to support efforts to reduce transportation emissions and identify projects and strategies to reduce these emissions. *See* 23 U.S.C. 175(d). Similarly, BIL included new language regarding national electric vehicle charging and hydrogen, propane, and natural gas fueling corridors to support changes in the transportation sector that help achieve a reduction in GHG emissions. *See* 23 U.S.C. 151. These programs are two examples of Congress' express focus on using transportation programs to reduce GHG emissions from transportation sources. The FHWA's GHG measure will help State DOTs and MPOs track the effectiveness of their transportation investments in projects that reduce GHG emissions, both through these programs and through other programs, such as the Surface Transportation Block Grant Program authorized at 23 U.S.C. 133.

The establishment of the GHG measure does not force investments in specific projects or strategies to reduce emissions, nor does it require the achievement of an absolute reduction target. However, FHWA has determined that the targets for the GHG measure

should show a reduction in $CO_2$ emissions. As discussed in response to comments in Section VII of this preamble, the establishment of declining targets is vital given the urgency of the climate crisis. Establishing declining targets will help State DOTs and MPOs plan toward reductions in GHG emissions and make Federal infrastructure investment decisions that reduce climate pollution, a principle set forth in E.O. 14008 (86 FR 7626). State DOTs and MPOs will set targets that indicate a reduction in $CO_2$ emissions, which FHWA has determined will be supportive of the policy goals set forth in 23 U.S.C. 150(b).

Although the rule requires declining targets for $CO_2$ emissions, FHWA is not setting forth any requirements in this rulemaking to determine how State DOTs and MPOs should determine their declining targets. In addition, as directed by 23 U.S.C. 145, States determine which of their projects shall be federally financed by Federal-aid highway formula dollars. State DOTs and MPOs will set and determine targets based on appropriate data as informed by State DOT and MPO policies and priorities. The FHWA is not prescribing what declining targets would look like in each State or MPO, and FHWA is not requiring State DOTs and MPOs to achieve targeted emission reductions, nor prescribing the selection of specific projects under this rulemaking. Thus, this approach is consistent with the Agency's authority under 23 U.S.C. 150(c) to establish measures for States to use to assess the performance of the Interstate and non-Interstate NHS in the furtherance of the national goal to enhance the performance of the transportation system while protecting and enhancing the natural environment.

In addition, adopting the measure for GHG emissions under 23 U.S.C. 150(c)(3) is appropriate in light of the structure of the TPM program. As discussed in the NPRM, Congress required FHWA to establish performance measures for a number of programs in addition to the NHPP, including an emissions related measure for the CMAQ Program under 23 U.S.C. 149. As discussed in the NPRM and in response to comments in Section VII of this preamble, the existence of the CMAQ emissions measure has raised questions regarding whether Congress intended FHWA to only measure emissions when those emissions are related to CMAQ, which is limited to criteria pollutants and nonattainment or maintenance areas under the Clean Air Act. However, this language only indicates congressional intent that

FHWA establish a performance measure for on-road mobile source emissions for the purposes of carrying out the CMAQ Program. Nothing in 23 U.S.C. 150 limits measures that take into account emissions only to measures established for the purposes of carrying out the CMAQ Program. The FHWA has determined that it is appropriate to examine relevant emissions as part of assessing performance of the Interstate and non-Interstate NHS in support of the NHPP.

For all of these reasons, FHWA asserts the GHG measure is consistent with FHWA's authority under 23 U.S.C. 150(c).

Reconsideration of Previous Actions

As discussed in Section II of this preamble, and detailed in Section III.C of the NPRM, FHWA has previously proposed and finalized actions related to a GHG measure. Specifically, FHWA previously finalized the PM3 rule, through which the Agency considered extensive public comments on whether and how FHWA should establish a GHG measure. The FHWA determined that it was appropriate to measure environmental performance, specifically as the percent change in $CO_2$ emissions from the reference year 2017, generated by on-road mobile sources on the NHS (82 FR 5970). On October 5, 2017 (82 FR 46427), however, FHWA proposed to repeal the 2017 GHG measure. As discussed in more detail in the NPRM to this action, FHWA repealed the GHG measure on May 31, 2018 (83 FR 24920), in light of policy direction from the previous administration to review existing regulations to determine whether changes would be appropriate to eliminate duplicative regulations, reduce costs, and streamline regulatory processes, and after considering public comments received. The repeal was effective on July 2, 2018. The FHWA identified three main reasons for the repeal: (1) reconsideration of the underlying legal authority; (2) the cost of the GHG measure in relation to the lack of demonstrated benefits; and (3) potential duplication of information produced by the GHG measure and information produced by other initiatives related to measuring $CO_2$ emissions.

As part of this rulemaking, FHWA evaluated each of these rationales to examine whether they remain appropriate in light of current information. First, FHWA proposed, and now finalizes, that the Agency has reconsidered its interpretation of the statute. Consistent with the reasoning set forth in the PM3 rule, FHWA believes adopting this measure under 23

U.S.C. 150(c) is appropriate in light of the Agency's authority under that section and based on the Agency's authority under Title 23, U.S.C. as a whole, as previously discussed in this section and detailed further in Section III.B of the NPRM. *See* 87 FR 42407–42410. Second, FHWA has determined that the benefits of the rulemaking, although difficult to quantify, are substantial and justify finalizing this action. In its 2022 NPRM, FHWA described how the substantial benefits of this regulation justified reconsidering and rejecting the Agency's conclusion in the 2018 final rule that the benefits of a GHG measure were too speculative and outweighed by the costs to justify retaining the measure as part of the TPM program. *See* 87 FR 42410–42411. The benefits and policy rationale for this regulation are further described in Section IV of this preamble. Third, and as discussed in the 2022 NPRM, *see* 87 FR 42411–42412, FHWA has determined that the information produced by the GHG measure is not duplicative in relation to information produced by other initiatives related to measuring $CO_2$ emissions, but rather complements that data to support a whole-of-government approach to addressing GHG emissions. The importance of this measure is further described in Section IV of this preamble.

FHWA adopts in full its analysis in the 2022 NPRM justifying the reconsideration and rejection of the conclusion from the 2018 final rule that 23 U.S.C. 150 did not provide FHWA with authority to measure the environmental performance of the NHS and adopt a GHG measure, and that the overall statutory scheme of Title 23, U.S.C. supported a narrower interpretation of performance of the NHS, and emphasizes some key points here. In the 2018 repeal, FHWA concluded that 23 U.S.C. 119(d)(1)(A) delineates the national goals that are relevant to eligibility of projects for funding under the NHPP, and the national goals included in section 119(d)(1)(A) are consistent with an interpretation of ''performance'' that focuses on the physical condition of the system and the efficiency of transportation operations across the system, rather than environmental performance. 83 FR 24923–24924. Upon reexamination of the statute, FHWA has determined that this previous interpretation was incorrect. Section 119(d)(1) of Title 23, U.S.C., establishes eligibility criteria for using funds apportioned to a State for carrying out the NHPP, but does not set forth all

relevant considerations for carrying out the program. Specifically, States are also required to establish asset management plans under 23 U.S.C. 119(e). These plans shall include strategies toward improving or preserving the condition of the assets and the performance of the system, including supporting progress toward the national goals in 23 U.S.C. 150(b). FHWA's previous interpretation ignored Congress's express direction for States to develop these plans for the NHS, which address both asset condition and system performance, and referenced all of the national goals in section 150(b), rather than a subset of goals such as the goals identified in 23 U.S.C. 119(d)(1). In addition, FHWA observes that 23 U.S.C. 119(d)(2) provides eligibility for projects under the NHPP that go beyond the limited subset of national goals listed in section 119(d)(1). The statute identifies eligible projects that support the national goal of environmental sustainability, such as environmental restoration and pollution abatement, control of noxious weeds and establishment of native species, and other environmental mitigation efforts. *See* 23 U.S.C. 119(d)(2)(M)–(O). When FHWA repealed the PM3 rule and determined that performance measures under 23 U.S.C. 150(c)(3) are limited to advancing the nationals goal in section 119(d)(1), the Agency did not appropriately consider the section 119(e) requirement to develop an asset management plan that supports achievement of *all* national goals in 23 U.S.C. 150(b), and eligibility for projects that support achieving environmental sustainability. In reexamining this authority, FHWA has determined that the Agency must consider the totality of 23 U.S.C. 150(b) when interpreting the meaning of performance on the Interstate and non-Interstate NHS and how performance is to be measured.

Additionally, FHWA has identified above several other provisions of Title 23, U.S.C., that support FHWA's proposal to address GHG emissions in this rulemaking and make it clear that assessing infrastructure performance under 23 U.S.C. 150(c)(3) properly encompasses the assessment of environmental performance, including GHG emissions. In the 2018 repeal final rule, FHWA considered these provisions irrelevant because they do not "specifically direct[ ] or require[ ] FHWA to adopt a GHG measure." 83 FR at 24923. However, these provisions do not prohibit FHWA from adopting a GHG measure—nor does any other provision in Title 23—and by stating the importance of protecting the environment and improving the

resiliency of the transportation system, including through the use of performance management, these provisions clearly support the use of a GHG measure to assess the environmental performance of the NHS. As discussed above, the passage of BIL added additional programs and eligibilities to Title 23, and the administration of these programs will greatly benefit from the measurement of the environmental performance, including measurement of GHG emissions on the NHS. FHWA believes that these provisions of Title 23, including those added after the 2018 repeal of the GHG measure, serve to underscore the importance of reestablishing the GHG measure.

As discussed in the preamble to the NPRM, FHWA acknowledges that this action largely reestablishes a measure similar to the measure finalized in 2017 and repealed in 2018. *See* 83 FR 42410. However, as discussed in the preamble to the NPRM, FHWA expects that States and MPOs have no reliance interests resulting from establishment and the repeal of the 2017 GHG measure. *See* 87 FR 42410. The FHWA repealed the 2017 GHG measure before the respective due dates for target setting or reporting, and FHWA is unaware of any State DOTs or MPOs that incurred costs because of the promulgation and prompt repeal of that measure. Nor did the repeal itself impose any compliance costs on State DOTs or MPOs. Accordingly, FHWA does not expect this final rule to result in any increased burden on State DOTs or MPOs by virtue of the fact that FHWA previously established a similar measure that was repealed before any State DOTs or MPOs relied on and implemented its target setting and reporting requirements. This measure is a new one, which State DOTs and MPOs have not previously implemented. As a result, FHWA expects that States and MPOs would not have any reliance interests based on the repeal of the 2017 GHG measure. After reviewing the comments on the proposal, FHWA reaffirms that any potential reliance interest would be outweighed by the benefits of this action, to the extent those interests exist.

## IV. Basis & Benefits of These Regulations

The FHWA believes that the performance management requirements are a powerful tool for achieving all seven of the statutory national transportation goals, including the Federal-aid highway program's national goal for environmental sustainability identified under 23 U.S.C. 150(b)(6), and establishing a GHG measure in

FHWA's TPM Program will provide a consistent basis for addressing the environmental sustainability of the transportation system and estimating on-road GHG emissions. In addition, the GHG measure will result in a consistent set of data that can be used to inform the future investment decisions of the Federal Government, State DOTs, and MPOs towards achieving their targets or goals.

By establishing the GHG performance measure, FHWA is taking action to address the largest source of U.S. $CO_2$ emissions. In 2021, the transportation sector accounted for 34.8 percent of total U.S. $CO_2$ emissions, with 82.7 percent of the sector's total $CO_2$ emissions coming from on-road sources.[7] The transportation sector is expected to remain the largest source of U.S. $CO_2$ emissions through 2050, increasing at an average annual rate of 0.3 percent per year despite improvements in the energy efficiency of light-duty vehicles, trucks, and aircraft.[8] Factors such as population growth, expansion of urban centers, a growing economy, and increased international trade are expected to result in growing passenger and freight movement. These changes can make GHG reductions and environmental sustainability both more challenging to implement and more important to achieve.[9]

In addition to being the largest source of U.S. $CO_2$ emissions,[10] the transportation sector is increasingly vulnerable to the effects of climate change including higher temperatures, more frequent and intense precipitation, and sea level rise. Much of existing transportation infrastructure was designed and constructed without consideration of these changes. The Sixth Assessment Report by the IPCC, released on August 7, 2021, confirms that human activities are increasing GHG concentrations that have warmed

---

[7] U.S. Environmental Protection Agency, 2023: Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990–2021, *available at* https://www.epa.gov/ghgemissions/inventory-us-greenhouse-gas-emissions-and-sinks-1990-2021.

[8] U.S. Energy Information Administration, 2021: Annual Energy Outlook 2021, *available at* https://www.eia.gov/outlooks/aeo/tables_ref.php.

[9] Jacobs, J.M., M. Culp, L. Cattaneo, P. Chinowsky, A. Choate, S. DesRoches, S. Douglass, and R. Miller, 2018: Transportation. In Impacts, Risks, and Adaptation in the United States: Fourth National Climate Assessment, Volume II [Reidmiller, D.R., C.W. Avery, D.R. Easterling, K.E. Kunkel, K.L.M. Lewis, T.K. Maycock, and B.C. Stewart (eds.)]. U.S. Global Change Research Program, Washington, DC, USA, pp. 479–511. doi: 10.7930/NCA4.2018.CH12, *available at* https://nca2018.globalchange.gov/chapter/12/.

[10] See EPA, Inventory of U.S. Greenhouse Gas Emissions and Sinks 1990–2021, at 2–28.

the atmosphere, ocean, and land at a rate that is unprecedented in at least the last 2000 years.[11] According to the report, global mean sea level has increased between 1901 and 2018, and changes in extreme events such as heatwaves, heavy precipitation, hurricanes, wildfires, and droughts have intensified since the last assessment report in 2014.[12] These changes in extreme events, along with anticipated future changes in these events because of climate change, threaten the reliability, safety and efficiency of the transportation system. At the same time, transportation contributes significantly to the causes of climate change [13] and each additional ton of $CO_2$ produced by the combustion of fossil fuels contributes to future warming and other climate impacts.

The first step toward reducing GHG emissions involves inventorying and monitoring those emissions. By establishing a consistent method for estimating GHG emissions and reporting on trends, the GHG measure aligns with E.O. 13990, E.O. 14008, and supports a U.S. target of reducing GHG emissions economy-wide 50 to 52 percent below 2005 by 2030, on a course toward reaching net-zero emissions economywide by no later than 2050.[14]

[11] See IPCC, 2021: Summary for Policymakers. In: Climate Change 2021: The Physical Science Basis. Contribution of Working Group I to the Sixth Assessment Report of the Intergovernmental Panel on Climate Change, available at *https://www.ipcc.ch/report/ar6/wg1/#SPM*.

[12] IPCC, 2021: Climate Change 2021: The Physical Science Basis. Contribution of Working Group I to the Sixth Assessment Report of the Intergovernmental Panel on Climate Change [Masson-Delmotte, V., P. Zhai, A. Pirani, S.L. Connors, C. Pe'an, S. Berger, N. Caud, Y. Chen, L. Goldfarb, M.I. Gomis, M. Huang, K. Leitzell, E. Lonnoy, J.B.R. Matthews, T.K. Maycock, T. Waterfield, O. Yelekçi, R. Yu, and B. Zhou (eds.)]. Cambridge University Press. In Press.

[13] Jacobs, J.M., M. Culp, L. Cattaneo, P. Chinowsky, A. Choate, S. DesRoches, S. Douglass, and R. Miller, 2018: Transportation. In Impacts, Risks, and Adaptation in the United States: Fourth National Climate Assessment, Volume II [Reidmiller, D.R., C.W. Avery, D.R. Easterling, K.E. Kunkel, K.L.M. Lewis, T.K. Maycock, and B.C. Stewart (eds.)]. U.S. Global Change Research Program, Washington, DC, USA, pp. 479–511. doi:10.7930/NCA4.2018.CH12.

[14] White House Fact Sheet: The Biden-Harris Electric Vehicle Charging Action Plan (December 13, 2021), available at *https://www.whitehouse.gov/briefing-room/statements-releases/2021/12/13/fact-sheet-the-biden-harris-electric-vehicle-charging-action-plan/*; White House Fact Sheet: President Biden Sets 2030 Greenhouse Gas Pollution Reduction Target Aimed at Creating Good-Paying Union Jobs and Securing U.S. Leadership on Clean Energy Technologies (Apr. 22, 2021), available at *https://www.whitehouse.gov/briefing-room/statements-releases/2021/04/22/fact-sheet-president-biden-sets-2030-greenhouse-gas-pollution-reduction-target-aimed-at-creating-good-paying-union-jobs-and-securing-u-s-leadership-on-clean-energy-technologies/*; White House Fact Sheet: President Biden's Leaders Summit on

Section 1 of E.O. 13990, "Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis," (86 FR 7037), articulates national policy objectives, including listening to the science, improving public health and protecting the environment, reducing GHG emissions, and strengthening resilience to the impacts of climate change. The E.O. 14008, "Tackling the Climate Crisis at Home and Abroad," (86 FR 7619), recommits the U.S. to the Paris Agreement and calls on the U.S. to begin the process of developing its nationally determined contribution to global GHG reductions. *See* E.O. 14008, § 102. The E.O. 14008 also calls for a government-wide approach to the climate crisis and acknowledges opportunities to create well-paying, union jobs to build a modern, sustainable infrastructure, to provide an equitable, clean energy future, and to put the U.S. on a path to achieve net-zero emissions, economywide, no later than 2050. *See id.*, § 201.

As a matter of transportation policy, FHWA considers the GHG measure essential not only to improve transportation sector performance and work toward achieving net-zero emissions economy-wide by 2050, but also to demonstrate Federal leadership in the assessment and disclosure of climate pollution from the transportation sector. Measuring and reporting complete, consistent, and timely information for on-road mobile source emissions is necessary so that all levels of government and the public can monitor changes in GHG emissions over time and make more informed decisions about the role of transportation investments and other strategies in achieving GHG reductions.

After reviewing the comments provided on the NPRM, FHWA has decided to finalize the measure proposed in the NPRM, which is the percent change in tailpipe $CO_2$ emissions on the NHS relative to the reference year. In choosing this measure, FHWA considered the measure's sensitivity to strategies and policies of interest to transportation agencies, as well as its simplicity, ease of calculation, and reliance on data States already report to FHWA. In particular, the GHG measure will utilize fuel use estimates collected by FHWA very shortly after these data are finalized, providing a consistent and timely data source that is better suited

Climate (Apr. 23, 2021), available at *https://www.whitehouse.gov/briefing-room/statements-releases/2021/04/23/fact-sheet-president-bidens-leaders-summit-on-climate/*.

for setting targets and monitoring trends in mobile source $CO_2$ emissions on the NHS. As a new source of information, the measure has the potential to result in greater public awareness of GHG emissions trends, provide increased transparency and improved decisionmaking at all levels of government, and support better informed planning choices to reduce GHG emissions or inform tradeoffs among competing policy choices. In these capacities, the proposed GHG measure is integral to a whole-of-government approach to address climate change and its effects.

## V. Summary of Comments

The FHWA received 39,751 submissions to the docket, including 39,522 from 7 comment campaigns, in response to the NPRM, resulting in 236 unique submissions containing 999 individual comments. The submissions were signed by 105,484 separate groups/individuals. The FHWA received comments from 98 advocacy and interest groups (including advocacy groups for active transportation and public transit, the natural environment, climate change action, clean air, and equity/environmental justice, among others), 31 State DOTs and the District of Columbia DOT, 33 State Attorneys General, one State Governor, 33 MPOs, two State environmental agencies, 10 County/Local government agencies, as well as 57 U.S. Senators from 38 states and 56 U.S. Representatives from 25 states. The FHWA also received comments from 24 industry associations (including the American Association of State Highway Transportation Officials (AASHTO), the Association of Metropolitan Planning Organizations (AMPO), and the American Public Transportation Association (APTA), as well as those representing highway and transportation users, roadway materials producers and roadway builders, and energy companies, among others). The FHWA also received comments from over 104,500 private citizens, the majority of which were submitted as part of comment campaigns.

## VI. Summary of Changes Made in This Final Rule

This section provides a summary of the changes made in the rule compared to the NPRM. Section VII provides further discussion on the significant changes and the reasons they were made.

### A. Reference Year

In the final rule, FHWA establishes that 2022 will be the reference year for this measure. The FHWA has changed

the definition in 23 CFR 490.505 and updated the calculation of the measure in 23 CFR 490.513(d) [15] accordingly.

### B. Net-Zero

The definition of net-zero was removed from 23 CFR 490.101, and 23 CFR 490.105(e)(10) was revised so targets must be declining for reducing tailpipe $CO_2$ emissions on the NHS, but they are not required to demonstrate reductions toward net-zero targets.

### C. State DOT Targets & Reports

In the final rule, FHWA establishes that State DOTs will establish initial targets for the GHG measure and report them no later than February 1, 2024. 23 CFR 490.105(e)(1) and 490.107(d). The February 1, 2024, date required changes to several sections of existing regulation. Below is a general summary of the initial target establishment requirements, the reporting process for the State Initial GHG Report due February 1, 2024, and the significant progress determinations that will be completed after the State biennial reports submitted by October 1, 2024, and 2026.

State DOT Target Establishment & Reporting Related to February 1, 2024

The performance period for the GHG measure will begin January 1, 2022 and extend 4 years. 23 CFR 490.105(e)(1). By February 1, 2024, State DOTs will establish initial targets for the GHG measure. 23 CFR 490.105(e)(1)(ii). Initially, State DOTs will establish 4-year targets; 2-year targets will not be established. 23 CFR 490.105(e)(1), 490.105(e)(4)(iii), and 490.105(e)(10)(i). For the initial 4-year target, the reference year will be used as the baseline. 23 CFR 490.105(e)(10)(i)(C).

State DOTs will report their 4-year targets to FHWA in the State Initial GHG Report by no later than February 1, 2024. 23 CFR 490.107(d). The State Initial GHG Report shall include the State DOT's 4-year target for the GHG measure, the basis for the target, a discussion of how the target relates to other longer-term performance expectations, and the metric information for the reference year. 23 CFR 490.107(d)(1). The metric reported will be calculated using the data specified in 23 CFR 490.107(d)(2). Because of the 2024 State Initial GHG Report, State DOTs will not include additional GHG information in the 2024 Mid Performance Period Progress Report, due October 1, 2024. 23 CFR 490.107(b)(2)(i). Biennial reporting

related to the GHG measure will begin with the 2026 Full Performance Period Progress Report and the 2026 Baseline Performance Period Report. 23 CFR 490.107(b)(1)(i), 490.107(b)(2)(i), and 490.107(b)(3)(i).

Significant Progress Determination on Initial Targets

After the 2026 Full Performance Period Progress Report, FHWA will determine whether a State DOT has made significant progress toward the achievement of the 4-year target for the GHG measure. The FHWA will use the data described in 23 CFR 490.109(d)(1) when calculating the actual performance and making the significant progress determination. The performance for the reference year will be used as the baseline performance in the 2026 significant progress determination. 23 CFR 490.105(e)(10)(i)(C).

The significant progress determination requirements related to the GHG measure will be phased in as described in 23 CFR 490.109(e)(6). The FHWA will not determine significant progress toward 2-year targets for this measure after the 2024 Mid Performance Period Progress Report since 2-year targets will not have been established, and information related to the GHG measure will not have been included in the 2024 Mid Performance Period Progress Report. Therefore, in 2024, FHWA will classify the assessment of progress toward the achievement of 2-year targets for the GHG measure as ''progress not determined'' and they will not be subject to any additional reporting requirements. 23 CFR 490.109(e)(6).

Biennial Reporting

FHWA revised proposed changes to section 490.107(b)(1), (b)(2), and (b)(3) to require biennial reporting related to the GHG measure to begin with the 2026 Full Performance Period Progress Report. And, consistent with 23 CFR 490.105(e)(5), the State DOT's 2- and 4-year targets will be reported in the 2026 Baseline Performance Period Report. See the discussion under ''State DOT Data for the GHG Metric Calculation'' for more information on the State DOT biennial reporting associated with the GHG metric.

### D. State DOT Data for the GHG Metric Calculation

State DOTs are required to calculate and report both the GHG measure and the GHG metric, the latter of which is defined as the calculation of tailpipe $CO_2$ emissions on the NHS for a given year computed in million metric tons

(mmt) and round to the nearest hundredth. 23 CFR 490.511(c). State DOTs use the metric to calculate the measure, which is the percent change between the current year and the reference year. To calculate the metric, State DOTs require several data inputs, and they are defined in 23 CFR 490.511(c). To ensure consistent calculation of the metric, the data requirements are defined in 23 CFR 490.509. To provide transparency and consistency, FHWA defines the specific data sources it will use when it calculates the metric and measure for the significant progress determination in 23 CFR 490.109(d).

In this final rule, proposed 23 CFR 490.509(h) was revised so that the State DOT will be able to use their best available vehicle miles traveled (VMT) data when establishing targets, reporting baseline and actual performance and discussing progress. This change addresses a comment that stated VMT data might not be finalized within the Highway Performance Monitoring System (HPMS) for all States by August 15th. The VMT data used by State DOTs will represent the prior calendar year and should be consistent with the final VMT data submitted by the State DOT to HPMS, to the maximum extent practicable. 23 CFR 490.509(h). The HPMS data as of November 30, 2023, will be used to calculate the metric for the reference year. 23 CFR 490.509(h).

Because FHWA will not necessarily have the VMT data the State DOT used, the biennial reporting requirements in proposed 23 CFR 490.107(b)(1)(ii)(H), (b)(2)(ii)(J), and (b)(3)(ii)(I) were revised in this final rule to require the State DOT to report the GHG metric value they calculated, the individual values used to calculate the GHG metric, and a description of the data source(s) used for the VMT information. This final rule removes the proposed requirement for the State DOT to report $CO_2$ emissions on all public roads as part of reporting the metric information since the values used to calculate the GHG metric can be used to calculate the all-roads value. A corresponding change was made to 23 CFR 490.511(f)(2) to align with the metric reporting requirements in the State DOT's biennial reports.

Section 490.109(d)(1)(vi) and (d)(1)(vii) were revised to require the significant progress determination to calculate the GHG metric and measure for the baseline and actual performance using the HPMS data available on November 30th of the year the significant progress determination is made. For the reference year, FHWA will use the HPMS data as of November 30, 2023. 23 CFR 490.109(d)(1)(vi)–(vii).

---

[15] In this section, the citations to 23 CFR part 490 refer to provisions as amended by this final rule.

Section 490.109(d)(1)(viii) was added to specify that the significant progress determination will use the $CO_2$ factors specified in section 490.509(f).

In the final rule, FHWA has added the requirement for State DOTs to submit the State Initial GHG Report, as described in VI.C. For that report, the State DOT will use the data specified in 23 CFR 490.107(d)(2) to calculate the metric.

Please note, 23 CFR 490.511 includes different requirements for State DOTs and MPOs when calculating the metric used to calculate the GHG measure. The State DOT's method is defined in 23 CFR 490.511(c) and the method will be the same for all states. The MPOs are granted flexibility in how they calculate the metric, as described in 23 CFR 490.511(d). This section only discusses the changes made in the final rule in relation to the data the State DOT will use when calculating the GHG metric. The changes made related to the MPO metric requirements are summarized below in Section VI.E.

### E. Initial MPO Targets & Reports

The final rule, in 23 CFR 490.511(d), retains the additional flexibility granted to MPOs in how they calculate the GHG metric. The final rule removes the proposed requirement for MPOs and State DOTs to mutually agree upon a method for calculating the metric, and instead requires MPOs to report a description of their metric calculation method(s). When that method is not one of the ones specified in 23 CFR 490.511(d), the MPO will include information demonstrating the method(s) has valid and useful results for measuring transportation related $CO_2$. 23 CFR 490.107(c)(2)(ii). While MPOs are not required to select a metric calculation in coordination with their State DOT, they are encouraged to coordinate with the State DOT on the data used to the maximum extent practicable.

The final rule removes the proposed requirement for the MPO to report $CO_2$ emissions on all public roads.

### F. Severability

The final rule adds a new section 23 CFR 490.515 that contains a severability clause applicable to the amendments to 23 CFR part 490 made by this final rule. FHWA believes that the amendments to part 490, including establishment and calculation of the GHG performance measure and declining targets, are capable of operating independently of one another. If one or more aspects of the GHG measure are determined to be invalid, the remaining provisions should remain unaffected and in force.

### G. Other Changes

The final rule contains several technical changes from the proposed rule. These changes are described in Table 1.

### TABLE 1—TECHNICAL EDITS TO THE FINAL RULE

| CFR section | Description of change |
| --- | --- |
| 23 CFR 490.101 | Corrects the abbreviated name for the *Fuels and Financial Analysis System—Highways* (Fuels & FASH) database. Corresponding changes were made throughout the rule. |
| 23 CFR 490.105(c)(5) | Clarifies language describing the GHG measure. |
| 23 CFR 490.105(d)(4) | Clarifies the applicability of the joint targets. |
| 23 CFR 490.105(e)(4)(i)(C) | Moves information about the performance period from the location proposed in the NPRM to here to align with references to the performance period throughout 23 CFR part 490. |
| 23 CFR 490.105(f)(10) | Clarifies rule language. |
| 23 CFR 490.107(a)(1) | Updates language to capture the edition of Section 490.107(d) in the final rule. |
| 23 CFR 490.107(c)(2) | Revises the structure and organization of the paragraph to improve readability. |
| 23 CFR 490.109(d)(1)(v) and (d)(1)(vii) | Clarifies that the reference year data will not be updated each time the data for the previous year is compiled. |
| 23 CFR 490.109(d)(1)(viii) | Clarifies that the $CO_2$ factor specified in Section 490.509(f) will be used. |
| 23 CFR 490.109(e)(4)(vi) | Substitutes "accepted" instead of "cleared." |
| 23 CFR 490.109(e)(4)(vii) | Adds the HPMS data extraction date. Listing this date is consistent with Section 490.109(e)(4)(vi) and does not change the intended approach. |
| 23 CFR 490.109(f)(1)(v) | Revises rule language to use consistent terminology. |
| 23 CFR 490.505 | Clarifies that approximately 97 percent of on-road tailpipe GHG emissions are $CO_2$. |
| 23 CFR 490.509(f) | Clarifies rule language. |
| 23 CFR 490.509(f)(2) | Revises rule language to use consistent terminology. |

## VII. Section-by-Section Discussion

This final rule was developed in response to comments received on the NPRM. Section VII summarizes major comments received and any substantive changes made to each section in this final rule. Editorial or minor changes in language are not addressed in this section. For sections where no substantive changes are discussed, the substantive proposal from the NPRM has been adopted in this final rule.

### Questions Posed in the NPRM

The FHWA requested comment on a number of items in the NPRM. The

FHWA invited comments on the following:

• How should FHWA structure improving targets for the GHG measure, as well as the associated reporting and significant progress requirements, and how could these targets align with and inform existing transportation planning and programming processes?

• Besides requiring targets that reduce GHGs over time, are there any specific ways the proposed GHG measure could be implemented within the framework of TPM to better support emissions reductions to achieve national policies for reductions in total U.S. GHG emissions?

• What changes to the proposed measure or its implementation in TPM could better the impact of transportation decisions on $CO_2$ emissions, and enable States to achieve tailpipe $CO_2$ emissions reductions necessary to achieve national targets?

• In instances that MPOs are establishing a joint UZA target, should FHWA require that the individual MPO-wide targets be the same as the jointly established UZA target?

• Should MPOs that establish a joint UZA target be exempt from establishing individual MPO-level targets, and instead only be required to adopt and support the joint UZA target?

• In cases where there are multiple MPOs with boundaries that overlap any portion of an UZA, and that UZA contains NHS mileage, should each of those MPOs establish their own targets, with no requirement for a joint UZA target?

• Are there other approaches to target setting in UZAs served by multiple MPOs that would better help MPOs reach net-zero emissions?

The FHWA also requested comment on assumptions that were developed as part of the RIA, as well as information on other benefits or costs that would result from implementation of the rule, as follows:

• The RIA includes assumptions regarding the applicability, level of effort and frequency of activities under proposed 23 CFR 490.105, 490.107, 490.109, 490.511, and 490.513. Are these assumptions reasonable? Are there circumstances that may result in greater or lesser burden relative to the RIA assumptions?

• Would the staff time spent implementing this measure reduce the burden of carrying out other aspects of State DOT and MPO missions, such as forecasting fuel tax revenues? If so, please describe and provide any information on programs that would benefit from this measure and estimate any costs that would be reduced by implementing this measure.

• Would the proposed rule result in economies of scale or other efficiencies, such as the development of consulting services or specialized tools that would lower the cost of implementation? If so, please describe such efficiencies and provide any information on potential cost savings.

• Would the proposed rule result in the qualitative benefits identified in the RIA, including more informed decisionmaking, greater accountability, and progress on National Transportation Goals identified in MAP–21? Would the proposed rule result in other benefits or costs? Would the proposed measure change transportation investment decisions and if so, in what ways? For State DOTs and MPOs that have already implemented their own GHG measure(s), FHWA welcomes information on the impact and effectiveness of their GHG emissions measure(s).

The FHWA received many comments on these items, and thanks commenters for their useful input. The FHWA considered these comments in developing this final rule and responds to significant adverse comments related to these questions and other comments in the following section.

*General Comments*

FHWA's Legal Justification for the GHG Measure

*Comment:* A large number of commenters addressed FHWA's legal authority for this measure. Many commenters affirmed FHWA's legal authority to establish the measure under 23 U.S.C. 150. These commenters note that under MAP–21, FHWA is required to establish "performance" measures to assess performance of the Interstate and non-Interstate NHS, *see* 23 U.S.C. 150(c)(3)(A)(ii)(IV)–(V), and FHWA's interpretation of "performance" to include environmental performance is consistent with the express statutory goals of the Federal-aid highway program, which include environmental sustainability under 23 U.S.C. 150(b)(6). In contrast, many commenters disputed FHWA's legal authority to establish the proposed measure. Several commenters stated that, contrary to FHWA's statements, this action will in fact set performance targets for the States and MPOs by requiring State DOTs and MPOs with NHS mileage to establish declining $CO_2$ emissions targets that align with the Administration's net-zero targets, while FHWA's authority is limited to establishing measures for States to use to measure performance. These commenters largely characterized the measure as a requirement that State DOTs and MPOs reduce GHG emissions. Notably, a large number of commenters stated that FHWA does not have the authority to regulate GHGs, as Congress has not assigned such authority to the Agency, and such authority would be more appropriately assigned to the Environmental Protection Agency (EPA). Similarly, several commenters claim that FHWA should not focus on regulating GHGs, and instead should work with the EPA to reduce $CO_2$ emissions. A commenter also asserted that the proposed rule inappropriately seeks to rebalance Congress's funding priorities.

*Response:* As discussed in Section III of this preamble, FHWA affirms that the Agency has the requisite statutory authority to adopt the GHG measure. A significant number of commenters questioning FHWA's authority to adopt the GHG measure have mischaracterized this rulemaking. The FHWA is not regulating GHG emissions via this measure, is not mandating any reductions, is not forcing States to select specific projects, and is not asserting authority through this rulemaking over GHG emissions from the transportation sector. Rather, this measure is designed to provide State DOTs and MPOs with the information necessary to make

informed transportation decisions. Although FHWA is requiring that State DOTs and MPOs set targets—consistent with the rest of the TPM program—FHWA is not mandating specific targets and is not setting those targets for State DOTs and MPOs. The FHWA is also neither approving nor disapproving individual targets. Thus, FHWA is applying the Agency's authority under 23 U.S.C. 150(c) and is not extending beyond that authority. However, upon examining comments and the preamble to the NPRM, FHWA recognizes that the language regarding aligning with net-zero targets could be clarified to better indicate FHWA's intent. Therefore, FHWA is clarifying that the Agency is not requiring that declining targets align to the Administration's net-zero targets as outlined in the national policy established under E.O. 14008. Rather, FHWA recommends that State DOTs and MPOs consider the Administration's targets when setting their declining targets.

*Comment:* Several commenters asserted that FHWA has not sufficiently justified changing its approach. Commenters assert that FHWA is merely reinstating a previous action and is changing the Agency's position based on policy preferences provided in E.O.s rather than technical expertise, such as by stating that the emissions measure would result in substantial benefits, while also stating that the benefits are not easily quantifiable. Several commenters assert that FHWA has failed to adequately justify this measure by relying on general reports on $CO_2$ emissions and climate change harms. In addition, commenters asserted that FHWA may not merely reexamine previous assertions in rulemakings and must instead provide technical analysis in support of the rulemaking. Commenters asserted that FHWA failed to consider whether declining targets will interfere with other statutory schemes by encouraging States to adopt electric vehicles to reduce GHGs while not focusing on reducing criteria pollutants under CMAQ. In addition, commenters assert FHWA failed to consider whether the rulemaking will disadvantage States with a range of different conditions, such as extreme climates and freight traffic.

*Response:* The FHWA disagrees with these commenters' assertions. The FHWA has reexamined the rationale for the 2018 repeal and has determined that FHWA has the authority to adopt this GHG measure and has provided updated analyses identifying why the GHG measure is appropriate and reasonable in light of FHWA's statutory mandate to adopt performance measures. The

FHWA's legal authority, technical justification, and reasoned analysis for this measure are detailed in the NPRM and in Sections III. and IV. of this preamble. FHWA has acknowledged that it is changing the position the Agency put forward in the 2018 repeal final rule and provided detailed legal, technical, and policy reasons for doing so. Commenters' assertion that FHWA must do more to justify changing its approach has no basis in law. *See FCC* v. *Fox Television Stations, Inc.,* 556 U.S. 502, 515–16 (2009). The FHWA also disagrees with the commenters' assertions about FHWA's failure to consider whether declining targets will disadvantage States or cause any potential harm through the adoption of electric vehicles. These comments are predicated on a misconception that FHWA is requiring any specific behavior by State DOTs and MPOs to reduce GHG emissions. The FHWA is not mandating reductions, and this rulemaking does not require or purport to require State DOTs or MPOs to select GHG reducing projects. Rather, State DOTs and MPOs will determine appropriate declining targets based on the conditions relevant to the State DOTs and MPOs. The FHWA expects—but does not require—that this measure will help State DOTs and MPOs select projects that will reduce GHG emissions.

*Comment:* Several commenters assert that FHWA lacks the authority to adopt the GHG measure based on the recent decision of *West Virginia* v. *EPA,* 142 S. Ct. 2587 (2022), related to the Major Questions Doctrine.

*Response:* The FHWA disagrees with the assertion that this measure is inconsistent with recent Supreme Court precedent. This rulemaking is not an extraordinary case. It does not involve a novel interpretation of longstanding FHWA authority, nor does it represent an unheralded assertion of regulatory authority with the significant economic and political impacts that implicate a major questions case under *West Virginia* v. *EPA.* The FHWA's approach is in line with FHWA's prior requirements for performance measures related to the national goals in 23 U.S.C. 150(b). This rulemaking also does not require State DOTs and MPOs to change their approach to selecting projects. Rather, the measure will provide them with additional information to inform their decisionmaking. As described in the RIA, this rulemaking has minimal costs for State DOTs and MPOs. Additionally, there is clear congressional authorization to establish performance measures under 23 U.S.C. 150(c). Contrary to inaccurate

statements made by commenters, FHWA is not regulating GHG emissions, but rather is setting forth an approach by which to measure GHG emissions related to transportation on the Interstate System and non-Interstate NHS, using publicly available data, which States and MPOs can use to make better-informed transportation investment decisions. Therefore, FHWA disagrees with the commenters' assertions related to the Major Questions Doctrine.

*Comment:* A number of commenters stated that FHWA does not have the authority to issue this GHG measure under 23 U.S.C. 150(c) because the statute limits performance measures only to those described in that subsection.

*Response:* As described in the NPRM and discussed in Section III of this preamble, FHWA has reconsidered its previous interpretation that this provision limits FHWA's authority to establish measures States use to assess performance on the NHS to measures that focus on the physical condition of the system and the efficiency of transportation operations across the system. FHWA now concludes that 23 U.S.C. 150(c) limits FHWA to establishing measures to carry out 23 U.S.C. 119 to measures that assess performance on the Interstate System and the NHS. However, the provision does not otherwise limit the meaning of ''performance.'' Thus, FHWA has concluded that the ''performance'' of the Interstate and non-Interstate NHS includes environmental performance, and FHWA disagrees with the commenters' conclusion that FHWA does not have authority to adopt this GHG measure.

*Comment:* Commenters noted that although FHWA is not proposing any penalties, FHWA would be able to influence the selection of projects by States that rely on formula funds that Congress requires FHWA to distribute to States.

*Response:* The FHWA did not propose, and is not finalizing, any requirements for specific use of funds related to the GHG measure. The measure and the associated targets established through the final rule are intended to help State DOTs and MPOs consistently and transparently monitor the current performance of the NHS, and plan transportation projects in a way that protects the long-term performance of the NHS. The final rule does not direct any action on the part of the State DOT or MPO with respect to selecting projects under the Federal-aid highway program. As per 23 U.S.C. 145, State DOTs determine which eligible

projects are federally funded, and FHWA reaffirms that nothing in this final rule should be construed to affect that bedrock principle. Therefore, FHWA disagrees with the commenters' assertion that FHWA may influence project selection through this measure.

*Comment:* Commenters note that BIL did not provide FHWA with new authority to regulate GHGs, but rather BIL established new programs to incentivize and reward State DOTs and MPOs for implementing emissions reduction strategies. Commenters also note that BIL and the Inflation Reduction Act (IRA) (Pub. L. 117–169) did not authorize FHWA to mandate GHG performance targets that States would be required to meet. One commenter asserts that the legislative history of BIL indicates that Congress considered but did not pursue climate change policy for FHWA. Commenters assert that Congress specifically chose not to address GHG emissions under 23 U.S.C. 150(c), and thus FHWA lacks authority to issue this measure. Commenters also assert that since Congress addressed GHG emissions in programs like the CRP under 23 U.S.C. 175 but did not add them to the performance measures in 23 U.S.C. 150(c), Congress intended to set performance measures for some programs and not set performance measures for other programs.

*Response:* As described in Section III of this preamble, FHWA's authority for this measure arises under 23 U.S.C. 150(c), and FHWA's interpretation of that authority is informed in part by new changes from BIL. Additionally, FHWA did not propose—and is not finalizing—any FHWA-mandated performance targets that States would be required to meet. The BIL contains a number of programs that aim to reduce GHG emissions from transportation sources, and collection and analysis of the GHG measure can support implementation of those programs. However, FHWA did not propose, and is not finalizing, any requirements related to those programs. In addition, FHWA disagrees with the assertion that BIL does not address climate change. As discussed in this preamble, there are a number of GHG emissions-related provisions in BIL, such as those found in division A, title I, subtitle D, titled ''Climate Change.'' These provisions include both the CRP under 23 U.S.C. 175 and the Promoting Resilient Operations for Transformative, Efficient, and Cost-Saving Transportation (PROTECT) program under 23 U.S.C. 176. The FHWA recognizes that these programs do not mandate reductions in GHG emissions, and as such, FHWA

does not assert authority over GHG emissions. However, FHWA disagrees with the commenters regarding congressional intent as related to the measurement of GHGs under 23 U.S.C. 150(c). Congress did not provide exact parameters for performance measures under 23 U.S.C. 150(c), and it did not clarify, let alone impose restrictions on, these parameters in BIL. Rather, FHWA must—based on the Agency's expertise—determine how to structure performance measures. As described in this preamble and in the preamble to the 2022 NPRM, FHWA has determined that measuring environmental performance is vital to assessing performance on the Interstate and non-Interstate NHS.

In addition, FHWA disagrees with the commenters' assertion that Congress's designation of mandatory performance measures for some programs but not others prohibits FHWA from exercising Agency expertise to define performance of the Interstate and non-Interstate NHS. Although Congress did not include a specific performance measure for GHG-related programs in enacting 23 U.S.C. 150, Congress also decided not to define performance under 23 U.S.C. 150(c)(3)(A)(ii)(IV)–(V) and, in the decade since enactment of MAP–21, Congress has not qualified FHWA's authority to define performance on the NHS, even after FHWA promulgated a GHG measure in the PM3 rule. For the same reasons, FHWA also disagrees with the commenters' statements regarding legislative history of BIL and IRA, and in particular, the significance that can be attributed to GHG and environmental performance-related language not being included in the enacted legislation. By itself, congressional inaction on a subject is an unreliable indicator of legislative intent because ''several equally tenable inferences may be drawn from such inaction, including the inference that the existing legislation already incorporated the offered change.'' *Pension Benefit Guaranty Corp.* v. *LTV Corp.,* 496 U.S. 633, 650 (1990) (quoting *United States* v. *Wise,* 370 U.S. 405, 411 (1962)) (internal quotation marks omitted). In this instance, there is no contemporaneous legislative record to explain why language relating to measuring GHG emissions with respect to performance of the NHS was not included in BIL. Moreover, BIL was passed long after the PM3 rulemaking was proposed and finalized. If anything, the fact that Congress was aware of FHWA's prior action to promulgate a GHG performance measure and did not use the opportunity in BIL to amend existing statutory language on

performance measures or the definition of performance on the NHS more likely indicates that Congress intended to leave such determinations to Agency expertise to be handled via regulatory authority. *See id.* Therefore, FHWA rejects the commenters' interpretation of congressional intent to restrict FHWA's authority to establish measures to assess performance of the NHS.

*Comment:* Commenters disagreed with FHWA's approach to supporting resilience through this measure. Commenters assert that both the NHPP under 23 U.S.C. 119 and BIL are focused on the physical condition of the highway system, and FHWA must focus on addressing physical issues with the roads, rather than $CO_2$ emissions. Commenters assert that, likewise, resilience deals with impacts on the transportation system, rather than impacts from emissions from the transportation system. Commenters also contend that $CO_2$ regulation is the purview of the EPA, not FHWA.

*Response:* The FHWA disagrees with the commenters' limited view of 23 U.S.C. 119's substantial focus on resilience and their characterization of FHWA's action to establish the GHG measure. As discussed in section III above, the NHPP is not solely focused on the physical performance of highways. For example, the requirements for State asset management plans include strategies supporting the progress toward the achievement of all national goals identified in 23 U.S.C. 150(b), including the goal to enhance the performance of the transportation system while protecting and enhancing the natural environment at 23 U.S.C. 150(b)(6). *See* 23 U.S.C. 119(e)(2). In addition, the BIL amended the requirements for asset management plans' lifecycle cost and risk management analyses so that they now must specifically take into consideration extreme weather and resilience. *See* 23 U.S.C. 119(e)(4)(D). In explicitly stating that both the purpose of the NHPP under 23 U.S.C. 119 is to increase the resiliency of the NHS and that environmental sustainability is an express national goal of the Federal-aid highway program under 23 U.S.C. 150(b), Congress clearly spoke to the importance of addressing environmental impacts related to the transportation system. Assessing environmental performance will support State and MPO efforts to increase the resiliency of the NHS to mitigate the cost of damages from sea level rise, extreme weather events, flooding, wildfires, or other natural disasters. By addressing the performance of the transportation system related to the largest source of

U.S. $CO_2$ emissions, FHWA is implementing Congress's express direction regarding NHPP goals. Measuring environmental performance though the GHG performance measure will assist States to consider $CO_2$ emissions from transportation in the performance management framework and help frame responses to the growing climate crisis. Reducing GHG emissions that are causing increases in temperature, sea level, extreme weather events, flooding, wildfires, and other natural disasters should then decrease the severity and impact of those conditions in the future. The FHWA has applied its expertise related to the transportation system and found that mitigating the cost of damage from natural disasters also requires helping State DOTs and MPOs address the cause of those disasters. However, and as discussed above, FHWA is not regulating $CO_2$ emissions or otherwise mandating specific reductions.

*Comment:* One commenter asserted that FHWA's action is a broad attempt to regulate GHGs, and Congress must speak more clearly before FHWA may assert it has authority to mandate that all of the States and Puerto Rico decrease on-road $CO_2$ emissions in furtherance of the Administration's emissions goals.

*Response:* The FHWA is not mandating that States or MPOs decrease emissions or compelling States to undertake projects that reduce GHGs. Consistent with the rest of the TPM program, FHWA is setting forth a program to measure performance on the Interstate and non-Interstate NHS, as directed by Congress.

*Comment:* One commenter stated that FHWA should develop an Environmental Impact Statement (EIS) for this action because of the rule's wide-ranging potential impacts.

*Response:* The FHWA disagrees that an EIS is appropriate for this rulemaking. The FHWA has analyzed this rule pursuant to the National Environmental Policy Act of 1969 (NEPA) (42 U.S.C. 4321 *et seq.*) and has determined that it is categorically excluded under 23 CFR 771.117(c)(20), which applies to the promulgation of rules, regulations, and directives. As discussed further in Section VIII of this preamble, FHWA does not anticipate any adverse environmental impacts from this rule, the purpose of which is to inform decisionmaking about the transportation sector's contribution to GHG emissions, and thereby contribute to environmental sustainability. Therefore, a categorical exclusion is appropriate for this rulemaking and no further NEPA approvals are required.

Comments on the Appropriateness of the Proposed Measure

*Comment:* A large number of commenters questioned the appropriateness of the proposed measure to assess GHG emissions. A small number of these commenters asserted the proposed measure is not appropriate for rural States since rural residents need to drive further to access essential goods and services and alternative transportation modes are limited. In addition, several other commenters asserted the proposed measure does not account for exogenous factors beyond the control of State DOTs and MPOs, including population growth, economic growth, goods movement, and State and local policies, among others. Relatedly, many commenters recommended using a per-capita measure in addition to or instead of a measure of total emissions. A smaller number of commenters recommended using a measure of VMT to demonstrate the impact of transportation decisions on changes in travel behavior. Some commenters stated that the measure places an unequal burden on rural States and States with growing populations.

Other commenters addressed technical considerations underlying the suitability of the proposed measure. A couple of commenters indicated the measure does not account for fluctuations to NHS mileage resulting from roadway reclassifications, and one commenter asserted the measure does not account for regional variations in vehicle fleet efficiency or roadway speeds. Several commenters recommended the proposed measure consider lifecycle processes, such as electricity used by electric vehicles and embodied carbon associated with vehicle manufacture and transportation infrastructure. One commenter recommended that the measure account for excess fuel consumption associated with poor pavement condition.

*Response:* The FHWA has retained the GHG performance measure proposed in the NPRM, the percent change in tailpipe $CO_2$ emissions on the NHS compared to the reference year, because of its simplicity, ease of calculation, and reliance on data States already report to FHWA. The FHWA acknowledges commenters' observations that the GHG footprint of on-road transportation extends beyond tailpipe $CO_2$ emissions and includes lifecycle processes supporting to generation of electricity used by EVs, the production of transportation fuels, the manufacture of vehicles, and the construction and maintenance of transportation

infrastructure. However, FHWA believes that addressing these factors in a GHG measure would lead to more complicated and potentially less reliable calculations.

In addition, FHWA believes that the measure sufficiently accounts for several of the factors cited by commenters, such as the effect of roadway speed, changes vehicle fleet efficiency, and the effect of pavement condition on fuel efficiency, all of which are represented through State-reported fuel sales that are used to calculate the measure. The FHWA also believes that a GHG measure is preferable to a VMT-only measure, which would serve an indirect proxy for GHG emissions that would not account for the benefits of highway operations and pavement strategies implemented by State DOTs, electrification of the vehicle fleet, or other improvements in vehicle efficiency. The GHG measure FHWA is establishing also supports tracking of progress toward GHG reduction goals. This would not be the case with a measure that normalizes the effect of population or economic growth or excludes truck $CO_2$ emissions. The FHWA notes that regulation does not prevent State DOTs and MPOs from using additional performance measures at the local level.

The FHWA rejects the concept that this measure places an unequal burden on rural States and States with rapidly growing populations, as States with various conditions can implement this measure to help evaluate performance. The FHWA also reiterates that this rulemaking does not set any specific targets or require any GHG reductions. The commenters' assertions about disadvantaging rural areas falsely assume that this measure mandates GHG reductions and penalizes States and MPOs that fail to achieve reductions. Neither the proposal, nor the final rule, do any such thing. Therefore, FHWA disagrees with the commenters' assertions about unequal burden on rural States and States with rapidly growing populations.

Comments on Transportation Agencies' Influence on GHG Emissions

*Comment:* Several commenters addressed State DOTs' and MPOs' ability to reduce GHG emissions year over year through planning and programming of transportation projects. Several commenters asserted State DOTs and MPOs have limited ability to materially reduce GHG emissions. These commenters noted that performance against the GHG measure is affected by many different factors outside the control of State DOTs and MPOs,

including a State government's policies, population and economic growth, and fuel prices, among others. They also assert that transportation planning and programming is a multiyear process and State DOTs and MPOs cannot have a meaningful impact on GHG emission reductions year over year.

In contrast, a large number of commenters asserted that transportation agency decisions influence GHG emissions, and that a GHG measure is important for evaluating the impact of these decisions. Many commenters asserted that establishing a nationwide, uniform performance measure would ensure consistency in tracking progress and help State DOTs, MPOs, and FHWA to identify the most effective programs, strategies, and projects for carbon reduction. The commenters also asserted that the proposed performance measure would inform State DOT and MPO efforts to carry out performance-based planning and project selection, consistent with statutory requirements. Several commenters asserted that the decisions that State DOTs make in terms of designing infrastructure and constructing the built environment have a profound influence on travel behavior. A large number of comment campaign letters also asserted that a GHG measure is important for understanding the long-term impact of transportation investments on GHG emissions and to better connect transportation decisions with climate goals.

*Response:* Upon review of the comments, FHWA has retained the measure as proposed. The FHWA agrees with commenters asserting that a GHG measure is useful for evaluating the impact of transportation investments and other policies on GHG emissions. The FHWA also agrees that transportation investments have a meaningful impact on travel behavior, and that transportation agencies' policies and programs involving vehicle electrification, highway operations, and roadway maintenance practices provide further opportunities to reduce GHG emissions in absence of changes to travel behavior. The BIL provides more than $27 billion in Federal funding to help State DOTs and MPOs achieve their GHG reduction targets. This total includes $6.4 billion in formula funding to State DOTs and local governments through the CRP to support a range of projects designed to reduce on-road $CO_2$ emissions; $5 billion to State DOTs through the National Electric Vehicle Infrastructure Formula Program to build out a national electric vehicle charging network; $2.5 billion in competitive funding to State DOTs and local governments to deploy electric vehicle

and alternative fuel infrastructure, $7.2 billion for the Transportation Alternatives Set-Aside that State DOTs and local governments can use to carry out pedestrian and bicycle infrastructure projects, and more than $5 billion to ensure the nation's transit systems are tackling the climate crisis.[16] In addition, transportation agencies have for decades been able to use Federal-aid Highway Program funds to support projects that reduce GHG emissions, including transit improvements, congestion reduction and traffic flow improvements, freight and intermodal initiatives, idle reduction technologies, travel demand management, carsharing, carpooling and vanpooling, and bike and pedestrian facilities. Given the range of options available to transportation agencies to reduce GHG emissions and the significant financial resources provided by BIL, FHWA rejects the premise that transportation agencies have limited capacity to influence GHG emissions.

The FHWA also believes that it is important for the measure to address total tailpipe $CO_2$ emissions on the NHS rather than normalizing this value by population or other factors, since atmospheric $CO_2$ concentrations are ultimately influenced by the total quantity of $CO_2$ emissions produced. The FHWA believes a measure addressing total emissions supports a whole-of-government approach to addressing climate change by implementing a consistent measure of $CO_2$ emissions on the NHS at the National, State, and metropolitan levels. The FHWA is requiring State DOTs and MPOs to establish declining GHG emissions targets. Contrary to the commenters' assertions FHWA is not requiring States to set specific declining target levels or achieve actual reductions in GHG emissions. State DOTs and MPOs have flexibility to set targets that are appropriate for their communities and that work for their respective climate change and other policy priorities, as long as the targets are declining.

Comments on Incentives and Disincentives

*Comment:* A large number of commenters addressed the creation of incentives or disincentives to strengthen the proposed GHG measure. The vast majority of these comments stated that

the proposed rule would be strengthened by including clear and specific incentives for those States and regions that meet their targets, such as providing extra points in competitive grant programs, favorable local match requirements, or expedited project/application review processes. Other commenters recommended restricting use of Federal transportation funds to projects that reduce GHG emissions in States and regions that did not meet their targets. A couple of commenters opposed creation of incentives or disincentives.

*Response:* Under 23 U.S.C. 145, the Federal-aid highway program is a federally assisted, State-administered program; FHWA does not determine which eligible projects, as selected by States, shall be financed. The FHWA cannot broadly limit the use of transportation funds in the manner recommended by commenters, and FHWA does not have the authority to restrict transportation funding for States that fail to meet their targets. However, BIL includes new programs that will help States and MPOs fund projects that reduce GHG emissions, which in turn, could assist them in meeting the targets that they set. This topic is further discussed in Section III this preamble. States and MPOs can additionally leverage their own programs to reduce GHG emissions by accounting for expected GHG impacts in the analysis and selection of transportation projects.

Comments on Penalties

*Comment:* Several commenters addressed the possibility of penalties being associated with the proposed measure. A few of these commenters sought clarification on whether FHWA intends to apply a penalty (including penalties associated with failure to comply with Federal requirements under 23 CFR 1.36). Other commenters requested the final rule include a section specifying that no penalties would be applied for not meeting a target. Other commenters asserted that FHWA is in fact providing a penalty for failing to reduce GHGs based on the Agency's authority under 23 CFR 1.36.

*Response:* There are no specific penalties for failing to achieve GHG targets. Rather, consistent with existing NHPP performance measures, if significant progress is not made for the target established for the GHG measure in 23 CFR 490.507(b), the State DOT must document the actions it will take to achieve that target no later than in its next biennial report, but is encouraged to do so sooner. Significant progress toward achieving NHPP performance targets is further described in 23 CFR

490.109. The FHWA did not propose specific penalties for failure to achieve performance targets, and is not finalizing any such penalty. Failure to achieve significant progress for this measure, as defined in 23 CFR 490.109, will also not trigger any penalties. State DOTs and MPOs that set a declining target but fail to achieve their targets can satisfy regulatory requirements by documenting the actions they will take to achieve that target in their next biennial report. The FHWA does not set or approve the State DOT's or MPO's targets.

Comments on Exemptions

*Comment:* Several commenters recommended various entities be exempt from the proposed measure for various reasons. The majority of these commenters asserted that rural States have limited options to reduce transportation GHG emissions through transit and other strategies that reduce VMT and should accordingly be exempted from the measure. A few commenters recommended that States and MPOs in attainment with the National Ambient Air Quality Standards be exempted from the GHG measure. One commenter asserted that the GHG measure does not recognize that rural States produce fewer GHG emissions than urban areas.

*Response:* The FHWA considered the comments suggesting certain entities be exempt from the GHG measure and declines to do so. Greenhouse gas emissions are produced on all NHS facilities. Once released, $CO_2$ and other GHGs take many years to leave the atmosphere, resulting in increasing global atmospheric concentrations of $CO_2$ emissions regardless of where they are produced. Urban and rural areas both contribute to increased carbon pollution in the atmosphere, and FHWA believes this rule will provide both with the tools to reduce carbon pollution. This is different from criteria pollutants, which last no more than weeks in the atmosphere and only impact local or regional air quality.

The FHWA also rejects commenters' suggestion that rural States have limited options to reduce transportation GHG emissions. If these States determine that transit and other measures to reduce VMT are not effective means of influencing GHG emissions, they have a wide range of alternative strategies and funding programs available. This includes both formula funding and discretionary grants to deploy electric vehicle charging infrastructure and thereby increase EV adoption, funding to improve roadway operations, and asset management practices to maintain

---

[16] *See* Biden-Harris Administration Takes Step Forward to Combat Climate Change, Announces Proposed Transportation Greenhouse Gas Emission Reduction Framework, *available at https:// highways.dot.gov/newsroom/biden-harris-administration-takes-step-forward-combat-climate-change-announces-proposed.*

roads and reduce excess fuel consumption from poor road condition surface. The FHWA reiterates that the final rule does not require rural States, or any State, set targets at a specific level or to reduce GHG emissions. The final rule also does not impose any penalties on a State for failing to meet its GHG targets. Therefore, there is no justification to exempt rural States, and doing so would run counter to the purpose of this rule, which is to provide consistent and timely information about on-road mobile source emissions on the NHS to support better informed planning choices to reduce GHG emissions or inform tradeoffs among competing policy choices.

Comments on Benefits of a GHG Measure

*Comment:* A large number of commenters addressed potential benefits from the proposed GHG measure. Several commenters, including State DOTs, that have independently measured and reported GHG emissions asserted that a GHG performance measure can inform planning and decision making, including project prioritization and statewide transportation planning processes. A few of these commenters additionally asserted that implementation of the proposed GHG measure as part of TPM would complement existing GHG reduction efforts. Additional benefits identified by commenters included: empowering State and local leaders to better align their transportation decisions with climate goals, enhancing transparency and accountability of investment decisions, supporting a consistent and coordinated approach to reducing GHG emissions across all levels of government, and supporting national GHG emission reduction goals in accordance with E.O. 13990 and E.O. 14008.

By contrast, several commenters questioned the benefits of the proposed measure. Several commenters asserted that DOTs and MPOs have limited influence over GHG emissions. One commenter asserted that the proposed measure would not help agencies identify projects to reduce GHG emissions and a couple of commenters asserted that the measure would not impact transportation decisions. Another commenter stated this is because the proposed rule does not propose a method for requiring continually decreasing GHG emissions and does not penalize noncompliance.

*Response:* The FHWA is establishing a GHG emissions performance measure in response to an increasingly urgent climate crisis and to improve the

transportation sector's GHG performance, which has lagged behind other major U.S. sectors. The EPA estimates of GHG emissions date back to 1990, and over that time the transportation sector has gone from being the third largest to the largest source of U.S. GHG emissions. The FHWA agrees with commenters that establishing a GHG performance measure is a critical step in improving transportation system performance and supporting national GHG reduction goals. A key premise underlying the GHG measure is that measuring and reporting complete, consistent, and timely information on $CO_2$ emissions from on-road mobile sources will provide opportunities for all levels of government and the public to make more informed decisions that consider transportation's contribution to climate change and opportunities to reduce GHG emissions. The FHWA believes that by establishing a uniform GHG measure, it is more likely that GHG emissions will be consistently and collaboratively considered by State DOTs and MPOs through transportation planning and performance management. The FHWA also agrees with the comments enumerating the benefits of establishing the GHG measure.

The FHWA disagrees that State DOTs and MPOs have limited influence over GHG emissions. As noted earlier, BIL provides more than \$27 billion in Federal funding to help State DOTs and MPOs achieve their GHG reduction targets, and States have additional ability to influence GHG emissions through highway operations and roadway maintenance. The FHWA also disagrees with commenters asserting that a GHG measure would not inform planning and investment decisions. As noted in comments from agencies that have implemented their own GHG measures, performance-based approaches that include GHG emissions have been successfully used to guide planning and investment decisions.

Comments on Burden Posed by a GHG Measure

*Comment:* Several commenters identified concerns about the impact of the proposed rule on State DOTs and MPOs. Several commenters asserted that the proposed rule would duplicate established and effective programs such as fuel economy standards established under the Corporate Average Fuel Economy (CAFE) Program, and transportation $CO_2$ estimates published by EPA and the Department of Energy (DOE). Other commenters asserted the implementation of calculating and tracking GHG emissions would be

overly burdensome, and that the costs of complying with declining targets would be significant for some States. A few commenters additionally asserted that the proposed GHG measure would not be sufficient for making program- and project-level investment decisions.

*Response:* FHWA disagrees that the measure established under this rule would place undue burden on States and MPOs. The FHWA also disagrees that the GHG measure would duplicate other Federal programs addressing transportation GHG emissions. A key purpose of the GHG measure is to provide an information source to help State DOTs, MPOs and other agencies set targets, monitor trends, and evaluate the impact of transportation investments and other strategies to reduce on-road GHG emissions. This is a different function from the CAFE program, which regulates GHG emissions rates for new vehicles and is not intended to account for factors such as changes in travel demand, congestion, and other factors affecting total on-road GHG emissions. While Federal agencies such as EPA and DOE publish estimates of total transportation $CO_2$ emissions, these data are not disaggregated to reflect on-road activity, and also lag the publication of FHWA fuel use data by up to a year. Since FHWA's GHG measure specifically addresses $CO_2$ on-road activity and utilizes FHWA's data for the estimated fuel volumes distributed shortly after its publication, it will serve as a comprehensive and timely information source to support transportation decision making and to track progress toward national goals.

Several State DOTs that have independently implemented their own on-road tailpipe $CO_2$ measure observed that all State DOTs already compile the necessary data as part of existing reporting obligations. These commenters asserted that the labor hour assumptions from the RIA are reasonable, that neither the estimation of the measure nor target setting would result in significant burdens for State DOT staff.

Lastly, FHWA disagrees that the cost of complying with declining targets will be burdensome to transportation agencies. The BIL provides over \$27 billion in Federal funding to help State DOTs and MPOs achieve the declining GHG targets that they will set under this rule. The rule does not impose compliance costs associated with achieving declining targets since the rule does not require that emissions actually decrease or establish any penalties in the event that declining targets are not achieved.

### § 490.101   Definitions

Comments on the Measure's Relationship to National GHG Goals

*Comment:* A large number of commenters addressed the proposed performance measure's relationship to the national GHG goals. Several commenters asserted that the proposed performance measure would support the national GHG goals and expressed support for this connection. A smaller number of commenters asserted that the proposed performance measure would not support the national goals, as meeting them through the targets is unattainable/unrealistic, would require actions beyond State DOT/MPO authority, and would not match the timeline needed to see improvements from BIL-funded projects.

In addition, several commenters asked for clarifications related to the Administration's national goals for reducing GHG emissions. One commenter asked whether the declining targets must demonstrate a 50–52 percent reduction in on-road $CO_2$ emissions relative to 2005 levels by 2030 and net-zero on-road $CO_2$ emissions by 2050, or whether the targets must only aid in meeting the Administration's goals. One commenter requested additional guidance on how to set targets consistent with the national GHG goals for 2030 and 2050, and another requested guidance on how to translate the proposed GHG targets, which would be expressed relative to 2021 levels, to the Administration's goals, which are expressed relative to 2005 levels. Another commenter requested clarification on the meaning of net-zero, and asked whether FHWA will provide mechanisms to offset remaining emissions to achieve net-zero by 2050.

*Response:* Upon considering public comments, FHWA recognizes that the reference to net-zero targets and national GHG goals in the NPRM may have caused confusion, and FHWA has removed the definition of net-zero from 23 CFR 490.101 and the requirement in 23 CFR 490.105(e)(10) that targets for the GHG measure "demonstrate reductions toward net-zero targets." In the final rule, FHWA is not requiring State DOTs and MPOs to set any specific declining targets or achieve national GHG goals. Declining targets are not required to align with the Administration's goal for the U.S. to reduce $CO_2$ emissions 50–52 percent below 2005 levels by 2030 and achieve net-zero emissions economywide by 2050, in accordance with national policy established under E.O.s 13990 and 14008. Rather, FHWA believes

these national goals can provide a useful roadmap for State DOTs and MPOs as they consider how their targets fit into a longer timeframe of emission reductions.

### § 490.105   Establishment of Performance Targets

Comments on Establishing Declining Targets

*Comment:* A large number of commenters addressed the requirement to establish declining targets. The majority of these commenters were opposed to this requirement. Most of these commenters asserted that a declining target is inconsistent with 23 U.S.C. 150, which provides States with discretion in setting performance targets. Commenters asserted that States should set data-driven targets based on their own circumstances and analysis, which is not possible when declining targets are required. Commenters also asserted that a requirement for declining targets would reflect FHWA's influencing the selection of projects, with States facing pressure to select projects to support declining targets without commensurate funding through BIL to implement this type of change.

One commenter noted this would be the only measure to which MPOs would be expected to aid States in documenting declining targets, and requested that FHWA provide MPOs a 5-year grace period before requiring the declining targets to be established.

In contrast, several commenters supported the requirement to establish declining targets. These commenters asserted that such a requirement would require States to set targets that will result in improvement, as opposed to other performance measures, and support urgent progress on reducing GHG emissions from transportation. These commenters also asserted that the declining target requirement would not impinge on States' authority to set their own targets.

A few commenters recommended that FHWA require State DOTs and MPOs to provide their underlying assumptions and rationale for vehicle emissions rates and VMT, as well as to clarify in the final rule that targets should be based not only on projections for improvement in vehicle efficiency, but also on projections for reductions in emissions because of VMT-reducing investments, system efficiency enhancements, and/or other strategies.

*Response:* After considering these comments, FHWA has retained the requirement for State DOTs and MPOs to set declining targets as proposed in the NPRM and as further discussed in

this final rule. State DOTs and MPOs that have NHS mileage within their State geographic boundaries and metropolitan planning area boundaries, respectively, are required under the rule to establish declining targets for reducing $CO_2$ emissions generated by on-road mobile sources. Given the urgency of responding to the climate crisis, FHWA believes it is inappropriate for State DOTs and MPOs to delay establishing targets. The FHWA also believes States and MPOs have the tools necessary to meet these timelines. State DOTs will establish targets no later than February 1, 2024, and MPOs are required to establish targets no later than 180 days after the State DOT establishes their targets. *See* 23 CFR 490.105(e)(1)(ii) and 490.105(f)(1).

The requirement for State DOTs and MPOs to establish declining targets for tailpipe $CO_2$ emissions on the NHS is vital given the urgency of the climate crisis. Declining targets will help State DOTs and MPOs plan toward reductions in GHG emissions and make Federal infrastructure investment decisions that reduce climate pollution, a principle set forth in E.O. 14008 (86 FR 7626). As discussed in the NPRM, FHWA is not prescribing what declining targets would look like in each State or MPO. State DOTs and MPOs have the flexibility to set targets that work for their respective policies and priorities, so long as the targets are declining. Under the rule, State DOTs and MPOs have discretion in setting an appropriate declining target as informed by complete, consistent, and timely State and local information on GHG emissions from on-road mobile source emissions. The rule provides State DOTs and MPOs with the tools to consider GHG emissions in making transportation decisions and imposes no penalties on States and MPOs that do not meet their targets; therefore, FHWA rejects the characterization that State DOTs and MPOs are being pressured or otherwise required to select any specific project based on this measure.

The FHWA disagrees with the assertion that States and MPOs cannot set data-driven targets based on their own circumstances and analyses when the targets must be declining. States and MPOs will use the appropriate data to set declining targets, as informed by their policies and priorities. State DOTs and MPOs will use the data to evaluate current performance and predict future performance when establishing declining targets.

In addition, FHWA has removed the proposed requirement for declining targets to demonstrate reductions toward net-zero targets. For additional

information on FHWA's decision not to include net-zero in the final rule, see the discussion under Comments on the Measure's Relationship to National GHG goals, in the Section-by-Section Discussion of § 490.101.

Comments on Alternative Target Setting Frequencies

*Comment:* A large number of commenters provided feedback related to a question raised in the NPRM about introducing a new requirement for State DOTs and MPOs to establish 8- and 20-year targets at the beginning of each 4-year performance period. Many commenters favored adding long-term targets. Commenters in favor of the requirement noted that long-term targets can function as policy goals to allow for more forward-looking evaluation of emissions trajectories. The other commenters supporting this change asserted that long-term targets better align with FHWA planning requirements (Long Range Transportation Plan (LRTP), Metropolitan Transportation Plan (MTP), State Transportation Improvement Program (STIP), Transportation Improvement Program (TIP)), and would create greater visibility and accountability.

In contrast, a small number of commenters opposed adding long-term targets. A few of these commenters noted that they support establishing long-term targets as a best practice, but not as a requirement. Others responded that long-term targets would be too burdensome to develop and would lead to speculative results that will not add value to the target setting process.

*Response:* The FHWA considered the comments citing the benefits of establishing long-term targets but declines to do so at this time to remain consistent with the existing TPM framework used for the other NHPP measures. Providing consistency with other measures minimizes the complexity of the TPM requirements. It also allows the measures with biennial targets to be considered in relation to each other, which can help illustrate how these measure areas are part of a single transportation system. State DOTs and MPOs can voluntarily establish longer-term targets in the manner that best aligns with their individual policies and plans.

Comments on MPO Joint Targets

*Comment:* Several commenters expressed concern about the proposed requirement for joint UZA targets. Almost all of these commenters otherwise supported the proposed measure but recommended removing

the joint UZA target from the final rule. They identified a variety of concerns, particularly that a joint UZA target would be duplicative of the requirement for metropolitan planning area targets, thereby adding administrative burden for both MPOs and State DOTs. They also asserted that a joint UZA target would be overly complex, especially for planning agencies that are part of multiple UZAs or for those that share borders with a planning agency that serves a different population, such as rural and urban. A few commenters suggested alternatives to the joint UZA target: removing the target based on MPO boundaries and only requiring targets based on UZA; only requiring targets on either MPO boundaries or those based on UZAs; or limiting the targets based on MPO boundaries and on UZA boundaries only to MPOs and UZAs of a certain size, regardless of if there is a joint target or only metropolitan planning area targets.

*Response:* The FHWA has considered these comments and decided to retain the requirement for joint UZA targets. The FHWA disagrees with comments suggesting a joint UZA target is duplicative of the requirement for metropolitan planning area targets. The FHWA believes the requirement to establish a joint UZA target would encourage collaboration across MPO boundaries through coordinated systems and region-based approaches to reducing GHG emissions. The FHWA believes this collaboration is useful regardless of the MPO or UZA size. Therefore, FHWA has retained the requirement for MPOs to collectively establish a single joint 4-year target for each UZA that contains NHS mileage and that is overlapped by the boundaries of two or more metropolitan planning areas. As provided in 23 CFR 490.105(f)(10), joint targets are also required to be declining targets for reducing $CO_2$ emissions from on-road mobile sources, and these targets are established in addition to each MPO's individual target for their metropolitan planning area. The targets established are required to be a quantifiable target, which means a value must be used.

To support implementation of this final rule, FHWA is publishing in the docket applicability tables with the MPOs required to establish joint targets in accordance with 23 CFR 490.105(d)(4) and 490.105(f)(10). As with all other MPO targets, and consistent with 23 CFR 490.105(f)(1), joint targets are to be established no later than 180 days after the MPOs' respective State DOT(s) establish their targets. For additional information on the timeline for establishing joint

targets, see the discussion under Comments on MPO Target Setting Frequency in this section.

Comments on MPO Target Setting Frequency

*Comment:* A small number of commenters provided feedback on the frequency of MPO targets. A couple of these commenters recommended that the final rule only include 4-year targets for MPOs. Another requested that the final rule add 2-year targets for MPOs to increase coordination with States on the same schedule. In addition, one commented that the final rule should leave out both the 2- and 4-year targets, and instead adopt 8- and 20-year targets.

*Response:* Upon consideration of the comments, FHWA has retained the requirement for MPOs to establish 4-year targets as previously established in 23 CFR 490.105(f). The FHWA believes the benefits associated with requiring MPOs to establish additional 2-year targets for the GHG measure would not exceed the additional burden to MPOs. The FHWA believes that introducing 8- and 20-year targets that would only apply to the MPOs and would only apply to a single measure would add confusion and complexity that would not be offset by meaningful benefits.

The final rule makes no changes to the MPO target establishment schedule, and MPOs will continue to report their baseline performance and progress toward their targets in their system performance report. *See* 23 CFR 490.107(c)(2). An MPO will establish targets for this measure, including any required joint targets, no later than 180 days after their respective State DOT(s) establishes their 4-year target for the measure. *See* 23 CFR 490.105(f)(1). The MPOs will report their established GHG targets, including any joint targets, to the State DOT in a manner that is documented and mutually agreed upon by both parties. *See* 23 CFR 490.107(c)(1).

Comments on Technical Assistance

*Comment:* A large number of commenters requested technical assistance from FHWA to assist in the implementation of the proposed performance measure. Examples cited by these commenters included tools and best practices for modeling the emissions impacts of various types of projects; strategies/pathways/roadmaps to reduce tailpipe $CO_2$ emissions (especially those with other social and economic impacts, including for disadvantaged communities); factors to consider in setting targets; and recommended targets to meet national GHG reduction goals.

*Response:* The FHWA believes the existing technical assistance, technical tools, and guidance available through FHWA's TPM and Energy and Emissions Websites, as well as resources provided by the National Highway Institute (NHI), AASHTO, AAMPO, and other publicly available sources provide the information necessary for State DOTs and MPOs to establish targets for the GHG measure. In addition to these existing resources, FHWA recently launched an Every Day Counts (EDC) innovation to help transportation agencies quantify GHG emissions and set targets for reducing GHG emissions through transportation planning. As this measure is implemented, FHWA will continue to consider how best to support State DOTs and MPOs in implementing all the TPM requirements in 23 CFR part 490 and will provide technical assistance on an ongoing basis.

Comments on Benchmarks

*Comment:* A few commenters suggested that FHWA provide intermediate benchmarks for States to use to ensure they are on track to meet the 2030 national GHG reduction goal.

*Response:* As noted earlier, while FHWA encourages State DOTs and MPOs to consider the Administration's GHG emissions reduction and net-zero goals when establishing targets, FHWA has removed the proposed requirement for State DOTs to align their declining targets with the Administration's GHG reduction goals. State DOTs and MPOs have the flexibility to set targets that work for their respective policies and priorities, so long as the targets are declining. For example, a State DOT might set targets that would result in steady, incremental progress toward net-zero emissions, or that achieve aggressive early GHG emissions reductions, or be more gradual at first and become more aggressive later. Therefore, FHWA declines to provide intermediate benchmarks at this time. However, State DOTs may voluntarily establish longer-term targets to serve as intermediate benchmarks to help them align their short-term emission reduction targets with their long-term GHG reduction goals.

*§ 490.107   Reporting on Performance Targets*

Comments on Reporting Start Date

*Comment:* Many commenters provided feedback on the reporting start date of October 1, 2022. All these commenters oppose this date, which they indicated would precede the NPRM public comment period, which closed on October 13, 2022. One commenter recommended that the rule be revised to either (1) not require States to set two-year targets for the 2022–2025 time period, and have States set their four-year targets for the 2022–2025 time period as part of the October 1, 2024 mid-performance period progress report; or (2) delay implementation altogether until the 2026–2029 performance period. Other commenters recommended a reporting start date in 2023, with the expectation that they would have six months to one year from the final rule for target setting/coordination before their first reporting. Other commenters recommended October 1, 2024 or October 1, 2028, indicating that these dates would correspond with other performance measures. A few commenters suggested a phased approach, such as reporting reference year data and their four-year target in the October 1, 2024 Mid Performance Period Progress Report, and then continuing with two- and four-year targets in the next performance period.

*Response:* Upon consideration of comments, FHWA determined that State DOTs and MPOs will establish or adjust targets every two years beginning in 2024. Targets will first be established for this measure by State DOTs and reported to FHWA in a State Initial GHG Report, no later than February 1, 2024. *See* 490.105(e)(1)(ii) and 490.107(d). The information provided by State DOTs in the 2024 State Initial GHG Report will be considered the 2024 Mid Performance Period Progress Report. *See* 490.107(b)(2)(i). State DOT reporting will follow an October 1st cycle beginning in 2026 to align with other measure reporting requirements. Recognizing the urgency of addressing the climate crisis, FHWA is establishing an initial date that is as early as practicable and will reflect the best available data. The FHWA is also establishing a February 1, 2024 reporting date for the first GHG targets to increase the opportunities for the targets to be used to help guide overall Federal investments available through the many programs available in BIL that can reduce $CO_2$ emissions. The February 1, 2024 reporting date is supportive of a 2022 GHG measure reference year since the 2022 VMT data are expected to be finalized by November 30, 2023.

The FHWA made changes throughout the regulation in response to the February 1, 2024 target establishment and reporting date, and they are summarized here. Consistent with all other NHPP measures, the GHG measure will have a 4-year performance period that will begin January 1, 2022. *See* 23 CFR 490.105(e)(4)(i) and 490.105(e)(4)(i)(C). The mid-point of the performance period is 2024, and the end of the performance period is 2026. The FHWA acknowledges that this date is in advance of this final rule's effective date. However, the start of the performance period merely serves as the benchmark that begins the TPM schedule. This measure does not generate any requirements for State DOTs or MPOs in advance of the effective date. The first GHG targets will be due on February 1, 2024, after the effective date of this rulemaking. The FHWA believes it is appropriate to begin the performance period on January 1, 2022 to align with the TPM program and to facilitate a mid-point of the performance period in 2024, and to align with TPM's existing 4-year performance period.

Since initial targets will be established so close to the mid-point, FHWA determined that 2-year targets would not be required. *See* 23 CFR 490.105(10)(i)(A) and 490.105(e)(4)(iii). Section 490.105(e)(10)(i)(B) requires that 4-year targets for this measure be established, and section 490.105(e)(1)(ii) requires they be established no later than February 1, 2024. Section 490.107(d) was added to create the State Initial GHG Report to receive the State DOT's initial 4-year GHG target.

The State Initial GHG Report requirements are similar to the Baseline Performance Period Report. In the State Initial GHG Report, State DOTs will provide the 4-year target, the basis for the target, the baseline data, which is the reference year for this performance period only, the relationship with other performance expectations, the data points used to calculate the GHG metric, described in 23 CFR 490.511(c), and the value calculated. The data used to calculate the metric for the reference year for the Initial GHG Report is specified in section 490.107(d)(2). Information on the GHG measure will be submitted as part of the biennial reports starting with the 2026 Full Performance Period Progress Report. *See* 23 CFR 490.107(b)(1), (b)(2), and (b)(3).

For additional information on how the initial target establishment requirements associated with February 1, 2024 will impact the significant progress determination done after the 2024 Mid Performance Period Progress Report, see the discussion under Comments on Significant Progress Timing, in the Section-by-Section Discussion of section 490.109.

## Comments on MPO Reporting Frequency and Process

*Comment:* Many commenters responded to the MPO reporting requirements and many proposed revisions to the requirements. Many of these commenters noted that the final rule should require MPOs to report every two years on progress towards the performance measure, asserting that MPOs have a significant impact on transportation investment decisions in metropolitan planning areas, and, therefore, should be as transparent as States in this regard. Similarly, another commenter suggested that the final rule could encourage but not require MPO reporting every two years given the additional burden of biennial reporting.

A couple of commenters requested that the final rule not require additional reporting by MPOs outside of the system performance report so as not to increase the reporting and tracking burden on MPOs and State DOTs.

*Response:* The FHWA considered the comments and determined the existing reporting requirements for MPOs in 23 CFR 490.107(c), which FHWA has successfully implemented for other performance measures, are appropriate for reporting on the GHG measure. The MPOs are required to report on performance within their metropolitan transportation plan (MTP), which are developed every 4 or 5 years. *See* 23 CFR 450.324(d). Biennial reporting by MPOs would necessitate an additional report outside of the MTP. At this time, FHWA does not believe that adding a new process for reporting on performance specifically for the GHG measure would provide benefits that would exceed the increased burden from additional reporting requirements. Therefore, FHWA has not made any changes in the final rule based on the comments. The FHWA has retained the requirement for MPOs to report progress toward their GHG target in their system performance report in the metropolitan plan.

For related information on the MPO target establishment timeline, see the discussion under Comments on MPO Target Setting Frequency in the Section-By-Section Discussion for section 490.105.

For additional information related to MPO reporting, see the discussion under Comments on MPO Report Content in this section.

## Comments on MPO Report Content

*Comment:* One commenter noted that there does not appear to be a requirement for the MPO to report the value of the measure (percent reduction

in tailpipe $CO_2$ emissions on the NHS) for their MPA or any required joint UZA targets (for those UZAs that overlap multiple MPOs). In addition, a commenter asked for clarification that reporting of the MPO metric calculation method is not required when an MPO supports the State targets. Another commenter noted that if an MPO chooses to support the State targets, reporting the MPO region total appears unnecessary. Commenters noted that for all the other performance measures (*e.g.,* safety measures bridge and pavement condition measures, and system performance and reliability measures), there is no requirement for MPOs to calculate and report metric or measure values to the State DOT(s).

*Response:* The FHWA has not made any changes in the final rule based on these comments. The FHWA believes that the requirement for MPOs to report the metrics used to calculate the measure and the metric calculation method is justified because MPOs can use a range of different approaches to calculate the metric, even if they choose to adopt State targets. For this measure, MPOs are required to report all targets they are required to establish, including any joint targets, to the State DOT in a manner that is documented and mutually agreed upon by both parties. *See* 23 CFR 490.107(c)(1). In the system performance report, MPOs will report baseline performance for this measure and progress toward the achievement of their targets. They will also report the calculation of annual tailpipe $CO_2$ emissions for the NHS for the period between the reference year and the first system performance report that includes the GHG measure information. Subsequent reports will cover the period between the current report and the last report. In addition, the MPO will report a description of their metric calculation method(s).

The FHWA has removed the proposed requirement for MPOs to report tailpipe $CO_2$ emissions on all roads. The reason for removing this requirement is described in response to the comments on MPO metric reporting, in the discussion for section 490.511.

As a new requirement of the rule, in the system performance report, FHWA is requiring MPOs using metric calculation methods not specified in section 490.511(d) to include information demonstrating the method(s) has valid and useful results for measuring transportation related $CO_2$. The reason for this requirement is provided in the discussion under Comments on Mutual Agreement of Metric Calculation Method by State

DOTs and MPOs, in the Section-by-Section Discussion for section 490.511.

Consistent with 23 CFR 450.226 and 23 CFR 450.340, the MPO's MTP and TIP must meet the Performance-Based Planning and Programming (PBPP) requirements of the planning rule for this performance measure by no later than 2 years after the effective date of this rule.

## Comments on Biennial Reporting Cycle

*Comment:* A few commenters provided general feedback on the State DOT biennial reporting cycle and recommended that the final rule not require two-year reporting for State DOTs.

*Response:* The FHWA has not made any changes in the final rule based on the comments. Section 150(e) of Title 23, U.S.C., requires State DOTs to report on performance to FHWA on a biennial basis. The FHWA considered the comments and determined the existing biennial reporting cycle established in 23 CFR 490.107(b), which FHWA has successfully implemented for other performance measures, will support State DOTs as they implement the new GHG measure within the context of the overall TPM program. This two-year reporting for State DOTs is consistent with other performance measures, which minimizes the incremental burden since State DOTs do not need to develop an additional reporting process and cycle for this one measure. Two-year reporting is also useful in helping State DOTs progress toward a longer-term goal and can reflect short-term actions such as operational improvements. Such short-term actions are typically outside the control of MPOs, which consequently have 4-year reporting requirements.

## Comments on Alternative Progress Reporting Requirements

*Comment:* A couple of commenters suggested additions to the reporting requirements. One requested a provision for qualitative reporting to describe progress on the measure, to be able to report trends and overall actions and strategies that contribute to lower sales of fossil fuel used for on-road vehicles. Another requested requiring State DOTs and MPOs to identify planned actions to reduce emissions and actions that have been implemented to reduce emissions.

*Response:* The FHWA has not made any changes in the final rule based on the comments. The reporting requirements in 23 CFR 490.107 represent the minimum requirements for State DOTs and MPOs under the TPM regulations. The requirements in the final rule do not prevent State DOTs

**85384**     **Federal Register** / Vol. 88, No. 234 / Thursday, December 7, 2023 / Rules and Regulations

and MPOs from providing more detailed qualitative reporting on progress and planned actions at the State and local level.

Comments on Publicizing GHG Reporting Information

*Comment:* A large number of commenters provided recommendations intended to increase the transparency and accessibility of reporting on performance. Some commenters recommended that FHWA publish a regular report on State DOT and MPO progress, with a couple of these commenters suggesting that such a report should be issued within three months of FHWA receiving the data and be made available in an interactive format that allows viewers to see both detailed and summary data. Commenters noted that having the data publicly available would also help stakeholders to hold State DOTs and MPOs accountable for progress toward their GHG targets.

*Response:* The FHWA has not made any changes in the final rule based on the comments. As part of FHWA's commitment to transparency, FHWA regularly publishes the State DOT's biennial reports and FHWA's significant progress determinations on its website as part of the publicly available TPM Dashboards, and the GHG measure will be included in the TPM Dashboards. The State performance dashboards and reports are available at *https://www.fhwa.dot.gov/tpm/reporting/state/*.

State DOTs and MPOs are required to report on progress as outlined in this final rule and described in 23 CFR 490.107. External reporting by the U.S. DOT on funds spent in specific areas is outside the scope of this rulemaking.

*§ 490.109   Assessing Significant Progress Toward Achieving the Performance Targets for the National Highway Performance Program and the National Highway Freight Program*

Comments on Consequences of Not Achieving Significant Progress

*Comment:* A small number of commenters addressed the requirement that State DOTs document the actions they will take should they fail to demonstrate significant progress toward their targets. Some of the commenters asserted such a requirement would not influence future target achievement. Some of these commenters recommended the final rule include requirements for State DOTs to provide more detailed information on projects or programs to reduce emissions. Such information would identify future actions to reduce emissions, and

include estimated emissions reductions, timelines for implementation and funding sources. One commenter recommended the requirement be revised to require a State DOT to document actions that have been taken in support of targets and identify barriers preventing target achievement. One commenter asked for clarification on whether the documented actions would be binding for MPOs.

*Response:* The FHWA has not made any changes in the final rule based on the comments. The FHWA does not intend to use the significant progress determination process to be punitive or to encourage State DOTs to establish easy-to-achieve targets. Establishing targets and assessing progress is intended to encourage State DOTs and MPOs to establish data-supported targets that consider anticipated resources and potential uncertainties and to provide data-supported explanations of performance changes. If a State DOT does not make significant progress, FHWA expects the State DOT to provide data-supported explanations for not achieving significant progress, and their plan to achieve said progress in the future.

The FHWA determined that creating additional requirements related to the consequences of not achieving significant progress toward achieving GHG performance targets would create potential burdens that outweigh the potential benefits of such efforts. The documentation requirements in 23 CFR 490.109(f)(1)(v) represents the minimum information State DOTs are federally required to provide. State DOTs can provide additional information in their biennial reports if they feel it supports their discussion of target achievement, or significant progress.

Information provided by the State DOT in response to the requirement in 23 CFR 490.109(f)(1)(v), does not, on its own, require that an MPO within that State select a specific project.

Comments on Significant Progress Criteria

*Comment:* A small number of commenters recommended that significant progress be defined more narrowly. Commenters suggested the significant progress determination be changed to require performance better than the level that would be achieved through reductions in vehicle emission rates alone, define a minimum percentage of a target that must be reached, use a trend based on multiple performance periods, or use some combination of such factors.

*Response:* The FHWA considered these comments and declines to apply a

narrower definition of significant progress. The existing criteria at 23 CFR 490.109(e)(2) for determining significant progress are well understood and have been applied successfully for the other NHPP and NHFP measures identified in 23 CFR 490.105(c)(1)–(6). Maintaining consistency with the existing significant progress determination criteria will ensure consistency with the other measures and simplify the process. Accordingly, FHWA will determine that a State DOT has made significant progress toward the achievement of each 2-year or 4-year applicable GHG target if (1) the actual performance level is better than the baseline performance, or (2) the actual performance level is equal to or better than the established target, as defined in 23 CFR 490.109(e)(2).

Comments on Significant Progress Timing

*Comment:* One commenter recommended that FHWA not require a significant progress determination for the first performance period since transportation emissions in initial years would reflect planning and investment decisions made prior to the final rule.

*Response:* In response to this and other comments and in line with 4-year targets being reported February 1, 2024, FHWA will not assess significant progress toward the achievement of 2-year targets for the GHG measure following the 2024 Mid Performance Period Progress Report. State DOT planning and investment decisions follow a cyclical process and should be informed by State DOT progress toward achieving its GHG targets. As a result, FHWA believes it to be beneficial to begin significant progress determinations for the GHG measure as early as is reasonable. The FHWA will first assess significant progress toward the achievement of targets for the GHG measure after the 2026 Full Performance Period Progress Report (due October 1, 2026).

In response to the initial target establishment requirements related to February 1, 2024, when conducting the significant progress determination after the 2026 Full Performance Period Progress Report, the performance for the reference year shall be used as the baseline performance, as described in 23 CFR 490.105(e)(10)(i)(C).

For additional information on the target establishment requirements associated with February 1, 2024, see the discussion under Comments on Reporting Start Date, in the Section-by-Section Discussion of section 490.107.

### § 490.503   Applicability

Comments on Roadway Applicability

*Comment:* A large number of commenters recommended that State DOTs and MPOs be required to set targets and track GHG emissions from travel on all public roads and not just the NHS. These comments asserted that the NHS represents only about 5 percent of total U.S. roadways, and just over 50 percent of vehicle miles traveled. They also asserted that setting targets and tracking emissions from travel on all public roads would provide a more comprehensive understanding of transportation emissions and allow for more comprehensive solutions.

*Response:* The FHWA is finalizing as proposed that this measure will assess performance on the NHS. The FHWA acknowledges that the NHS only represents a limited set of U.S. roadways, and a measure for all public roads would capture more emissions from the transportation sector. However, as detailed in Section III of this preamble, FHWA is promulgating this rulemaking under 23 U.S.C. 150(c)(3)(A)(ii)(IV)–(V), which requires that the Secretary establish measures for States to use to assess the performance of the Interstate System and the non-Interstate NHS. The statute does not provide authority to measure performance on public roads other than the Interstate and non-Interstate NHS. Thus, the GHG measure under 23 CFR 490.105(c)(5), and associated requirements, must be based on performance on the Interstate System and non-Interstate NHS. However, State DOTs and MPOs can choose to implement other measures to support their programs, including measures that apply to all roads, in a manner that best aligns with their individual policies and plans.

### § 490.505   Definitions

Comments on Reference Year

*Comment:* Many commenters, including those both supporting and opposed to the proposed measure, provided feedback on the use of calendar year (CY) 2021 as the reference year, with all asserting that it would not be appropriate because of the lingering effects of the COVID–19 pandemic on travel in 2021. Commenters noted that using CY 2021 would set the baseline artificially low as VMT and fuels sales continue to rebound and would make it difficult for States to meet declining targets. Commenters provided one or more of the following suggestions as an alternative to using CY 2021 as the reference year: 2022 or a year further in

the future; 2019 as a pre-pandemic year; 2005 as a reference to the national GHG targets; or the 5-year average as the baseline.

*Response:* The FHWA agrees with the commenters' observation that the COVID–19 pandemic reduced travel demand, motor fuel consumption, and $CO_2$ emissions in 2021 as compared to pre-pandemic levels, and that using 2021 as a reference year would establish a lower-than-normal basis for evaluating future performance. In response to these concerns, FHWA is establishing 2022 as the reference year for the GHG measure. In 2022, travel activity is estimated to have nearly rebounded to pre-pandemic levels, with FHWA's December 2022 Traffic Volume Trends report showing cumulative mileage of 3.17 trillion miles in 2022, compared with 3.27 trillion miles in 2019.[17] 2022 is also the most recent year for which finalized VMT estimates will be available to use in calculating the State DOTs' GHG metric and measure.

Comments on Definition of GHG Emissions

*Comment:* Several commenters requested clarification on the definition of GHG emissions provided in the NPRM. These commenters asserted that definition proposed at 23 CFR 490.505 goes beyond tailpipe $CO_2$ emissions to include methane, nitrous oxides, and hydrofluorocarbons. Commenters asserted that this broader definition could open the door to further regulation without a rulemaking.

*Response:* The definition of GHG included in the NPRM is a common, scientific definition of GHG emissions, which include $CO_2$ in addition to other gases such as methane ($CH_4$), nitrous oxide ($N_2O$), and hydrofluorocarbons (HFCs). According to EPA data, $CO_2$ accounts for approximately 97 percent of on-road GHG emissions when weighting the 100-year global warming potential of $CO_2$ and other greenhouse gases.[18] The FHWA concluded that because approximately 97 percent of on-road GHG emissions are from $CO_2$, including non-$CO_2$ gases in the measure

would not yield significant benefits. Any changes to the GHG measure, including any expansion to the applicability of this measure beyond tailpipe $CO_2$ emissions, would follow notice and comment rulemaking.

### § 490.509   Data Requirements

Comments on $CO_2$ Emissions Factor

*Comment:* Several commenters provided feedback on the proposal for FHWA to provide a standard $CO_2$ emissions factor for each fuel type. A few of the commenters said FHWA should establish $CO_2$ emissions factors, with one recommending that FHWA provide optional supplemental fuel blend information and State-specific carbon intensity values based on Low Carbon Fuel Standards reporting. Several commenters requested that FHWA consider accommodating alternative emissions factors for fuel blends when States and MPOs provide credible alternatives. A few commenters requested additional clarity on $CO_2$ emissions factors, including what they will look like, how they will change over time, how they will be accessed, whether they will vary based on location, and for some specific examples. One commenter stated there is a need to incorporate the biogenic nature of $CO_2$ from bioethanol into the emissions factor calculation, with one commenter expressing general concerns about the inputs to EPA's Motor Vehicle Emissions Simulator (MOVES) Model.

*Response:* As proposed in the NPRM, FHWA will publish uniform $CO_2$ emissions factors for each fuel type to be used by all States in calculating the State DOT's metric for the GHG measure. The FHWA believes that the requirement for States to use a uniform factor, for each fuel type will ensure consistency and comparability of States' estimates of tailpipe $CO_2$ emissions.

The FHWA recognizes that some States have implemented or are considering the implementation of low carbon fuels programs to reduce the overall carbon intensity of transportation fuels. However, since these programs often target reductions in the GHG emissions from well-to-pump processes, FHWA believes that including emission factors for alternative fuel blends as part of a tailpipe-only measure would be overly complex. The FHWA recognizes that $CO_2$ emissions estimates for the transportation sector as reported in the EPA's Inventory of U.S. GHG Emissions and Sinks do not include $CO_2$ emissions associated with biofuels, such as the ethanol component of E10 and other gasoline blends, since it is assumed that

---

[17] *See* Office of Highway Policy Information, Federal Highway Administration, Traffic Volume Trends December 2022, *available at https://www.fhwa.dot.gov/policyinformation/travel_monitoring/22dectvt/;* Traffic Volume Trends December 2019, *available at https://www.fhwa.dot.gov/policyinformation/travel_monitoring/19dectvt/.*

[18] See EPA Inventory of U.S. Greenhouse Gas Emissions and Sinks: 1990–2021, table 2–13, *available at https://www.epa.gov/ghgemissions/inventory-us-greenhouse-gas-emissions-and-sinks-1990-2021.* EPA's estimates weight $CO_2$ and other greenhouse gases on their 100-year global warming potentials, as specified in the Intergovernmental Panel on Climate Change Fifth Assessment Report.

the combustion of the biogenic component of these fuels is recycled as biofuel crops and forests regenerate. The FHWA will consider EPA's accounting practice for addressing biofuel $CO_2$ emissions as it develops the standard $CO_2$ emissions factors to support this final rule. The FHWA will publish these factors on its website by August 15th of each biennial reporting year.

### Comments on Data Availability Date

*Comment:* A small number of commenters requested that FHWA provide data to calculate the system performance earlier than the annual date of August 15, with a few specifying that this should be no later than May 1 of each year or, if no joint UZA target is required, then no later than July 1.

One commenter indicated that the prior year's data in Table VM–3—Annual Vehicle Miles and Table MF–21—Motor-Fuel Use has been published in mid-late October in the past, which would conflict with an October 1 deadline for report submissions.

*Response:* The FHWA appreciates commenters' interest in having data available as early as possible to support State biennial reporting on October 1 of each even year. While estimates of annual motor fuel volumes distributed are not expected to be finalized by FHWA until August 15th, States and MPOs can develop preliminary estimates and forecasts of GHG emissions using the values in FHWA's *Monthly Motor Fuel Reported by States* publication, available on the website of FHWA's Office of Highway Policy Information, and the State-reported fuel sale information.

In response to the comments requesting data earlier than proposed and FHWA's reexamination of when the VMT data will be available, FHWA revised 23 CFR 490.509(h) as well as 23 CFR 490.109(d)(1)(vi) and (d)(1)(vii) to ensure that State DOTs are able to use their most accurate VMT data to estimate the NHS share of total on-road tailpipe $CO_2$ emissions when reporting actual performance and discussing progress. These changes were made in response to a comment noting that HPMS VMT data may not be finalized by August 15, as proposed in the NPRM.

The final rule allows State DOTs to use their best available VMT data that represents the prior calendar year when reporting performance and their GHG measure and metric information in the biennial reports. *See* 23 CFR 490.509(h). Related changes were made to the State DOT metric reporting requirements for the biennial reports. *See* 490.107(b)(1)(ii)(H), (b)(2)(ii)(J) and (b)(3)(ii)(I). Because the VMT data used

by the State DOT when preparing the biennial report may not be known to FHWA, State DOTs are required to provide the values they use to calculate the reported metric, and a description of the data source(s) used for the VMT information they report. Section 490.511(f)(2) was revised to be consistent with the metric reporting requirements in 23 CFR 490.107(b)(1)(ii)(H), (b)(2)(ii)(J), and (b)(3)(ii)(I).

The change to 23 CFR 490.509(h) necessitated changes to the data FHWA will use in the significant progress determination. In 23 CFR 490.109(d)(1)(vi) and (d)(1)(vii) FHWA has specified that for the significant progress determination, baseline performance will be based on data from HPMS as of November 30th of the baseline report year, and the reference year will be based on HPMS data as of November 30, 2023. The FHWA also added section 490.109(e)(4)(vii) to clarify that the data used must be accepted by FHWA by the dates specified in section 490.109(d)(1).

### Comments on Accessibility of Fuel Sales Data

*Comment:* A small number of commenters expressed concern at MPOs' inability to access the Fuels & FASH dataset and requested more guidance on how the data could be accessed. One commenter suggested using publicly available State data instead. Another requested clarification on how a State will calculate the aggregate fuel consumption by fuel type.

*Response:* States are responsible for submitting preliminary estimated totals of monthly fuel volumes distributed for gasoline and "special fuel" (which primarily consists of diesel) which are due to FHWA 90 days following the end of a given month. These estimates are made publicly available for each State as part of FHWA's Monthly Motor Fuel Report, accessible on the Office of Highway Policy Information website. Final estimated fuel for a given year are adjusted to account for: (1) updated monthly fuel volumes distributed for gasoline and "special fuel" provided by the States, and (2) non-highway use of fuels. These estimates will be available by August 15 of each reporting year (*i.e.,* the following year).

### Comments on Non-Highway Fuel Use

*Comment:* A couple of commenters asserted a portion of fuel sales are consumed off the roadway network, which is a circumstance that is likely more prevalent in rural areas. These commenters asserted that off-highway

use of fuels would not be accounted for in fuel use data provided by FHWA.

*Response:* The FHWA uses a modeling process to estimate the portion of gasoline that is distributed and used for non-highway purposes. These data are then used to adjust the gasoline volume data submitted by the States to identify the volumes that are used specifically for on-highway purposes. In addition, FHWA instructs all States not to report non-highway use of special fuels, including red dyed diesel and kerosene that is untaxed and intended for non-highway applications.

### Comments on GHG Emissions Analysis Techniques

*Comment:* A commenter asserted that the effectiveness of the proposed rule would be limited by current traffic modeling practices. The commenter asserted that the final rule would benefit from improved data collection and analysis techniques, a more standardized approach to documenting projects within the STIP/TIP and ensuring a requirement that emissions from induced demand be included in modeling.

*Response:* The FHWA believes the data and methods specified in the NPRM are appropriate to evaluate performance related to the GHG measure. State $CO_2$ estimates are calculated by multiplying gallons of fuel taxed by each State by the $CO_2$ emissions for each fuel type. The FHWA's Fuels & FASH database will serve as the source of fuel use data since it is a national, established, and validated source of fuel use information as reported by States. The FHWA believes that Fuels & FASH provides advantages for estimating fuel consumption and $CO_2$ emissions compared to model-based approaches, which by necessity are built on simplified mathematical representations of transportation networks, travel choices, vehicle fuel efficiency, and other factors. Fuels sales data implicitly accounts for travel demand and fuel consumption resulting from transportation policies and investments, including behavioral changes following highway construction (sometimes referred to as "induced demand"). The FHWA recognizes that fuel sales may not precisely align with the amount of fuel combustion and $CO_2$ emissions within the boundaries of a State, particularly since drivers may cross State lines to purchase fuel. However, FHWA believes the data and methods for the State DOT metric calculation achieve an appropriate balance between simplicity and accuracy and will

FHWA000023

24-10470.307

provide a useful way to monitor trends over time.

The FHWA recognizes that MPOs lack a data source comparable to Fuels & FASH and therefore must estimate $CO_2$ emissions using an approach different from the States. The FHWA believes that it is appropriate to leave the data and metric calculation methods to the discretion of MPOs, and that it would be unreasonable to specify data collection standards or modeling practices, particularly since some MPOs do not employ technical staff or support travel and emissions models. However, FHWA has updated the final rule to require MPOs that choose a metric calculation approach not enumerated in section 490.511(d) to demonstrate the method has valid and useful results.

Finally, State DOTs and MPOs may employ travel models, emissions models, and other analytics to support transportation planning, programming, and the development of GHG reduction targets. In so doing, they can consider the degree to which their models are sensitive to the travel and emissions impacts of GHG reduction strategies and other decisions, such as future highway capacity. However, FHWA believes it is not appropriate to specify the models or other practices that States and MPOs use for these purposes as part of the final rule.

For additional information related to the $CO_2$ factor, see the discussion under Comments on $CO_2$ Emissions Factor, in this section.

### § 490.511  Calculation of National Highway System Performance Metrics

Comments on State DOT GHG Metric Calculation Method

*Comment:* Several commenters provided input on the calculation of the proposed GHG performance measure. A few commenters expressed support for using existing national data sets for fuel sales and VMT data, while a few comments offered proposed revisions. Alternatives suggested included allowing States to propose alternative or additional data sets or methodologies and requiring States to use one of the methods offered for MPOs in the proposed rule (*i.e.,* MOVES or FHWA's Energy and Emissions Reduction Policy Analysis Tool (EERPAT)).

*Response:* The FHWA has retained the State DOT metric calculation method proposed in the NPRM. This approach is based on fuel use data that is already collected by States and reported to FHWA, ensuring comparability between State estimates. As noted in response to the previous comment, FHWA believes this approach

provides a more accurate estimate of total fuel use and $CO_2$ emissions than model-based approaches. The FHWA recognizes that this approach includes some simplifying assumptions, particularly by assuming a similar rate of GHG emissions on NHS and non-NHS facilities per VMT. While it is expected that emissions rates would differ somewhat between NHS- and non-NHS facilities, FHWA believes that this simplifying assumption is justified since the difference between emissions rates on NHS- and non-NHS facilities would be largely constant from year-to-year and similar across States, providing a consistent way to monitor performance.

For additional information on how the MPO's metric calculation method is selected and documented, see the discussion under Comments on Mutual Agreement on MPO Metric Calculation Method by State DOTs and MPOs, which is part of this section.

Comments on MPO GHG Metric Calculation Method

*Comment:* Several commenters addressed MPO metric calculation methodology and reporting. Approximately half of these commenters supported preserving MPOs' flexibility in calculating the GHG metric. In contrast, a couple of commenters supported requiring MPOs to use the MOVES model to calculate GHG emissions, while one asserted that FHWA should provide the data needed for MPOs to calculate a metric for the GHG measure. In addition, one commenter questioned the requirement for MPOs to calculate and report tailpipe $CO_2$ emissions on all roads, noting the MPO may choose a methodology that allows for calculating the GHG metric for NHS roads directly.

*Response:* Upon consideration of comments, FHWA is preserving MPOs' flexibility to use a range of different approaches in calculating the metric for the GHG measure. The FHWA recognizes that technical capabilities vary across MPOs and that some MPOs may not support a travel demand model or be required to use EPA's MOVES model. The FHWA also appreciates the observation that some MPOs may choose to calculate tailpipe $CO_2$ emissions on the NHS facilities directly. This is inherently different from State DOTs, which are required to calculate $CO_2$ emissions for all roads before estimating the proportion of emissions associated with the NHS. Accordingly, in the final rule, FHWA has removed the requirement for MPOs to report tailpipe $CO_2$ emissions for all roads.

Comments on Mutual Agreement on MPO Metric Calculation Method by State DOTs and MPOs

*Comment:* A small number of commenters addressed the requirement for the MPO metric calculation method to be mutually agreed upon by both the State DOT and the MPO. A few commenters opposed the requirement for the MPO to obtain concurrence on the metric calculation method. Similarly, one commenter recommended that an MPO be allowed to use, without the need to obtain additional approvals, any regional data, models, and methodologies that is already used to measure GHG for purposes of air quality conformity modeling or other GHG performance measures. One commenter recommended the metric calculation method be covered in the "written provisions" section of the system performance report.

*Response:* The FHWA agrees with commenters that the requirement for MPOs and States to agree on the MPO's metric calculation method creates burden for both groups. In response to the comments, FHWA is not requiring the MPO's metric calculation method to be mutually agreed upon by the State DOT and MPO, but MPOs are encouraged to coordinate with the State DOT on the data used to the maximum extent practicable.

The FHWA has instead added a requirement to section 490.107(c)(2)(ii) that if the metric calculation method used by the MPO is not specified in section 490.511(d), the MPO must demonstrate the method's validity and usefulness in measuring transportation-related $CO_2$ emissions in the system performance report. The FHWA believes that this change will be sufficient to ensure accountability in the methods MPOs use to calculate the GHG metric, absent the requirement for mutual agreement on the method with State DOTs. Consistent with FHWA's collaboration and coordination requirements in 23 CFR part 450, FHWA encourages MPOs and the State DOTs to work together in identifying methods, tools, and data the MPO's can use to calculate the MPO's metric for the GHG measure.

For additional information related to reporting of the MPO's metric, see the discussion under Comments on MPO Report Content, in the Section-by-Section Discussion for section 490.107.

*Comments on the RIA*

Comments on the Estimated Cost of the Regulation

*Comment:* Many commenters discussed cost estimates from the RIA. Many commenters asserted that the RIA underestimated direct implementation costs of the measure and provided examples of costs that they believe were underestimated. Examples cited include the time and level of expertise needed to establish targets, conduct biennial reporting, conduct stakeholder engagement, develop and maintain models, and achieve coordination between DOTs, MPOs, and State agencies. Several commenters also asserted that achieving national GHG reduction goals would require significant changes to transportation investments that would carry significant monetary costs and would require significant time to implement. A few commenters also asserted that achieving GHG reductions through strategies to reduce on-road travel activity would create further social and economic costs including increased congestion and travel times. Another commenter asserted that reducing on-road GHG emissions would reduce the consumption of traditionally taxed fuels and require the establishment of a different highway finance revenue model that is not based on the consumption of fossil fuels.

In contrast, several commenters asserted that the burdens of the proposed performance measure would be negligible. These commenters noted that States and MPOs have already established processes and partnerships under the TPM framework and that staff efforts to quantify and report GHG emissions on the NHS would not be expected to create significant cost burden and are in line with existing performance measures.

Other commenters noted that work performed in support of the GHG measure would not support other aspects State DOTs' and MPOs' missions in ways that would mitigate net costs of the proposed rule. One State DOT also asked for clarification on how the total costs of compliance in time and cost is calculated.

*Response:* The FHWA has reexamined the RIA considering public comments and any updated information, and FHWA has determined that the RIA cost estimates should be primarily unchanged from the RIA in support of the NPRM, with a small reduction in estimated burden based on the elimination of the NPRM requirement for States and MPOs to estimate $CO_2$ emissions for all roads in addition to the NHS. The FHWA recognizes commenters' observations that many State DOTs and MPOs will need to develop capacity to address GHG emissions through interagency coordination, stakeholder engagement, and the consideration of strategies to support GHG reduction targets. The FHWA believes that these examples of costs were addressed through the NPRM RIA labor hour estimates for section 490.105, which assume that the level of effort for setting targets in the first reporting period will be approximately twice that of subsequent reporting periods. The FHWA has included in the RIA a break-even analysis of the $CO_2$ reductions from the rule that would be necessary to equal its costs. This analysis determined that the required reductions would represent a very small proportion of total transportation $CO_2$ emissions.

In addition, FHWA reiterates State DOTs and MPOs will not experience costs from achieving GHG reduction targets since FHWA is not requiring specific declining target values to be established, nor is it mandating penalties for failing to meet the targets established.

The FHWA recognizes that changes in fuel use may impact highway funding. However, as this rulemaking does not require any reductions in fuel use, this issue is outside of the scope of this rulemaking, nor does FHWA have any authority to change the statutory funding scheme established by Congress.

Comments on the Use of the Social Cost of Carbon

*Comment:* Several commenters raised concerns about the use of the social cost of carbon dioxide (SC–$CO_2$) to conduct a ''break-even'' analysis of $CO_2$ reductions required for the proposed measure to equal its costs. These commenters asserted that use of the Interagency Working Group (IWG) on Social Cost of Greenhouse Gases [19] ''interim'' social costs of GHGs overstate damages from GHG emissions. In contrast, several commenters noted the social cost of carbon likely significantly underestimates the actual cost of climate damages caused by GHG emissions because important categories of climate damages cannot be quantified.

*Response:* As discussed further in the RIA for the final rule, the IWG on Social Cost of Greenhouse Gases published interim estimates for the SC–$CO_2$ per ton of carbon emissions for each year from 2020 to 2050. As noted by the IWG's technical support document prepared under E.O. 13990, the SC–$CO_2$ framework in principle can capture all climate change impacts, including (but not limited to) changes in net agricultural productivity, human health effects, property damage from increased flood risk natural disasters, disruption of energy systems, risk of conflict, environmental migration, and the value of ecosystem services. The SC–$CO_2$ estimates used in the break-even analysis for this rule were developed over many years, using transparent process, peer-reviewed methodologies, the best science available at the time of that process, and with input from the public. However, many important categories of climate damages cannot currently be fully quantified and monetized, and so the SC–$CO_2$ values very likely underestimate the climate damages caused by GHG pollution. The IWG's technical support document further notes that the SC–$CO_2$ as estimated should reflect the societal value of reducing $CO_2$ emissions by one metric ton, and that the SC–$CO_2$ is the theoretically appropriate value to use in conducting economic analyses of policies that affect $CO_2$ emissions.[20] The DOT is an IWG member, and FHWA has reviewed the technical support document and has determined that the recommended values are appropriate for use in the break-even analysis in the RIA.

## VIII. Rulemaking Analyses and Notices

*A. Executive Order 12866 (Regulatory Planning and Review), Executive Order 13563 (Improving Regulation and Regulatory Review), and DOT Regulatory Policies and Procedures*

The Office of Management and Budget (OMB) has determined that this rulemaking is a significant regulatory action within the meaning of E.O. 12866, as amended by E.O. 14094 (''Modernizing Regulatory Review''), because it raises legal or policy issues for which centralized review would meaningfully further the President's

---

[19] Interagency Working Group on Social Cost of Greenhouse Gases, U.S. Government. ''Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide Interim Estimates under Executive Order 13990'' (February 2021), *available at* https://www.whitehouse.gov/wp-content/uploads/2021/02/TechnicalSupportDocument_SocialCostofCarbonMethaneNitrousOxide.pdf.

[20] Interagency Working Group on Social Cost of Greenhouse Gases, U.S. Government. ''Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide Interim Estimates under Executive Order 13990'' (February 2021), *available at* https://www.whitehouse.gov/wp-content/uploads/2021/02/TechnicalSupportDocument_SocialCostofCarbonMethaneNitrousOxide.pdf.

priorities or the principles set forth E.O. 12866. The rule will not have an annual effect on the economy of $200 million or more. The rule will not adversely affect in a material way the economy, any sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, territorial, or tribal governments or communities. In addition, the changes would not interfere with any action taken or planned by another agency and would not materially alter the budgetary impact of any entitlements, grants, user fees, or loan programs. As described above, FHWA estimates that total costs associated with this rule, between 2023 and 2032, will be $10.8 million, discounted at 7 percent, and $12.7 million discounted at 3 percent (these figures are estimated in 2020 dollars). On an annual basis, the total costs would be $1,535,045 discounted at 7 percent and $1,494,406 discounted at 3 percent. The FHWA is unable to quantify the benefits of the rulemaking; consequently, FHWA describes the expected benefits qualitatively in the preamble and the RIA. These benefits include potentially significant reductions in GHG emissions resulting from decisions and actions based on greater consideration of GHG emissions in transportation planning, public awareness of GHG emissions trends, and better information on the impact of transportation decisions on GHG emissions. While many of the benefits in the proposed rule are difficult to quantify, FHWA believes that the benefits justify the costs. As discussed in greater detail in the RIA, FHWA estimates that benefits of this rule would exceed its costs with a reduction of less than 0.01 percent of the average annual amount of $CO_2$ emissions from U.S. transportation sources in 2019, based on a range of discount rates used to estimate the social cost of $CO_2$ and the 7 and 3 percent discount rates used to estimate the total costs of the final rule. The full RIA is available in the docket.

### B. Regulatory Flexibility Act

In compliance with the Regulatory Flexibility Act (Pub. L. 96–354, 5 U.S.C. 601–612), FHWA has evaluated the effects of this rule on small entities and has determined that it is not anticipated to have a significant economic impact on a substantial number of small entities. The rule will affect two types of entities: State governments and MPOs. State governments are not included in the definition of small entity set forth in 5 U.S.C. 601. Metropolitan planning organizations are considered governmental jurisdictions,

and to qualify as a small entity they would need to serve fewer than 50,000 people. *See* 5 U.S.C. 601(5). Metropolitan planning organizations are designated to serve UZAs with populations of 50,000 or more. *See* 23 U.S.C. 134(d)(1). Therefore, FHWA certifies that the rule will not have a significant economic impact on a substantial number of small entities.

### C. Unfunded Mandates Reform Act of 1995

This rule would not impose unfunded mandates as defined by the Unfunded Mandates Reform Act of 1995 (Pub. L. 104–4, 109 Stat. 48). The Unfunded Mandates Reform Act of 1995 (section 202(a)) requires us to prepare a written statement, which includes estimates of anticipated impacts, before proposing "any rule that includes any Federal mandate that may result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100,000,000 or more (adjusted annually for inflation) in any one year." The current threshold after adjustment for inflation is $177 million, using the most current (2022) Implicit Price Deflator for the Gross Domestic Product. This rule will not result in the expenditure by State, local, and Tribal governments, in the aggregate, or by the private sector, of $177 million or more in any one year (2 U.S.C. 1532). In addition, the definition of "Federal Mandate" in the Unfunded Mandates Reform Act excludes financial assistance of the type in which State, local, or Tribal governments have authority to adjust their participation in the program in accordance with changes made in the program by the Federal Government. The Federal-aid highway program permits this type of flexibility.

### D. Executive Order 13132 (Federalism Assessment)

This rule has been analyzed in accordance with the principles and criteria contained in E.O. 13132, and FHWA has determined that this rule will not have sufficient federalism implications to warrant the preparation of a federalism assessment. The FHWA also has determined that this rule will not preempt any State law or State regulation or affect the States' ability to discharge traditional State governmental functions.

### E. Paperwork Reduction Act of 1995

Under the Paperwork Reduction Act of 1995 (PRA) (44 U.S.C. 3501, *et seq.*), Federal agencies must obtain approval from OMB for each collection of information they conduct, sponsor, or require through regulations. The FHWA

has determined that this rule contains collection of information requirements for the purposes of the PRA. This rule introduces a GHG performance measure that will be implemented as part of the overarching TPM regulations in 23 CFR part 490, which includes State DOT reporting on performance. The collection of State DOT reports in support of 23 CFR 490.107 is covered by OMB Control No. 2125–0656.

The FHWA has analyzed this rule under the PRA and has determined the following:

*Respondents:* 52 State DOTs.
*Frequency:* Single State Initial GHG Report, and ongoing biennial reporting.
*Estimated Average Burden per Response:* Approximately 88 hours to complete and submit the required report, or 44 hours annually.
*Estimated Total Annual Burden Hours:* Approximately 2,288 hours annually.

In addition, MPO coordination and reporting activities are covered by OMB Control No. 2132–0529, Metropolitan and Statewide and Nonmetropolitan Transportation Planning.

### F. National Environmental Policy Act

The FHWA has analyzed this rule pursuant to the NEPA and has determined that it is categorically excluded under 23 CFR 771.117(c)(20), which applies to the promulgation of rules, regulations, and directives. Categorically excluded actions meet the criteria for categorical exclusions under the Council on Environmental Quality regulations and under 23 CFR 771.117(a) and normally do not require any further NEPA approvals by FHWA. This rule will establish in FHWA regulations a performance measure for on-road $CO_2$ emissions on the NHS for use by States and MPOs in measuring transportation performance. The FHWA does not anticipate any adverse environmental impacts from this rule, the purpose of which is to inform decisionmaking about the transportation sector's contribution to GHG emissions, and thereby contribute to environmental sustainability; moreover, no unusual circumstances are present under 23 CFR 771.117(b).

### G. Executive Order 13175 (Tribal Consultation)

The FHWA has analyzed this rule in accordance with the principles and criteria contained in E.O. 13175, "Consultation and Coordination with Indian Tribal Governments." The rule will implement statutory requirements under 23 U.S.C. 150(c)(3)(A)(ii)(IV)–(V) to establish measures for States to assess the performance of the Interstate and

non-Interstate NHS, which FHWA interprets to include environmental performance. This measure establishes requirements only for States and MPOs that receive Title 23 Federal-aid highway funds and have NHS mileage within their jurisdictions; it would not have direct effects on one or more Indian Tribes, would not impose substantial direct compliance costs on Indian Tribal governments, and would not preempt Tribal laws. Accordingly, the funding and consultation requirements of E.O. 13175 do not apply and a Tribal summary impact statement is not required.

As noted above, FHWA anticipates the benefits from this rulemaking include potentially significant reductions in GHG emissions resulting from decisions and actions based on greater consideration of GHG emissions in transportation planning by States and MPOs, public awareness of GHG emissions trends, and better information on the impact of transportation decisions on GHG emissions. Although this rulemaking does not apply to Tribes, FHWA expects that Tribes would benefit from potential reductions in GHG emissions that result from State and MPO implementation of this rulemaking.

*H. Executive Order 12898 (Environmental Justice)*

The E.O. 12898 requires that each Federal Agency make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minorities and low-income populations. The FHWA has determined that this rule does not raise any environmental justice issues.

*I. Regulation Identifier Number*

A RIN is assigned to each regulatory action listed in the Unified Agenda of Federal Regulations. The Regulatory Information Service Center publishes the Unified Agenda in April and October of each year. The RIN contained in the heading of this document can be used to cross reference this action with the Unified Agenda.

**List of Subjects in 23 CFR Part 490**

Bridges, Highway safety, Highways and roads, Reporting and recordkeeping requirements.

Issued under authority delegated in 49 CFR 1.81 and 1.85.

**Shailen P. Bhatt,**
*Administrator, Federal Highway Administration.*

In consideration of the foregoing, FHWA amends Title 23, Code of Federal Regulations by revising part 490, to read as follows:

## PART 490—NATIONAL PERFORMANCE MANAGEMENT MEASURES

■ 1. The authority citation for part 490 continues to read as follows:

**Authority:** 23 U.S.C. 134, 135, 148(i), and 150; 49 CFR 1.85.

■ 2. Amend § 490.101 by adding in alphabetical order the definition of "Fuels and Financial Analysis System—Highways (Fuels & FASH)" to read as follows:

**§ 490.101   Definitions.**

\*     \*     \*     \*     \*

*Fuels and Financial Analysis System—Highways (Fuels & FASH)* as used in this part means FHWA's system of record for motor fuel, highway program funding, licensed drivers, and registered vehicles data.

\*     \*     \*     \*     \*

■ 3. Amend § 490.105 by:
■ a. Adding paragraph (c)(5);
■ b. Revising paragraph (d) introductory text, and adding paragraphs (d)(1)(v) and (d)(4);
■ c. Adding paragraphs (e)(1)(i), (e)(1)(ii), and (e)(4)(i)(C), revising paragraph (e)(4)(iii), and adding paragraph (e)(10); and
■ d. Revising paragraphs (f)(1)(i) and (f)(3), and adding paragraph (f)(10).
The additions and revisions read as follows:

**§ 490.105   Establishment of performance targets.**

\*     \*     \*     \*     \*

(c) \*  \*  \*

(5) 490.507(b) for greenhouse gas (GHG) emissions on the NHS;

\*     \*     \*     \*     \*

(d) *Target scope.* Targets established by State DOTs and MPOs shall, regardless of ownership, represent the transportation network or geographic area, including bridges that cross State borders, that are applicable to the measures as specified in paragraphs (d)(1), (2), and (4) of this section.

(1) \*  \*  \*

(v) 490.503(a)(2) for the GHG measure specified in § 490.507(b);

\*     \*     \*     \*     \*

(4) MPOs shall establish a joint target for the GHG measure specified in

§ 490.507(b), for each urbanized area that meets the criteria specified in paragraph (f)(10) of this section. The joint target shall represent the performance of the transportation network specified in § 490.503(a)(2).

(e) \*  \*  \*

(1) *Schedule.* State DOTs shall establish targets not later than the dates provided in paragraphs (e)(1)(i) and (e)(1)(ii) of this section, and for each performance period thereafter, in a manner that allows for the time needed to meet the requirements in this section and so that the final targets are submitted to FHWA by the due date provided in § 490.107(b).

(i) State DOTs shall establish initial targets not later than May 20, 2018, except as provided in paragraph (e)(1)(ii) of this section.

(ii) State DOTs shall establish initial targets for the GHG measure identified in § 490.507(b) not later than February 1, 2024.

\*     \*     \*     \*     \*

(4) \*  \*  \*

(i) \*  \*  \*

(C) For the GHG measure in § 490.105(c)(5), the performance period will begin on January 1, 2022 and will extend for a duration of 4-years. Subsequent performance periods will begin as described in paragraph (4)(i)(A) of this section.

\*     \*     \*     \*     \*

(iii) Except as provided in paragraphs (e)(7) and (e)(8)(v), and (e)(10)(i) of this section, State DOTs shall establish 2-year targets that reflect the anticipated condition/performance level at the midpoint of each performance period for the measures in paragraphs (c)(1) through (7) of this section, and the anticipated cumulative emissions reduction to be reported for the first 2 years of a performance period by applicable criteria pollutant and precursor for the measure in paragraph (c)(8) of this section.

\*     \*     \*     \*     \*

(10) *Targets for the GHG measure.* Targets established for the GHG measure in paragraph (c)(5) of this section shall be declining targets for reducing tailpipe $CO_2$ emissions on the NHS.

(i) The following requirements apply only to the targets established for the State Initial GHG Report, described in § 490.107(d), and 2026 Full Performance Period Progress Report, described in § 490.107(b)(3), for the measure in § 490.507(b):

(A) State DOTs are exempt from the required 2-year target described in paragraph (e)(4)(iii) of this section.

(B) State DOTs shall establish a 4-year target, required under paragraph

(e)(4)(iv) of this section, and report this target in their 2024 State Initial GHG Report, required under § 490.107(d).

(C) The performance for the reference year shall be used as the baseline performance.

(f) * * *

(1) * * *

(i) The MPOs shall establish 4-year targets, described in paragraph (e)(4)(iv) of this section, for all applicable measures, described in paragraphs (c) and (d) of this section. For the GHG measure described in (c)(5) of this section, the targets established shall be declining targets for reducing tailpipe $CO_2$ emissions on the NHS.

*      *      *      *      *

(3) *Target establishment options.* For each performance measure identified in paragraph (c) of this section, except the CMAQ Traffic Congestion measures in paragraph (f)(5) of this section, MPOs meeting the criteria under paragraph (f)(6)(iii) of this section for Total Emissions Reduction measure, the MPOs shall establish targets for the metropolitan planning area by either:

(i) Agreeing to plan and program projects so that they contribute toward the accomplishment of the relevant State DOT target for that performance measure; or

(ii) Committing to a quantifiable target for that performance measure for their metropolitan planning area.

*      *      *      *      *

(10) *Joint Targets for the GHG Measure.* Where an urbanized area contains mainline highways on the NHS, and any portion of that urbanized area is overlapped by the metropolitan planning area boundaries of two or more MPOs, those MPOs shall collectively establish a single joint 4-year target for that urbanized area, described in paragraph (e)(4)(iv) of this section. The target established shall be a declining target for reducing tailpipe $CO_2$ emissions on the NHS. This joint target is in addition to the targets for the metropolitan planning area required in paragraph (f)(1)(i) of this section.

(i) The NHS designations and urbanized area data shall be from the data contained in HPMS 1 year before the State DOT Baseline Performance Period Report is due to FHWA.

(ii) Only one target shall be established for the entirety of each applicable urbanized area regardless of roadway ownership. In accordance with paragraph (f)(9) of this section, each MPO shall report the same joint target for the urbanized area.

(iii) The target established for each urbanized area shall represent a quantifiable target for that urbanized area.

■ 4. Amend § 490.107 by
■ a. Revising paragraphs (a)(1) and (b)(1)(i), and adding paragraph (b)(1)(ii)(H);
■ b. Revising paragraph (b)(2)(i) and adding paragraph (b)(2)(ii)(J);
■ c. Revising paragraph (b)(3)(i) and adding paragraph (b)(3)(ii)(I);
■ d. Revising paragraph (c)(2); and
■ e. Adding paragraph (d).

The additions and revisions read as follows:

### § 490.107   Reporting on performance targets.

(a) * * *

(1) All State DOTs and MPOs shall report in accordance with the schedule and content requirements under paragraphs (b), (c), and (d) of this section, respectively.

*      *      *      *      *

(b) * * *

(1) * * *

(i) *Schedule.* State DOTs shall submit a Baseline Performance Period Report to FHWA by October 1st of the first year in a performance period. State DOTs shall submit their first Baseline Performance Period Report to FHWA by October 1, 2018, and subsequent Baseline Performance Period Reports to FHWA by October 1st every 4 years thereafter, except for the GHG measure specified in § 490.105(c)(5). For the Baseline Performance Period Report, State DOTs shall submit information related to the GHG measure in the report due to FHWA by October 1, 2026, and every 4 years thereafter.

(ii) * * *

(H) GHG metric and metric information for the GHG measure. The metric and the individual values used to calculate the GHG metric, as described in § 490.511(c), for the calendar year preceding the reporting year, and a description of the data source(s) used for the VMT information.

*      *      *      *      *

(2) * * *

(i) *Schedule.* State DOTs shall submit a Mid Performance Period Progress Report to FHWA by October 1st of the third year in a performance period. State DOTs shall submit their first Mid Performance Period Progress Report to FHWA by October 1, 2020, and subsequent Mid Performance Period Progress Reports to FHWA by October 1st every 4 years thereafter, except for the GHG measure specified in § 490.105(c)(5). For the Mid Performance Period Progress Report, the State DOTs shall submit information related to the GHG measure in the report due to FHWA by October 1, 2028, and every 4 years thereafter.

(ii) * * *

(J) GHG metric and metric information for the GHG measure. The metric and the individual values used to calculate the GHG metric, as described in § 490.511(c), for the calendar year preceding the reporting year, and a description of the data source(s) used for the VMT information.

*      *      *      *      *

(b) * * *

(3) * * *

(i) *Schedule.* State DOTs shall submit a progress report on the full performance period to FHWA by October 1st of the first year following the reference performance period. State DOTs shall submit their first Full Performance Period Progress Report to FHWA by October 1, 2022, and subsequent Full Performance Period Progress Reports to FHWA by October 1st every 4 years thereafter, except for the GHG measure specified in § 490.105(c)(5). For the Full Performance Period Progress Report, State DOTs shall submit information related to the GHG measure in the report due to FHWA by October 1, 2026, and every 4 years thereafter.

(ii) * * *

(I) *GHG metric and metric information for the GHG measure.* The metric and the individual values used to calculate the GHG metric, as described in § 490.511(c), for the calendar year preceding the reporting year, and a description of the data source(s) used for the VMT information.

(c) * * *

(2) The MPOs shall report baseline condition/performance and progress toward the achievement of their targets in the system performance report in the metropolitan transportation plan in accordance with part 450 of this chapter. For the GHG measure in § 490.105(c)(5), the MPOs shall also report:

(i) The calculation of annual tailpipe $CO_2$ emissions for the NHS, and may include all public roads, described in § 490.511(f), for the period between the current and previous system performance report, and the reference year.

(ii) A description of the metric calculation method(s) used, as described in § 490.511(d). When the method(s) used are not specified in § 490.511(d), the MPO must include information demonstrating the method(s) has valid and useful results for measuring transportation related $CO_2$.

*      *      *      *      *

(d) *State Initial GHG Report.* For the GHG measure in § 490.105(c)(5), State DOTs shall submit an Initial GHG Report by February 1, 2024.

(1) The State Initial GHG Report shall include:

(i) *Targets.* The 4-year target for the performance period, as required in § 490.105(e), and a discussion, to the maximum extent practicable, of the basis for the established target;

(ii) *Baseline performance.* Performance derived from the data collected for the reference year, for the 4-year target required under paragraph (d)(1) of this section;

(iii) *Relationship with other performance expectations.* A discussion, to the maximum extent practicable, on how the established target in paragraph (d)(1) of this section support expectations documented in longer range plans, such as the State asset management plan required by 23 U.S.C. 119(e) and the long-range statewide transportation plan provided in part 450 of this chapter; and

(iv) *GHG metric and metric information for the GHG measure.* The metric and the individual values used to calculate the GHG metric, as described in § 490.511(c), for the reference year.

(2) For the State Initial GHG Report, the State DOT shall use the following data to calculate the GHG metric, described in § 490.511(c), for the reference year.

(i) Data published by FHWA for the CO₂ factors for each on-road fuel type associated with the reference year.

(ii) The fuel consumed data shall meet the requirements in § 490.509(g) for the reference year.

(iii) The VMT data shall meet the requirements of § 490.509(h) for the reference year.

■ 5. Amend § 490.109 by adding paragraph (d)(1)(v), revising paragraph (d)(1)(vi), and adding paragraphs (d)(1)(vii) and (viii), (e)(4)(vi) and (vii), (e)(6), and (f)(1)(v) to read as follows:

**§ 490.109 Assessing significant progress toward achieving the performance targets for the National Highway Performance Program and the National Highway Freight Program.**

\*      \*      \*      \*      \*

(d) \*  \*  \*

(1) \*  \*  \*

(v) Data contained within Fuels & FASH on August 15th of the year in which the significant progress determination is made that represents performance from the prior year for targets established for the GHG measure in § 490.105(c)(5), and data from Fuels & FASH that represents performance for the reference year.

(vi) Baseline condition/performance data contained in Fuels & FASH, HPMS, and NBI of the year in which the Baseline Period Performance Report is

due to FHWA that represents baseline conditions/performances for the performance period for the measures in §§ 490.105(c)(1) through (5). For the GHG measure, specified in § 490.105(c)(5), the baseline performance data from HPMS shall be the data contained within HPMS on November 30th of the year the Baseline Period Performance Report is due to FHWA.

(vii) Data contained within the HPMS on November 30th of the year in which the significant progress determination is made that represents performance from the prior year for targets established for the GHG measure specified in § 490.105(c)(5), and HPMS data as of November 30, 2023 that represents performance for the reference year.

(viii) The CO₂ factor specified in § 490.509(f) for the baseline performance, prior year, and reference year for targets established for the GHG measure specified in § 490.105(c)(5).

\*      \*      \*      \*      \*

(e) \*  \*  \*

(4) \*  \*  \*

(vi) A State DOT's reported data are not accepted in the Fuels & FASH, by the data extraction date specified in paragraph (d)(1) of this section for the GHG measure in § 490.105(c)(5).

(vii) A State DOT's reported data are not accepted in the HPMS by the data extraction date specified in paragraph (d)(1) of this section for the GHG measure in § 490.105(c)(5).

\*      \*      \*      \*      \*

(6) *Phase-in of new requirements for the GHG Measure.* The following requirements shall only apply to the GHG targets, described in § 490.513(d), and the significant progress determination conducted immediately after the submittal of the 2024 Mid Performance Period Progress Report, described in § 490.107(b)(2):

(i) Consistent with § 490.105(e)(10)(i), State DOTs are not required to establish a 2-year target, and, consistent with 490.107(b)(2), State DOTs will not submit information related to the GHG measure in the 2024 Mid Performance Period Progress Report.

(ii) At the midpoint of the performance period, FHWA shall not make a determination of significant progress toward the achievement of 2-year targets for the GHG measure; and

(iii) The FHWA will classify the assessment of progress toward the achievement of targets in paragraph (e)(6)(ii) of this section as "progress not determined" and they will be excluded from the requirement under paragraph (e)(2) of this section.

(f) \*  \*  \*

(1) \*  \*  \*

(v) If significant progress is not made for the target established for the GHG measure in § 490.105(c)(5), then the State DOT shall document the actions it will take to achieve the GHG performance target.

\*      \*      \*      \*      \*

**Subpart E—National Performance Management Measures To Assess Performance of the National Highway System**

■ 6. Amend § 490.503 by adding paragraph (a)(2) to read as follows:

**§ 490.503   Applicability.**

(a) \*  \*  \*  \*

(2) The Greenhouse Gas (GHG) measure in § 490.507(b) is applicable to all mainline highways on the Interstate and non-Interstate NHS.

\*      \*      \*      \*      \*

■ 7. Amend § 490.505 by adding in alphabetical order definitions of "Greenhouse gas", and "Reference year" to read as follows:

**§ 490.505   Definitions.**

\*      \*      \*      \*      \*

*Greenhouse gas (GHG)* is any gas that absorbs infrared radiation (traps heat) in the atmosphere. Approximately 97 percent of on-road GHG emissions are carbon dioxide (CO₂) from burning fossil fuel. Other transportation GHGs are methane (CH₄), nitrous oxide (N₂O), and hydrofluorocarbons (HFCs).

\*      \*      \*      \*      \*

*Reference year* is calendar year 2022 for the purpose of the GHG measure.

\*      \*      \*      \*      \*

■ 8. Amend § 490.507 by revising the introductory text and adding paragraph (b) to read as follows:

**§ 490.507   National performance management measures for system performance.**

There are three performance measures to assess the performance of the Interstate System and the performance of the non-Interstate NHS for the purpose of carrying out the National Highway Performance Program (referred to collectively as the NHS Performance measures).

\*      \*      \*      \*      \*

(b) One measure is used to assess GHG emissions, which is the percent change in tailpipe CO₂ emissions on the NHS compared to the reference year (referred to as the GHG measure).

■ 9. Amend § 490.509 by adding paragraphs (f) through (h) to read as follows:

**§ 490.509　Data requirements.**

\* 　 \* 　 \* 　 \* 　 \*

(f) The FHWA will post on the FHWA website, no later than August 15th of each reporting year, the $CO_2$ factors for each on-road fuel type that will be used to calculate the GHG metric for the GHG measure in § 490.105(c)(5).

(g) Fuel sales information needed to calculate the fuel consumed for the GHG measure in § 490.507(b) shall:

(1) Represent the total number of gallons of fuel consumed by fuel type; and

(2) Be based on fuels sales data for the prior calendar year, and reported to Fuels & FASH.

(h) Annual vehicle miles traveled (VMT) needed to calculate the GHG measure in § 490.507(b) shall come from the best available data that represents the prior calendar year and is consistent, with the maximum extent practicable, with data submitted to HPMS. The VMT data needed to calculate the GHG metric in § 490.511(c) for the reference year, shall be the HPMS data as of November 30, 2023.

■ 10. Amend § 490.511 by adding paragraphs (a)(2), (c), (d), and (f) to read as follows:

**§ 490.511　Calculation of National Highway System performance metrics.**

(a) \* 　 \* 　 \*

(2) Annual Total Tailpipe $CO_2$ Emissions on the NHS for the GHG measure in § 490.507(b) (referred to as the GHG metric).

\* 　 \* 　 \* 　 \* 　 \*

(c) Tailpipe $CO_2$ emissions on the NHS for a given year shall be computed in million metric tons (mmt) and rounded to the nearest hundredth as follows:

### Equation 1 to paragraph (c)

$$(\text{Tailpipe } CO_2 \text{ Emissions on NHS})_{CY} = \left( \sum_{t=1}^{T} (\text{Fuel Consumed})_t \times (CO_2 \text{ Factor})_t \right) \times$$

$$\left( \frac{\text{NHS VMT}}{\text{Total VMT}} \right)$$

Where:

(Tailpipe $CO_2$ Emissions on NHS)$_{CY}$ = Total tailpipe $CO_2$ emissions on the NHS in a calendar year (expressed in mmt, and rounded to the nearest hundredth);

T = the total number of on-road fuel types;

$t$ = an on-road fuel type;

(Fuel Consumed)$_t$ = the quantity of total annual fuel consumed for on-road fuel type "$t$" (to the nearest thousand gallons);

($CO_2$ Factor)$_t$ = is the amount of $CO_2$ released per unit of fuel consumed for on-road fuel type "$t$";

NHS VMT = annual total vehicle-miles traveled on NHS (to the nearest one million vehicle-miles); and

Total VMT = annual total vehicle-miles traveled on all public roads (to the nearest one million vehicle-miles).

(d) For the GHG measure specified in § 490.507(b), MPOs are granted additional flexibility in how they calculate the GHG metric, described in

§ 490.511(a)(2). MPOs may use the MPO share of the State's VMT as a proxy for the MPO share of $CO_2$ emissions in the State, VMT estimates along with MOVES [1] emissions factors, FHWA's Energy and Emissions Reduction Policy Analysis Tool (EERPAT) model, or other method the MPO can demonstrate has valid and useful results for $CO_2$ measurement.

\* 　 \* 　 \* 　 \* 　 \*

(f) Tailpipe $CO_2$ emissions generated by on-road sources travelling on the NHS (the GHG metric), and generated by on-road sources travelling on all roadways (the step in the calculation prior to computing the GHG metric) shall be calculated as specified in paragraph (c) of this section. The calculations shall be reported in the State Biennial Performance Reports, as required in § 490.107, and shall address the following time periods.

(1) The reference year, as required in § 490.107(b)(1)(ii)(H); and

(2) The calendar year preceding the reporting year, as required in § 490.107(b)(1)(ii)(H), (b)(2)(ii)(J) and (b)(3)(ii)(I).

[1] MOVES (Motor Vehicle Emission Simulator) is EPA's emission modeling system that estimates emissions for mobile sources at the national, county, and project level for criteria air pollutants, GHGs, and air toxics. See *https://www.epa.gov/moves*. The EMFAC model is used in California for emissions analysis.

■ 11. Amend § 490.513 by adding paragraph (d) to read as follows:

**§ 490.513　Calculation of National Highway System performance measures.**

\* 　 \* 　 \* 　 \* 　 \*

(d) The GHG measure specified in § 490.507(b) shall be computed to the nearest tenth of a percent as follows:

### Equation 3 to paragraph (d)

$$\frac{(\text{Tailpipe } CO_2 \text{ Emissions on NHS})_{CY} - (\text{Tailpipe } CO_2 \text{ Emissions on NHS})_{\text{reference year}}}{(\text{Tailpipe } CO_2 \text{ Emissions on NHS})_{\text{reference year}}} \times 100$$

Where:

(Tailpipe $CO_2$ Emissions on NHS)$_{CY}$ = total tailpipe $CO_2$ emissions on the NHS in a calendar year (expressed in million

metric tons (mmt), and rounded to the nearest hundredth); and

(Tailpipe $CO_2$ Emissions on NHS)$_{\text{reference year}}$ = total tailpipe $CO_2$ emissions on the NHS in calendar year 2022 (expressed in

million metric tons (mmt), and rounded to the nearest hundredth).

■ 12. Add § 490.515 to read as follows:

**85394**    **Federal Register** / Vol. 88, No. 234 / Thursday, December 7, 2023 / Rules and Regulations

**§ 490.515   Severability.**

The provisions of §§ 490.105(c)(5), 105(d), 105(d)(1)(v), 105(d)(4), 105(e)(1)(i), 105(e)(1)(ii), 105(e)(4)(i)(C), 105(e)(4)(iii), 105(e)(10), 105(f)(1)(i), 105(f)(3), 105(f)(10), 107(a)(1), 107(b)(1)(i), 107(b)(1)(ii)(H), 107(b)(2)(i), 107(b)(2)(ii)(J), 107(b)(3)(i), 107(b)(3)(ii)(I), 107(c)(2), 107(d), 109(d)(1)(v), 109(d)(1)(vi), 109(d)(1)(vii), 109(d)(1)(viii), 109(e)(4)(vi), 109(e)(4)(vii), 109(e)(6), 109(f)(1)(v), 503(a)(2), 505, 507(b), 509(f), 509(g), 509(h), 511(a)(2), 511(c), 511(d) 511(f), and 513(d) are separate and severable from one another and from the other provisions of this part. If any provision is stayed or determined to be invalid, the remaining provisions shall continue in effect.

[FR Doc. 2023–26019 Filed 12–6–23; 8:45 am]

**BILLING CODE 4910–22–P**

# CERTIFICATE OF SERVICE

I hereby certify that on September 16, 2024, I electronically filed the foregoing record excerpts with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*/s/ Jeffrey E. Sandberg*

Jeffrey E. Sandberg