No. 24-10470

# In the United States Court of Appeals for the Fifth Circuit

STATE OF TEXAS; TEXAS DEPARTMENT OF TRANSPORTATION,
*Plaintiffs-Appellees,*

*v.*

U.S. DEPARTMENT OF TRANSPORTATION; FEDERAL HIGHWAY ADMINISTRATION; SHAILEN BHATT, IN HIS OFFICIAL CAPACITY, AS ADMINISTRATOR OF THE FEDERAL HIGHWAY ADMINISTRATION; PETE BUTTIGIEG, IN HIS OFFICIAL CAPACITY, AS SECRETARY OF TRANSPORTATION
*Defendants-Appellants.*

On Appeal from the United States District Court
for the Northern District of Texas, Lubbock Division

## RESPONSE BRIEF FOR APPELLEES

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

AARON L. NIELSON
Solicitor General

WESLEY S. WILLIAMS
IAN LANCASTER
Assistant Attorneys General

Counsel for Plaintiffs-Appellees

# CERTIFICATE OF INTERESTED PERSONS

No. 24-10470

STATE OF TEXAS; TEXAS DEPARTMENT OF TRANSPORTATION,

*Plaintiffs-Appellees,*

v.

U.S. DEPARTMENT OF TRANSPORTATION; FEDERAL HIGHWAY ADMINISTRATION; SHAILEN BHATT, IN HIS OFFICIAL CAPACITY AS ADMINISTRATOR OF THE FEDERAL HIGHWAY ADMINISTRATION; PETE BUTTIGIEG, IN HIS OFFICIAL CAPACITY AS SECRETARY OF TRANSPORTATION

*Defendants-Appellants,*

Under the fourth sentence of Fifth Circuit Rule 28.2.1, Appellees, as governmental parties, need not furnish a certificate of interested persons.

/s/ Aaron L. Nielson
AARON L. NIELSON
*Counsel for Plaintiffs-Appellees*

i

## STATEMENT REGARDING ORAL ARGUMENT

The district court concluded that the U.S. Department of Transportation ("DOT"), acting through the Federal Highway Administration (collectively, "FHWA"), exceeded its authority by promulgating a rule—the National Performance Management Measures; Assessing Performance of the National Highway System, Greenhouse Gas Emissions Measure, 88 Fed. Reg. 85,364 (Dec. 7, 2023) ("2023 Rule")—forcing state departments of transportation and municipal planning organizations to develop and report progress towards federal emissions goals. Although the district court's decision speaks for itself, the State of Texas and the Texas Department of Transportation (collectively, "Texas") agree this appeal warrants oral argument given the importance of the underlying issue and the various potential paths to affirmance.

# TABLE OF CONTENTS

Certificate of Interested Persons ................................................................. i

Statement Regarding Oral Argument ......................................................... ii

Table of Authorities ................................................................................... iv

Introduction ................................................................................................ 1

Statement of Jurisdiction ........................................................................... 2

Issues Presented.......................................................................................... 2

Statement of the Case ................................................................................. 3

    A.  The National Highway Performance Program ............................... 3

    B.  Rulemaking Under the Obama and Trump Administrations ...................7

    C.  The 2023 Rule ............................................................................... 10

    D.  This Litigation ............................................................................... 11

    E.  The *Kentucky* Litigation .............................................................. 15

Summary of the Argument......................................................................... 16

Standard of Review ................................................................................... 18

Argument.................................................................................................... 19

   I.   The 2023 Rule Exceeds FHWA's Authority. ................................. 19

    A.  Congress did not authorize the 2023 Rule.................................... 19

    B.  FHWA's counterarguments fail. .................................................. 28

  II.  The 2023 Rule Suffers from Additional Flaws. ............................. 40

    A.  The 2023 Rule is arbitrary and capricious. ................................. 40

    B.  The 2023 Rule violates the Spending Clause. ............................. 44

  III.  Judge Hendrix issued appropriate relief under the APA............................ 46

    A.  Judge Hendrix appropriately vacated the 2023 Rule. ................. 46

    B.  FHWA's counterarguments again fail. ....................................... 47

Conclusion................................................................................................. 50

Certificate of Service................................................................................. 51

Certificate of Compliance ......................................................................... 51

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Adams v. All Coast, LLC,*
  15 F.4th 365 (5th Cir. 2021)...............................................................20

*Al-Adahi v. Obama,*
  613 F.3d 1102 (D.C. Cir. 2010) ........................................................ 31

*Apter v. HHS,*
  80 F.4th 579 (5th Cir. 2023)............................................................. 39

*Arlington Cent. Sch. Bd. of Educ. v. Murphy,*
  548 U.S. 291 (2006) ................................................................... 26, 44

*Atchafalaya Basinkeeper v. Chustz,*
  682 F.3d 356 (5th Cir. 2012) ............................................................38

*Avoyelles Sportsmen's League, Inc. v. Marsh,*
  715 F.2d 897 (5th Cir. 1983) ............................................................40

*Azar v. Allina Health Servs.,*
  587 U.S. 566 (2019)......................................................................... 37

*Bartenwerfer v. Buckley,*
  598 U.S. 69 (2023) ........................................................................... 23

*Biden v. Nebraska,*
  143 S.Ct. 2355 (2023) ...................................................................... 33

*BMC Software, Inc. v. CIR,*
  780 F. 3d 669 (5th Cir. 2015)........................................................... 23

*Braidwood Mgmt. Inc., v. Becerra,*
  104 F.4th 930 (5th Cir. 2024)..................................................... 46, 50

*Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.,*
  98 F.4th 220 (5th Cir. 2024) ...................................................... 34, 46

*Cargill v. Garland,*
  57 F.4th 447 (5th Cir. 2023) ............................................................ 49

*Chamber of Com. of U.S. v. SEC,*
  88 F.4th 1115 (5th Cir. 2023)..................................................... 46, 47

*Chevron, USA, Inc. v. NRDC, Inc.,*
  467 U.S. 837 (1984)........................................................27, 28, 29, 30

iv

*City of Arlington v. FCC,*
    569 U.S. 290 (2013) ........................................................ 30

*Corley v. United States,*
    556 U.S. 303 (2009) .............................................. 23, 25, 34

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.,*
    144 S.Ct. 2440 (2024) ..................................................... 46

*Data Mktg. P'ship v. U.S. Dep't of Lab.,*
    45 F.4th 846 (5th Cir. 2022) ................................... 2, 15, 46

*Djie v. Garland,*
    39 F.4th 280 (5th Cir. 2022) ............................................. 1

*Dubin v. United States,*
    599 U.S. 110 (2023) ....................................................... 21

*Entergy Corp. v. Riverkeeper, Inc.,*
    556 U.S. 208 (2009) ....................................................... 33

*Exelon Wind 1, LLC v. Nelson,*
    766 F.3d 380 (5th Cir. 2014) ..................................... 22, 35

*FDA v. Brown & Williamson Tobacco Corp.,*
    529 U.S. 120 (2000) ................................................. 25, 34

*FEC v. Cruz,*
    596 U.S. 289 (2022) ................................................. 32, 43

*Franciscan All., Inc. v. Becerra,*
    47 F.4th 368 (5th Cir. 2022) ........................................... 32

*Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson,*
    559 U.S. 280 (2010) ....................................................... 24

*Gulf Restoration Network v. U.S. Dep't of Transp.,*
    452 F.3d 362 (5th Cir. 2006) ........................................... 40

*Heating, Air Conditioning & Refrigeration Distribs. Int'l v. EPA,*
    71 F.4th 59 (D.C. Cir. 2023) ........................................... 20

*Johnson v. United States,*
    576 U.S. 591 (2015) ....................................................... 22

*Kentucky v. FHWA,*
    No. 5:23-cv-162, 2024 WL 1402443
    (W.D. Ky. Apr. 1, 2024) ........................... 2, 15, 16, 42, 43, 45

*Kovac v. Wray,*
    109 F.4th 331 (5th Cir. 2024) ......................................... 40

v

*Lomax v. Ortiz-Marquez*,
  590 U.S. 595 (2020) ................................................................ 30

*Loper Bright Enters. v. Raimondo*,
  144 S.Ct. 2244 (2024) ......................... 1, 17, 19, 27, 28, 29, 30, 34, 35

*Loughrin v. United States*,
  573 U.S. 351 (2014) ................................................................ 37

*Louisiana v. Biden*,
  55 F.4th 1017 (5th Cir. 2022) ................................................... 40

*Louisiana v. U.S. Dep't of Energy*,
  90 F.4th 461 (5th Cir. 2024) ..................................................... 42

*Mayfield v. U.S. Dep't of Lab.*,
  117 F.4th 611 (5th Cir. 2024) .................................................... 19

*In re MCP No. 185*,
  No. 24-7000, 2024 WL 3650468 (6th Cir. Aug. 1, 2024) ................... 27

*Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*,
  60 F.4th 956 (5th Cir. 2023) ..................................................... 41

*Michigan v. EPA*,
  576 U.S. 743 (2015) ................................................................ 41

*Mohasco Corp. v. Silver*,
  447 U.S. 807 (1980) ................................................................ 23

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010) ............................................................ 49, 50

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) .............................................................. 40, 42

*NLRB v. Sw Gen., Inc.*,
  580 U.S. 288 (2017) ................................................................ 25

*Northshore Dev., Inc. v. Lee*,
  835 F.2d 580 (5th Cir. 1988) .................................................. 19, 47

*Ohio v. EPA*,
  144 S.Ct. 2040 (2024) .............................................................. 41

*Perrin v. United States*,
  444 U.S. 37 (1979)................................................................... 20

*Peterson v. Bell Helicopter Textron, Inc.*,
  806 F.3d 335 (5th Cir. 2015)...................................................... 49

*Matter of PetroQuest Energy, Inc.*,
  54 F.4th 299 (5th Cir. 2022) ..................................................... 49

*Polselli v. IRS,*
 598 U.S. 432 (2023) ............................................................... 35

*Printz v. United States,*
 521 U.S. 898 (1997) ............................................................... 45

*Pugin v. Garland,*
 599 U.S. 600 (2023) ...............................................................20

*Sturgeon v. Frost,*
 587 U.S. 28 (2019) .................................................................. 39

*Sw. Elec. Power Co. v. EPA,*
 920 F.3d 999 (5th Cir. 2019) ................................................ 47

*Tech. Automation Servs. Corp. v. Liberty Surplus Ins. Corp.,*
 673 F.3d 399 (5th Cir. 2012) ................................................48

*Texas v. Alabama-Coushatta Tribe,*
 918 F.3d 440 (5th Cir. 2019) ........................................ 18, 47

*Texas v. EPA,*
 No. 23-60069, 2023 WL 7204840 (5th Cir. May 1, 2023) ................................. 41

*Texas v. United States,*
 50 F.4th 498 (5th Cir. 2022) ...............................18, 47, 48

*Texas v. Yellen,*
 105 F.4th 755 (5th Cir. 2024) ............................................... 45

*Third Nat'l Bank in Nashville v. Impac Ltd.,*
 432 U.S. 312 (1977) ............................................................... 34

*UARG v. EPA,*
 573 U.S. 302 (2014)...............................................34, 36, 41

*United States ex rel. Conyers,*
 108 F.4th 351 (5th Cir. 2024) ...............................................22

*United States v. Lauderdale County,*
 914 F.3d 960 (5th Cir. 2019).................................................. 37

*United States v. Palomares,*
 52 F.4th 640 (5th Cir. 2022) ................................................. 38

*United States. v. Transocean Deepwater Drilling, Inc.,*
 767 F.3d 485 (5th Cir. 2014).................................................. 34

*United States v. X-Citement Video, Inc.,*
 513 U.S. 64 (1994) .................................................................. 26

*United Steel v. MSHA,*
 925 F.3d 1279 (D.C. Cir. 2019) ................................... 46, 47

vii

*Wash. State Dep't of Social & Health Servs. v. Guardianship Estate of Keffeler*,
   537 U.S. 371 (2003) ...................................................................... 31

*West Virginia v. EPA*,
   597 U.S. 697 (2022) ................................................................... 9, 34

*White Glove Staffing, Inc. v. Methodist Hosps. of Dall.*,
   947 F.3d 301 (5th Cir. 2020) .....................................................49-50

*Whitman v. Am. Trucking Ass'ns*,
   531 U.S. 457 (2001) ......................................................................20

*Williams v. Taylor*,
   529 U.S. 362 (2000) ......................................................................24

*Wisc. Cent. Ltd. v. United States*,
   585 U.S. 274 (2018) ......................................................................20

*Yates v. United States*,
   574 U.S. 528 (2015) ...................................................................... 31

**Constitutional Provisions, Statutes, Regulations, and Rules:**

U.S. Const. art. I, §8, cl. 1 ....................................................................2

5 U.S.C. §706(2) .........................................................................15, 40, 46

23 U.S.C.:
   §101 ....................................................................................... 11
   §101(11) ................................................................................. 21
   §101(12) ................................................................................. 21
   §101(16) ................................................................................. 21
   §103(b) ................................................................................... 21
   §103(b)(1) .................................................................................3
   §103(b)(3)(G) ........................................................................ 39
   §104(b) ....................................................................................44
   §119 ........................................... 4, 6, 8, 11, 14, 30, 31, 38, 39
   §119(b) ......................................................................................4
   §119(b)(1) ........................................................................ 14, 24
   §119(b)(4) ................................................... 14, 24, 30, 32, 40
   §119(d) ................................................................. 25, 38, 39, 44
   §119(d)(4) ............................................................................. 14
   §119(d)(1)(A) ..................................................................... 4, 39
   §119(d)(1)(B) ...........................................................................4

§119(d)(1)(B)(2) ........................................................................... 39
§119(d)(2) ............................................................................... 4, 25
§119(d)(2)(A) ................................................................................. 4
§119(d)(2)(B) ................................................................................. 4
§119(d)(2)(D) ................................................................................. 4
§119(d)(2)(E) ................................................................................. 4
§119(d)(2)(H) ................................................................................. 4
§119(d)(2)(M) ................................................................................ 5
§119(d)(2)(N) .......................................................................... 5, 25
§119(d)(2)(O) ................................................................................ 5
§119(d)(2)(P) ................................................................................. 4
§119(f)(1) ...................................................................................... 6
§119(g) .......................................................................................... 5
§134 ......................................................... 4. 11, 14, 38, 39
§135 ......................................................... 4, 11, 14, 38, 39
§150 ........................... 6, 8, 12, 13, 14, 16, 19, 24, 27, 28, 36, 38, 39
§150(b) ..................................... 4, 11, 12, 13, 23, 36
§150(b)(6) ........................... 7, 8, 13, 24, 28, 30, 32, 36, 37, 38
§150(c) ........................... 5, 7, 12, 14, 23, 25, 30, 32, 33, 39, 43
§150(c)(1) ...................................................................................... 5
§150(c)(2)(C) ........................................................... 5, 20, 30, 32
§150(c)(3) ........................................... 6, 12, 28, 30, 35, 36, 38
§150(c)(3)(i) ................................................................................ 29
§150(c)(3)(ii)(V) ......................................................................... 30
§150(c)(3)(iv) ............................................................................. 29
§150(c)(3)(A) .............................................................................. 38
§150(c)(3)(A)(ii) ........................................... 13, 21, 22, 34
§150(c)(5) ........................... 13, 14, 23, 26, 34, 35, 36, 38
§150(c)(5)(B) ............................................................................. 30
§150(d) ................................................................................. 6, 43
§150(d)(1) ...................................................................................... 6
§150(e)(1) ...................................................................................... 6
§150(e)(3) ...................................................................................... 6
§328 ............................................................................................... 5
§328(a) ................................................................................. 5, 25
§329 ............................................................................................... 5
§329(a) .......................................................................................... 5

28 U.S.C.:
  §1291 ............................................................................................2
  §1331............................................................................................2
Pub. L. No. 112 Stat. 405 (2012).................................................3
23 C.F.R. §1.36 ....................................................................... 7, 43
Fed. R. Civ. P. 56(a) ................................................................ 18

**Other Authorities:**

82 Fed. Reg. 5,970 (Jan. 18, 2017) ...............................................7
83 Fed. Reg. 24,920 (May 31, 2018) ...........................................8
88 Fed. Reg. 85,364 (Dec. 7, 2023) .............................................ii
Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 195 (2012) ........................................... 21, 22, 24
Black's Law Dictionary (10th ed. 2014) ...................................39
Black's Law Dictionary (3d ed. 1933) .......................................46
Executive Order No. 13,990, 86 Fed. Reg. 7037 (Jan. 25, 2021) ........................ 9, 10
Executive Order No. 14,008, 86 Fed. Reg. 7619 (Feb. 1, 2021) ........................ 9, 10
John A. Paulos, *Innumeracy: Mathematical Illiteracy and Its Consequences* (1988) .... 31
Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933 (2018)......46
Lee Lacy, *Dwight D. Eisenhower and the Birth of the Interstate Highway System*, U.S. Army (Feb. 20, 2018), https://perma.cc/8F9R-THBA ................................3
Manik Roy, *The 112th Congress on Climate Change: Deadlocked,* Center for Climate & Energy Solutions (Sept. 21, 2012) https://perma.cc/H6VF-H7W2 .......................26
Mila Sohoni, *The Power to Vacate a Rule*, 88 Geo. Wash. L. Rev. 1121 (2022) ........48
*National Highway Performance Program*, FHWA, https://perma.cc/RUE5-4XPG.........................3
*Performance*, Oxford English Dictionary, https://perma.cc/6VPX-2JLS ................................20
Rodney E. Slater, *The National Highway System: A Commitment to America's Future,* DOT: Public Roads, vol. 59, no. 4 (Spring 1996), https://perma.cc/YZB8-XA53 ................................3
The White House, *Press Briefing by Principal Deputy Press Secretary Karine Jean-Pierre* (Oct. 21, 2021), http://tiny.cc/em4mxz .............................10

## INTRODUCTION

Federal agencies "cannot act without congressional authorization," ROA.4727, and courts must "independently" interpret statutes and "ensure that agencies" satisfy the Administrative Procedure Act. *Loper Bright Enters. v. Raimondo*, 144 S.Ct. 2244, 2266, 2268 (2024). Not only does independent judicial review ensure that agencies obey Congress, but it also enhances stability for the public by preventing policy from flipflopping when administrations change. *See id.* at 2272.

Here, after exhaustively reviewing the relevant statutory language, Judge J. Wesley Hendrix of the Northern District of Texas concluded that FHWA unlawfully "requir[ed] the states to measure, report, and set declining targets for the amount of carbon dioxide emitted by vehicles using the interstate and national-highway systems." ROA.4727. Congress "ma[d]e clear that 'performance of the Interstate/National Highway Systems' focuses on the infrastructure's effectiveness in facilitating travel, commerce, and national defense—not environmental outputs of vehicles using the systems." ROA.4727. Accordingly, Judge Hendrix vacated the Biden Administration's unlawful rule, ROA.4774—which replaced the Trump Administration's rule, which had in turn replaced the Obama Administration's rule, which had adopted FHWA's unlawful interpretation in the first place.

On appeal, FHWA challenges Judge Hendrix's statutory interpretation and his decision to vacate the 2023 Rule. But FHWA does not advance any arguments that Judge Hendrix did not carefully consider and reject. As he explained, where, as here, "a regulation attempts to override statutory text, the regulation loses every time." ROA.4774 (quoting *Djie v. Garland*, 39 F.4th 280, 285 (5th Cir. 2022)). Nor is that

the only flaw with this rule, which is also arbitrary and capricious and a violation of the Spending Clause, U.S. Const. art. I, §8, cl. 1. Judge Hendrix had no occasion to reach these additional flaws, but another court—addressing this same rule—has already concluded that FHWA acted arbitrarily and capriciously. *See Kentucky v. FHWA*, No. 5:23-cv-162, 2024 WL 1402443 (W.D. Ky. Apr. 1, 2024).

Furthermore, as Judge Hendrix also recognized, "vacatur is 'the appropriate remedy' by 'default.'" ROA.4771 (quoting *Data Mktg. P'ship v. U.S. Dep't of Lab.*, 45 F.4th 846, 859 (5th Cir. 2022)). That default remedy is amply warranted here because FHWA has never "explained how [it] would substantiate the 2023 Rule if given the opportunity to do so." ROA.4769. Judge Hendrix thus did err at all and certainly did not abuse his discretion.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. §1331. ROA.12. It issued a final judgment on March 27, 2024, ROA.4776-4777, and FHWA appealed on May 23, 2024, ROA.4778-4779. This Court has jurisdiction under 28 U.S.C. §1291.

## ISSUES PRESENTED

1. Whether the 2023 Rule exceeds FHWA's statutory authority.

2. Whether the 2023 Rule is arbitrary and capricious or violates the Spending Clause.

3. Whether the district court acted within its discretion by vacating the 2023 Rule.

## STATEMENT OF THE CASE

### A.    The National Highway Performance Program

**1.**    Having witnessed the importance of an interconnected highway system in World War II, President Dwight D. Eisenhower called on Army logistics personnel to evaluate and develop a similar system in the United States. *See, e.g.*, Lee Lacy, *Dwight D. Eisenhower and the Birth of the Interstate Highway System*, U.S. Army (Feb. 20, 2018), https://perma.cc/8F9R-THBA. That plan succeeded, and today "more than 40 percent of all highway traffic, 75 percent of heavy truck traffic, and 90 percent of tourist traffic" use the National Highway System ("NHS"). Rodney E. Slater, *The National Highway System: A Commitment to America's Future,* DOT: Public Roads, vol. 59, no. 4 (Spring 1996), https://perma.cc/YZB8-XA53.

The NHS's primary goals remain largely unchanged: (1) to "serve major population centers, international border crossings, ports, airports, public transportation facilities, and other intermodal transportation facilities and other major travel destinations;" (2) to "meet national defense requirements;" and (3) to "serve interstate and interregional travel and commerce." 23 U.S.C. §103(b)(1).

**2.**    Congress enacted the Moving Ahead for Progress in the 21st Century Act in 2012. Pub. L. No. 112-141, 126 Stat. 405 (2012). The act established today's National Highway Performance Program ("NHPP"), which "provides support" for the NHS's construction and operation "and to ensure that investments of Federal-aid funds in highway construction are directed to support progress toward the achievement of performance targets established" by the States. *National Highway Performance Program (NHPP)*, FHWA, https://perma.cc/RUE5-4XPG. "The

3

NHPP is the largest federal-aid highway program in the country, with recent annual authorizations averaging nearly $30 billion dollars." ROA.4728.

In §150(b), Congress identified seven goals for the NHPP: (1) "safety," (2) "infrastructure condition," (3) "congestion reduction," (4) "system reliability," (5) "freight movement and economic vitality," (6) "environmental sustainability," defined as "enhanc[ing] the performance of the transportation system while protecting and enhancing the natural environment," and (7) "reduced project delivery delays." 23 U.S.C. §150(b) (capitalization omitted); *see also* 23 U.S.C. §119(b) (setting forth NHPP's broad purposes).

Additionally, "[t]he NHPP's statutory authorization and funding requirements are found in 23 U.S.C. § 119." ROA.4728. Apart from being on the NHS, 23 U.S.C. §119(c), eligible projects must meet *each* of three criteria in §119. *First*, a project must "support[] progress toward the achievement of national performance goals for improving infrastructure condition, safety, congestion reduction, system reliability, or freight movement." *Id.* §119(d)(1)(A). *Second*, a project must be consistent with statewide and metropolitan transportation planning requirements. *Id.* §119(d)(1)(B) (cross-referencing "sections 134 and 135" of title 23). And *third*, a project also must meet at least one of nineteen enumerated operative purposes. *Id.* §119(d)(2).

Most of the nineteen operative purposes in §119(d)(2) have nothing to do with environmental policy but instead concern things like construction and inspection of bridges and tunnels or building bus terminals and pedestrian walkways. *See, e.g.*, *id.* at §§119(d)(2)(A), (B), (D), (E), (H), (P). Three of the enumerated operative purposes, however, relate to the environment:

4

(M) Environmental restoration and pollution abatement in accordance with section 328 [i.e., 23 U.S.C. §328].

(N) Control of noxious weeds and aquatic noxious weeds and establishment of native species in accordance with section 329 [i.e., 23 U.S.C. §329].

(O) Environmental mitigation efforts related to projects funded under this section, as described in subsection (g) [i.e., 23 U.S.C. §119(g)].

*Id.* §§119(d)(2)(M)-(O). None of these three, however, speaks to the environmental effects of vehicles; instead, each concerns NHS projects themselves.[1]

**3.**   Section 150(c) directs FHWA to conduct "a rulemaking that establishes performance measures and standards." *Id.* §150(c)(1). This power, however, is limited. Not only must FHWA consult with "State departments of transportation, metropolitan planning organizations, and other stakeholders," but it may "only" issue "performance measures" as "described" by §150(c). *Id.* §150(c)(2)(C). FHWA thus may only establish performance measures for the purpose of administering the NHPP, the Highway Safety Improvement Program, and the Congestion Mitigation and Air Quality Program ("CMAQ"), as well as freight movement. *Id.* §§150(c)(3)-(6).

---

[1] *See, e.g.,* 23 U.S.C. §328(a) ("[E]nvironmental restoration and pollution abatement to minimize or mitigate the impacts of any transportation project funded under this title (including retrofitting and construction of stormwater treatment systems ….) may be carried out to address water pollution or environmental degradation caused wholly or partially by a transportation facility."); *id.* §329(a) ("funds … may be used" for "(1) … plants" to stabilize the soil and the like or for addressing "(2) … plants which impair or impede the establishment, maintenance, or safe use of a transportation system"); §119(g) ("[E]nvironmental mitigation efforts referred to in [§119](d)(2)(O) include participation in natural habitat and wetlands mitigation efforts relating to projects funded under this title ….").

As it relates to the NHPP (the program at issue here), FHWA—"for the purpose of carrying out §119," *id.* §150(c)(3)—must establish:

> (i) minimum standards for States to use in developing and operating bridge and pavement management systems;
>
> (ii) measures for States to use to assess—
>
>> (I)   the condition of pavements on the Interstate system;
>>
>> (II) the condition of pavements on the [NHS] (excluding the Interstate);
>>
>> (III) the condition of bridges on the [NHS];
>>
>> (IV) the performance of the Interstate System; and
>>
>> (V) the performance of the [NHS] (excluding the Interstate System);
>
> (iii) minimum levels for the condition of pavement on the Interstate System, only for the purposes of carrying out section 119(f)(1); and
>
> (iv) the data elements that are necessary to collect and maintain standardized data to carry out a performance-based approach.

*Id.*

Section 150 does not define "performance" in Subclauses (IV)-(V). ROA.285.

Once FHWA establishes performance measures, responsibility shifts to the States. Section 150(d) requires each State to "set performance targets that reflect" FHWA's performance measures. 23 U.S.C. §150(d)(1). States must also submit biennial reports that describe, *inter alia*, "the condition and performance of the [NHS] in the State," and "progress in achieving [the State's] performance targets …." *Id.* §§150(e)(1), (3). The division of labor is therefore clear: FHWA establishes performance measures, and the States set targets and submit reports respecting

pursuit of those measures. If FHWA determines that a State has not met its responsibilities, FHWA may withhold NHPP funding or project approvals, or take other action it deems appropriate. *See* 23 C.F.R. §1.36.

### B. Rulemaking Under the Obama and Trump Administrations

**1.** On January 18, 2017, just two days before President Obama's presidency ended, FHWA published a final rule to implement performance measures under §150(c). *See* National Performance Management Measures; Assessing Performance of the National Highway System, Freight Movement on the Interstate System, and Congestion Mitigation and Air Quality Improvement Program, 82 Fed. Reg. 5,970 (Jan. 18, 2017) ("2017 Rule"); ROA.1434-1514. As relevant here, one performance measure concerned the percentage change in carbon dioxide ("$CO_2$") emissions from vehicles ("2017 GHG Measure"), which required States "to establish [declining $CO_2$ emissions] targets and report on progress." ROA.1438. FHWA would then "assess every 2 years to determine if a State DOT … made significant progress toward achieving their targets." ROA.1438.

FHWA had never before created such a performance measure. Nonetheless, it pointed to its authority to establish measures for the "performance of the Interstate and non-Interstate NHS," and claimed that §150(c) allows the agency to define "performance" as including the environmental performance of vehicles that drive on covered roads (as opposed to the covered roads themselves). ROA.1458-1459. To support that novel interpretation, FHWA cited the environmental sustainability goal in §150(b)(6), a patchwork of other statutes, and its own guidance. ROA.1459.

**2.**    "[T]he 2017 Rule's shelf life was short." ROA.4734. Under the Trump Administration, FHWA rescinded the 2017 GHG Measure just one year after its promulgation. *See* National Performance Management Measures; Assessing Performance of the National Highway System, Freight Movement on the Interstate System, and Congestion Mitigation and Air Quality Improvement Program, 83 Fed. Reg. 24,920 (May 31, 2018) ("2018 Rule"); ROA.1417-1433.

FHWA identified three reasons for that rescission. *First*, the agency's 2017 interpretation was based on a "strained reading" of §150. ROA.1420. Indeed, FHWA could not identify "any statutory provision that specifically directs or requires FHWA to adopt a GHG measure," and—critically—§150(b)(6)'s goal of environmental sustainability was "not one of the categories of performance measures specifically mentioned in subsection (c) [of §150]." ROA.1420. FHWA also reasoned that neither the purposes of the NHPP in §119—namely, the physical condition, and efficiency, of transportation—nor the structure of §150 supported the 2017 Rule's capacious understanding of "performance." ROA.1420-1421.

*Second*, FHWA explained that the 2017 Rule "impose[d] unnecessary regulatory burdens on State DOTs … with no predictable benefits." ROA.1421. FHWA thus determined that there was no justification for imposing costs on the States to conduct actions "purely administrative in character" because "the measure itself did not require reductions in $CO_2$ emissions and would not have produced predictable climate change effects." ROA.1422.

*Third*, FHWA reasoned that "there are other existing methods for producing nearly the same information as would result from the GHG measure, using publicly

available data and methodologies[.]" ROA.1422. Thus, rescission would "reduce the existing duplication, streamline the regulations, and reduce the potential for confusion that can arise when multiple Federal and State entities impose different requirements for categorizing and measuring $CO_2$ emissions." ROA.1423.

**3.** Promptly upon taking office, President Biden issued two executive orders respecting federal environmental policies: Executive Order No. 13,990, 86 Fed. Reg. 7037 (Jan. 25, 2021) ("EO 13,990"), ROA.1291-1297, and Executive Order No. 14,008, 86 Fed. Reg. 7619 (Feb. 1, 2021) ("EO 14,008"), ROA.1298-1312.

EO 13,990 requires all agencies to "immediately review all existing regulations, orders, guidance documents, policies, and any other similar agency actions" issued under the Trump Administration that "are or may be inconsistent with, or present obstacles to" President Biden's climate agenda. ROA.1291. Agencies must also "promptly take steps to rescind" identified actions through rulemakings that are "appropriate and consistent with applicable law." ROA.1296.

EO 14,008 sets forth President Biden's goal to "achieve net-zero emissions, economy-wide, by no later than 2050." ROA.1301. Reaching that goal would fundamentally change energy and environmental policy in a way that Congress has never authorized. *See generally West Virginia v. EPA*, 597 U.S. 697 (2022). Nevertheless, President Biden announced in April 2021 his plan to achieve "a 50-52 percent reduction from 2005 levels in economy-wide net greenhouse pollution in 2030." ROA.1345. The White House also announced a "whole-of-government approach" to advance his "climate agenda"—even "without Congress." The

White House, *Press Briefing by Principal Deputy Press Secretary Karine Jean-Pierre* (Oct. 21, 2021), http://tiny.cc/em4mxz.

### C.    The 2023 Rule

**1.**    FHWA published a notice of proposed rulemaking on July 15, 2022, to establish new NHPP performance measures. ROA.316-337. In critical respects, the 2022 proposed rule was an attempt to resurrect the 2017 GHG Measure by establishing a "method for the measurement and reporting of [$CO_2$] emissions associated with transportation." ROA.317.

As relevant here, FHWA proposed to require States to establish declining targets "that align with the Administration's net-zero targets" for $CO_2$ emissions from vehicles on the NHS. ROA.316. The proposed rule also required States to "biennially report on their progress in meeting the targets." ROA.316. FHWA thus revived its theory that "performance" as used in Subclauses (IV)-(V) includes environmental performance of the NHS (including emissions from the vehicles using the NHS) and pointed to the same statutes relied upon by the Obama Administration. ROA.324. Further, FHWA claimed that the 2018 Rule conflicted with the "national priorit[ies] and national goal[s]" identified in EO 13,990 and EO 14,008. ROA.321.

Over 100,000 individuals and organizations filed comments. ROA.292. Texas explained that the proposed rule was "impermissible overreach," ROA.4490, and that achieving year-after-year declining emissions targets would be effectively impossible, ROA.4493-4499. Additionally, Texas critiqued FHWA's failure to account for the costs of trying to meet such impossible targets. ROA.4502-4503.

**2.** FHWA published the 2023 Rule on December 7, 2023. ROA.285-315. The 2023 Rule is quite like the proposed rule, except for its declining emission targets are no longer expressly tied to President Biden's emission-reduction goals. ROA.301. The 2023 Rule also claims that "[t]here are no specific penalties for failing to achieve GHG targets," ROA.299, but never disputes it requires States to create such targets and that a State's failure to comply with this federal mandate could result in lost highway funding. "Aside from those differences, the crux of the 2022 Proposed Rule remain[]—states are required to measure and report $CO_2$ emissions generated by on-road mobile sources on the highway system and to establish declining $CO_2$ emission targets." ROA.4737.

FHWA again cited §150(b), as well as §101, §119, §134, and §135, to support its interpretation. ROA.288-289. FHWA also brushed aside concerns that the 2023 Rule will impose significant costs on the States—with little to no benefit—by claiming that "State DOTs … will not experience costs from achieving GHG reduction targets since FHWA is not requiring specific declining targets be established, nor is it mandating penalties for failing to meet the targets established." ROA.309. FHWA did not dispute that relevant data is available to it through other means—one of the points highlighted by FHWA in 2018—but rather stated that the 2023 Rule "complements that data to support a whole-of-government approach to addressing GHG emissions." ROA.290.

### D. This Litigation

**1.** Because the 2023 Rule "was scheduled to take effect on January 8, 2024," Texas sued FHWA on December 19, 2023, urging the district court to vacate the

rule as unauthorized, arbitrary and capricious, and unconstitutional. ROA.8-30. After Texas sought a preliminary injunction, FHWA agreed to extend compliance deadlines, and the parties both moved for summary judgment. ROA.4738-4739.[2]

**2.** On March 27, 2024, Judge Hendrix issued a nearly 50-page opinion concluding that FHWA exceeded its authority. ROA.4727-4775. He first considered §150 alone and determined it does not support the rule for four reasons:

> First, the key terms' definitions focus on the infrastructure's effectiveness at achieving its purposes and not on the environmental impact of vehicles using the infrastructure. Second, all of the related performance measures in Section 150(c)(3) focus on physical infrastructure, which makes it less likely that the DOT's broad interpretation is accurate. Third, the DOT's proposed interpretation would render other portions of the statute superfluous. And fourth, Section 150(b)'s list of—and language related to—the national goals of the federal-aid highway program indicate that "performance" of the system does not include environmental performance.

ROA.4745-4746.

Accordingly, Judge Hendrix concluded that "Section 150(c)'s limited, precise statutory language cannot bear the weight of the DOT's proposed expansive interpretation." ROA.4744. "And precedent makes clear that when Congress provides an agency with a limited grant of authority, courts should be hesitant to adopt an agency's expansive interpretation of its own power." ROA.4744. Because

---

[2] No one disputes that Texas has standing. The 2023 Rule injures Texas by imposing compliance costs, and "there is little doubt that the plaintiffs' imminent injuries—which they would incur should the 2023 Rule take effect—are the direct result of the DOT's enforcement of the 2023 Rule and are therefore fairly traceable to the challenged rule." ROA.4741. Also, "the relief sought by the plaintiffs—vacatur of the rule—would redress the plaintiffs' injuries." ROA.4741.

§150 focuses on the performance of the NHS rather than on vehicles that use that system, Judge Hendrix concluded that the "plain language of Section 150 alone demonstrates that the Rule exceeded the DOT's authority," ROA.4761.

Judge Hendrix also focused on §150's structure to reason that "[t]he clear focus of Section 150(c)(3)(A)(ii) on the physical structures of the interstate and national-highway systems demonstrates that 'performance' is also focused on those physical structures." ROA.4751. Yet FHWA's expansive reading would "permit[] the DOT to require states to measure anything that happens to use or relate in any way to those systems." ROA.4752-4753. Judge Hendrix further considered §150's performance measures for the CMAQ. Section 150(c)(5) "directs the DOT to establish measures relating to on-road mobile source emissions," i.e., vehicles. ROA.4753 (quotations omitted). Adopting the 2023 Rule's interpretation of "performance" as including environmental effects of vehicles accordingly would render superfluous §150(c)(5). ROA.4754-4755. Furthermore, because §150(c)(5) is "precisely drafted to cover only certain pollutants," but not $CO_2$, Congress could not have intended the word "performance" to include $CO_2$ measurement. ROA.4755-4757.

Judge Hendrix concluded his textual analysis of §150 by observing that the national goals in §150(b) further "undermine the agency's interpretation." ROA.4757. For one thing, they broadly focus on infrastructure conditions rather than environmental concerns. ROA.4758-4759. For another, "[i]f the DOT's interpretation were correct, the national goal [in §150(b)(6)] could be restated as 'to protect and enhance the natural environment while protecting and enhancing the natural environment.'" ROA.4760. And if those failings were not enough, §150(b)'s

environmental sustainability goal is addressed by §119's funding for environmental projects and—critically—§150(c)(5)'s performance measures for CMAQ which, as noted, Congress wrote to *exclude* $CO_2$ emissions. ROA.4760-4761.

**3.** Because §150 is "connected" to §119, Judge Hendrix also concluded that "Section 119 and its purposes aid the Court in determining the scope of Section 150's permissible performance measures." ROA.4761-4762. He identified two relevant purposes of the NHPP: "to provide support for the condition and performance of the [NHS]" and "to provide support for activities to increase the resiliency of the [NHS] to mitigate the cost of damages from sea level rise, extreme weather events, flooding, wildfires, or other natural disasters." ROA.4762 (quoting 23 U.S.C. §§119(b)(1), (4)). Given that language, if "performance" included environmental performance, §119(b)(4) would be redundant. ROA.4762.

Judge Hendrix next examined how projects are evaluated for eligibility and determined that each §119(d) criteria undermines FHWA's interpretation because none "mention[s] environmental sustainability." ROA.4764. And while §134 and §135 "requires states to consider the environmental impact of transportation decisions in their planning processes, that consideration is wholly divorced from whether Section 150(c) authorizes a GHG emissions measure." ROA.4764 n.16.

Finally, Judge Hendrix concluded that because §119(d)'s list of goals and operative purposes authorizes funding for "specific, narrow activities," such funds "could not properly apply toward the reduction of GHG emissions." ROA.4765-4766. Indeed, "none of the provisions [in §119(d)] touch a subject even remotely related to $CO_2$ emissions by vehicles." ROA.4767. Judge Hendrix accordingly

determined that "[t]he specific inclusion of these authorized environmental purposes—and the omission of anything related to GHG emissions—further weigh against adopting the DOT's broad interpretation of 'performance.'" ROA.4767.[3]

**4.**    As for a remedy, Judge Hendrix explained that the APA directs courts to "hold unlawful and set aside agency action that is in excess of the statutory authority." ROA.4768 (citing 5 U.S.C. §706(2)). Under this Court's precedent, the "default rule is to vacate" because remand without vacatur applies only in limited circumstances. ROA.4768-4769 (citing *Data Mktg*, 45 F.4th at 859).

Judge Hendrix thus vacated the 2023 Rule because it suffers from significant flaws that cannot be cured upon remand; in fact, FHWA failed to "explain[] how [it] would substantiate the 2023 Rule if given the opportunity to do so." ROA.4769. FHWA also offered no argument that that vacatur would have disruptive effects. ROA.4769-4770. Furthermore, Judge Hendrix reasoned that because of the rule's impending deadlines, "adequate relief requires an affirmative blockade of the agency's action, not merely a defensive tool." ROA.4772.

### E.  The *Kentucky* Litigation

A group of 21 States challenged the 2023 Rule in the Western District of Kentucky. *Kentucky v. FHWA*, No. 5:23-cv-162-BJB (W.D. Ky.). In an opinion issued five days after Judge Hendrix's, the district court there concluded that not only can FHWA not require declining $CO_2$ emission targets, *Kentucky*, 2024 WL 1402443 at *9, but that the 2023 Rule is arbitrary and capricious in two respects.

---

[3] Judge Hendrix had no reason to reach Texas's additional arguments that the 2023 Rule is arbitrary and capricious and unconstitutional. ROA.4767 n.17.

*First*, FHWA could not link the rule's purported benefits (emissions reductions) to the establishment of declining emission goals. *Id*. at \*12. *Second*, by collecting information already available, FHWA has imposed costs on the States without adequate analysis or justification. *Id*. at \*13-14.

Because those States "sought relief limited to the challenger states—not vacatur of the Rule in its entirety," *id*. at \*15, the court "issue[d] declaratory relief … and invite[d] additional briefing on the propriety of injunctive relief," *id*. at \*18. In a joint status report, FHWA pledged to "not seek to enforce the Final Rule in or against the Plaintiff States … unless and until" the decision was "overturned." Joint Status Report at 2, *Kentucky v. FHWA*, No. 5:23-CV-162-BJB (W.D. Ky. Apr. 22, 2024), ECF No. 104. The States reserved their rights to seek injunctive relief "if appropriate under the circumstances." *Id*.

## SUMMARY OF THE ARGUMENT

Congress never authorized FHWA to create $CO_2$-driven performance measures for vehicles that drive on national highways. Not only is that what §150 says, but it is the only interpretation that does not make a hash out of the rest of the statute. Judge Hendrix also did not abuse his discretion by vacating the 2023 Rule.

**I.** Nothing in §150's text, structure, or context supports FHWA's view that "performance" includes the emissions profile of vehicles on national highways. Judge Hendrix applied all relevant tools of interpretation to arrive at the best reading of the statute and determined that "performance" as used in Subclauses (IV)-(V) concerns the NHS itself, such as highways. By contrast, if "performance" included

the environmental performance of cars that drive on the NHS, rather than the NHS itself, other statutes would be superfluous or nonsensical.

FHWA's main counterargument effectively asks this Court to disregard *Loper Bright*. Nothing in this reticulated statute, however, suggests that Congress's use of the phrase "performance of the [NHS]" constitutes an express delegation of interpretative authority that allows FHWA to construe the statute contrary to its best reading. True, FHWA has some discretion to decide *which* "performance" measures to require, but not to decide what a "performance" measure *is* in the first place. FHWA also offers various theories regarding specific statutory language, but Judge Hendrix carefully considered and rejected each of them. Furthermore, FHWA's interpretation invites, rather than avoids, a constitutional violation, and the Supreme Court in *Loper Bright* expressly discouraged agency flipflopping of the sort that happened here, and certainly did not enable it.

**II.**   Although Judge Hendrix did not reach Texas's arbitrary and capricious and Spending Clause claims, the 2023 Rule is unlawful for these reasons, too. For example, the rule is arbitrary and capricious because it relies upon factors—including President Biden's unilateral emission goals—that Congress did not intend FHWA to consider; FHWA also failed to consider relevant costs or adequately address the objection that the agency does not need the rule because it already has access to the data. And if FHWA were correct about how to read this statute, the 2023 Rule would violate the Spending Clause by impermissibly conditioning federal highway funding upon compliance with hopelessly indeterminate terms.

**III.** Judge Hendrix also did not abuse his discretion by vacating the 2023 Rule. Under the APA's plain language and this Court's precedent, vacatur is the default rule—not the exception. Judge Hendrix documented why he followed that default rule here, including that FHWA did not argue that it could justify its rule if given an opportunity on remand and did not identify any disruptive effects. Accordingly, applying this Court's precedent, he vacated the 2023 Rule.

On appeal, FHWA urges a different remedy, but ignores critical aspects of Judge Hendrix's analysis. Regardless, FHWA has not demonstrated that Judge Hendrix mis-weighed the relevant factors, much less that he abused his discretion. Instead, FHWA seeks to replace this Court's precedent with a different standard. Both the rule of orderliness and first principles bar such arguments. Because the 2023 Rule is contrary to law and cannot be remedied on remand, vacatur is appropriate.

## STANDARD OF REVIEW

The Court reviews a district court's "grant of summary judgment *de novo*, applying the same standards as the district court." *Texas v. United States*, 50 F.4th 498, 521 (5th Cir. 2022). Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* at 521-22 (quoting Fed. R. Civ. P. 56(a)).

The Court reviews "the district court's decision to vacate" an unlawful rule "for abuse of discretion." *Id.* at 529. This standard is "highly deferential." *Texas v. Alabama-Coushatta Tribe*, 918 F.3d 440, 447 (5th Cir. 2019). It "is not enough" that a different decision "might have been permissible, or even warranted"; instead, the

district court's decision "must have been so unwarranted as to constitute an abuse of discretion." *Northshore Dev., Inc. v. Lee*, 835 F.2d 580, 582 (5th Cir. 1988).

## ARGUMENT

### I.    The 2023 Rule Exceeds FHWA's Authority.

It is blackletter law that FHWA must follow Congress's directives, and that this Court must "independently interpret the statute" to ensure that happens. *Loper Bright*, 144 S.Ct. at 2263. Such independent review "requires using 'all relevant interpretative tools' to determine the 'best' reading of a statute; a merely 'permissible reading' is not enough." *Mayfield v. U.S. Dep't of Lab.*, 117 F.4th 611, 617 (5th Cir. 2024) (quoting *Loper Bright*, 144 S.Ct. at 2266). Here, Judge Hendrix explained—correctly, and in detail—why FHWA's strained (but politically convenient) reading of "performance" is not the "best" one. FHWA's counterarguments uniformly fail.

#### A.    Congress did not authorize the 2023 Rule.

Judge Hendrix addressed each aspect of the interpretative question here and concluded that Congress "indicate[d] at every turn that measuring the 'performance of … the [NHS]' does not authorize measures of environmental performance," much less the environmental performance of vehicles that merely happen to sometimes use the NHS. ROA.4767. Instead, Congress "instructed that it is the roadways' efficiency and reliability in facilitating travel, commerce, and the national defense that may be measured." ROA.4767. The Court should affirm.

**1.** At the outset, the Court should focus on §150's plain language, which "limit[s] the permissible performance measures to only those specifically

enumerated in the statute." ROA.4744 (citing 23 U.S.C. §150(c)(2)(C)). Agencies always must respect such limits because "Congress … does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions." *Heating, Air Conditioning & Refrigeration Distribs. Int'l v. EPA*, 71 F.4th 59, 67-68 (D.C. Cir. 2023) (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)). The key term in Subclauses (IV)-(V) is "performance." Everything about §150's text confirms that FHWA cannot use that term as a launching pad for advancing the President's climate goals.

*First*, when interpreting statutes, courts must "interpret the words consistent with their 'ordinary meaning … at the time Congress enacted the statute.'" *Wisc. Cent. Ltd. v. United States*, 585 U.S. 274, 277 (2018) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)). Courts frequently apply dictionary definitions when interpreting undefined terms. *See, e.g.*, *Pugin v. Garland*, 599 U.S. 600, 604-05 (2023); *Adams v. All Coast, LLC*, 15 F.4th 365, 371 (5th Cir. 2021) (per curiam).

Here, Judge Hendrix explained that "performance" means "the competence or effectiveness of a person or thing in performing an action; *spec.* the capabilities, productivity, or success of a machine, product, or person when measured against a standard." ROA.4747 (quoting *Performance*, Oxford English Dictionary, https://perma.cc/6VPX-2JLS). Because "[t]he term focuses on an identified object's or person's capability," it follows that "Congress authorized the DOT to create a measure to assess 'the [competence or effectiveness]' of the identified objects—the Interstate System and National Highway System." ROA.4747 (alteration in original).

Because the focus must be on the "capabilities" of the nouns in Subclauses (IV)-(V), Judge Hendrix next turned to the statutory definitions of "Interstate System," "National Highway System," and "Highway," and determined that "each definition relates to transportation infrastructure and describes their purposes as facilitating travel, commerce, and national defense." ROA.4747 (discussing 23 U.S.C. §§101(11), 101(12), 101(16), 103(b)). By contrast, none concerns the environment. Accordingly, "[s]ynthesizing the various definitions," Judge Hendrix concluded that "[t]he performance of these transportation systems turns on their 'competence or effectiveness' at achieving the specified aims of these roadways," and correctly concluded that nothing about the ordinary meaning of "performance" includes $CO_2$ emissions from vehicles using the NHS. ROA.4749. After all, how much $CO_2$ *vehicles* happen to emit has nothing to do with a *road's* "competence or effectiveness" or "capability." ROA.4747.

*Second*, "[w]hen interpreting words with disputed meanings, courts should consider words in light of the terms surrounding them," ROA.4750 (citing *Dubin v. United States*, 599 U.S. 110, 118 (2023)). That is because when words are "'associated in a context suggesting that the words have something in common, they should be assigned a permissible meaning that makes them similar.'" ROA.4750 (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 195 (2012)).

Here, Judge Hendrix reasoned that "the company 'performance of … the [NHS]' keeps is uniformly focused on the physical condition of transportation infrastructure." ROA.4750. In §150(c)(3)(A)(ii), Congress refers (twice) to "the

condition of pavements" and once to the "condition of bridges." But Congress never refers to the environment. Accordingly, because §150(c)(3)(A)(ii) lists three conditions that "relate expressly to physical conditions," it follows that "the two immediately following measurements … are likewise limited to the systems' physical infrastructure …." ROA.4751. Yet FHWA's interpretation, far from harmonizing with the rest of the §150(c)(3)(A)(ii), "would 'generate confusion or unpredictability,' like a list of 'fire-engine red, light pink, maroon, *navy blue*, or colors that otherwise involve shades of red.'" ROA.4751 (quoting *Johnson v. United States*, 576 U.S. 591, 603 (2015)). Furthermore, Judge Hendrix noted that Congress repeatedly paired "performance" with the word "condition," further confirming that "performance" is "tied to the physical infrastructure." ROA.4752.

Similarly, Judge Hendrix observed that Congress "express[ly]" limited "the number of authorized performance measures," yet FHWA's interpretation would allow the agency to "require states to measure anything that happens to use or relate in any way to those systems." ROA.4752-4753. When reading statutes, "'[t]he provisions of a text should be interpreted in a way that renders them compatible, not contradictory.'" ROA.4752 (quoting Scalia & Garner, *supra*, at 180).

*Third*, courts must "prefer[] the reading that does not render portions of that text superfluous." ROA.4754 (quoting *Exelon Wind 1, LLC v. Nelson*, 766 F.3d 380, 399 (5th Cir. 2014)); *see also, e.g.*, *United States ex rel. Conyers*, 108 F.4th 351, 357 (5th Cir. 2024) That is because courts do not lightly presume that Congress acts for no reason. Courts also "apply the canon *expressio unius est exclusio alterius*" when "the specificity and apparent comprehensiveness of an [legal text's] enumeration of a

category of things … implies that things not enumerated are excluded." *BMC Software, Inc. v. C.I.R.*, 780 F. 3d 669, 676 (5th Cir. 2015).

Here, §150(c) allows FHWA to create measures relating to vehicle emissions—but not in Subclauses (IV)-(V). Instead, such power is found in §150(c)(5), and even then, such power does not extend to $CO_2$-based performance measures. Accordingly, it makes no sense to say that Subclauses (IV)-(V) authorize such a measure. As Judge Hendrix explained, "[t]he DOT's 'reading is thus at odds with one of the most basic interpretive canons, that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.'" ROA.4756 (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009)). In fact, not only does FHWA's reading violate the anti-superfluity canon, it also violates "the negative-implication canon." ROA.4755. After all, FHWA attempts to rely on Subclauses (IV)-(V) (which do not mention environmental measures or vehicles) rather than §150(c)(5) (which expressly addresses both) because §150(c)(5) excludes "GHG emissions." ROA.4756-4757. "Congress's choice to address emissions in (c)(5), and to do so in a way that cannot authorize the 2023 Rule, implies the exclusion of other on-road mobile source emission measurements, including GHG emissions." ROA.4757 (following *Bartenwerfer v. Buckley*, 598 U.S. 69, 78 (2023)).

*Fourth*, courts also consider statutory structure and should try to give the same word the same meaning "across the same section of a statute." ROA.4760 (following *Mohasco Corp. v. Silver*, 447 U.S. 807, 826 (1980)). Applying that rule, Judge Hendrix recognized that §150(b)'s list of goals further dooms the 2023 Rule. For example,

23

"performance" as used in §150(b)(6)'s environmental goal *cannot* mean what FHWA says "performance" means in Subclauses (IV)-(V), because §150(b)(6) *distinguishes* "performance" from "protecting and enhancing the natural environment." ROA.4759. If Congress intended "performance" to include "protecting and enhancing the natural environment," as FHWA's reading requires, then §150(b)(6) would read: "To enhance the protection and enhancement of the natural environment while protecting and enhancing the natural environment." FHWA's reading thus makes a dog's breakfast of the statute.

2.    Moving beyond §150's plain language, the Court should also focus on §150's place in the "broader statutory context." ROA.4761 (citing, *inter alia*, *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 289-90 (2010)). That is because "'[c]ontext is a primary determinant of meaning,'" especially where, as here, a statute "'contains many interrelated parts that make up the whole.'" ROA.4761 (citing Scalia & Garner, *supra*, at 167).

*First*, although not themselves operative provisions of the statute, §119's list of broad purposes distinguishes between "'performance of the National Highway System'" and "'mitigat[ing] the cost of damages from' natural disasters," expressly including sea-level increases. ROA.4762 (contrasting 23 U.S.C. §119(b)(1) and §119(b)(4)). As Judge Hendrix explained, this distinction confirms that "performance" in Subclauses (IV)-(V) cannot include environmental concerns because Congress determined that "performance" does not include environmental mitigation. ROA.4762 (following *Williams v. Taylor*, 529 U.S. 362, 404 (2000)). Otherwise, §119(b)(4) would be superfluous, contrary to basic rules of

interpretation. *See Corley*, 556 U.S. at 314. And given the language Congress used, "it is unclear how measuring GHG emissions could make the system itself more resilient to natural disasters when they occur." ROA.4763.

*Second*, "Section 119's 'national performance goals' do not mention environmental sustainability," but instead "[e]ach of the goals—infrastructure condition, safety, reducing congestion, system reliability, and freight movement—focuses on the system's infrastructure and efficiency." ROA.4764. This too is key, for "[i]t is a fundamental canon … that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme," and courts should read them as creating "a symmetrical and coherent regulatory scheme" and "fit, if possible, all parts into an harmonious whole." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (quotations omitted; cleaned up). That "fundamental canon" forbids setting §119(d) in conflict with §150(c). *Id.*

*Third*, not one of §119(d)'s list of nineteen operative purposes "include[s] GHG emission reduction." ROA.4765 (discussing 23 U.S.C. §119(d)(2)). Only a handful relate to environmental concerns, and even then, only for "specific, narrow activities" like addressing "'water pollution'" or "'noxious weeds.'" ROA.4765 (quoting 23 U.S.C. §§119(d)(2)(N), 328(a)). Indeed, "the explicit enumeration of these provisions evince that Congress specifically excluded other environmental purposes." ROA.4767 (citing *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 302 (2017)). It follows that Congress, which imposed "strict" and highly specific "limit[s]," did not authorize FHWA to promulgate the 2023 Rule. ROA.4753. This is particularly true because Congress *did* allow FHWA to consider vehicles emissions in

§150(c)(5), yet excluded $CO_2$ emissions. Congress thus made plain—repeatedly—that it was not authorizing FHWA to create $CO_2$-based performance measures, and certainly not through the modest word "performance" in Subclauses (IV)-(V), which linguistically and structurally does not speak to $CO_2$ at all.

*Fourth*, the Court should not forget commonsense. The relevant language here was enacted in 2012 during a period of divided government. Congress knew how to address climate issues but instead focused on physical infrastructure. It is implausible (to say the least) that Congress, after refusing scores of calls to reform the nation's environmental laws, nonetheless empowered FHWA to impose on the States a $CO_2$-based performance measure for vehicles. *See, e.g.*, Manik Roy, *The 112th Congress on Climate Change: Deadlocked,* Center for Climate & Energy Solutions (Sept. 21, 2012) https://perma.cc/H6VF-H7W2 ("Reflecting an anti-regulatory mood on Capitol Hill, there have been nearly as many proposals to block efforts to curb carbon emissions as proposals to strengthen them. And, reflecting the general state of gridlock in Congress, virtually none … has been enacted.").

3. If there were any doubt, moreover, constitutional avoidance should squelch it. Courts construe statutes to avoid constitutional doubts, not invite them. *See, e.g.*, *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 78 (1994). Here, if FHWA were right about what this statue means, then—as discussed below, *see infra* pp.44-45—it would flunk the Spending Clause, which requires that "when Congress attaches conditions to a State's acceptance of federal funds, the conditions must be set out unambiguously." *Arlington Cent. Sch. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (cleaned up). FHWA's reading would allow it to force "states to measure

anything that happens to use or relate in any way to those systems," ROA.4753, with no advance notice of what categories such measurement requirements may fall into. That is not what the statute says, and it certainly does not say it so overwhelmingly as to overcome constitutional avoidance.

**4.** Finally, the Supreme Court's anti-flipflopping rule also defeats the 2023 Rule. In *Loper Bright*, the Chief Justice explained that "*Chevron* affirmatively destroy[ed]" "reliance interests" by "authorizing an agency to change positions as much as it likes." 144 S.Ct. at 2272; *see also id.* at 2273 (overruling *Chevron, USA, Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984)). Yet agencies may only flipflop if Congress has given them "power to do so," as determined by the best reading of the statute. *Id.* Otherwise, agencies could "leav[e] those attempting to plan around agency action in an eternal fog of uncertainty." *Id.*; *see also id.* at 2288 (Gorsuch, J., concurring) (because "executive officials [could] replace one 'reasonable' interpretation with another at any time" under *Chevron*, "[a]ffected individuals [could] never be sure of their legal rights and duties") (quotation omitted); *In re MCP No. 185*, No. 24-7000, 2024 WL 3650468, at *6 (6th Cir. Aug. 1, 2024) (Sutton, C.J., concurring) (addressing the anti-flipflopping rule).

This case is tailor-made for the anti-flipflopping rule because, instead of imposing a $CO_2$-based performance measure soon after §150's enactment, FHWA waited until the waning days of the Obama Administration to act—which action was rescinded by the Trump Administration with a rule that reverted the NHPP to the *status quo ante*. The Biden Administration then undid the Trump Administration's rule by issuing the 2023 Rule. *See supra* pp.7-11. And a future administration may

27

reverse course again. None of this is consistent with "rule of law" principles. *Loper Bright*, 144 S.Ct. at 2272 (quotation omitted).

### B. FHWA's counterarguments fail.

**1.** Although acknowledging (at 36) that Judge Hendrix's analysis of §150's language and structure is "multi-faceted," FHWA ultimately dismisses his reading (at 38) as a "restrictive gloss" with "no footing in the most relevant statutory text." Instead, FHWA maintains (at 39) that Congress gave it "discretion in determining what additional performance measures to establish for the NHPP." FHWA's theory, however, fails for at least two reasons.

*First*, FHWA's lead argument (at 28-33) fundamentally misunderstands *Loper Bright*. Indeed, its argument would not have worked even under *Chevron*. FHWA claims (at 34) that the 2023 Rule is a "permissible" exercise of its authority under §150(c)(3). Yet FHWA's reading makes a complete hash of §150(b)(6)—the primary statute FHWA relies on to justify its agency-empowering reading of Subclauses (IV)-(V). Regardless, a "permissible" reading is insufficient; it must be the "best reading." *Loper Bright*, 144 S.Ct. at 2266. FHWA cannot point to any statutory language directly supporting the 2023 Rule, nor does FHWA address the dictionary definition of "performance" or the statutory definitions of "Interstate System," "National Highway System," and "Highway." Instead, FHWA asks the Court (at 30, 37) to read Subclauses (IV)-(V) as creating discretion to pursue "Congress's goals." But as Justice Gorsuch has explained, "we're all textualists now," which requires "faithful adherence to the written law." *Loper Bright*, 144 S.Ct. at 2291 n.6.

FHWA's claim (at 39) that Congress "delegate[d] discretionary authority" to FHWA to define "performance" thus gives up the game. Granted, agencies may have discretion when Congress "expressly" authorizes them "to give meaning to a particular statutory term," "empower[s]" them "to prescribe rules to 'fill up the details' of a statutory scheme," or uses "flexibility"-creating terms like "appropriate or reasonable." *Loper Bright*, 144 S.Ct. at 2263; *see also id.* at n.5 (examples of express delegation). But merely failing to "define or qualify the term 'performance,'" FHWA.Br.39, is not a delegation. To the contrary, FHWA's is the very type of argument that the Supreme Court accepted in *Chevron* and rejected in *Loper Bright*. Compare *Chevron*, 467 U.S. at 841-42 (reasoning that because Congress did not define "stationary source," there was no "static" definition and courts must defer to the agency) *with Loper Bright*, 144 S.Ct at 2262 ("The APA, in short, incorporates the traditional understanding of the judicial function, under which courts must exercise independent judgment in determining the meaning of statutory provisions."). FHWA's overarching theory that it enjoys discretion to define "performance" is thus not only incorrect, but also "prevents [judges] from judging." *Loper Bright*, 144 S.Ct. at 2268.

Section 150's language further underscores FHWA's conceptual error. No one doubts that FHWA has discretion to identify "the data elements that are *necessary* to collect and maintain standardized data to carry out a performance-based approach," 23 U.S.C. §150(c)(3)(iv) (emphasis added), as well as what "*minimum* standards" should be imposed with respect to enumerated highway features, *id.* §150(c)(3)(i) (emphasis added). But such discretion does not extend to redefining

"performance of the [NHS]," *id.* §150(c)(3)(ii)(V), to focus "on-road mobile source emissions," which are separately addressed in §150(c)(5)(B). That FHWA is forced to smuggle the word "appropriate" into its argument (at 40) and to rely (also at 40) on *City of Arlington v. FCC*, 569 U.S. 290 (2013), speaks volumes. After all, *City of Arlington* explicitly rests on *Chevron* deference. *See, e.g.*, *id.* at 296 (relying on principles of interpretation that *Loper Bright* overrules).

FHWA's reliance (at 40) on *Lomax v. Ortiz-Marquez*, 590 U.S. 595 (2020), moreover, is further afield. Judge Hendrix did not "narrow" Subclauses (IV)-(V) but instead gave them their natural reading in light of what they say and their overall place in the statute. Furthermore, *Lomax* stresses that Congress intends the same word to have the same meaning "across a statute." *Id.* at 600. Here, that rule requires affirmance because "performance" cannot include environmental concerns without, for example, making §150(b)(6) and §119(b)(4) incomprehensible.

FHWA's authority under §150(c)(3), in other words, extends to molding the details of the measures themselves—not, as FHWA asserts, redefining building-block statutory terms like "performance." The Court knows Congress did not intend FHWA's narrow authority to be broadened because Congress expressly "limit[ed] performance measures *only* to those described" in §150(c). 23 U.S.C. §150(c)(2)(C) (emphasis added). Therefore, the Court must determine the "best reading" rather than a "permissible" one. *Loper Bright*, 144 S.Ct. at 2266.

*Second*, FHWA's argument does not work even on its own terms. Not only does FHWA give short shrift to the actual language in §150(b)(6)'s goal, but FHWA all but ignores that §150(c)(3) was enacted "for the purpose of carrying out section 119"

30

and that Subclauses (IV)-(V) require an assessment of "the performance of" the Interstate System and NHS. It follows then—as Judge Hendrix understood—that when assessing these systems' "performance," one must understand what the systems seek to perform. Yet, "Section 119's 'national performance goals' do not mention environmental sustainability," and not one of §119's nineteen operative purposes "include[s] GHG emission reduction." ROA.4764-4765.

**2.**    FHWA's brief also contains another conceptual flaw. Throughout, FHWA attempts to dismiss each individual piece of Judge Hendrix's analysis without stepping back and looking at the totality of the evidence. But that is not how courts interpret statutes—or evidence more generally. *See, e.g.*, *Yates v. United States*, 574 U.S. 528, 552 (2015) (Alito, J., concurring in judgment) (citing *Wash. State Dep't of Social & Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 384-85 (2003); *Al-Adahi v. Obama*, 613 F.3d 1102, 1105-06 (D.C. Cir. 2010)). "Many mundane mistakes in reasoning can be traced to a shaky grasp of the notion of conditional probability." *Al-Adahi*, 613 F.3d at 1105 (quoting John Allen Paulos, *Innumeracy: Mathematical Illiteracy and Its Consequences* 63 (1988)). For example, one who fails to understand the value of interrelated evidence "may think that if a particular fact does not itself prove the ultimate proposition … the fact may be tossed aside and the next fact may be evaluated as if the first did not exist." *Id.* Yet doing so would be "a fundamental mistake." *Id.* at 1106 (quoting federal government's brief).

Here, Judge Hendrix relied on many interpretative rules and canons—each of which points the *same* direction. FHWA responds by minimizing each portion of his "multi-faceted" analysis. FHWA.Br.36-49. Every piece of that analysis, however,

has at least some weight in determining what "performance of the [NHS]" means. Because interpretative evidence must be combined, FHWA's strategy of attempting to poke holes in individual pieces of Judge Hendrix's analysis fails.

This totality-of-the-evidence principle has special bite here, moreover, because the main evidence FHWA relies on—§150(b)(6) and §119(b)(4)—affirmatively *support* Judge Hendrix's reading. In both statutes, Congress expressly distinguished between "performance" of the NHS and environmental goals. It thus makes no sense to suggest that "the performance of the National Highway System" and "the performance of the Interstate System" in Subclauses (IV)-(V) includes environmental goals. Given that FHWA's own best evidence undermines the agency's (current) interpretation, the Court should affirm the district court.

**3.** FHWA also cannot dismiss (at 41) rules and canons of interpretation as "inapposite." FHWA, for example, attacks (at 39-40) Judge Hendrix's reliance on the fact that the statute nowhere expressly authorizes a $CO_2$-based performance measure by arguing that "no provision of law *prohibits* FHWA from adopting a GHG emissions measure." ROA.289 (emphasis added); *see also* FHWA.Br.18 n.5. But that is backwards—"an agency 'literally has no power to act ... unless and until Congress authorizes it to do so by statute.'" *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 378 (5th Cir. 2022) (quoting *FEC v. Cruz*, 596 U.S. 289, 301 (2022)). Congress declared that FHWA may establish only those performance measures "described" by §150(c). 23 U.S.C. §150(c)(2)(C). Where, as here, "Congress provides an agency with a limited grant of authority, courts should be hesitant to adopt an agency's

expansive interpretation of its own power." ROA.4744 (citing *Biden v. Nebraska*, 143 S.Ct. 2355, 2368-71 (2023)).

Further, Congress's exclusion of a qualifier for "performance" does not mean FHWA has broad leeway. Just the opposite: Here, "statutory silence, when viewed in context, is best interpreted as limiting agency discretion." *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 223 (2009). If Congress wanted to authorize FHWA to create a $CO_2$-based performance measure, it would have said so.

Nor is FHWA correct (at 41) that failing to recognize Subclauses (IV)-(V) as "authority 'described in' section 150(c) would afford those provisions no meaning at all." Judge Hendrix identified what Subclauses (IV)-(V) may be used to assess: The "competence or effectiveness" of the Interstate and National Highway Systems' "physical infrastructure and [their] ability to meet [their] objectives." ROA.4749, 4751. This does not mean FHWA cannot take any action, but it does prevent "open[ing] the floodgates and effectively eliminat[ing] the strict limit that Congress placed on the agency's authority to promulgate measures." ROA.4753. For example, FHWA can use Subclauses (IV) and (V) to measure various performance metrics for roadways—such as traffic congestion, the condition of traffic signs, or the number of emergency offramps—which are directly tied to a road's physical characteristics and provide insight into its ability to meet other enumerated objectives. But FHWA cannot impose a $CO_2$-based performance measure for car emissions, which has nothing to do with the road itself.

By contrast, FHWA's view that "performance" includes characteristics of vehicles rather than of highways would give the agency authority over countless

issues that have "never before been subject to such requirements." *West Virginia*, 597 U.S. at 722 (citing *UARG v. EPA*, 573 U.S. 302, 310, 324 (2014)). For example, nothing would prevent FHWA from using Subclauses (IV)-(V) to require States to record whether vehicles are made with (or without) union labor or are manufactured by companies that have purchased (or not purchased) carbon offsets. Congress did not surreptitiously authorize FHWA to address such hot-button issues in a statute targeting how roads perform.

FHWA also claims (at 42-44) that Judge Hendrix erred by drawing a negative inference from §150(c)(5), which authorizes FHWA to consider emission from cars—but not $CO_2$. Courts, however, must "use every tool at their disposal to determine the best reading of the statute and resolve the ambiguity," *Loper Bright*, 144 S.Ct. at 2266, and "strive to 'interpret the statute as a symmetrical and coherent regulatory scheme,'" *United States. v. Transocean Deepwater Drilling, Inc.*, 767 F.3d 485, 495 (5th Cir. 2014) (quoting *Brown & Williamson*, 529 U.S. at 133). Judge Hendrix did just that. He looked to §150(c)(3)(A)(ii) and determined that because Subclauses (I)-(III) refer to physical conditions, so do Subclauses (IV)-(V). ROA.4751. After all, "words grouped in a list should be given related meanings." *Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 242 (5th Cir. 2024) (quoting *Third Nat'l Bank in Nashville v. Impac Ltd.*, 432 U.S. 312, 322 (1977)).

Judge Hendrix's approach also aligned "with one of the most basic interpretative canons, that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corley*, 556 U.S. at 314 (cleaned up). Recognizing the

34

interrelationship between the CMAQ (the subject of §150(c)(5)) and NHPP (the subject of §150(c)(3)), he concluded that if "performance" in Subclauses (IV)-(V) covered vehicles' $CO_2$ emissions, "Congress would not have needed to separately authorize such measures later in the statute." ROA.4755; *see also Polselli v. IRS*, 598 U.S. 432, 439 (2023) ("Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another section of the same Act.") (quotations omitted). Judge Hendrix's conclusion again makes sense. Under FHWA's view, nothing would stop it from imposing measures to assess the "performance" of the NHS under the NHPP by tracking ozone, carbon monoxide, and particular matter—thus nullifying any need for §150(c)(5). The Court should "prefer[] the reading that does not render portions of that text superfluous." *Exelon Wind 1*, 766 F.3d at 399. Furthermore, FHWA's citation to its own regulations (at 43) reflects confusion; the question is what the *statute* means, not what regulations FHWA has promulgated.

FHWA next claims (at 43) that Judge Hendrix "overlook[ed] the fundamental difference between a statutory mandate and statutory authorization." Not so. Sections 150(c)(3) and (5) mandate FHWA to establish performance measures for *both* the NHPP and CMAQ, respectively. The question is what "performance of the [NHS]" means and whether Congress granted FHWA discretion to answer that question. After *Loper Bright*, this Court—not FHWA—says what the law is.

For similar reasons, FHWA's argument (at 44) regarding overlapping measures fails. The agency points to its use of "travel-time reliability and travel delays" as a performance measure it has imposed across several programs, not just the NHPP.

This argument misses the point. That FHWA has created overlapping measures where it has authority under multiple provisions does not mean that it can create a different measure without authority. If §150(c)(3) allowed FHWA to create emission-performance measures for vehicles, there would be no need for §150(c)(5). FHWA cannot "rewrite clear statutory terms to suit its own sense of how the statute should operate." *UARG*, 573 U.S. at 328.

**3.**    Judge Hendrix also explained why §150(b)'s goals do not support the 2023 Rule. ROA.4757-61. FHWA disagrees (at 31-32, 44-49), but again misses its mark.

Judge Hendrix's analysis starts from a simple proposition: "[N]either GHG emissions nor environmental sustainability more broadly is included as one of the categories of performance measures in Section 150(c)(3)." ROA.4758. FHWA, however, maintains (at 45) that to effectuate §150(b)'s national goals, it may use Subclauses (IV)-(V) to "establish[] performance measures that relate to goals for which Congress has not already mandated specific corresponding measures" because otherwise there would be "little work for Subclauses (IV)-(V) to do."

This argument fails for at least four reasons. *First*, "performance" in Subclauses (IV)-(V) cannot relate to environmental protection because §150(b)(6) distinguishes "the performance of the transportation system" from "protecting and enhancing the natural environment." *Supra* pp.23-24. *Second*, Judge Hendrix *did* identify a corresponding measure for §150(b)(6): "[T]he environment-related goal relates to the measures detailed in (c)(5)'s air-quality program." ROA.4758. *Third*, FHWA cannot point to any requirement in §150 that performance measures must provide for each national goal. The lack of any textual connection between the statute's listed

goals and performance measures "indicates that the states do not necessarily need to measure and report on every aspect of the national goals." ROA.4759. And *fourth*, FHWA is flat-out wrong that Subclauses (IV)-(V) serve little to no purpose absent something like a $CO_2$-based performance measure. *See supra* p.33.

FHWA's effort to downplay that "performance" in Subclauses (IV)-(V) cannot, as a matter of plain text, relate to environmental concerns because of the distinction Congress drew in §150(b)(6) also fails. "The task of statutory interpretation begins and, if possible, ends with the language of the statute," *United States v. Lauderdale County*, 914 F.3d 960, 964 (5th Cir. 2019) (citation omitted), and it is a "cardinal principle" that "courts 'must give effect, if possible, to every clause and word of a statute,'" *Loughrin v. United States*, 573 U.S. 351, 358 (2014) (citation omitted). Courts do not "lightly assume that Congress silently attaches different meanings to the same term in the same or related statutes." *Azar v. Allina Health Servs.*, 587 U.S. 566, 574 (2019). Here, §150(b)(6) contains two distinct clauses, and "[b]y separating the two aspirations with the conjunction 'while,' the statutory language distinguishes 'the performance of the transportation system' from 'protecting and enhancing the natural environment.'" ROA.4759. Judge Hendrix thus refused to read "the national goal" as saying "'to protect and enhance the natural environment while protecting and enhancing the natural environment.'" ROA.4760.

FHWA asserts (at 45-46) that this approach was wrong because it would prevent the agency from "develop[ing] any 'performance' measures related to section 150(b)(6)." But FHWA cannot rebut the "established rule of statutory

37

interpretation that no provision should be construed to be entirely redundant." *Atchafalaya Basinkeeper v. Chustz*, 682 F.3d 356, 358 (5th Cir. 2012) (per curiam). And as noted, FHWA can create a performance measure relating to §150(b)(6) through §150(c)(5).

FHWA thus cannot answer Judge Hendrix's point that §150(b)(6) "is more obviously and naturally accounted for in other portions of the statute," specifically §119's environment-focused projects and the CMAQ's performance measures under §150(c)(5). ROA.4760. "The meaning of a statutory provision is often clarified by the remainder of the statutory scheme." *United States v. Palomares*, 52 F.4th 640, 642-43 (5th Cir. 2022) (quotations omitted). Here, §150(c)(3) was enacted "for the purpose of carrying out section 119." 23 U.S.C. §150(c)(3)(A). Dispositive here (and, tellingly, minimized by FHWA in its discussion on page 47 of its brief), nothing in §119(d)'s list of goals allows a $CO_2$-based performance measure. FHWA's objection (at 46) that accounting for CMAQ is a "non sequitur" because "Congress intended for progress toward its national goals to be measured and tracked" therefore cannot get off the ground because, again, nothing in §150 requires that every goal be covered by each performance measure, and regardless, the CMAQ's performance measures allow for—using FHWA's words—"progress toward [the environmental sustainability goal] to be measured and tracked."

Finally, FHWA crams its remaining arguments (at 48 to 49) into just over a page of briefing. It asserts (at 33, 48) that Judge Hendrix "overlooked" provisions of §134 and §135 relating to "statewide planning processes." Judge Hendrix, however, did not overlook anything, but rather explained that "[w]hile this language requires

states to consider the environmental impact of transportation decisions in their planning processes, that consideration is wholly divorced from whether Section 150(c) authorizes a GHG emissions measure." ROA.4764 n.16. He further explained that "to assert that the language in Sections 134 and 135 indicates that 'performance' includes 'environmental performance' ignores the more relevant statutory language present in both Section 150 and Section 119." ROA.4764 n.16.

FHWA also errs regarding §119(b)(4)'s statement of purpose (as well as the very general statement of purpose in 23 U.S.C. §101(b)(3)(G)). As the Supreme Court has held—unanimously—agencies cannot rely on such general statements of purposes for regulatory authority. *See Sturgeon v. Frost*, 587 U.S. 28, 57 (2019); *see also Apter v. HHS*, 80 F.4th 579, 589 (5th Cir. 2023). What matters is §119(d), which identifies which "national performance goals" FHWA can act on, and lists only "improving infrastructure condition, safety, congestion reduction, system reliability, or freight movement on the [NHS]." 23 U.S.C. §119(d)(1)(A); *see also* ROA.4729. None of those goals authorizes a $CO_2$-based performance measure, nor do any of 119(d)'s nineteen *operative* "purposes." 23 U.S.C. §119(d)(1)(B)(2). Section 119(d), moreover, is written conjunctively—an eligible project must satisfy both §119(d)(1)(A) "and" §119(d)(1)(B)(2). *See* Conjunctive/disjunctive canon, Black's Law Dictionary (10th ed. 2014) ("[I]n a legal instrument, *and* joins a conjunctive list to combine items, while *or* joins a disjunctive list to create alternatives."). It therefore makes no sense to say FHWA can create a performance measure that fails *both* requirements.

Regardless, Judge Hendrix did not overlook that one of NHPP's purposes is "to provide support for activities to increase the resiliency of the National Highway System to *mitigate the cost of damages*" from "sea level rise[s]" and the like. 23 U.S.C. §119(b)(4) (emphasis added). FHWA asserts that "transportation contributes significantly *to the causes of* climate change," ROA.286 (emphasis added), but NHPP "is not about mitigating the causes of the damage to the system, but about mitigating the damage to the system," ROA.4763.

## II. The 2023 Rule Suffers from Additional Flaws.

Although lack of statutory authorization is fatal, the 2023 Rule is also arbitrary and capricious and unconstitutional. The Court "may affirm on grounds other than those relied upon by the district court," *Kovac v. Wray*, 109 F.4th 331, 335 (5th Cir. 2024) (quotation omitted), and has done so in "cases too numerous to cite," *Louisiana v. Biden*, 55 F.4th 1017, 1022 (5th Cir. 2022) (quotation omitted).

### A. The 2023 Rule is arbitrary and capricious.

Even if FHWA has discretion to redefine "performance," the agency abused that discretion. Courts must "hold[] agencies to certain minimal standards of rationality," *Gulf Restoration Network v. U.S. Dep't of Transp.*, 452 F.3d 362, 368 (5th Cir. 2006) (quoting *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 905 (5th Cir. 1983)), by vacating agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with [the] law," 5 U.S.C. §706(2)(A). Under this standard, agencies cannot ignore "important aspect[s] of the problem" or rely on "factors which Congress has not intended [them] to consider." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43

(1983). They also must "consider[] the costs and benefits associated" of "regulation," *Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956, 973 (5th Cir. 2023) (citing *Michigan v. EPA*, 576 U.S. 743, 751 (2015)), and make decisions that are "reasonable and reasonably explained," *Ohio v. EPA*, 144 S.Ct. 2040, 2053 (2024) (quotation omitted). The 2023 Rule fails this standard.

1.    To begin, the 2023 Rule is part and parcel of President Biden's government-wide approach to emissions reductions. FHWA admittedly issued the proposed rule to "align with the Administration's target of net-zero emissions," ROA.287, and maintains that the 2023 Rule "supports a U.S. target of reducing GHG emissions economy-wide 50 to 52 percent below 2005 by 2030, on a course toward reaching net-zero emissions economy-wide by no later than 2050," ROA.292.

FHWA's reliance on the Biden Administration's emissions goals renders the 2023 Rule arbitrary and capricious. No law authorizes FHWA to consider $CO_2$ emissions at all when establishing performance measures, much less emissions from vehicles driving on national highways. The federal government cannot leverage statutes to achieve the White House's policy goals absent authorization from Congress. *See, e.g.*, *UARG*, 573 U.S. at 328. Here, FHWA's reliance on factors that Congress did not authorize it to consider is arbitrary and capricious because agencies cannot "giv[e] undue weight to non-statutory factors ...." *Texas v. EPA*, No. 23-60069, 2023 WL 7204840, at *6 (5th Cir. May 1, 2023) (per curiam).

2.    The 2023 Rule is also not "reasonable and reasonably explained." *Ohio*, 144 S.Ct. at 2053. Recall how the rule works. Although States must comply by expending resources to set targets and submit reports with respect to FHWA's performance

measures (or else lose highway funds or be subject to other sanctions), there is no punishment for not meeting those measures. Rather than offering a "carrot" or a "stick," FHWA instead "hope[s]" that its rule will induce States to reduce $CO_2$ emissions. *Kentucky*, 2024 WL 1402443, at *11.

As another court—addressing this same 2023 Rule—has explained, FHWA's "assumption" that GHG performance measures will lead to reduced $CO_2$ emissions is a "head-scratcher." *Id.* "Why would making states calculate an unenforceable GHG Measure cause them to choose highway projects that reduce tailpipe emissions?" *Id.* Additionally, "nothing in the record explains why step 1 (collecting state emissions targets) should induce step 2 (states reducing emissions)." *Id.* That is because "[n]othing … in basic reasoning supports this informational-inducement rationale." *Id.* at *12. FHWA's failure to offer a coherent theory is fatal. *See id.* (citing *Louisiana v. U.S. Dep't of Energy*, 90 F.4th 461, 473 (5th Cir. 2024)). "Lacking any rational connection between the Administrator's non-enforcement, state unwillingness to voluntarily reduce emissions, and the Final Rule's benchmarking process, the Administrator has failed to establish 'a rational connection between the facts found and the choice made.'" *Id.* (quoting *State Farm*, 463 U.S. at 43). No wonder FHWA previously admitted that a GHG measure "imposes unnecessary regulatory burdens … with no predictable benefits." ROA.1421.

Unfortunately, the arbitrary-and-capricious nature of the 2023 Final Rule goes even deeper. The rule purports to allow States to establish their own targets, so long as they are declining. ROA.290. FHWA also claims that it "is not requiring State DOTs … to achieve targeted emission reductions." ROA.290; *see also* FHWA.Br.35.

But this approach, presented to the Court (at 36) as "an inducement for voluntary improvement by willing States," in effect serves as a mandate. Despite claiming that failure to *meet* the established targets will not result in a civil penalty, FHWA acknowledged in the proposed rule that a State's failure to *set* declining targets "may be subject to penalties under 23 CFR 1.36." ROA.330, n.39. This statement went unchanged in the final rule. *See* ROA.299. Congress, however, made clear that it is for the States to set performance targets. 23 U.S.C. §150(d). "Nothing in §150(c) or (d) contemplates the Administrator appropriating that target-setting authority by defining performance measure in a way that dictates the choice of targets given states by Congress." *Kentucky*, 2024 WL 1402443 at *9. Without *any* delegation of authority from Congress, FHWA "literally has no power to act," much less grounds to exercise discretion. *Cruz*, 596 U.S. at 301.

**3.**    FHWA also failed to consider the full costs of the 2023 Rule. Under any theory of rationality, a federal agency cannot force States to spend money unless doing so will accomplish something. Yet here, not only are States not obligated to meet FHWA's performance measures, but "FHWA *already has* the factual information needed to calculate the percentage change in annual emissions attributable to the National Highway System." *Kentucky*, 2024 WL 1402443 at *13; *see also id.* (explaining how FHWA obtains the data under other programs). "What, then, is the point of foisting onto the states the requirement to calculate and report the GHG measure? The Administrator never says." *Id.* at *14.

During the notice-and-comment process, Texas raised the issue of costs, ROA.4499-4501, but its concerns were dismissed by FHWA which contended that

the 2023 Rule neither requires specific targets nor imposes penalties. ROA.309. Yet States must spend resources to create targets and file reports. And if a State does not make enough progress (as determined by FHWA) toward achieving its targets, FHWA will require that State to provide "data-supported explanations" and document the actions it will take "to achieve said progress in the future." ROA.299, 305-06. FHWA cannot reasonably claim that the 2023 Rule is merely a paperwork exercise while simultaneously requiring States to identify "actions to be taken" should performance targets not be met.

### B.     The 2023 Rule violates the Spending Clause.

The 2023 Rule is also unconstitutional under FHWA's own reading of the statute. "[W]hen Congress attaches conditions to a State's acceptance of federal funds, the conditions must be set out unambiguously." *Murphy*, 548 U.S. at 296 (quotation omitted). Congress thus must provide "clear notice" of the obligations linked to funding, because "States cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain.'" *Id.* (citation omitted).

Here, Congress has apportioned federal funds amongst the States, including Texas, as part of the NHPP. 23 U.S.C. §104(b). And Congress has established clear requirements to be eligible for NHPP funding. Eligible projects are limited to those that support the national performance goals relating to infrastructure, safety, congestion, reliability, and freight movement, satisfy planning requirements, and meet at least one statutory purpose. *Id.* §119(d). Because of the importance of highway funds, Texas and other States are keenly aware of these conditions.

The 2023 Rule, however, uses Congress's "spending power to functionally commandeer the states." *Texas v. Yellen*, 105 F.4th 755, 767 (5th Cir. 2024). Under FHWA's approach—by which "performance" apparently can include almost anything connected to the NHS, including characteristics of vehicles that simply drive on the highway—the States have no idea what is required. ROA.4499-4501. If FHWA's expansive reading stands, nothing will stop the agency from issuing even more dubious performance measures, leaving the States in the dark as to what conditions may or may not be tied to federal funding in the future. As Judge Hendrix explained, FHWA's view "would untether the [agency's] limitation[s] from the interstate and national-highway systems' infrastructure, instead permitting [it] to require states to measure anything that happens to use or relate in any way to those systems." ROA.4752-4753. That is a far cry from "clear notice."

The federalism problem is obvious. "When the federal government forces state governments to implement a federal program, it foists the blame for the program's 'burdensomeness' and 'defects' onto the States." *Kentucky*, 2024 WL 1402443, at *14 (quoting *Printz v. United States*, 521 U.S. 898, 930 (1997)). Yet the 2023 Rule "seems to neglect these risks—if it's not affirmatively embracing the shifting of accountability for climate-change policy." *Id.* Forcing the States, under penalty of losing highway funds, to enmesh themselves in and add (putative) legitimacy to the Biden Administration's climate agenda is the antithesis of "accountability." *Id.* At a minimum this objection requires the Court to narrowly construe the statute to avoid unconstitutionality. *See supra* pp.26-27. But if, in fact, the statute means what FHWA says, the Court should hold that the 2023 Rule is unconstitutional.

### III.    Judge Hendrix issued appropriate relief under the APA.

Because the 2023 Rule is unlawful, Judge Hendrix "set [it] aside." 5 U.S.C. §706(2). Doing so comports with precedent, and certainly was not an abuse of discretion. Once more, FHWA's counterarguments fail.

### A.    Judge Hendrix appropriately vacated the 2023 Rule.

A court "set[s] aside agency action" by vacating it. *Id.* § 706(2); *see also Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 144 S.Ct. 2440, 2460 (2024) (Kavanaugh, J., concurring). When Congress adopted the APA, "set aside" meant "to cancel, annul, or revoke." Black's Law Dictionary 1612 (3d ed. 1933). Accordingly, the APA "establishes a unique form of judicial review that differs from judicial review of statutes." Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 950 (2018). Vacated agency action is "formally nulli[fied] and revoke[d]," *Data Mktg.*, 45 F.4th at 859 (quoting Mitchell, *supra*, at 950), and therefore cannot be applied against anyone, *see Career Colls.*, 98 F.4th at 255 (vacatur "is not party-restricted"). As Judge Hendrix aptly noted "[t]o vacate is to void." ROA.4774.

This Court has "repeatedly described" vacatur as the "default remedy" for unlawful agency action. *Braidwood Mgmt. Inc., v. Becerra*, 104 F.4th 930, 952 (5th Cir. 2024) (quotations omitted); *see also United Steel v. MSHA*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) ("The ordinary practice is to vacate unlawful agency action."). Departure from the "default rule is justifiable only in 'rare cases' satisfying two conditions." *Chamber of Com. of U.S. v. SEC*, 88 F.4th 1115, 1118 (5th Cir. 2023). These conditions concern "'(1) the seriousness of the deficiencies of the action, that

is, how likely the agency will be able to justify its decision on remand; and (2) the disruptive consequences of the vacatur'" *Texas*, 50 F.4th at 529 (quoting *United Steel*, 925 F.3d at 1287).

Here, Texas requested vacatur rather than seeking a permanent injunction. ROA.29. Judge Hendrix thus correctly followed precedent and concluded that this case calls out for the default Congress set. ROA.4772. This is not a "rare case" meriting an exception from the default remedy, *Chamber of Com.*, 88 F.4th at 1118, because the 2023 Rule was "promulgated in excess of the agency's statutory authority and is therefore substantially deficient," ROA.4769. Nor did FHWA offer a plausible way to cure this flaw—which goes to the heart of the 2023 Rule—if the rule were remanded. ROA.4769. Vacatur also will not be disruptive because the rule has never been "functionally effective." ROA.4769-4770. Indeed, FHWA raised no relevant arguments "on this front." ROA.4769. Judge Hendrix thus followed "Fifth Circuit precedent" and vacated it. ROA.4773-4774 (citing, *inter alia*, *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1033 (5th Cir. 2019); *Texas*, 50 F.4th at 529-30).

### B.    FHWA's counterarguments again fail.

FHWA says little about this Court's framework and nothing about the district court's application of the two factors identified by this Court for when the APA's default remedy might not apply. Instead, FHWA focuses on a court's discretion to choose remedies other than vacatur. That argument is misplaced, especially given the "highly deferential" standard of review, *Alabama-Coushatta*, 918 F.3d at 447, under which FHWA can only prevail if Judge Hendrix's decision is "so unwarranted as to constitute an abuse of discretion," *Northshore Dev.*, 835 F.2d at 582.

**1.**    At the outset, FHWA says nothing about the two *Texas* factors this Court has identified for "deciding whether vacatur is appropriate": (1) "'the seriousness of the deficiencies of the action' or 'how likely it is the agency will be able to justify its decision on remand,'" and (2) "'the disruptive consequences of vacatur.'" ROA.4769 (quoting *Texas*, 50 F.4th at 529). FHWA's failure to brief this issue constitutes forfeiture—indeed, double forfeiture because FHWA also did not adequately address these issues in the district court, ROA.4769. In all events, Judge Hendrix properly assessed these factors and did not abuse his discretion. And because he "conclude[d] that the proper remedy here is vacatur," it follows under this Court's precedent that "relief not limited to the plaintiffs." ROA.4773. Given this Court's decision in *Texas*, that should be the end of the analysis.

Despite failing to address the *Texas* factors, FHWA's argues (at 49-50) that courts ordinarily limit relief to the plaintiff's particular harm. This argument is irrelevant under the rule of orderliness because the Supreme Court has not cast doubt on this Court's precedent, much less "unequivocally overrule[d]" it. *Tech. Automation Servs. Corp. v. Liberty Surplus Ins. Corp.*, 673 F.3d 399, 405 (5th Cir. 2012) (quotation omitted); *see also* ROA.4773 n.18 (courts "cannot ignore existing Fifth Circuit precedent"). This argument is also wrong because FHWA commits a category error. Vacatur is not an injunction, but rather a specialized remedy requiring "invalidation—and an invalid rule may not be applied to anyone." Mila Sohoni, *The Power to Vacate a Rule*, 88 Geo. Wash. L. Rev. 1121, 1173 (2022). Accordingly, "injunction-related case law misses the mark." ROA.4770.

**2.**     Confronted with this Court's precedent, FHWA backtracks (at 51) to say that vacatur is not "mandatory." Judge Hendrix said the same. ROA.4768. But this issue is irrelevant because FHWA does not engage with *Texas*'s holding about when courts can depart from vacatur. And, in any event, "a more limited remedy is not party-specific vacatur," but instead is "some other kind of remedy—'injunctive, declarative, or otherwise.'" ROA.4771 (quoting *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023)).

That latter point is critical because "there is no other clear, more limited remedy requested by the plaintiffs that the Court could grant here that would redress the plaintiffs' injury." ROA.4771. As Judge Hendrix explained, among other things, (1) it is not clear that a court even can issue an injunction where, as here, the plaintiff did not did not seek such relief during the district court's proceedings, ROA.4771 (citing *Peterson v. Bell Helicopter Textron, Inc.*, 806 F.3d 335, 341 (5th Cir. 2015); (2) the federal government failed to adequately brief injunctive relief, ROA.4771-4772 (noting that FHWA did not brief all four injunction factors); (3) regardless, "vacatur is often considered 'a less drastic remedy' than an injunction, so courts typically vacate rather than enjoin," ROA.4772 (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165-66 (2010); and (4) FHWA did "not argue that the Court should grant a declaratory judgment in lieu of vacatur." ROA.4772.

FHWA barely responds to Judge Hendrix's analysis. Indeed, it limits its response (at 56 n.11) to *Peterson* to a footnote. Yet "'[a]rguments subordinated in a footnote are ... waived.'" *Matter of PetroQuest Energy, Inc.*, 54 F.4th 299, 306 n.13 (5th Cir. 2022) (quoting, *inter alia*, *White Glove Staffing, Inc. v. Methodist Hosps. of*

*Dall.*, 947 F.3d 301, 308 (5th Cir. 2020)). Judge Hendrix is also correct that a party should not receive a more drastic remedy like an injunction without asking for it when a less drastic remedy—indeed, the *default* remedy established by Congress— is available. Nor can FHWA raise new arguments after failing to adequately brief the issue of injunctive relief in the district court. ROA.4771-4772. And FHWA does not cite *Monsanto*, let alone rebut Judge Hendrix's analysis—thus forfeiting any argument. Regardless, an injunction carries with it possible contempt and ongoing judicial intervention, while vacatur does not. Judge Hendrix therefore did not abuse his discretion by choosing the "less drastic" option. In fact, this Court has recently faulted a district court for issuing a "universal injunction" precisely because that court had *already* imposed vacatur. *See Braidwood*, 104 F.4th at 935. By contrast, Judge Hendrix here properly imposed vacatur without injunctive relief.

## CONCLUSION

The Court should affirm the district court's judgment in all respects.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENt Webster
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

/s/ Aaron L. Nielson
AARON L. NIELSON
Solicitor General
Aaron.Nielson@oag.texas.gov

WESLEY S. WILLIAMS
IAN LANCASTER
Assistant Attorneys General

Counsel for Plaintiffs-Appellees

## CERTIFICATE OF SERVICE

I certify that on November 1, 2024, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Aaron L. Nielson
AARON L. NIELSON

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,927 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program sued to calculate the word count).

/s/ Aaron L. Nielson
AARON L. NIELSON