No. 24-10470

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

———————————

STATE OF TEXAS; TEXAS DEPARTMENT OF TRANSPORTATION,

*Plaintiffs-Appellees,*

v.

U.S. DEPARTMENT OF TRANSPORTATION; FEDERAL HIGHWAY
ADMINISTRATION; SHAILEN BHATT, in his official capacity, as
Administrator of the Federal Highway Administration; PETE BUTTIGIEG,
in his official capacity, as Secretary of Transportation,

*Defendants-Appellants.*

———————————

On Appeal from the United States District Court
for the Northern District of Texas

———————————

## REPLY BRIEF FOR DEFENDANTS-APPELLANTS

———————————

SUBASH IYER
 *Acting General Counsel*
CHARLES E. ENLOE
 *Assistant General Counsel for
  Litigation and Enforcement*
EMILY KVESELIS
 *Trial Attorney
 U.S. Department of Transportation*

J. AYANNA BUTLER
 *Chief Counsel*
CHRISTOPHER RICHARDSON
 *Assistant Chief Counsel, Legislation,
  Regulations & General Law Division*
LEV GABRILOVICH
 *Senior Attorney Advisor,
  Program Legal Services Division
  Federal Highway Administration*

BRIAN M. BOYNTON
 *Principal Deputy Assistant
  Attorney General*

MICHAEL S. RAAB
JEFFREY E. SANDBERG
 *Attorneys, Appellate Staff
 Civil Division, Room 7214
 U.S. Department of Justice
 950 Pennsylvania Avenue NW
 Washington, DC 20530
 (202) 532-4453*

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY ........................................................ 1

ARGUMENT ...................................................................................... 3

I.    THE RULE IS WITHIN FHWA'S STATUTORY AUTHORITY ....... 3

    A.    FHWA Permissibly Exercised Its General Authority To
        Establish Performance Measures. ................................................. 3

    B.    The Rule Is Not Arbitrary And Capricious. ............................... 20

    C.    The Rule Does Not Violate The Spending Clause. ..................... 23

II.    THE DISTRICT COURT ERRED IN BELIEVING IT HAD NO
     OPTION BUT TO ORDER UNIVERSAL VACATUR ..................... 25

CONCLUSION ...................................................................................... 31

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:**                                                                    **Page(s)**

*Ali v. Federal Bureau of Prisons,*
  552 U.S. 214 (2008) ................................................................... 12

*Azar v. Allina Health Servs.,*
  587 U.S. 566 (2019) ................................................................... 11

*Arizona v. Thompson,*
  281 F.3d 248 (D.C. Cir. 2002) ................................................... 26

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers,*
  781 F.3d 1271 (11th Cir. 2015) ................................................. 27

*Board of Cty. Comm'rs of Weld Cty. v. EPA,*
  72 F.4th 284 (D.C. Cir. 2023) .................................................... 19

*Bostock v. Clayton Cty.,*
  590 U.S. 644 (2020) ..................................................................... 9

*Bourque v. State Farm Mut. Auto. Ins. Co.,*
  89 F.4th 525 (5th Cir. 2023) ..................................................... 26

*Cargill v. Garland,*
  57 F.4th 447 (5th Cir. 2023) (en banc), *aff'd*, 602 U.S. 406 (2024) ............. 27

*Clean Water Action v. U.S. EPA,*
  936 F.3d 308 (5th Cir. 2019) ..................................................... 20

*Cummings v. Premier Rehab Keller, P.L.L.C.,*
  596 U.S. 212 (2022) ................................................................... 23

*Department of Commerce v. New York,*
  588 U.S. 752 (2019) ................................................................... 22

*FCC v. Prometheus Radio Project,*
  592 U.S. 414 (2021) ................................................................... 20

*Gill v. Whitford,*
  585 U.S. 48 (2018) ..................................................................... 25

*Gundy v. United States,*
  588 U.S. 128 (2019) ..................................................................... 4

*Johnson v. U.S. Office of Pers. Mgmt.*,
　783 F.3d 655 (7th Cir. 2015) ........................................................ 27

*Kentucky v. FHWA*, No. 5:23-cv-162,
　2024 WL 1402443 (W.D. Ky. Apr. 1, 2024),
　*on appeal*, No. 24-5532 (6th Cir.) .................................. 19, 26-27, 28, 29, 30

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
　591 U.S. 657 (2020) ...................................................................... 9

*Loper Bright Enters. v. Raimondo*,
　144 S. Ct. 2244 (2024) ........................................... 4, 7, 8, 18, 24

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*,
　463 U.S. 29 (1983) ...................................................................... 20

*New Hampshire Lottery Commission v. Rosen*,
　986 F.3d 38 (1st Cir. 2021) .......................................................... 27

*Nuziard v. Minority Bus. Dev. Agency*,
　721 F. Supp. 3d 431 (N.D. Tex. 2024) .......................................... 28

*Pennhurst State Sch. & Hosp. v. Halderman*,
　451 U.S. 1 (1981) ........................................................................ 24

*Republic of Sudan v. Harrison*,
　587 U.S. 1 (2019) ........................................................................ 10

*Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.*,
　120 F.4th 494 (5th Cir. 2024) ...................................................... 26

*United States v. Transocean Deepwater Drilling, Inc.*,
　767 F.3d 485 (5th Cir. 2014) ........................................................ 18

*United States ex rel. Polansky v. Exec. Health Res., Inc.*,
　599 U.S. 419 (2023) .................................................................... 11

**Statutes:**

5 U.S.C. § 703 .............................................................................. 27

23 U.S.C. § 119 ............................................................................ 15

23 U.S.C. § 119(b)(4) ............................................................. 5, 14, 21

23 U.S.C. § 119(d)(2) ........................................................ 16

23 U.S.C. § 134(a)(1), (h)(1)(E), (I), (2)(A) ....................... 5

23 U.S.C. § 135(d)(1)(E), (I), (2)(A) ................................. 5

23 U.S.C. § 150 ..................................................... *passim*

23 U.S.C. § 150(a) .......................................... 1, 3, 11

23 U.S.C. § 150(b) ................................. 3, 4, 5, 14, 15

23 U.S.C. § 150(b)(1)-(7) ............................................... 1

23 U.S.C. § 150(b)(1) ................................................. 13

23 U.S.C. § 150(b)(2) ................................................. 11

23 U.S.C. § 150(b)(4) ............................................. 13, 15

23 U.S.C. § 150(b)(5) ................................................. 17

23 U.S.C. § 150(b)(6) ........................................... 1, 5, 17

23 U.S.C. § 150(b)(7) ................................................. 17

23 U.S.C. § 150(c) ................................... 3, 4, 10, 11

23 U.S.C. § 150(c)(1) ................................................... 1

23 U.S.C. § 150(c)(2)(C) ............................................... 9

23 U.S.C. § 150(c)(3) ............................................... 4, 6

23 U.S.C. § 150(c)(3)(A)(ii)(I)-(III) ......................... 1, 4, 12

23 U.S.C. § 150(c)(3)(A)(ii)(IV)-(V) ....................... *passim*

23 U.S.C. § 150(c)(3)(A)(iii)-(iv) ..................................... 1

23 U.S.C. § 150(c)(4) ........................................ 1, 6, 11, 13

23 U.S.C. § 150(c)(5) ........................................... 1, 6, 16

23 U.S.C. § 150(c)(5)(B) ............................................. 16

23 U.S.C. § 150(c)(6) ........................................... 1, 6, 11

23 U.S.C. § 150(d) ..................................................... 3

23 U.S.C. § 150(e) ............................................................. 3

23 U.S.C. § 175(a)(2) ...................................................... 15

23 U.S.C. § 175(b)-(c) ..................................................... 15

23 U.S.C. § 315 ................................................................ 8

**Regulations:**

88 Fed. Reg. 85,364 (Dec. 7, 2023) ..................................... *passim*

23 C.F.R. § 490.507(a)(1)-(2) ......................................... 13

23 C.F.R. § 490.515................................................................ 19

**Other Authorities:**

Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* (2012)............ 4-5

## INTRODUCTION AND SUMMARY

In 2012, Congress "transform[ed] the Federal-aid highway program," enacting seven "national transportation goals" upon which to "refocus[]" planning of federally funded State highway projects.  23 U.S.C. § 150(a); *see id.* § 150(b)(1)-(7).  To evaluate progress toward those goals, Congress directed the Federal Highway Administration (FHWA) to develop "performance measures and standards."  *Id.* § 150(c)(1).  Congress not only specifically mandated measures on various discrete topics, *id.* § 150(c)(3)(A)(ii)(I)-(III), (iii)-(iv), (4)-(6), but also directed FHWA to conceive additional measures of the agency's own design for evaluating the "performance" of the "National Highway System" and "Interstate System" in the context of the National Highway Performance Program (NHPP).  *Id.* § 150(c)(3)(A)(ii)(IV)-(V).

Pursuant to that latter authority, FHWA promulgated the Rule at issue here, which establishes a performance measure for on-road tailpipe $CO_2$ emissions on the National Highway System (the greenhouse gas (GHG) measure).  *See* 88 Fed. Reg. 85,364 (Dec. 7, 2023) (Rule).  The GHG measure furthers Congress's expressly enacted goal of "environmental sustainability," 23 U.S.C. § 150(b)(6), by making available timely, convenient, nationally consistent information that States may, at their option, consult in making planning decisions.  The Rule also calls upon States to adopt declining targets

for that measure, which States set based on their own "policies and priorities"; the Rule "neither requir[es] any specific targets nor mandat[es] any penalties for failing to achieve" them. 88 Fed. Reg. at 85,367-69.

Our opening brief discussed at length the errors in the district court's analysis. Plaintiffs' response brief simply repeats those mistakes. There is no basis in the text of Subclauses (IV)-(V) to read it to exclude considerations of "environmental performance," Response Br. for Appellees (Br.) 19, or to be solely limited to "a road's physical characteristics," Br. 33. Plaintiffs' repeated emphasis on the need to read statutory provisions in context—and to give the same term a consistent meaning throughout the whole statute—simply provides more support for the agency's interpretation of "performance."

Plaintiffs fare no better in their alternative contentions that the Rule is arbitrary and capricious or exceeds Spending Clause authority. Both arguments rest largely on the misimpression that the Rule compels States to reduce emissions. As explained, although the Rule provides an important first step in encouraging voluntary action by States, the Rule itself does not compel emissions reductions, nor does it threaten to withhold any funding from States that fail to achieve them. In so doing, the Rule simply adheres to the statute.

In all events, the district court's merits conclusions did not justify the relief it imposed: vacatur of the Rule as to all States. Plaintiffs did not demand

universal relief; defendants expressly opposed it; and the district court itself considered it a "disfavored" solution. ROA.4773 n.18. The court nonetheless felt constrained to impose it based on the assumption that other forms of relief were procedurally foreclosed by plaintiffs' failure to propose them.

That assumption was erroneous, and plaintiffs do not seriously contend otherwise. Instead, they urge that the district court had discretion to fashion an appropriate remedy. But the court here misunderstood that very principle. As our opening brief explained, universal vacatur is not a permissible option here, but even if it is, the Court should vacate and remand so the district court can exercise its informed discretion.

## ARGUMENT

## I.    THE RULE IS WITHIN FHWA'S STATUTORY AUTHORITY

### A.    FHWA Permissibly Exercised Its General Authority To Establish Performance Measures.

**1.** This case involves interpretation of 23 U.S.C. § 150. That statute has a straightforward logical structure—it establishes a system of "[p]erformance management" that will "refocus[] on national transportation goals," *id.* § 150(a); it then articulates seven specific national goals, *id.* § 150(b); it directs and empowers FHWA to develop various performance measures for States to use, *id.* § 150(c); and it instructs States to set targets for those measures, *id.* § 150(d), on which they then periodically report, *id.* § 150(e).

At issue here is the scope of FHWA's authority to develop performance measures for the NHPP under section 150(c)(3). That subsection expressly requires measures on several topics. *See* 23 U.S.C. § 150(c)(3)(A)(ii)(I)-(III) (requiring measures for "the condition of pavements" and "the condition of bridges" on the National Highway System). But it also further directs FHWA to create other measures for assessing "the performance of the Interstate System" and "the performance of the National Highway System (excluding the Interstate System)" more generally. *Id.* § 150(c)(3)(A)(ii)(IV)-(V). These latter provisions—which the parties refer to as Subclauses (IV)-(V)—are indisputably "general" in scope. ROA.4733. And because they do not specify what particular "performance" measures to adopt, they require FHWA to exercise its reasonable policy judgment. *See Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2263 (2024) (explaining that, even as a court must independently interpret the statute, "the statute's meaning may well be that the agency is authorized to exercise a degree of discretion").

Though Congress did not expressly define "performance" as used in Subclauses (IV)-(V), that concept readily finds meaning in the seven national goals set forth in section 150(b), which are "'an appropriate guide' to the 'meaning of the statute's operative provisions.'" *Gundy v. United States*, 588 U.S. 128, 142 (2019) (plurality op.) (brackets omitted) (quoting Scalia &

Garner, *Reading Law: The Interpretation of Legal Texts* 220 (2012)).  Among those goals is "environmental sustainability," meaning "[t]o enhance the performance of the transportation system while protecting and enhancing the natural environment."  23 U.S.C. § 150(b)(6).

As discussed in our opening brief (at 31-32), section 150(c) mandates many performance measures that obviously relate to one or more of the goals set forth in section 150(b).  For other goals, Congress left to FHWA's discretion how best to track progress within the performance-management regime.  Congress also no doubt expected that FHWA would, in formulating performance measures under its Subclause (IV)-(V) authority, consider the measures' potential utility when implementing other statutory provisions governing the NHPP and related programs throughout Title 23.  *See, e.g.*, 23 U.S.C. § 119(b)(4) (establishing statutory purpose of NHPP to "mitigate the cost of damages" associated with events likely caused or exacerbated by climate change; *id.* §§ 134(a)(1), (h)(1)(E), (I), (2)(A), 135(d)(1)(E), (I), (2)(A) (noting "national interest" in "minimizing transportation-related fuel consumption and air pollution" and requiring States and metropolitan planning organizations (MPOs) to "protect and enhance the environment [and] promote energy conservation" and otherwise "support the national goals described in section 150(b)" in their planning processes).

As explained in our opening brief (at 33-36), FHWA reasonably invoked its discretionary Subclause (IV)-(V) authority in promulgating the GHG measure. "[M]easuring environmental performance of the Interstate and non-Interstate [National Highway System] is vital" given the "statutory goal of environmental sustainability." 88 Fed. Reg. at 85,367. "[T]ransportation contributes significantly to the causes of climate change, representing the largest source of U.S. $CO_2$ emissions[.]" *Id.* at 85,365 (footnote omitted). In turn, the "increases in heavy precipitation, coastal flooding, heat, wildfires, and other extreme events" caused by climate change "threaten the reliability, safety, and efficiency of the transportation system." *Id.* at 85,364, 85,368; *see id.* at 85,370 ("transportation sector is increasingly vulnerable" to carbon emissions).

As FHWA explained, "[t]he first step toward reducing GHG emissions involves inventorying and monitoring those emissions." 88 Fed. Reg. at 85,365. That data-driven exercise then assists willing States with efforts to weigh environmental sustainability, among other goals, when selecting highway projects and planning implementation of related federal programs. Indeed, the GHG measure serves the same general purpose as other performance measures promulgated under 23 U.S.C. § 150(c)(3)-(6): not to

force particular outcomes, but rather, to facilitate voluntary accomplishment of shared transportation goals.

**2.**  As our opening brief explained at length, the district court erred in finding the GHG measure beyond the agency's authority.  In response, plaintiffs press various arguments that are either non-responsive to the interpretive analysis or are affirmatively helpful to FHWA's position.

Plaintiffs' principal submission is the truism that because "[f]ederal agencies 'cannot act without congressional authorization,'" Br. 1, FHWA "'literally has no power to act … unless and until Congress authorizes it to do so,'" Br. 32.  FHWA agrees:  in issuing the Rule, it relied on express statutory authority under Subclauses (IV)-(V).  The scope of that authority is determined *de novo* by a court, *see generally Loper Bright*, 144 S. Ct. 2244, and an agency must remain within the bounds of authority conferred.  But the basic point that an agency must act pursuant to express authority says nothing about how to interpret the express authority that is indisputably involved here.

Plaintiffs contend that FHWA "asks this Court to disregard *Loper Bright*," Br. 17; *see* Br. 28-30, but fail to acknowledge that decision's important lessons.  Courts must "exercise independent judgment in determining the meaning of statutory provisions" and must "determine the best reading of the statute" rather than merely "declar[e] a particular party's reading

'permissible.'" *Loper Bright*, 144 S. Ct. at 2262, 2266.  But "the best reading of a statute" may be that "the agency is authorized to exercise a degree of discretion," as when agencies "prescribe rules to 'fill up the details' of a statutory scheme" through the exercise of policy judgment.  *Id.* at 2263.  In that instance, the "role of the reviewing court" is not to substitute its own policy judgment, but instead, to "'fix[] the boundaries of the delegated authority'" and "ensur[e] the agency has engaged in 'reasoned decisionmaking' within those boundaries."  *Id.* (brackets omitted).

That is the case here—as confirmed by the logic of plaintiffs' own arguments.  Subclauses (IV)-(V) require FHWA to promulgate additional measures for the "performance of the National Highway System."  23 U.S.C. § 150(c)(3)(A)(ii)(IV)-(V); *cf.* 23 U.S.C. § 315 (authorizing FHWA to "promulgate all needful rules and regulations for the carrying out of the provisions of [Title 23]").  Plaintiffs agree that "[t]he key term in Subclauses (IV)-(V) is 'performance,'" Br. 20, but "Section 150 does not 'define 'performance,'" Br. 6.  Rather, FHWA has "discretion to decide *which* 'performance' measures to require," Br. 17, and to "mold[] the details of the measures," Br. 30.  Indeed, plaintiffs themselves hypothesize various measures they believe FHWA could—if desired, at its initiative—promulgate under Subclauses (IV)-(V).  *See* Br. 33 (endorsing possible measures concerning

"traffic congestion," "the condition of traffic signs," or "the number of emergency offramps").

The parties' agreement that Subclauses (IV)-(V) is a source of discretionary authority refutes much of plaintiffs' own argument. Plaintiffs repeatedly emphasize (*e.g.*, Br. 8, 32, 33) that Subclauses (IV)-(V) do not by their terms specifically demand the creation of a GHG measure. But that is equally true of the alternative measures that plaintiffs endorse, or of the travel-time reliability measure that the agency in fact has promulgated (*see infra* pp. 12-13). There is no "such thing as a 'canon of donut holes,' in which Congress's failure to speak directly" to one potential application of a statute "creates a tacit exception" barring that application. *Bostock v. Clayton Cty.*, 590 U.S. 644, 669 (2020). Rather, general language implies general authority. A court may not "impos[e] limits on an agency's discretion that are not supported by the text." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 677 (2020).

Plaintiffs' recognition of this discretionary authority also undermines their heavy reliance (Br. 5, 19-20, 30, 32-33) on the proviso instructing FHWA to "limit performance measures only to those described in this subsection." 23 U.S.C. § 150(c)(2)(C). Subclauses (IV)-(V) appear "in this subsection" (*i.e.*, section 150(c)). *Id.* That proviso of course constrains FHWA's ability to

9

establish novel measures that cannot be traced to delegated authority, but it does not prevent FHWA from relying on authority that Congress has conferred.  Congress's conscious provision of general authority to elaborate additional "performance" measures for the NHPP, but not for the other Federal-aid highway programs addressed by section 150(c), must be given meaningful effect.  *See, e.g.*, *Republic of Sudan v. Harrison*, 587 U.S. 1, 12 (2019) ("'Congress generally acts intentionally when it uses particular language in one section of a statute but omits it in another.'").

**3.**  Plaintiffs fall back to contesting the scope rather than existence of FHWA's discretionary authority under Subclauses (IV)-(V), but their arguments on this score fare no better.  Plaintiffs posit that the phrase "performance of the National Highway System" should be interpreted narrowly as speaking only to the physical condition of infrastructure without any connection to "vehicles using the [National Highway System]," Br. 21; *see* Br. 17 (distinguishing "cars that drive on the NHS" and "the NHS itself").  But the interpretive principles that plaintiffs invoke in fact cut directly against their position.

As plaintiffs correctly emphasize, context is a "'primary determinant of meaning,'" Br. 24, and courts "should try to give the same word the same meaning 'across the same section of a statute,'" Br. 23; *see also* Br. 37 (citing

*Azar v. Allina Health Servs.*, 587 U.S. 566, 574 (2019)).  Here, what all agree is the "key term" in Subclauses (IV)-(V)— "performance"—appears throughout Section 150.  Under everyone's logic, then, "performance" should carry the same meaning in Subclauses (IV)-(V) as it bears throughout the statute.

Read as a whole, section 150 demonstrates that Congress understood "performance" to be multifaceted and to extend to matters beyond mere physical "condition" of roadways.[1]  From the outset, Congress declares that "[*p*]*erformance* management will transform the Federal-aid highway program" through "refocusing" on seven "national transportation goals," only one of which ("infrastructure condition") relates exclusively to physical assets. 23 U.S.C. § 150(a), (b)(2).  Similarly, FHWA must "establish[] *performance* measures and standards" pertaining to an array of topics, *id.* § 150(c), most of which also involve consideration or measurement of the vehicles using the system.  *See, e.g.*, *id.* § 150(c)(4) (safety); *id.* § 150(c)(6) (freight movement).

Instead of considering the statute as a whole, plaintiffs focus solely on the three subclauses preceding Subclauses (IV)-(V), which the district court

---

[1] Certainly, context can provide no support for plaintiffs' suggestion that "performance" should be construed the same as "condition."  Br. 22.  The very fact that Congress used both "condition" and "performance" as distinct terms—and deployed them separately throughout the statute—demonstrates that those concepts should be given different meanings.  *See United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 432 (2023) ("'[E]very clause and word of a statute' should have meaning.'").

understood to "'relate expressly to physical conditions.'" Br. 22 (quoting ROA.4751). But those three subclauses are logically and legally distinct. Subclauses (I)-(III) specifically mandate—regardless of FHWA's own priorities—the creation of performance measures for pavement and bridge "condition." Subclauses (IV)-(V), in turn, direct FHWA to devise additional "performance" measures that the agency itself adjudges to be appropriate as a matter of its own policy judgment.

Contrary to plaintiffs' assumption, courts "do not woodenly apply limiting principles every time Congress includes a specific example along with a general phrase." *Ali v. Federal Bureau of Prisons*, 552 U.S. 214, 227 (2008). That caution applies with maximum force where, as here, the purportedly related terms actually appear in separately numbered statutory provisions and use distinct language (addressing "condition" in the former subclauses, and "performance" in the latter). As previously explained (Opening Br. 41-42), the more appropriate inference is that, by enacting Subclauses (IV)-(V) as freestanding provisions, Congress intended them to operate distinctly from the specifically mandated measures set forth in Subclauses (I)-(III).

Plaintiffs' argument that performance measures promulgated under Subclauses (IV)-(V) must be limited to physical characteristics is also inconsistent with other unchallenged agency practice (as well as with plaintiffs'

12

own proposed "traffic congestion" measure, *see supra* p. __).  In 2017, FHWA

relied upon Subclauses (IV)-(V) to promulgate measures for "travel time

reliability," *i.e.*, the consistency of traffic flow hour-to-hour and day-to-day.

*See* 23 C.F.R. § 490.507(a)(1)-(2).  FHWA reasoned that this measure, though

of course not expressly required by statute, was an appropriate measure of

"performance" under Subclauses (IV)-(V) in part because it furthered the

congressionally enacted national goal of "system reliability," meaning "[t]o

improve the efficiency of the surface transportation system." 23 U.S.C.

§ 150(b)(4).  Yet that measure tracks the experience of vehicles transiting the

National Highway System, not the condition of physical infrastructure.

Of course, performance measures must meaningfully relate to the

functioning of the National Highway System.  Plaintiffs are correct that

FHWA has no authority to address solely "the characteristics of vehicles rather

than of highways."  Br. 33.  But the GHG measure does not purport to address

the "emissions profile" of particular vehicles.  Br. 16.  Rather, it is a measure of

aggregate emissions associated with use of the National Highway System.

Just as Congress has tasked FHWA with tracking aggregate safety outcomes

without empowering it to impose safety standards on individual cars, *cf.*

23 U.S.C. § 150(b)(1), (c)(4), FHWA can lawfully measure aggregate

environmental effects of, and impacts upon, the National Highway System without encroaching upon other agencies' regulation of vehicle emissions.

Plaintiffs are also quite wrong to suggest that FHWA has assumed authority to promulgate performance measures for "'anything that happens to use or relate in any way'" to federal highways.  Br. 22 (quoting ROA.4752-53).  Nothing in the agency's statutory analysis (*see* 88 Fed. Reg. at 85,367-69) suggests that the agency believes itself authorized to promulgate performance measures concerning, for example, the extent of "union labor" employed on highway projects.  Br. 34.  Unlike environmental sustainability, promoting labor unions is not one of Congress's national transportation goals, *cf.* 23 U.S.C. § 150(b), and it is also not apparent how increasing union employment would do anything to support efforts to enhance the resiliency of the National Highway System, *cf.* 23 U.S.C. § 119(b)(4).

**4.**  Plaintiffs commit a similar series of interpretive errors in positing, in the alternative, that "performance" should at least be read to exclude "environmental performance."  *E.g.*, Br. 19.  As explained, the concept of "performance" in section 150 is general, multifaceted, and appropriately informed by Congress's expressly enacted national goals, including but not limited to "environmental sustainability."  There is no greater basis to exclude environmental-performance concerns from Subclauses (IV)-(V) than to exclude

concerns about, for example, "system reliability," "freight movement and economic vitality," or "reduced project delivery delays." 23 U.S.C. § 150(b)(4)-(5), (7).

Plaintiffs suggest that categorical exclusion of environmental concerns should be acceptable because other substantive provisions of Title 23 could serve Congress's stated environmental purpose, but that is a non sequitur. Section 150 was enacted precisely because Congress was no longer satisfied with assuming its goals would be fulfilled by the ordinary operation of Title 23, but instead desired a performance-management scheme to track progress. The national goals set forth in 150(b) are at the very heart of section 150's performance-management scheme. And to the extent "'other portions of the statute'" (Br. 38) also demonstrate Congress's commitment to environmental goals, that only underscores the utility of creating a GHG performance measure—*e.g.*, by informing States' planning under the Carbon Reduction Program, which provides tens of billions of dollars for projects to reduce "carbon dioxide emissions from on-road highway sources." 23 U.S.C. § 175(a)(2); *see id.* § 175(b)-(c).

Plaintiffs' erroneous conflation of the performance-management statute with substantive provisions is also reflected in its arguments about 23 U.S.C. § 119, governing the NHPP. It is true that projects under section 119 must

satisfy various criteria, including "meet[ing] at least one of nineteen enumerated operative purposes" in section 119(d)(2). Br. 4. But emissions reduction does not itself have to be an eligible project type in order for a State to consider that goal when carrying out the NHPP. The very point of the performance-management regime is not to authorize new types of projects, but rather, to inform the States' exercise of discretion when selecting among projects otherwise eligible by statute. *See, e.g.*, Opening Br. 47 n.10 (examples of ways States could consider emissions in choosing among eligible projects).

When plaintiffs do turn their attention to the performance-management regime, they draw inferences that are simply unwarranted. Plaintiffs note that 23 U.S.C. § 150(c)(5) directs that "[f]or the purpose of carrying out section 149"—the Congestion Mitigation and Air Quality (CMAQ) program—FHWA shall "establish measures for States to use to assess … on-road mobile source emissions." 23 U.S.C. § 150(c)(5)(B). But as already explained (Opening Br. 42-44), that authority is legally and logically distinct. The CMAQ measure quantifies a different type of performance (the outcomes of specific funded projects); tracks only non-GHG pollutants (those governed by the Clean Air Act); and addresses only risks to public health, not to the resiliency of federal highways. Congress did not silently divest FHWA of authority to promulgate emissions-related measures for the NHPP simply by requiring distinct

16

emissions measures under a different program.  If anything, the fact that Congress considered it useful to measure emissions in assessing the performance of the CMAQ program only supports the reasonableness of FHWA's conclusion that emissions-related measures could also prove useful in assessing the performance of other Federal-aid highway programs.

Finally, plaintiffs incorrectly argue that FHWA's reading of the statute would render "incomprehensible" section 150(b)(6), which declares Congress's goal "[t]o enhance the performance of the transportation system while protecting and enhancing the natural environment."  23 U.S.C. § 150(b)(6). Plaintiffs illogically assert that "[i]f Congress intended 'performance' to include 'protecting and enhancing the natural environment' … then § 150(b)(6) would read: 'To enhance the protection and enhancement of the natural environment while protecting and enhancing the natural environment."  Br. 24.  But the most reasonable reading of section 150(b)(6) is not that Congress saw some conceptual opposition between "performance" and "protect[ing]" the environment; rather, Congress was affirming its intention that all of the multifarious aspects of performance (*e.g.*, safety, freight movement, pavement condition, etc.) should not be pursued in a manner unduly detrimental to environmental goals.  In all events, the GHG measure is not a substantive initiative to "protect[] and enhanc[e] the environment"; it is a measure to track

a major threat to the resiliency of the National Highway System, which itself sustains damage from the emissions that its functioning produces.

**5.**  Plaintiffs' remaining assertions also fail.  Plaintiffs complain that FHWA "dismiss[es] each individual piece of [the district court's] analysis without stepping back and looking at the totality."  Br. 31.  But it is FHWA's interpretation, not plaintiffs', that results in a "'symmetrical and coherent regulatory scheme.'"  Br. 34 (quoting *United States v. Transocean Deepwater Drilling, Inc.*, 767 F.3d 485, 495 (5th Cir. 2014)).  Plaintiffs' desultory, kitchen-sink approach—leaping from one unwarranted inference or proposed constraint to the next—does not add up to a single, consistent "best reading."

Plaintiffs misread *Loper Bright* in suggesting that FHWA's interpretation of Subclauses (IV)-(V) violates a purported "anti-flipflopping rule."  Br. 27.  As discussed, while *Loper Bright* emphasizes that statutes have a fixed meaning, sometimes that meaning is that agencies are allowed to exercise policy judgment.  Changes in policy are permissible—and, from the perspective of democratic accountability, may well be desirable—so long as an agency stays within legal bounds.[2]  And those bounds do not change simply because, as

---

[2] Plaintiffs' observation that section 150 was "enacted in 2012 during a period of divided government," Br. 26, only underscores the point.  Rather than force legislative agreement as to every specific performance measure for every Federal-aid highway program, Congress left to presidentially

*Continued on next page.*

plaintiffs emphasize (Br. 8, 27-28), the 2018 Rule had given Subclauses (IV)-(V) an unduly narrow interpretation. With the demise of *Chevron* deference, an agency's mistakenly narrow reading of a statute cannot bind a court any more than a mistakenly broad one.

Finally, plaintiffs note the fact that the 2023 Rule not only promulgates a GHG measure, but also directs States to "set declining targets." Br. 1. The district court in the parallel *Kentucky* litigation found the 2023 Rule invalid for that reason. *See Kentucky v. FHWA*, No. 5:23-cv-162, 2024 WL 1402443 (W.D. Ky. Apr. 1, 2024), *on appeal*, No. 24-5532 (6th Cir.). As explained at length in appellate briefing in *Kentucky*, FHWA did not exceed the bounds of its authority in calling upon States to set declining targets. But even if it did, that requirement is severable from the remainder of the rule. *See* 23 C.F.R. § 490.515 (Rule's express severability clause); *see, e.g., Board of Cty. Comm'rs of Weld Cty. v. EPA*, 72 F.4th 284, 296 (D.C. Cir. 2023) ("[R]egulations—like statutes—are presumptively severable[.]").

---

accountable policy judgment the question of what "performance" measures to adopt for the NHPP under Subclauses (IV)-(V).

**B.      The Rule Is Not Arbitrary And Capricious.**

Implicitly recognizing the flaws in their statutory arguments, plaintiffs invite this Court to affirm on the basis that the Rule was arbitrary and capricious (Br. 40-44), but those arguments are similarly meritless.

**1.**  "The scope of review under the 'arbitrary and capricious' standard is narrow[.]"  *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  This Court does not "'substitute its judgment for that of the agency,'" *Clean Water Action v. U.S. EPA*, 936 F.3d 308, 316 (5th Cir. 2019), but instead "simply ensures that the agency has acted within a zone of reasonableness," *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

The Rule here is both "reasonable and reasonably explained."  *Id.* Its lengthy preamble sets forth the Rule's purpose, its benefits and costs, and its inherent limits given the statutory design.  *See* 88 Fed. Reg. at 85,364-88. As FHWA explained, the GHG measure is a vital measure of environmental performance because "transportation"—in particular "on-road mobile source[s]"—"contributes significantly to the causes of climate change, representing the largest source of U.S. $CO_2$ emissions."  88 Fed. Reg. at 85,364-65 (footnote omitted).  In turn, "the transportation sector is increasingly vulnerable to the effects of climate change including higher temperatures, more frequent and intense precipitation, and sea level rise," inasmuch as "[m]uch of

existing transportation infrastructure was designed and constructed without consideration of these [climate] changes." *Id.* at 85,370.  And one of the core objectives of the NHPP is to "increase the resiliency of the National Highway System to mitigate the cost of damages" from climate change.  23 U.S.C. § 119(b)(4).  The federal government and States have a shared interest in reducing emissions to forestall those adverse effects.

The Rule provides meaningful support for that effort.  It does not itself compel any reduction in emissions.  Rather, consistent with FHWA's other performance measures, "[t]he first step toward reducing GHG emissions involves inventorying and monitoring those emissions."  88 Fed. Reg. at 85,371.  "A key premise underlying the GHG measure is that measuring and reporting complete, consistent, and timely information on $CO_2$ emissions from on-road mobile sources will provide opportunities for all levels of government and the public to make more informed decisions."  *Id.* at 85,379.  In particular, the Rule will help to better "inform tradeoffs among competing policy choices" when States are making plans and choosing projects.  *Id.* at 85,365.

Given statutory limitations, FHWA explained that the Rule cannot "require" States to select "projects that will reduce GHG emissions."  88 Fed. Reg. at 85,375.  But it indicated that it and other agencies stand ready to support States' voluntary efforts, including by "help[ing] [them] effectively

use" the $27 billion in federal funds for reducing GHG emissions included in the 2022 Bipartisan Infrastructure Law. *Id.* at 85,368, 85,379. And even for States that do not prioritize emissions, their data and reporting will prove valuable for other States in their efforts to understand the consequences of different policies and to identify "the most effective programs, strategies, and projects." *Id.* at 85,377.

**2.** Plaintiffs' lightly developed arguments identify no unreasonableness in the Rule. Plaintiffs assert that the Rule "relies upon factors … that Congress did not intend FHWA to consider." Br. 17; *see* Br. 41. But they cite only the Administration's general goal of achieving net-zero emissions by 2050, and the final Rule expressly does *not* require States to align themselves with that goal. *See* 88 Fed. Reg. at 85,380 (noting that "FHWA has removed th[at] proposed requirement"). In any event, there is nothing wrong with an agency advancing the President's goals. "[A] court may not set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by an Administration's priorities." *Department of Commerce v. New York*, 588 U.S. 752, 781 (2019).

There is also no basis for plaintiffs' assertion that FHWA failed to adequately weigh the Rule's benefits and costs. They complain (Br. 42) that it is uncertain how much the Rule will ultimately yield real-world performance

improvements. But that uncertainty is an inherent feature of the statute, which seeks to induce voluntary cooperation by States by sharing useful information, not by forcing particular outcomes. And as to costs, plaintiffs do not seriously that FHWA reasonably valued the outlays associated with the Rule's data-calculation and target-setting activities, nor do they deny that FHWA consciously worked to reduce States' costs by designing the GHG measure to require only simple calculations and familiar data inputs. 88 Fed. Reg. at 85,371, 85,377, 85,386-87.

Plaintiffs protest that States will incur costs if they do endeavor to reduce emissions. Br. 43. But neither the Rule nor the statute themselves "force States to spend money" on emissions reductions (*id.*) or penalize States for failing to meet emissions targets. Rather, the Rule requires only that States calculate the GHG measure and set targets. Plaintiffs' fears that the Rule will lead to "lost highway funding" (Br. 11) are baseless.

### C.    The Rule Does Not Violate The Spending Clause.

Plaintiffs are also wrong to hypothesize a Spending Clause problem. "Congress has broad power under the Spending Clause of the Constitution to set the terms on which it disburses federal funds." *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 216 (2022). "[L]egislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal

funds, the States agree to comply with federally imposed conditions."
*Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). As with actual
contractual obligations, a state must "voluntarily and knowingly accept[] the
terms" attached to federal funding for those terms to be enforceable. *Id.*

Nothing about the Rule or section 150 violates those principles.
As plaintiffs do not dispute, Congress may—but need not—award federal
money to States to build and maintain their highways. In so choosing,
Congress may permissibly establish goals for federal highway spending, and it
may create a performance-management regime to track progress toward
achieving those goals. Congress may also, subject to constitutional limitations,
delegate to agencies the power to "'fill up the details'" of that regime. *Loper
Bright*, 144 S. Ct. at 2263.

Plaintiffs argue that it would violate the Spending Clause to withhold
funds based upon States' failure to reduce emissions. Again, however, States
do not risk funding for failing to meet GHG targets. The Rule expressly states
that "[t]he FHWA is neither requiring any specific targets *nor mandating any
penalties for failing to achieve these targets*." 88 Fed. Reg. at 85,367 (emphasis
added). Because States' NHPP funding is not at risk for failure to meet their
GHG targets, there is no funding "condition" to analyze for statutory clarity.

Nor is the Rule "hopelessly indeterminate" (Br. 17).  The Rule clearly defines the GHG measure, delineates the respective roles of FHWA and States, and emphasizes States' freedom to establish targets and ultimately select eligible highway projects consistent with their own "policies and priorities."  88 Fed. Reg. at 85,369.  It is unclear why plaintiffs consider themselves aggrieved by a regime that maximizes their own flexibility.

## II.    THE DISTRICT COURT ERRED IN BELIEVING IT HAD NO OPTION BUT TO ORDER UNIVERSAL VACATUR

**A.**  In all events, even if the Rule suffered some defect, the judgment still cannot stand.  As explained in our opening brief, plaintiffs did not demand universal vacatur, and defendants opposed it.  And the district court acknowledged that under Supreme Court precedent, such "vacatur runs contrary to the ordinary principle that relief is limited to what is necessary to redress the plaintiff's demonstrated harm.to what is necessary to redress the plaintiff's demonstrated harm."  ROA.4773 n.18 (citing *Gill v. Whitford*, 585 U.S. 48, 73 (2018)).  The court's belief that it was nonetheless compelled to order universal vacatur rested solely on the erroneous view that other forms of relief were procedurally foreclosed.  But defendants expressly invited plaintiff-specific vacatur or other relief, and plaintiffs do not dispute that party-specific relief is feasible and would redress their claimed injuries.

Under these circumstances, universal vacatur is not a permissible remedy. But even if it were permissible, this Court should nonetheless vacate and remand so that the district court may exercise informed discretion. *See Bourque v. State Farm Mut. Auto. Ins. Co.*, 89 F.4th 525, 528 (5th Cir. 2023) ("Where a district court bases its legal analysis on an erroneous understanding of the governing law, it has abused its discretion.") (quotation marks omitted); *cf., e.g., Arizona v. Thompson*, 281 F.3d 248, 259 (D.C. Cir. 2002) (declaring regulation invalid where, "even though the agency might be able to adopt the regulation in the exercise of its discretion," the agency mistakenly stated it had been compelled to select that particular outcome).

**B.** Plaintiffs make no serious effort to defend the district court's belief that it was hamstrung into ordering universal vacatur. They repeatedly assert that in this Circuit, "vacatur is the default" remedy under the Administrative Procedure Act (APA). Br. 18; *see* Br. 2, 46. But vacatur, even if permissible, need not be universal: as this Court recently reaffirmed, there are "situations" in which "party-specific vacatur is definitely appropriate." *Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.*, 120 F.4th 494, 510 (5th Cir. 2024). This is one of them—the Rule "operates on a state-by-state basis, with no one state's compliance or coercion affecting that of any other state." *Kentucky*,

2024 WL 1402443, at *2.  The district court erred in believing it lacked any

discretion to even consider party-specific vacatur.  *Cf.* ROA.4773.

Moreover, a "default" remedy is not mandatory.  Even assuming that

"vacatur is the presumptive remedy for a violation of the Administrative

Procedure Act, courts have discretion to craft other remedies."  *Johnson v. U.S.*

*Office of Pers. Mgmt.*, 783 F.3d 655, 663 (7th Cir. 2015); *accord, e.g.*, *Black Warrior*

*Riverkeeper, Inc. v. U.S. Army Corps of Engineers*, 781 F.3d 1271, 1290 (11th Cir.

2015) ("The decision whether to vacate agency action falls within our broad

equitable discretion.").  The APA itself contemplates that other remedies

remain available, such as "declaratory judgments" and "injunction[s]."  *See*

5 U.S.C. § 703 (describing permissible "form[s] of proceeding for judicial

review" of agency action as including "actions for declaratory judgments or

writs of prohibitory or mandatory injunction").

As our opening brief noted, this Court sitting *en banc* recently remanded

in an APA case for consideration of a possible "more limited remedy" than

universal vacatur.  *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (en

banc) (plurality op.), *aff'd*, 602 U.S. 406 (2024).  And other courts have often

exercised their discretion to impose other equitable remedies.  *See, e.g.*, *New*

*Hampshire Lottery Commission v. Rosen*, 986 F.3d 38, 62 (1st Cir. 2021) (vacating

order "grant[ing] relief under the APA" because the "remedy provided by the

Declaratory Judgment Act is adequate under the circumstances"); *Nuziard v. Minority Bus. Dev. Agency*, 721 F. Supp. 3d 431, 499-502 (N.D. Tex. 2024) (explaining that the court was "clearly authorized to grant other remedies that would serve the same function" as vacatur, and ultimately ordering a plaintiff-specific "declaratory judgment … and permanent injunction" instead).

Plaintiffs do not dispute the "court's discretion to choose remedies other than vacatur." Br. 47. Indeed, the *Kentucky* decision—which plaintiffs cite with favor—followed just that course. *See Kentucky*, 2024 WL 1402443, at *15-17. The *Kentucky* court expressly refused to vacate the Rule and instead issued declaratory relief (which the plaintiffs thereafter agreed was sufficient to redress their injuries, obviating any need for an injunction). That court emphasized that "relief should be no greater than necessary to protect the rights of the prevailing litigants." *Id.* at *15 (quotation marks omitted); *see id.* at *19 (observing that even the district court in this case had "candidly recogniz[ed] the infirmities of universal relief").

Plaintiffs' discussion of remand without vacatur (Br. 48-49) is beside the point. Defendants have not suggested that remedy; they instead requested that any relief entered be plaintiff-specific. *See* ROA.4673-75. The fact that plaintiffs here demanded "vacatur" rather a declaratory judgment or injunction does not resolve the issue, because the proper remedy is a matter for the court

itself to decide.  Far from being irrelevant, the "'injunction-related case law'" (Br. 48) cited in defendants' opening brief (at 49-50) demonstrates that there are other paths to complete relief.  The district court committed legal error in believing those paths to be unavailable, despite having been raised by defendants themselves, solely because they were not "requested by the plaintiffs" or otherwise "noticed to the defendants."  ROA.4771-72.

Finally, plaintiffs' suggestion that the district court's error be excused on the ground that vacatur is "less drastic" than other relief (Br. 50) gets things backwards.  As the *Kentucky* court explained, the assumption that "vacatur is *always* less intrusive runs counter to practically all received remedial wisdom"; on the contrary, "vacatur is in practice often the *more* drastic remedy." *Kentucky*, 2024 WL 1402443, at *16.  Unlike universal vacatur, party-specific equitable relief—such as a declaratory judgment or injunction—can fully remedy plaintiffs' claimed injuries without affecting the rights of the many other States who chose not to sue.  *Cf.* 88 Fed. Reg. at 85,379 (noting supportive comments filed by state DOTs); ROA.4429-4442 (supportive comments of California, Colorado, Illinois, Maryland, Massachusetts, Minnesota, New York, Oregon, Rhode Island, Vermont, Washington, Wisconsin, and the District of Columbia).  Where, as here, vacatur would potentially prejudice many other sovereign parties, "[a] party-specific

injunction seems tailor-made to fit relief—and the judicial role—to their proper size," *Kentucky*, 2024 WL 1402443, at *16, and to better accord with "basic principles of federalism," *id.* at *16 n.18. Certainly, the more radical course was to overlook the defendants' arguments for more limited relief (ROA.4673-75) and to force a remedy on States who have not requested it. *See Kentucky*, 2024 WL 1402443, at *19 (criticizing the court's remedial decision in this case and explaining that it "encapsulates the problem with universal remedies").[3]

For those reasons, universal vacatur is unavailable here. But at a minimum, the Court should vacate and remand so the district court is afforded an opportunity to exercise its informed discretion. That court should not have to resign itself to what it considered a "disfavored" remedy simply because it erroneously saw "no viable or appropriate alternative." ROA.4773 n.18.

---

[3] Plaintiffs emphasize (Br. 50) that APA remedies do not automatically carry the same threat of enforcement via contempt. *See Kentucky*, 2024 WL 1402443, at *16 (acknowledging same point). But the district court could simply have followed in the same course as the *Kentucky* court by imposing plaintiff-specific declaratory relief. Certainly, plaintiffs have demonstrated no practical need for any "affirmative blockade" (Br. 15) beyond a declaration that the Rule does not apply to them.

# CONCLUSION

For the foregoing reasons and those in our opening brief, the judgment should be reversed.

Respectfully submitted,

SUBASH IYER
*Acting General Counsel*

CHARLES E. ENLOE
*Assistant General Counsel for Litigation and Enforcement*

EMILY KVESELIS
*Trial Attorney*
*U.S. Department of Transportation*

J. AYANNA BUTLER
*Chief Counsel*

CHRISTOPHER RICHARDSON
*Assistant Chief Counsel, Legislation, Regulations & General Law Division*

LEV GABRILOVICH
*Senior Attorney Advisor, Program Legal Services Division*
*Federal Highway Administration*

November 2024

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

MICHAEL S. RAAB
/s/ *Jeffrey E. Sandberg*
JEFFREY E. SANDBERG
*Attorneys, Appellate Staff*
*Civil Division, Room 7214*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 532-4453*
*jeffrey.e.sandberg@usdoj.gov*

## CERTIFICATE OF SERVICE

I hereby certify that on November 22, 2024, I electronically filed the

foregoing reply brief with the Clerk of Court for the United States Court of

Appeals for the Fifth Circuit by using the appellate CM/ECF system.  Service

will be accomplished by the appellate CM/ECF system.

*/s/ Jeffrey E. Sandberg*
Jeffrey E. Sandberg

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of

Appellate Procedure 32(a)(7)(B) because it contains 6,491 words.  This brief

also complies with the typeface and type-style requirements of Federal Rule of

Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for

Microsoft 365 in Calisto MT 14-point font, a proportionally spaced typeface.

*/s/ Jeffrey E. Sandberg*
Jeffrey E. Sandberg